JRS:AMR
F. #2023R00487

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                             Docket No. 23-CR-328 (KAM)

TONY CLANTON and
LAWRENCE DOTSON,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTIONS IN LIMINE

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Andrew M. Roddin
Assistant U.S. Attorney
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

I.  Factual Background ...................................................................................... 1

    A.  January 20, 2023 Home Invasion.............................................................. 1

    B.  June 3, 2023 Gunpoint Robbery of Annadale Smoke Shop ............................. 2

    C.  June 24, 2023 Attempted Robbery and Home Invasion ................................. 3

    D.  June 27, 2023 Law Enforcement Impersonation and Attempted Robbery in Edison, New Jersey................................................................................................... 4

    E.  July 12, 2023 Armed Robbery in Brooklyn, New York ................................ 6

    F.  Evidence Found in the Defendants' Homes and Cars ..................................... 7

    G.  Evidence Found in Dotson's Cell Phone .................................................... 7

    H.  Dismissal of Complaint Identifying Clanton as a Gunman in the June 3, 2023 Robbery of Annadale Smoke Shop ......................................................................... 8

    I.  Prior Convictions of the Defendants......................................................... 9

        1.  Tony Clanton ................................................................................. 9

        2.  Lawrence Dotson ........................................................................... 10

II.  ARGUMENT ............................................................................................ 11

    A.  Evidence of the January 20, 2023 Home Invasion and the June 24, 2023 Attempted Home Invasion Is Admissible....................................................................... 11

        1.  Evidence of the Home Invasions Is Admissible as Direct Evidence ........................ 11

        2.  Evidence of the Home Invasions Is Admissible Pursuant to Rule 404(b)................. 17

    B.  Evidence from Dotson's Cell Phone Is Admissible........................................ 21

    C.  The Defendants Should Be Precluded from Referencing Possible Punishment and the Identification of Clanton in the July 24, 2023 Complaint ................................. 24

    D.  The Government Should Be Permitted to Cross-Examine the Defendants on their Prior Felony Convictions ........................................................................... 27

        1.  Tony Clanton ................................................................................. 28

2.  Lawrence Dotson ........................................................................................... 31

III. CONCLUSION ................................................................................................ 32

PRELIMINARY STATEMENT

Defendants Tony Clanton and Lawrence Dotson are charged with conspiracy to commit Hobbs Act robbery, completed and attempted Hobbs Act robberies, and use of firearms during crimes of violence.  As described below, the defendants committed or attempted five gunpoint robberies between January 20, 2023 and July 12, 2023.  For the reasons set forth below, the government respectfully submits that the Court should admit evidence of a January 20, 2023 home invasion and a June 24, 2023 attempted home invasion; admit messages from Dotson's cell phone; preclude evidence of possible punishment and the identification of Clanton in a July 24, 2023 complaint; and permit the government to conduct limited cross-examination of both defendants about their prior felony convictions.

I.    FACTUAL BACKGROUND

    A.    January 20, 2023 Home Invasion

On January 20, 2023, the defendants attempted to rob a residence on Clinton Avenue in Staten Island, New York using guns.  Surveillance video from the apartment complex where the crime happened shows a man wearing a white Tyvek-style painting suit and gloves walking into the apartment building, leaving and getting into a U-Haul van parked across the street, and then reentering the building.  The video shows the resident of the apartment ("Victim-1") and Victim-1's child entering the vestibule and the man in the Tyvek suit closing the door behind them.  The man in the Tyvek suit then pointed a silver revolver at Victim-1 and said, in substance, "Don't make this a homicide," struck Victim-1 in the head with the gun, causing Victim-1 to fall to the floor, and fired a shot from the gun.  A second perpetrator armed with a gun is then shown on video running into the door and entering the building.  This second gunman took Victim-1's apartment keys and tried unsuccessfully to use them to open Victim-1's apartment door, after which point both perpetrators fled in the U-Haul van.

Video footage from the days leading up to the home invasion described above shows the two perpetrators surveilling the building as part of the planning of the crime using the U-Haul van and a white Mercedes registered to the defendant Lawrence Dotson (the "Dotson Mercedes"). Records from U-Haul show that the van used in the surveillance and the home invasion was rented using a phone number ending in 2967, which was used by defendant Tony Clanton (the "Clanton 2967 Number").

Phone company records for the Clanton 2967 Number show that it was associated with the same device ID and account number as another phone number used by defendant Clanton ending in 8087 (the "Clanton 8087 Number"). A search of one of defendant Clanton's cars following his July 25, 2023 arrest also revealed business cards for Spin Empire, a business operated by defendant Clanton, with the name Tony Clanton and a phone number ending in 3005, which was crossed out and replaced in pen with the Clanton 2967 Number.

Cell phone location information shows that both the Clanton 2967 Number and a number ending in 1264, which was used by defendant Dotson (the "Dotson 1264 Number"), were in the vicinity of the January 20, 2023 home invasion around the time it occurred.

B. June 3, 2023 Gunpoint Robbery of Annadale Smoke Shop

On June 3, 2023, the defendants robbed Annadale Smoke Shop, which is located at 827 Annadale Road, Staten Island, New York, approximately 0.3 miles from defendant Dotson's residence. At approximately 10:15 p.m., two men wearing masks approached a person working at the smoke shop ("Victim-2") and each brandished a firearm. The two gunmen then pushed Victim-2 inside the store, tied up Victim-2's hands using zip ties, and pressed a gun to the back of Victim-2's head. The gunmen took approximately $4,700 from Victim-2's person, approximately $1,000 in cash from the store's register, and packages of cigarettes from behind

the counter.  Victim-2 reported that during the robbery, the gunmen were on a phone call with another individual that Victim-2 could hear on speakerphone.

Cell phone location information shows that the defendants' cell phones were in the vicinity of Annadale Smoke Shop around the time of the robbery.  Phone company records also show that at approximately 10:08 p.m., the defendants' phone numbers had a phone call with each other lasting approximately 30 minutes, indicating that they were on the phone together during the robbery and corroborating Victim-2's statement.  During that call, both phones connected to a cell tower and sector that covered the vicinity of Annadale Smoke Shop but did not cover Dotson's nearby residence.

C.    June 24, 2023 Attempted Robbery and Home Invasion

On June 24, 2023, on Gunton Place, Staten Island, New York, the defendants attempted to rob a resident of that block ("Victim-3").  During the attempted robbery, a man with a gun menaced Victim-3 with the gun and tried to force his way into Victim-3's home.

A few months before the attempted robbery and home invasion, Victim-3 met defendant Dotson at a strip club on Staten Island.  Messages obtained from Dotson's cell phone pursuant to a search warrant show that Dotson and Victim-3 communicated by phone beginning in March 2023.  A few days before the robbery, on or about June 21, 2023, Dotson told Victim-3 that Dotson knew someone who was "selling a white 2021 S580"—a type of Mercedes that defendant Clanton drove—"for $60000!"  Victim-3 asked for information about the car and asked Dotson to put him in touch with the seller (i.e., with Clanton).  Phone company records show that the Clanton 8087 Number communicated with Victim-3's phone number eight times between June 21, 2023 and June 22, 2023.

Video footage shows that on June 24, 2023, Dotson parked the Dotson Mercedes in front of Victim-3's residence.  Victim-3 came out of the residence and got into the front

3

passenger seat of the Dotson Mercedes.  While Victim-3 was in the front passenger seat and Dotson was in the driver's seat, a man entered the rear passenger door of the Dotson Mercedes, took out a gun, and told Victim-3 not to move.  Victim-3 got out of the Dotson Mercedes and ran into the residence, followed by the gunman, who attempted unsuccessfully to force his way inside and then ran away.  Video footage shows the gunman running eastbound on Gunton Place and turning northbound on Totten Street, where he got into a gray sedan consistent with a gray BMW registered to Spin Empire, defendant Clanton's business (the "Clanton BMW").  Dotson drove away in the Dotson Mercedes but later returned in the same car and met with the police in an effort to disguise his involvement in the robbery.  During that conversation, Dotson told the police that his phone number was the 1264 Number.

Phone company records show that the Dotson 1264 Number communicated with both the Clanton 8087 Number and Victim-3's phone number around the time of the attempted home invasion.  During those communications, the Clanton 8087 Number and the Dotson 1264 Number connected to cell towers located in the vicinity of Victim-3's residence and nearby areas.

D.    June 27, 2023 Law Enforcement Impersonation and Attempted Robbery in Edison, New Jersey

On June 27, 2023, between approximately 9:25 p.m. and 9:48 p.m., two men armed with guns impersonated FBI agents and tried to rob the owner of a jewelry store ("Victim-4") in front of Victim-4's residence in Edison, New Jersey.

Video footage from a Harbor Freight Tools store located at 2295 Forest Avenue, Staten Island, New York, shows that on the morning of June 27, 2023, the Clanton BMW parked in the store's parking lot and a person who appears to be defendant Clanton got out of its driver's door and walked into the store.  The video then shows the person who appears to be Clanton

making a purchase, getting back into the driver's door of the Clanton BMW, and leaving. A receipt from Harbor Freight Tools shows that the only item purchased was a 10-pack of zip ties—the same type of items that the gunmen in the Annadale Smoke Shop robbery used to restrain Victim-2 approximately three weeks earlier.

At approximately 12:07 p.m., video footage from a house on the block where the attempted robbery later took place shows cars that appear to be the Clanton BMW, Dotson Mercedes, and a black Infiniti ("the Black Infiniti") driving together. Two males were seen getting out of the Black Infiniti and getting into the Clanton BMW and the Dotson Mercedes. License plate reader records show the Clanton BMW and the Dotson Mercedes driving together that afternoon in the area of New Jersey where Victim-4's jewelry stores are located.

Victim-4 reported that when Victim-4's car arrived at Victim-4's residence that evening, two men approached Victim-4's car while wearing masks, what appeared to be bulletproof vests with the letters "FBI," and an FBI badge. One of the men had a gun raised in his right hand, used it to knock on the passenger side window of Victim-4's car, and said, in substance, "Come out of the car," while the other man stood at the driver's side window. Victim-4 drove away from the residence.

Dash camera videos from two police cars show that the Dotson Mercedes, the Clanton BMW, and the Black Infiniti were traveling together near the vicinity of the attempted robbery of Victim-4 shortly after it was reported. Additionally, cell phone location information shows that the defendants' cell phones were in the vicinity of the attempted robbery around the time it occurred. Phone company records also show that around certain times that the license plate reader records indicate that the defendants' cars were traveling together, the defendants'

cell phones were communicating with each other and were near each other, as they were on June 3 and 24, 2023.

Records from Amazon show that on June 18, 2023, six days before the attempted robbery in Edison, New Jersey, Tony Clanton ordered the following three items to be shipped to his residence on Staten Island:

- "FBI - Bureau Novelty Duty Costume Jacket - Mens Coaches Jacket"

- "Police Badge Holder, Law Enforcement Badge Holder, Universal Badge Holders Belt Clip with Chain for Officer Gifts (Oval)"

- "The Hat Depot Law Enforcement 3D Embroidered Hat."

E.    July 12, 2023 Armed Robbery in Brooklyn, New York

On July 12, 2023, at approximately 2:50 p.m., a man armed with a gun robbed an owner of an ice cream store ("Victim-5") at Victim-5's home in Brooklyn, New York. That afternoon, Victim-5 visited the ice cream store, collected approximately $6,700 in cash from the store, and changed the cash into larger bills at a TD Bank branch in Brooklyn. Victim-5 then drove toward Victim-5's home, tailed by a white Mercedes-Benz registered to defendant Tony Clanton (the "Clanton Mercedes"). As Victim-5 walked to the door, a man wearing a ski mask approached Victim-5, displayed a gun, and took Victim-5's bag while pointing the gun. The gunman then drove away in the Clanton Mercedes.

Video footage from a traffic camera located approximately 1.5 blocks from the location of the robbery shows the Clanton Mercedes driving past that area approximately one to two minutes before the robbery. Location information for defendant Tony Clanton's phone number shows that it was in the vicinity of the TD Bank branch and Victim-5's residence around the time of the robbery.

F.    Evidence Found in the Defendants' Homes and Cars

On July 25, 2023, pursuant to judicially authorized search warrants, law enforcement agents searched Clanton's residence, Dotson's residence, the Clanton Mercedes, the Dotson Mercedes, and the Black Infiniti.

Law enforcement agents found two business cards in the Clanton Mercedes listing Tony Clanton as the president of Spin Empire, LLC.  In addition to the name Tony Clanton, both cards listed a phone number ending in 3005, which was crossed out and replaced in pen with the Clanton 2967 Number.  Law enforcement also found additional documents that referred to Spin Empire and a construction-style vest with high-visibility stripes.  In the Dotson Mercedes, law enforcement agents found a high-visibility construction-style vest with the words "SPIN EMPIRE LLC FIRE WATCH MANAGER," further reinforcing that a relationship existed between Clanton and Dotson.

G.    Evidence Found in Dotson's Cell Phone

Dotson's cell phone, which was seized from his person upon his arrest, was also searched pursuant to a judicially authorized search warrant.  The phone contained text messages with a phone number saved under the contact name "Tone," which the government expects to prove at trial was Tony Clanton, and with the Clanton 8087 Number, which was saved under the contact name "Tone2."  In messages from January 2022, Clanton (using the "Tone" number") and Dotson discussed the planning of a robbery.  Specifically, Clanton referred to a "nice mix I'm lining up" "in the Bronx" that would involve "like 400,000 cash Rolex's [sic] and bricks."  Dotson wrote, among other messages, "What's good? U know u can count on me!", "I'll lay down whoever needs to be laid down!"  Clanton wrote, "We talk tomorrow be ready around 10 am," and Dotson responded, "I need to do something now, I'm on E and insurance is due in a few days! [emojis]".

Dotson's phone also contained messages with the Clanton 8087 Number in which the two discussed planning another robbery. On July 15, 2023, after discussing how the two were doing, Clanton (using the Clanton 8087 Number) wrote, "Homework bro [thumbs up image]". Dotson responded, "Ok", "Nothing changed or ever will, just let me know what's good." A few hours later, Clanton sent a video showing a theft from a Brinks truck and wrote, "3days [sic] ago 6.8 million cash  brinks truck [emoji]." Dotson responded, "That's an inside job", "For sure", "With those jump offfs [sic], we can do it".

H.   Dismissal of Complaint Identifying Clanton as a Gunman in the June 3, 2023 Robbery of Annadale Smoke Shop

As the Court is aware from the parties' prior filings, see ECF Nos. 29 and 31, on July 24, 2023, the government filed a complaint charging the defendants with conspiracy to commit Hobbs Act robbery, and arrest warrants for both defendants were issued. The complaint affidavit identified two video-recorded participants in the June 3, 2023 robbery of Annadale Smoke Shop as "the defendants TONY CLANTON and LAWRENCE DOTSON" and "two men identified as CLANTON and DOTSON." ECF No. 3 at 2. The complaint also explained that the affiant "believe[d] the men shown in this video footage to be the defendants TONY CLANTON and LAWRENCE DOTSON based on, among other things, their height, weight, build, skin tone, and modus operandi in other robberies—which are consistent with those of CLANTON and DOTSON—in addition to other evidence described in this affidavit." Id. at 3.

The following day, July 25, 2023, the defendants were arrested and ordered detained. On July 28, 2023, the government informed counsel for both defendants that the affiant who swore to the complaint (a law enforcement agent) believed that, after seeing Clanton in person and upon further review of the evidence, a person who had been identified in the complaint as Clanton may possibly be another person. On the government's motion and with the

consent of defense counsel, the complaint was dismissed without prejudice, and the defendants were released from custody on July 28, 2023.  The instant indictment was filed on August 15, 2023.

At this time, the government does not intend to call the affiant who swore to the July 24, 2023 complaint to testify at trial.

I.    Prior Convictions of the Defendants

1.    Tony Clanton

On October 22, 1997, Clanton was convicted in the Eastern District of New York of violating the Hobbs Act, 18 U.S.C. § 1951; and of a firearms offense, in violation of 18 U.S.C. § 924(c)(1).  In that case, after an undercover police officer arranged to buy guns from Clanton, Clanton robbed the undercover officer of jewelry and buy money at gunpoint.  When other officers approached, Clanton tried to shoot the undercover officer.  See Docket No. 97-CR-776 (ERK) (RER), ECF No. 105 (Proposed Findings of Fact and Recommendation) at 2.  He was sentenced on February 11, 1998 to 37 months' imprisonment on the § 1951 count and 60 months' imprisonment on the § 924(c)(1) count, to run consecutively.  He was also ordered to return a bracelet stolen from a Deputy U.S. Marshal within 30 days.  After his release from custody in 2005, Clanton violated the terms of his supervised release by committing an armed home invasion robbery the following year during which he shot a man in the leg.  See id. at 4-7, 25.  On August 18, 2008, he was sentenced on the violation of supervised release to 18 months' imprisonment to run consecutively to the state sentence he was serving on a May 27, 2008 conviction described below.

On June 16, 1998, Clanton was convicted in Queens County Supreme Court of robbery in the first degree, in violation of New York Penal Law ("N.Y.P.L.") Section 160.15(1). He was sentenced to three to six years' imprisonment.

On May 27, 2008, Clanton was convicted in Richmond County Supreme Court of criminal possession of a controlled substance in the third degree, in violation of N.Y.P.L. § 220.16(1), and criminal possession of a weapon in the second degree, in violation of N.Y.P.L. § 265.03(2).  In that case, on January 8, 2007, Clanton approached a person at the person's home in Queens and showed a fake Drug Enforcement Administration ("DEA") shield and a fake search warrant.  Clanton then kicked down the apartment door and stole a safe, approximately $4,000 in cash, and personal papers.  When law enforcement agents searched Clanton's residence, they found, among other things, a similar fake search warrant, a bulletproof vest, handcuffs, a counterfeit law enforcement identification card, drugs, guns, and other contraband. Clanton was sentenced to an aggregate term of 11 years' imprisonment on June 10, 2008, and he was released from state prison on July 13, 2016.

On May 5, 2009, Clanton was convicted of assault in the second degree, in violation of N.Y.P.L. § 120.05(2) (intentionally causing physical injury by means of a deadly weapon or a dangerous instrument), for an assault he committed while incarcerated on June 7, 2008.  He was sentenced to six years' imprisonment to run concurrently to the 2008 state sentence described above.

If Clanton testifies, the government seeks to cross-examine him by asking about the 2008 and 2009 convictions.

2.    Lawrence Dotson

On May 27, 1992, Dotson was convicted by a Richmond County Supreme Court jury of murder in the second degree, in violation of N.Y.P.L. § 125.25(1); criminal possession of a weapon in the second degree, in violation of N.Y.P.L. § 265.03; and criminal possession of a loaded firearm in the third degree, in violation of N.Y.P.L. § 265.02(4).  Dotson was sentenced to an aggregate term of imprisonment of 25 years to life on June 17, 1992, and he was released

from state prison on July 9, 2018.  If Dotson testifies, the government seeks to cross-examine him by asking about these convictions and his sentence, but not the underlying facts.

II.    ARGUMENT

    A.    Evidence of the January 20, 2023 Home Invasion and the June 24, 2023 Attempted Home Invasion Is Admissible

        Evidence of the uncharged January 20, 2023 home invasion and the uncharged June 24, 2023 attempted home invasion (collectively, the "Home Invasions") is direct evidence of the defendants' Hobbs Act robbery conspiracy and their violations of 18 U.S.C. § 924(c) (brandishing a weapon during a crime of violence) on June 3, 2023 (both defendants) and July 12, 2023 (defendant Clanton).  Specifically, this evidence variously (i) ties the defendants to the Clanton 8087 Number and Dotson 1264 Number, respectively, (ii) ties the defendants to the Clanton BMW and the Dotson Mercedes, respectively, (iii) reveals a relationship between the defendants, and (iv) establishes the foreseeability to both defendants that firearms would be possessed and brandished in connection with their crimes.  As such, it is not evidence of "crime[s], wrong[s], or other act[s]" subject to Federal Rule of Evidence ("Rule") 404(b).

        Even if it were such evidence, the proffered evidence is admissible under Rule 404(b) to show knowledge, intent, motive, plan, identity, absence of mistake and lack of accident, and for other permissible purposes, including to explain the relationship between the defendants.

      1.    Evidence of the Home Invasions Is Admissible as Direct Evidence

        Pursuant to Rule 402, absent, inter alia, a rule or statute to the contrary, relevant evidence is admissible.  Evidence is relevant "if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action."  Fed. R. Evid. 401; see also United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997)

("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime.").

It is well established that if an event is, among other things, "inextricably intertwined with the evidence regarding the charged offense, or [] it is necessary to complete the story of the crime on trial," that event is admissible subject to the balancing test of Rule 403 and is not considered "other crimes" evidence under Rule 404(b). United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); see also United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989). The Second Circuit has interpreted this category of evidence to include acts that provide necessary background or context for the charged crimes. See Gonzalez, 110 F.3d at 941-42 (uncharged burglary admissible in trial for felon in possession of a firearm because, inter alia, it provided "crucial background evidence that gave coherence to the basic sequence of events that occurred on the night" of defendant's arrest); United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." (quoting United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988))).

It is well established in the Second Circuit that where a defendant is charged with a conspiracy, "'[a]n act that is alleged to have been done in furtherance of the alleged conspiracy' is considered 'part of the very act charged.'" United States v. Smothers, 652 F. Supp. 3d 271, 284 (E.D.N.Y. 2023) (quoting United States v. Diaz, 176 F.3d 52, 79 (2d Cir.

1999)); see also United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994) (in a conspiracy case, "uncharged acts may be admissible as direct evidence of the conspiracy itself").

It is a "fundamental tenet of the law of conspiracy," pursuant to the Supreme Court's decision in Pinkerton, that a defendant can be held criminally liable for the reasonably foreseeable acts of his co-conspirator. United States v. Vario, 943 F.2d 236, 240 (2d Cir. 1991). As the Second Circuit has explained, "[t]he Pinkerton theory permits criminal liability of a conspirator 'for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if he did not himself participate in the substantive crimes.'" United States v. Bala, 236 F.3d 87, 95 (2d Cir. 2000) (quoting United States v. Romero, 897 F.2d 47, 51 (2d Cir. 1990)); see also United States v. Parkes, 497 F.3d 220, 232 (2d Cir. 2007) (holding that, with respect to Pinkerton, "'a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement'" (quoting Cephas v. Nash, 328 F.3d 98, 101 n. 3 (2d Cir. 2003))); accord United States v. Wiley, 846 F.2d 150 (2d Cir. 1988). "Whether a particular substantive crime is foreseeable and in furtherance of the conspiracy is a factual question to be determined by the jury." United States v. Bruno, 873 F.2d 555, 560 (2d Cir. 1989). "Thus, if the jury first concludes that a conspiracy existed and that the defendant knowingly participated in the conspiracy, the jury must next consider whether a particular substantive crime committed by the defendant's co-conspirators was reasonably foreseeable to the defendant and in furtherance of the conspiracy." United States v. Graziano, 616 F. Supp. 2d 350, 366 (E.D.N.Y. 2008), aff'd, 391 F. App'x 965 (2d Cir. 2010).

As set forth below, the proffered evidence is direct proof of the defendants' involvement in the substantive robberies and the conspiracy, their ties to cars and phones used in the robberies, their relationship, and the foreseeability of the possession and brandishing of firearms.

Establishing that Dotson was the user of the Dotson 1264 Number and the Dotson Mercedes, which were used around the times and locations of the crimes described above (other than the July 12, 2023 robbery), is crucial proof in the government's case. As described above, the Dotson 1264 Number was used to communicate with the Clanton 2967 Number on January 20, 2023 and was used to communicate with the Clanton 8087 Number and Victim-3's phone number on June 24, 2023. Moreover, the Dotson 1264 Number connected to cell towers around the locations of the crimes, and the Dotson Mercedes is shown on video near the locations of the crimes. As a result, establishing who possessed and used the Dotson 1264 Number is highly probative direct evidence of that person's involvement in the charged crimes. Dotson's statement to the police on June 24, 2023 that the Dotson 1264 Number was his and his use of it on that date tend to show that Dotson was the user of that number and should be admitted as direct evidence of the charged crimes.[1]

Similarly, establishing that Clanton and Dotson were the drivers of the Clanton BMW and the Dotson Mercedes, respectively, which were also used in some of the crimes

---

[1]    Because the statement was made for the purpose of disguising the nature of the robbery and Dotson's involvement in it, as well as preventing detection and apprehension of Dotson and his co-conspirators, it is admissible as a co-conspirator's statement in furtherance of the Hobbs Act robbery conspiracy. See Fed. R. Evid. 801(d)(2)(E); Bourjaily v. United States, 483 U.S. 171, 176 (1987). It is also admissible as non-hearsay to corroborate the association between that number and Dotson. See United States v. Lieberman, 637 F.2d 95, 101 (2d Cir. 1980).

described above, tends to prove that the defendants were physically present for the crimes in which those cars were used.  Evidence that the Clanton BMW was present during the June 24, 2023 attempted home invasion that began in Dotson's presence inside of the Dotson Mercedes—around the time when the Clanton 8087 Number was connecting to cell towers in the vicinity of that crime—is important to establishing that Clanton was the user of the Clanton BMW.  And evidence that Dotson drove the Dotson Mercedes to Victim-3's residence and returned in it after the attempted home invasion is important to establishing that he was the user of the Dotson Mercedes.

The presence of both defendants during the Home Invasions, and their communications with each other before and after them, provide evidence of the charged offenses by demonstrating that they had a sufficiently close relationship to rely on each other in committing serious crimes.  See, e.g., United States v. Pascarella, 84 F.3d 61, 72 (2d Cir. 1996) ("We have held repeatedly that it is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators."); United States v. Guerrero, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011) ("[E]vidence related to the defendants' prior illicit transactions with their co-conspirators . . . admissible to explain the development of the illegal relationship between the defendants and their co-conspirators and explain the mutual trust that existed between the coconspirators."); Taylor, 767 F. Supp. 2d at 437 ("Although [the defendants] assert that they will not deny knowing the CW, rendering it unnecessary to elicit testimony regarding the CW's relationship with the defendants, the Court finds that the testimony [regarding prior joint-illegal conduct] is relevant and admissible to explain the illegal relationship between the co-conspirators

and to complete the story of the crime charged.") (emphasis in original).  The government should be permitted to present evidence of this relationship in order to persuasively explain to the jury that the defendants' presence at the same times and places over a period of many weeks was not by chance, but rather was part of a calculated plan between accomplices to carry out Hobbs Act robberies.

The use of firearms during both Home Invasions is direct evidence of the defendants' possession and brandishing of firearms during crimes of violence in violation of 18 U.S.C. § 924(c), as charged in Counts Three and Six.  Even where a defendant did not himself possess or brandish a firearm, it is well settled that "a conspirator can be held criminally responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable . . . ."  United States v. Masotto, 73 F.3d 1233, 1239 (2d Cir. 1996); see also United States v. Young, 561 F. App'x 85, 89 (2d Cir. 2014) (summary order) (same).  In order to prove that theory of liability at trial, the government must show that the use of firearms during the robberies on June 3, 2023 and July 12, 2023 was reasonably foreseeable to the defendants.  See Masotto, 73 F.3d at 1239.  "[T]he Second Circuit has upheld Section 924(c) convictions under Pinkerton in robbery or drug conspiracies where, for example, the defendant has some awareness of his co-conspirators use of firearms from conversations, observations, and/or prior interactions."  United States v. Graziano, 616 F. Supp. 2d 350, 367, 370-71 (E.D.N.Y. 2008) (finding the lack or prior similar conduct by the acting co-conspirator significant in rejecting a charge based on a Pinkerton theory); see also Bruno, 873 F.2d at 560 (finding that a reasonable jury could conclude that the use of a firearm in furtherance of a conspiracy was reasonably foreseeable where the defendant had previously witnessed the use of firearms by his co-conspirators).  Here, part of that proof is based on the defendants' knowledge

that firearms were used in the Home Invasions, making it foreseeable to them that firearms would be used in subsequent crimes.  See Taylor, 767 F. Supp. 2d at 438 (finding a defendant's prior gun possession admissible because it was directly relevant to issue of opportunity, absence of mistake and access to a weapon).

>   2.   Evidence of the Home Invasions Is Admissible Pursuant to Rule 404(b)

If the Court finds that the evidence of the Home Invasions constitutes "other acts" under Rule 404(b), the evidence is admissible pursuant to that rule for several permissible, non-propensity purposes.

Evidence of uncharged crimes or "other acts" may be admitted pursuant to Rule 404(b) for a number of permissible purposes, including to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.  Fed. R. Evid. 404(b)(2); see United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988).  The Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application, and applies an "inclusionary or positive approach" to admitting "other acts" evidence.  See United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002) (citing United States v. Pitre, 960 F.2d 1112, 1118 (2d Cir. 1992)); see also United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984) ("We have adopted the inclusionary or positive approach to [404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").  The inclusionary rule allows the admission of such evidence "for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence," as set forth below.  Carboni, 204 F.3d at 44.  The Court has wide discretion in making a determination of admissibility under Rule 404(b).  Id.

A party must satisfy three requirements in order for evidence of "other crimes, wrongs or acts" to be admitted under the rule.  First, the evidence must be offered for a purpose

17

other than to prove a defendant's bad character or criminal propensity.  See United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991); United States v. Colon, 880 F.2d 650, 656 (2d Cir. 1989).  Second, the evidence must be relevant under Rules 401 and 402 and not run afoul of Rule 403.  See Mickens, 926 F.2d at 1328; Ortiz, 857 F.2d at 903; Levy, 731 F.2d at 1002.  Third, if the defendant requests that the jury be instructed as to the limited purpose for which the government's evidence is being admitted, the court must furnish such an instruction.  See Mickens, 926 F.2d at 1328-29; Levy, 731 F.2d at 1002.

The Second Circuit repeatedly has held that evidence of uncharged crimes may be admitted at trial to establish the existence and evolution of a relationship of trust between co-conspirators, as well as to prove the existence of the charged conspiracy.[2]  See, e.g., United

---

[2]    Several Second Circuit decisions appear to analyze "other acts" evidence pertaining to the relationship of trust among co-conspirators under the rubric of Rule 404(b).  Others, however, have suggested that relationship of trust evidence, at least in conspiracy cases, is synonymous with direct proof of a charged conspiracy or evidence that completes the story of or provides crucial background to the charged offenses, and thus may be admitted without regard to Rule 404(b).  See, e.g., United States v. Morillo-Vidal, 547 Fed. App'x 29, 30-31 (2d Cir. 2013) (testimony regarding other crimes was admissible because it was "relevant background information" that, inter alia, "explained [a conspirator's] relationship to his co-conspirator [] and his knowledge of [the co-conspirator's] role in a national drug conspiracy," evidence that qualifies as "highly probative when the charged conduct covers a conspiracy") (summary order); United States v. Moten, 564 F.2d 620, 628 (2d Cir. 1977) ("[P]roof of prior drug dealing by individual defendants with [a cooperating witness] at a time previous to commencement of the conspiracy charged was clearly admissible to show the basis for the existence of the conspiracy charged and the mutual trust which existed between [the cooperating witness] and his customers.  It was therefore admissible against all the defendants to show the nature and existence of the conspiracy charged."); see also Guerrero, 882 F. Supp. 2d at 492-93 (noting that it "is debatable" whether the challenged evidence relating to other crimes that "explain the development of the illegal relationship between the defendants and their co-conspirators and explain the mutual trust that existed between coconspirators" falls under the rubric of 404(b) because evidence that, among other things, is necessary to complete the story of the charged offense is direct evidence).

Under either analysis, an important basis for admitting the evidence discussed herein is that it proves the existence and development of the relationship between the defendants in the charged conspiracy.

States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (upholding admission of evidence relating to the defendant's prior criminal activities with co-conspirators in charged drug conspiracy as relevant evidence "to inform jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed"); Diaz, 176 F.3d at 79 (holding that an act done in furtherance of the charged conspiracy is part of the charged crime); United States v. Pipola, 83 F.3d 556, 565-66 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case."); Thai, 29 F.3d at 812 ("uncharged acts may be admissible as direct evidence of the conspiracy itself"); United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history."); United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993) (holding that co-defendants' relationship over a 14-year period, during which stolen property and narcotics crimes were committed, "was properly admitted to explain how the illegal relationship between the two [defendants] developed").

As set forth above, the proffered evidence related to the defendants' participation in the Home Invasions is direct evidence of the relationship between them that supports the Hobbs Act robbery conspiracy charged in Count One. However, should the Court find otherwise, the evidence is admissible under Rule 404(b) to establish the development of the relationship of trust among the two co-conspirators. See, e.g., United States v. Mercado, 573 F.3d 138, 141 (2d Cir. 2009) (upholding admission of evidence of prior gun sale by the defendant in a case charging a drug conspiracy and noting that using such evidence to show the

basis for trust between co-conspirators is "especially applicable in this case where . . . some of the observed conduct might be nothing more than innocent acts of a friend, and not a knowing participation in a conspiracy"); Pipola, 83 F.3d at 565-66 (evidence that the defendant and his co-conspirators made usurious loans, as well as other uncharged crimes of armed robbery, burglary and using and selling stolen and counterfeit credit cards, admissible to explain the evolution of the defendant's relationship with his co-conspirators in robbery conspiracy trial because the challenged evidence made the charged conspiracy to commit armed robberies "more plausible").

Similarly, evidence that the defendants committed a prior home invasion on January 20, 2023 using a firearm is evidence that the use of firearms in their subsequent crimes was foreseeable to each of them. As set forth above, in order to prove the defendants' guilt under a Pinkerton theory, the government must show that the use of a firearm was foreseeable, and the prior use of a firearm in the January 20, 2023 home invasion committed by the defendants is part of that proof. To put it another way, evidence of the use of a firearm during the January 20, 2023 home invasion made it "more plausible," see Pipola, 83 F.3d at 566, that each defendant would know that a gun would also be used during the charged crimes.

Finally, the proffered evidence is highly relevant and probative of the charged offenses, and the defendants will not be unfairly prejudiced by the admission of such evidence, as the Home Invasions were not significantly more severe than the charged crimes. There is accordingly no basis to exclude the evidence under Rule 403.

Evidence of other crimes is routinely admitted so long as the evidence "'[does] not involve conduct any more sensational or disturbing than the crimes with which [the defendants have been] charged.'" Pitre, 960 F.2d at 1120 (quoting United States v. Roldan-

Zapata, 916 F.2d 795, 804 (2d Cir. 1990)).  Thus, where the uncharged crimes are similar in

nature to the charged crimes, Rule 404(b) evidence is generally admissible under the Rule 403

balancing test.  See Mercado, 573 F.3d at 142 (finding admissible prior gun sales because "[g]un

transactions are not especially worse or [more] shocking than the [drug conspiracy] at issue");

United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999) (upholding admissibility of evidence

that the defendant, a police officer charged with engaging in excessive use of force with an

arrestee, choked another arrestee, on the basis that "the evidence did not involve conduct more

inflammatory than the charged crime, and the district court gave a careful limiting instruction").

Even where there is a risk of undue prejudice, such risk can be mitigated effectively by a

cautionary instruction limiting the jury's consideration of the evidence to the purposes for which

it is offered.  See Mickens, 926 F.2d at 1329.

Because the proffered evidence—one completed and one attempted home

invasion of a similar severity to the other charged offenses—does "not involve any more

sensational or disturbing" than the offenses charged, Pitre, 960 F.2d at 1120, there is no risk of

unfair prejudice with respect to that evidence.  Moreover, the jury can be given an appropriate

limiting instruction as to any and all of the proffered evidence to minimize any potential unfair

prejudice.

B.    Evidence from Dotson's Cell Phone Is Admissible

As explained further below, all of the proffered statements from Dotson's cell

phone are relevant and admissible under the Federal Rules of Evidence, pursuant to the hearsay

exemptions or exceptions set forth in the Federal Rules of Evidence, or because they are non-

hearsay.

The Federal Rules of Evidence define hearsay as "a statement that: (1) the

declarant does not make while testifying at the current trial or hearing; and (2) a party offers in

evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).

"Hearsay is not admissible unless any of the following provides otherwise: a federal statute;

these rules; or other rules prescribed by the Supreme Court."  Fed. R. Evid. 802.

Not all out-of-court statements are hearsay.  First, out-of-court statements made

by the defendant are not hearsay when introduced by the government in a criminal trial to prove

the truth of the facts stated therein because they are admissions of an adverse party.  See Fed. R.

Evid. 801(d)(2)(A).

Second, Rule 801(d)(2)(E) excludes from the definition of hearsay statements

"made by a party's coconspirator of a party during and in furtherance of the conspiracy."  A co-

conspirator statement is admissible if the court finds by a preponderance of the evidence that

(1) the conspiracy existed at the time the statement was made; (2) both the declarant and the non-

offering party were part of the conspiracy; and (3) the statement was made in furtherance of the

conspiracy.  Bourjaily v. United States, 483 U.S. 171, 176 (1987); see also United States v.

Gigante, 166 F.3d 75, 82 (2d Cir. 1998).  While the hearsay statement itself may be considered in

establishing the existence of the conspiracy, "there must be some independent corroborating

evidence of the defendant's participation in the conspiracy."  Gigante, 166 F.3d at 82 (quoting

United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996)).

With respect to the first requirement, the conspiracy in which the defendant and

the declarant are engaged "need not be the crime charged in the indictment" for the statements to

be admissible.  United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002).  It is sufficient that the

defendant and the declarant were in a conspiracy together.  Id.  With respect to the second

requirement, statements made during the course and in furtherance of a conspiracy must be such

as to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a

criminal activity." Gigante, 166 F.3d at 82 (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990)). "This can include those statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." Id. (quoting Maldonado-Rivera, 922 F.2d at 959); see also Russo, 302 F.3d at 46 (statements which "inform . . . [coconspirators] of the status of the conspiracy are in furtherance of the conspiracy within the meaning of 801(d)(2)(e)"). Relatedly, the Second Circuit has held that a status update is sufficient to satisfy the "in furtherance" requirement of Rule 801(d)(2)(E). United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994); see also United States v. Stewart, 433 F.3d 273, 293 (2d Cir. 2006) (holding that the statement need not actually further the conspiracy, but instead need only be made with the intent to further some objective of the conspiracy); United States v. Mulder, 273 F.3d 91, 103 (2d Cir. 2001); United States v. Schlesinger, 372 F. Supp. 2d 711, 720 (E.D.N.Y. 2005).

Third, statements that are not being offered for their truth also are not hearsay. For example, out-of-court statements made by a third party are not hearsay if offered as circumstantial evidence of the declarant's state of mind, rather than for their truth. United States v. Detrich, 865 F.2d 17, 21 (2d Cir. 1988); United States v. Dunloy, 584 F.2d 6, 11 (2d Cir. 1978). Similarly, questions or commands do not generally constitute hearsay. See United States v. Bellomo, 176 F.3d 580, 586-87 (2d Cir. 1999); United States v. Dominguez-Gabriel, 511 Fed. App'x 17, 20 (2d Cir. 2013); Quartararo v. Hanslmaier, 186 F.3d 91, 98 (2d Cir. 1999). Finally, when a defendant makes statements in the context of a conversation with a third party, the statements of the third party are admissible non-hearsay to the extent that they are necessary to place the defendant's statements in proper context. See United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990); United States v. Davis, 890 F.2d 1373, 1380 (7th Cir. 1989).

The government intends to introduce at trial certain text messages from Dotson's cell phone, portions of which are described above.  These statements are admissible as direct evidence of the defendants' participation in the Hobbs Act robbery conspiracy.  Dotson's communications with Victim-3 discussing the possible sale of a Mercedes of the kind Clanton drove were in furtherance of the conspiracy; these messages were designed to encourage Victim-3 to communicate with Clanton and to obtain the funds to buy the Mercedes, so that the conspirators could rob Victim-3 of those funds.

Similarly, Dotson's communications with Clanton, both in 2022 and 2023, discussed planning robberies together and were thus made in furtherance of a conspiracy of the same kind.  The 2022 statements are admissible to show the relationship between the co-conspirators.  See Pascarella, 84 F.3d 61, 72; Guerrero, 882 F. Supp. 2d 463.  Additionally, even where the two conspirators simply asked each other, for example, "You good bro just checking on you?", as Clanton did on July 15, 2023, those statements are admissible as providing reassurance and fostering trust and cohesiveness between them.  See Gigante, 166 F.3d at 82 (quoting Maldonado-Rivera, 922 F.2d at 959).

C.    The Defendants Should Be Precluded from Referencing Possible Punishment and the Identification of Clanton in the July 24, 2023 Complaint

Evidence or argument concerning  the possible punishments the defendants might face if convicted, including mandatory minimum sentences, is irrelevant to the jurors' fact-finding task.  As the Supreme Court has explained, this is because "of the basic division of labor in our legal system between judge and jury":

> The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict.  Information regarding the consequences of a verdict is therefore irrelevant to the jury's task.

Shannon v. United States, 512 U.S. 573, 579 (1994); see also United States v. Glick, 463 F.2d 491 (2d Cir. 1972) (the jury's "function was to decide guilt or innocence and [] sentencing was the judge's province and his alone").  For this reason, "juries are not to consider the consequences of their verdicts" and should reach their verdicts "without regard to what sentence might be imposed."  Shannon, 512 U.S. at 579 (internal quotation marks omitted); see United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992).  Thus, "as a general matter, jurors are not informed of mandatory minimum or maximum sentences."  Shannon, 512 U.S. at 586; see also United States v. Johnson, 62 F.3d 849, 850-51 (6th Cir. 1995) ("every circuit to address this issue has held that a defendant is not entitled to an instruction about a mandatory sentence"); United States v. Harrison, 179 F. App'x 411, 412-13 (9th Cir. 2006) (district court properly refused to inform jury about 15-year mandatory minimum sentence); United States v. Broxton, 926 F.2d 1180, 1183 (D.C. Cir. 1991) (no error in refusing to inform jury about mandatory minimum sentence); United States v. Parrish, 925 F.2d 1293, 1299 (10th Cir. 1991) (jury instruction about mandatory minimum sentences properly omitted); United States v. Thomas, 895 F.2d 1198, 1200 (8th Cir. 1990) (the court need not instruct the jury on a mandatory sentence); United States v. Delgado, 914 F.2d 1062, 1066-67 (8th Cir. 1990) (no error in refusing to inform jury of mandatory minimum sentence); United States v. Goodface, 835 F.2d 1233, 1237 (8th Cir. 1987) (denying request to inform the jury of the mandatory minimum sentence faced by the defendant because "the penalty to be imposed upon a defendant is not a matter for the jury"); United States v. Cox, 696 F.2d 1294, 1298 (11th Cir. 1983) (disapproving of informing a jury of a minimum or maximum punishment); United States v. McCracken, 488 F.2d 406, 425 (5th Cir. 1974) (it is "error to tell the jury about the consequences of a certain verdict even if they are mandatory").

The only exceptions are where the jury plays a role in sentencing (for example, in death penalty cases) or where the jury has been affirmatively misled about sentencing consequences (for example, by being told that a defendant would "go free" if found not guilty by reason of insanity), in which case the jury's misperceptions may be corrected.  See Shannon, 512 U.S. at 579, 587-88; United States v. Pabon-Cruz, 391 F.3d 86, 94- 95 (2d Cir. 2004); United States v. Polouizzi, 564 F.3d 142, 162 (2d Cir. 2009).  Neither exception applies here.  In a non-capital case such as this one, the jury does not have a role in determining the defendant's sentence; rather, the mandatory minimum penalties applicable to the crimes charged here have already been determined by Congress.  Furthermore, the government will not make any representations to the jury regarding the sentencing consequences of a conviction or acquittal.  Thus, the possible punishment the defendants might face is simply not the jury's concern and is entirely irrelevant.

Similarly, the identification of Clanton in the July 24, 2023 complaint fails the Rule 403 balancing test because it has no relevance or probative value and has great potential for prejudice at a trial at which the affiant who swore to the complaint is not asked to identify anyone.  At trial, the government does not anticipate that any witness will identify either of the gunmen in the June 3, 2023 robbery of Annadale Smoke Shop as Clanton; rather, the government expects the evidence to establish that Clanton participated in the robbery without being physically present inside the smoke shop.  Therefore, the fact that someone once believed one of the gunmen inside the smoke shop was Clanton does not make Clanton's guilt or non-guilt any more or less likely.  And presenting this evidence would create a risk of confusing the jury about whether Clanton was one of the gunmen in the June 3, 2023 robbery, an argument that no party is expected to present.  Nor is it relevant to any witness's credibility, given that the

person who made that identification is not expected to testify.  In the absence of any

identification at trial by the affiant who swore to the complaint, evidence related to the July 24,

2023 complaint would serve no relevant purpose, would confuse the jury, and could invite the

jury to improperly consider the appropriateness of law enforcement conduct rather than the

defendants' guilt or non-guilt.

     D.    The Government Should Be Permitted to Cross-Examine the Defendants on their Prior Felony Convictions

Federal Rule of Evidence 609 governs the admissibility of evidence of prior

convictions for impeachment purposes.  As relevant here, if the witness is a criminal defendant,

evidence of a prior felony conviction is admissible "if the probative value of the evidence

outweighs its prejudicial effect to that defendant."  Fed. R. Evid. 609(a)(1)(B).  Under Rule

609(a)(1), the "evidence" of prior convictions that may be admitted includes "the essential facts

of a witness's convictions, including the statutory name of each offense, the date of conviction,

and the sentence imposed."  United States v. Estrada, 430 F.3d 606, 615 (2d Cir. 2005); see also

United States v. Brown, 606 F. Supp. 2d 306, 315-16 (E.D.N.Y. 2009) (same).

In weighing the probative versus prejudicial value of impeaching a defendant with

a prior conviction pursuant to Rule 609(a)(1), courts in the Second Circuit consider five factors:

(1) the impeachment value of the prior crimes, (2) the date of the conviction and the defendant's

subsequent history, (3) the degree of similarity between the past crimes and the charged crime,

with dissimilarity favoring admission, (4) the centrality of the defendant's credibility to the case,

and (5) the importance of the defendant's testimony.  See United States v. Crumble, No. 18-CR-

32 (ARR), 2018 WL 2016852, at *5 (E.D.N.Y. May 1, 2018) (quoting Brown, 606 F. Supp. 2d at

312).

If the later of the date of conviction or the date of the defendant's release from confinement for that conviction is more than 10 years old, then, pursuant to Rule 609(b), evidence of the conviction is admissible only if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect" and the party seeking to offer it gives the opposing party reasonable written notice of its intent to use the evidence.  Courts apply the same balancing test as that prescribed by Rule 609(a), but the heightened standard of Rule 609(b) requires that the evidence have more probative value than that required under Rule 609(a).  See Brown, 606 F. Supp. 2d at 313.  In addition, under Rule 609(b), a court must "make an on-the-record finding based on specific facts and circumstances that the probative value of the evidence substantially outweighs the danger of unfair prejudice."  Jones v. N.Y. City Health & Hosps. Corp., 102 F. App'x 223, 226 (2d Cir. 2004) (summary order); see also United States v. Payton, 159 F.3d 49, 57-58 (2d Cir. 1998) (upholding district court's decision to admit defense witness's 13-year-old convictions where court specifically found that witness's "credibility was 'crucial' because she would be testifying in direct contradiction to the government's witnesses on the key element of possession of the .38 caliber revolver; the impeachment value of her convictions was substantial; and the government provided defendant with sufficient advance notice of its intent to use these convictions in her cross examination").

The government addresses each defendant's prior convictions in turn.

1.    Tony Clanton

The government should be permitted to cross-examine Clanton about his felony convictions from 2008 (criminal possession of a controlled substance and criminal possession of a weapon) and 2009 (assault).

With respect to the impeachment value of the 2008 conviction, the first factor to be considered, "Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a

witness's propensity to testify truthfully." <u>United States v. Estrada</u>, 430 F.3d 606, 617 (2d Cir. 2005). Clanton's use of fake law enforcement-style materials in that incident inherently involved the use of deception to persuade the victim that he was a genuine DEA agent. The second factor, the date of the convictions and the defendant's subsequent history, also weighs in favor of admission; Clanton was released from state custody on July 13, 2016, approximately seven and a half years before the scheduled trial date in this case. <u>See</u> <u>Brown</u>, 606 F. Supp. 2d at 315 (date of conviction from eight and a half years before trial was not an admissibility concern and could be considered by jury in determining whether the conviction impeached defendant's credibility). And his "subsequent history" quickly included additional criminal conduct: an assault committed while incarcerated three days before being sentenced. While the 2008 conviction more closely resembles the charged crimes than do the other convictions (the third factor), a proper limiting instruction that indicates that the prior conviction is only offered in connection with Clanton's credibility would sufficiently mitigate the possibility that the jury would draw any improper inferences. Depending on the specific content of Clanton's testimony, the fourth and fifth factors may also weigh in favor of allowing questioning about the 2008 conviction. Specifically, if Clanton were to testify that neither he nor the other co-conspirators posed as law enforcement agents during the June 27, 2023 attempted robbery, or that he ordered law enforcement-style equipment from Amazon for some innocuous purpose, the jury should be permitted to know that Clanton previously used such equipment in an act of deception in furtherance of a theft. Accordingly, the probative value of cross-examination on the 2008 conviction would not be outweighed by its prejudicial effect.

All five factors also weigh in favor of allowing cross-examination of Clanton about his 2009 assault conviction. First, while violent crimes are less indicative of credibility

that crimes involving dishonesty, see United States v. Estrada, 430 F.3d 606, 617 (2d Cir. 2005), the fact that Clanton was willing to ignore the law even while subject to the stringent supervision of the jail context makes this conviction more probative of his credibility than, for example, an assault of similar severity committed while at liberty.  Second, the age of the conviction weighs in favor of admissibility.  Clanton's six-year sentence ran concurrently to the 11-year sentence described above, and he did not reenter the community until July 13, 2016.  Because "the structure of the Federal Rules of Evidence suggest that the probative value of a conviction is affected by time spent in the community since a conviction, not the time since the conviction," Crumble, 2018 WL 2016852, at *8, the date of this conviction operates similarly to the date of the 2008 conviction.  Third, an assault committed while behind bars is significantly different from the robberies with which Clanton is now charged, and whatever prejudice might arise from learning that the defendant had previously been convicted of a violent crime could be mitigated by not telling the jury that this felony conviction was for an assault.  See United States v. Jackson, No. 19-CR-356 (ARR), 2020 WL 7063566, at *3 (E.D.N.Y. Dec. 2, 2020) ("Here, this risk of prejudice can be eliminated by prohibiting the government from inquiring into 'the nature or statutory name of [the] offense,' while still allowing it to inquire into the other 'essential facts,' namely the fact of the felony conviction, the date, and the length of the sentence.") (quoting Estrada, 430 F.3d at 616)); see also Brown, 606 F. Supp. 2d at 312 ("[I]t is within the discretion of the district courts to further limit the evidence of the prior conviction to exclude the nature or statutory name of the offense.").  With respect to the fourth and fifth factors, if the defendant were to testify that he did not join the charged conspiracy or that he did not foresee the use of violence of firearms as part of the conspiracy, the jury's deliberation could depend greatly on whether those claims were true or not.  These factors weigh in favor of admission.

2.    Lawrence Dotson

With respect to Dotson's 1992 convictions for murder and possession of a loaded firearm, each of the five factors also weighs in favor of permitting cross-examination about the fact that Dotson was convicted of felony offenses and sentenced to a term of imprisonment of 25 years to life, without identifying the conviction as a murder.

First, Dotson's murder conviction is probative of his willingness to lie. While, as discussed above, violent crimes are less indicative of credibility, extremely serious violent crimes "may bear on truthfulness, to the extent that more serious offenses indicate a stronger willingness to ignore the law." Estrada, 430 F.3d at 617-18. Because a murder is inherently extraordinarily serious, this factor weighs in favor of admissibility. Second, Dotson's release in 2018, approximately five and a half years before the trial in this case begins, falls well within the 10-year period referred to in Rule 609(b). Third, although the murder, like the charged robberies, involved a firearm, any potential for prejudice could be reduced by not revealing to the jury that a firearm was used in the murder. Finally, the fourth and fifth factors would favor admission of this evidence on the same grounds discussed above: if Dotson were to testify that he did not join the conspiracy or foresee that violence or firearms would be used in furtherance of it, the jury's assessment of his credibility would benefit from knowing that he had previously been convicted of felonies.

The government recognizes the potential for unfair prejudice if the jury learns that Dotson has previously committed a murder by means of a firearm. For this reason, the government does not seek to inform the jury that the offenses of conviction were murder and possession of a loaded firearm. Instead, the government seeks only to elicit that Dotson was convicted of three felonies in 1992 and was sentenced to a term of imprisonment of 25 years to life. Learning of this sentence will appropriately inform the jury of the seriousness of Dotson's

31

previous crimes while mitigating the risk of prejudice. See Crumble, 2018 WL 2016852, at *8 ("If I admit this conviction under Rule 609, I will likely also find that the probative value of the length of this sentence outweighs its prejudicial effect: although an eight-year sentence may suggest to the jury that Crumble committed a serious and possibly violent crime, it also indicates a lack of respect for the law." (citations omitted)).

III.    CONCLUSION

For the reasons set forth above, the government respectfully submits that evidence of the January 20, 2023 and June 24, 2023 home invasions should be admitted; that messages from Dotson's phone should be admitted; that evidence of possible punishment should be precluded; that evidence of the identification of Clanton in the July 24, 2023 complaint should be precluded; and that the government should be permitted to conduct limited cross-examination of both defendants about their prior felony convictions.

Dated:    Brooklyn, New York
          November 30, 2023

Respectfully submitted,

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:    /s/ Andrew M. Roddin
       Andrew M. Roddin
       Assistant United States Attorney
       (718) 254-6455