UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA,

                                          **MEMORANDUM AND ORDER**

     -against-                            23-CR-328 (KAM)


TONY CLANTON, et al.,

                         Defendants.
------------------------------------X

**MATSUMOTO, United States District Judge:**


     On August 15, 2023, a grand jury sitting in the Eastern
District of New York returned a six-count indictment (ECF No.
18, the "Indictment") charging Tony Clanton ("Clanton") and
Lawrence Dotson ("Dotson" and together with Clanton,
"Defendants") with Count One, Hobbs Act Robbery Conspiracy
between June 2023 and July 2023 in violation of 18 U.S.C. §
1951(a); Count Two, Hobbs Act Robbery on June 3, 2023, in
violation of 18 U.S.C. § 1951(a); Count Three, Use of a Firearm
During a Crime of Violence in violation of 18 U.S.C. §
924(c)(1)(A) – specifically the Crime of Violence alleged in
Count Two; and Count Four, Attempted Hobbs Act Robbery on June
27, 2023 in violation of 18 U.S.C. § 1951(a).  (Indictment ¶¶ 1-
4.)  Clanton was also charged with Count Five, Hobbs Act Robbery
on July 12, 2023, in violation of 18 U.S.C. § 1951(a) and Count
Six, Use of a Firearm During a Crime of Violence in violation of

1

18 U.S.C. § 924(c)(1)(A) – specifically the Crime of Violence alleged in Count Five.  (Indictment ¶¶ 5-6.)

Pending before this Court is Clanton's **(I)** pre-trial motion to suppress evidence purportedly obtained in violation of Clanton's rights under the Fourth Amendment of the United States Constitution and in violation of Fed. R. Crim. P. 12.  (ECF Nos. 52, 54, and 56[1], "Mot. to Suppress"; 64, "Def. Reply".)  The Government opposes Clanton's motion to suppress.  (ECF No. 60, "Govt. Opp.")

Also before this Court are Clanton's motions in limine **(II)** seeking preclusion of any cross-examination regarding Clanton's criminal history, **(III)** seeking preclusion of any reference to Clanton as a "convicted felon," notwithstanding his prior felony convictions, **(IV)** seeking preclusion of license plate reader results, **(V)** seeking preclusion of any reference to witnesses or parties as "victims," **(VI)** seeking preclusion of any uncharged bad acts, **(VII)** seeking preclusion of any records relating to Clanton's prior incarceration, and **(VIII)** seeking preclusion of any opinion testimony by any witness not admitted as an expert. (ECF Nos. 53, "Def. Mot. in Lim."; 64, "Def. Reply".)  The

---

[1] Clanton filed identical motions to suppress at ECF Nos. 52 and 54, which both comprise a Memorandum of Law in Support of Clanton's motion to suppress. Clanton also separately filed exhibits to his motion to suppress as ECF Nos. 56, 56-1, 56-2, 56-3.  The Court refers to the Memorandum of Law in Support of Clanton's Motion to Suppress, which was filed twice at ECF Nos. 52 and 54, as "Mot. to Suppress" and the accompanying exhibits as follows: ECF No. 56-1, "Mot. to Suppress Ex A"; ECF No. 56-2; "Mot. to Suppress Ex. B"; and ECF No. 56-3, "Mot. to Suppress Ex. C."

government opposes Clanton's motions in limine.  (ECF No. 60, "Govt. Opp.")

Also before the Court are the government's motions in limine seeking admission of evidence regarding the January 20, 2023 Attempted Home Invasion and the June 24, 2023 Attempted Home Invasion,[2] **(IX)** seeking admission of evidence from Dotson's Cell Phone, **(X)** seeking preclusion of evidence regarding possible punishment, **(XI)** seeking preclusion of any reference to the possible misidentification of Clanton in the July 24, 2023 Complaint, and seeking to cross-examine Defendants Clanton and Dotson regarding certain prior felony convictions.[3]  (ECF Nos. 55, "Govt. Mot. in Lim."; 63, "Govt. Reply".)  Clanton opposes the government's motions in limine.  (ECF No. 58, "Def Opp.")

Finally, the Court also reviews **(XII)** Clanton's motion to exclude testimony from the Government's expert witness on historical cell site location information and timing advance records pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  (ECF Nos. 74, "Mot. to Excl."; 86, "Mot. to

---

[2] Because the government's motion in limine seeking admission of evidence from the January 20, 2023 Attempted Home Invasion and the June 24, 2023 Attempted Home Invasion directly corresponds to Clanton's motion in limine to preclude evidence of uncharged offenses, the Court examines both motions in limine together in section **(VI)** of this Memorandum and Order.

[3] Because the government's motion in limine seeking to cross-examine Clanton and Dotson regarding certain prior felony convictions directly corresponds to Clanton's motion in limine seeking preclusion of any cross-examination regarding Clanton's criminal history, the Court examines both motions in limine together in section **(II)** of this Memorandum and Order.

Excl. Reply".)  The Government opposes Clanton's *Daubert* motion (ECF No. 85, "Opp. to Excl.").

Based on the Court's review of the parties' motions, the case record, and applicable law, and for the reasons set forth below, Clanton's pre-trial motion to suppress evidence and Clanton's request for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) are **DENIED**.  Clanton's *Daubert* motion to exclude testimony by the Government's expert witness is **DENIED**. Clanton's motions in limine to preclude reference to any witnesses as "victims" is **DENIED** and Clanton's motion in limine to preclude evidence of license plate reader results is **DENIED**. Clanton's motions in limine to preclude reference to him as a "Convicted Felon," to preclude witness testimony without expert notice, and to preclude admission of records relating to his prior incarceration are denied as **MOOT**.  The Government's motion in limine to preclude any reference to the possible consequences of a conviction, to admit evidence regarding the January 20, 2023 and June 24, 2023 Attempted Home Invasions, and to preclude reference to the possible misidentification of Clanton in the now-dismissed July 24, 2023 Complaint are **GRANTED**.

Finally, the Court reserves ruling on Clanton's motion in limine to preclude cross-examination regarding his criminal history and on the government's corresponding motion in limine to admit cross-examination regarding certain of Clanton's and

4

Dotson's felony convictions as further explained below.  The Court also reserves ruling on the government's motion in limine to admit evidence obtained from the Dotson Phone.

## Background

I.   **Factual Background**

A. **The July 12, 2023 Warrant**

On July 12, 2023, the government obtained a warrant to acquire cell phone location information for one phone number believed to be associated with Dotson ("Dotson Phone")[4] and two phone numbers believed to be associated with Clanton ("Clanton Phone 1" and "Clanton Phone 2").[5]  The "July 12, 2023 Warrant" application was submitted with an affidavit of FBI Special Agent Jacqueline Muller (the "FBI Agent-Affiant").  *See generally* (ECF No. 56-1, July 12, 2023 Warrant Affidavit, "Mot. to Suppress Ex. A".)  In the warrant affidavit, the FBI Agent-Affiant set forth an evidentiary basis for a finding of probable cause and attested that the phones at issue had been used by Clanton and Dotson in connection with four robberies or attempted robberies between January 2023 and June 2023 and that the fruit of the

---

[4] The Dotson Phone is referred to as Subject Phone 1 in the July 12, 2023 Warrant application and July 24, 2023 Warrant applications, and ends in the digits "1264."

[5] Clanton Phone 1 is referred to as Subject Phone 2 in the July 12, 2023 Warrant application and July 24, 2023 Warrant applications, and ends in the digits "2967."  Clanton Phone 2 is referred to as Subject Phone 3 in the July 12, 2023 Warrant application and July 24, 2023 Warrants applications, and ends in the digits "8087."

requested search warrants would yield evidence of violations of 18 U.S.C. §§ 912, 922(g)(1), 924(c), 1951(a), 2, and 371.  (Mot. to Suppress Ex. A ¶¶ 5-7).  The FBI Agent-Affiant also identified three vehicles, a white Mercedes registered to Dotson (the "Dotson Mercedes"), a grey BMW registered to Spin Empire, a business owned by Clanton (the "Clanton-Business BMW"), and a black Infiniti registered to Clanton (the "Clanton Infiniti"). (Mot. to Suppress Ex. A ¶ 8.)

### 1. January 20, 2023 Attempted Home Invasion

The first incident described in the July 12, 2023 Warrant affidavit is a January 20, 2023 attempted home invasion (the "January 20, 2023 Attempted Home Invasion").  (Mot. to Suppress Ex. A ¶ 12.)  The FBI Agent-Affiant stated that surveillance video footage depicted a man in a painter's suit entering a residential apartment building in Staten Island, New York, threatening an individual who was accompanied by a child in the vestibule of the apartment building, and striking that individual with a revolver before firing a shot.  (*Id.*)  The FBI Agent-Affiant further stated that a second man in dark clothing entered the same vestibule with a gun, forcibly obtained apartment keys from the individual who had been struck by the man in the painter's suit, and unsuccessfully attempted to open the individual's apartment door using the keys that had been forcibly obtained from the individual.  (*Id.*)  Both the

perpetrators depicted in the video surveillance footage
ultimately left the apartment and drove away in a rented U-Haul
van that had been parked nearby.  (*Id.*)  According to the FBI
Agent-Affiant, the U-Haul van that was used to flee the scene of
the January 20, 2023 Attempted Home Invasion was rented from a
nearby U-Haul location on the morning of January 17, 2023.  The
registration information associated with the January 17, 2023
rental for a U-Haul van reflected a name believed to be an alias
of Clanton, the phone number for Clanton Phone 1, and an email
address that includes Clanton's last name.  (Mot. to Suppress
Ex. A ¶¶ 13, 15-17.)  Video footage from January 17, 2023 of the
apartment building where the January 20, 2023 Attempted Home
Invasion took place captured the same U-Haul van that was rented
on January 17, 2023 and also reflected a man with similar
clothing and features as one of the participants in the January
20, 2023 Attempted Home Invasion.  (Mot. to Suppress Ex. A ¶
15.)  Video footage from January 18, 2023 reflects two men with
similar features as the perpetrators of the January 20, 2023
Attempted Home Invasion exiting the Dotson Mercedes and entering
the same U-Haul van which was used to flee the January 20, 2023
Attempted Home Invasion, walking towards the apartment building
where the January 20, 2023 Attempted Home Invasion took place,
taking an item from the mailbox, returning to the U-Haul van,
and then exiting the U-Haul van to return to the Dotson

Mercedes.  (Mot. to Suppress Ex. A ¶ 16.)  The U-Haul depicted
in the January 17, 2023 and January 18, 2023 videos and which
was used to flee the scene of the January 20, 2023 Attempted
Home Invasion was ultimately found abandoned on January 28, 2023
within close proximity to the site of the January 20, 2023
Attempted Home Invasion and the location of a business
associated with Clanton.  (Mot. to Suppress Ex. A ¶ 14.)

### 2. June 3, 2023 Annadale Smoke Shop Robbery

The July 12, 2023 Warrant affidavit next describes a
robbery that took place at the Annadale Smoke Shop in Staten
Island, New York on June 3, 2023 (the "June 3, 2023 Annadale
Smoke Shop Robbery").  (Mot. to Suppress Ex. A ¶¶ 18-21.)
According to the FBI Agent-Affiant, an employee of the Annadale
Smoke Shop was robbed by two men who carried handguns and wore
dark clothing, latex gloves, and masks.  (Mot. to Suppress Ex. A
¶ 18.)  The perpetrators allegedly approached the employee on
the sidewalk outside of the store, forced him into the store,
tied his hands with zip ties, threatened him with a handgun, and
forcibly obtained cash from his person and the store register.
(Mot. to Suppress Ex. A ¶¶ 18-19.)  Video footage from the New
York Police Department's speed camera reflects the Clanton-
Business BMW, the Clanton Infiniti, and the Dotson Mercedes
driving near an intersection in the vicinity of the Annadale
Smoke Shop within minutes of the June 3, 2023 Annadale Smoke

8

Shop Robbery.  (Mot. to Suppress Ex. A ¶¶ 20-21.)  The events of
the June 3, 2023 Annadale Smoke Shop Robbery underlie Counts Two
and Three of the Indictment.  *See* (Indictment ¶¶ 2-3) ("the
defendants TONY CLANTON and LAWRENCE DOTSON" are alleged to have
participated in "the robbery of an operator of a smoke shop
business in Staten Island, New York" on or about "June 3, 2023"
and to have "knowingly and intentionally possess[ed] [] firearms
in furtherance of" their participation in "the crime charged in
Count Two").

### 3. June 24, 2023 Attempted Home Invasion

The FBI Agent-Affiant also described an attempted invasion
of a residential building in Staten Island, New York on June 24,
2023 (the "June 24, 2023 Attempted Home Invasion").  (Mot. to
Suppress Ex. A ¶¶ 22-23.  Dotson sat in the Dotson Mercedes with
an individual identified as Dotson's friend, who was sitting in
the passenger seat.  (Mot. to Suppress Ex. A ¶ 23.)  As Dotson
and his friend spoke in the Dotson Mercedes, a gunman wearing
dark clothing entered the backseat of the Dotson Mercedes and
instructed Dotson's friend not to move while pointing a gun at
Dotson's friend.  (*Id.*)  When Dotson's friend ran out of the
Dotson Mercedes and into his home, the gunman chased after him,
but was unable to open the door to the residential building.
(*Id.*)  The gunman menaced him and "tried to force his way into
[Dotson's friend's] home."  (Mot. to Suppress Ex. A ¶ 22.)  The

gunman, apparently unable to get into Dotson's friend's home, ran eastbound and entered the Clanton-Business BMW and drove away from the scene of the attempted home invasion.  (Mot. to Suppress Ex. A ¶ 23.)  Shortly before the incident, a car that appears to be the Clanton-Business BMW was observed driving past the Dotson Mercedes in the direction of the street where the Clanton-Business BMW was parked immediately after the incident. (*Id.*)  The two cars, the Dotson Mercedes and the Clanton-Business BMW, were seen driving nearby each other shortly after the incident.  (*Id.*)  After the incident, Dotson met with police officers and provided the phone number ending in 1264, which is the phone number for the Dotson Phone, as his own phone.  (*Id.*)

### *4. The June 27, 2023 Attempted Robbery*

Next, the July 12, 2023 Warrant affidavit describes an attempted robbery and impersonation of federal law enforcement officials that took place in Edison, New Jersey on June 27, 2023 (the "June 27, 2023 Attempted Robbery").  (Mot. to Suppress Ex. A ¶ 24.)  On the evening of June 27, 2023, the owner of jewelry stores in New Jersey was driving his wife to their shared residence when he pulled into the driveway of his home and observed another car parked on the street nearby.  (*Id.*)  Two men exited the car wearing hats, masks, and what appeared to be FBI bulletproof vests with the letters "FBI" and an FBI badge, and approached the jewelry store owner while he sat in his car.

10

(*Id.*)  At least one of the men who approached the jewelry store owner appeared to be in possession of a gun, which he used to knock on the window of the passenger door and instructed the occupants to exit the car.  (*Id.*)  The jewelry store owner drove away from the perpetrators and met with the police.  (*Id.*)  Earlier that day, the Dotson Mercedes, Clanton-Business BMW, and Clanton Infiniti were observed by a local resident and on video surveillance footage driving on the same block as the jewelry store owner's home.  (*Id.*)  The three cars were also tracked by license plate reader cameras driving through an intersection nearby the jewelry store owner's stores, and video footage depicts the three cars driving from the jewelry store owner's home towards his jewelry stores hours before the attempted robbery.  (*Id.*)  Police dashboard cameras also observed the three cars traveling together near the jewelry store owner's home shortly after the attempted robbery.  (*Id.*)  The events of the June 27, 2023 Attempted Robbery underlie Count Four of the Indictment.  *See* (Indictment ¶ 4) ("On or about June 27, 2023, . . . the defendants TONY CLANTON and LAWRENCE DOTSON" are alleged to have "knowing and intentionally attempt[ed] to obstruct, delay and affect commerce . . . by the robbery of an operator of a jewelry store in Edison, New Jersey.").

### 5. The Harbor Freight Tools Video

The FBI Agent-Affiant stated that on the morning of the June 27, 2023 Attempted Robbery, Clanton was observed purchasing zip ties from a Harbor Freight Tools store in Staten Island and entering and exiting the Clanton-Business BMW, which was parked in the Harbor Freight Tools store parking lot.  (Mot. to Suppress Ex. A ¶ 25.)  The FBI Agent-Affiant noted that zip ties are "the same type of items that the gunmen in the [June 3, 2023 Annadale Smoke Shop Robbery] used to restrain" the Annadale employee, and that "[a] receipt from Harbor Freight Tools shows that the only item [Clanton] purchased was a 10-pack of zip ties." (*Id.*)

**B. The July 24, 2023 Warrants**

On July 24, 2023, six additional search warrants were issued by Magistrate Judge Marcia P. Henry (the "July 24, 2023 Warrants").  One of the July 24, 2023 Warrant affidavits, which was largely based on the same factual allegations in the July 12, 2023 Warrant, as well as information that was derived from the July 12, 2023 Warrant, asserted a probable cause basis to request "GPS location information" associated with the Dotson Phone and Clanton Phone 2.  (ECF No. 56-2, July 24, 2023 Cell Search Warrant Affidavit, "Mot. to Suppress Ex. B" ¶¶ 9-11.) The same FBI Agent-Affiant who signed and prepared the affidavit for the July 12, 2023 Warrant prepared and signed the affidavit for the July 24, 2023 Cell Search Warrant.  *See generally* (Mot.

to Suppress Ex. B.)  The other five warrants ("the July 24, 2023 Search and Arrest Warrants") asserted a probable cause basis for the search of two premises, one believed to be Dotson's residence and the other believed to be Clanton's residence, the Dotson Mercedes, the Clanton-Business BMW, the Clanton Infiniti, and a fourth vehicle registered to Clanton (the "Clanton Mercedes").  The July 24, 2023 Search and Arrest Warrants were supported, in part, by a separate affidavit which was also prepared and signed by the FBI Agent-Affiant.  *See generally* (ECF No. 56-3, July 24, 2023 Search and Arrest Warrants Affidavit, "Mot. to Suppress Ex. C".)  In the July 24, 2023 Warrant affidavit, the FBI Agent-Affiant described much of the same factual basis that was provided for the July 12, 2023 Warrant, including but not limited to identifying Clanton in the June 27, 2023 Harbor Freight Tools video.  (Mot. to Suppress Ex. C ¶ 35.)

### 1. The July 12, 2023 Robbery

In the affidavit for the July 24, 2023 Search and Arrest Warrants, the FBI Agent-Affiant also described an additional robbery alleged to have taken place on July 12, 2023 in Brooklyn, New York (the "July 12, 2023 Robbery").  (Mot. to Suppress Ex. C ¶¶ 36-38.)  This incident involved the owner of an ice cream store being robbed of $6,700 in cash as the ice cream store owner attempted to transfer a bag of cash from his

13

ice cream store to a TD Bank branch and then to his home.  (Mot. to Suppress Ex. C ¶ 37.)  The ice cream store owner allegedly collected approximately $6,700 in cash from his ice cream store, transferred the cash to a TD Bank branch located in Brooklyn, New York, where he exchanged the cash for larger bills, and then drove to his home with the cash, where upon he was robbed in front of his home.  (*Id.*)  The ice cream store owner described a gunman dressed in dark clothing and a ski mask who demanded money from him at gunpoint and fled in a white Mercedes with New Jersey license plates.  (*Id.*)  According to the FBI Agent-Affiant, video footage from a nearby residence and traffic camera images captured the Clanton Mercedes, which matched the ice cream store owner's description of the getaway vehicle from the July 12, 2023 Robbery, driving to and from the ice cream store owner's home at around the time of the robbery.  (*Id.*) The FBI Agent-Affiant further noted that cell phone location information associated with Clanton Phone 1 revealed location information that placed Clanton Phone 1 at or near the location of the TD Bank branch and at or near the location of the ice cream store owner's home within close temporal proximity of the time of the robbery.  (*Id.*)  The events of the July 12, 2023 Robbery underlie Counts Five and Six of the Indictment.  *See* (Indictment ¶¶ 5-6) ("the defendant TONY CLANTON is alleged to have participated in "the robbery of an operator of an ice-cream

14

business in Brooklyn, New York" on or about "July 12, 2023" and
to have "knowingly and intentionally possess[ed] [] firearms in
furtherance of" his participation in "the crime charged in Count
Five").

## II.  Procedural Background

On July 25, 2023, pursuant to the July 12, 2023 Warrant for
cell site location information for the Dotson Phone and the two
Clanton phones, the six July 24, 2023 Warrants for GPS location
data, searches of Dotson's and Clanton's residences, searches of
the four Dotson and Clanton vehicles, and the arrest of Dotson
and Clanton, and a subsequently filed Complaint, Clanton was
arrested and arraigned before Magistrate Judge Henry.  (July 25,
2023 Min. Entry.)  At Clanton's arraignment, Clanton's defense
counsel argued that the images of Clanton included in the
detention memorandum submitted by the government pursuant to the
July 24, 2023 Arrest Warrant and Complaint did not match
Clanton's appearance.  (Mot. to Suppress at 13.)  On July 28,
2023, the AUSA moved to dismiss the July 24, 2023 Complaint
based on a possible misidentification of Clanton in video
surveillance footage depicting the June 3, 2023 Annadale Smoke
Shop Robbery.[6]  The Complaint was dismissed without prejudice on
July 28, 2023 by Magistrate Judge James Cho.

---

[6] Although Clanton states that the FBI Agent-Affiant "determined that Mr.
Clanton was not one of the individuals depicted in the video" of the Annadale
Smoke Shop Robbery (Mot. to Suppress at 14), the government states that

On August 17, 2023, Clanton was arraigned on the instant Indictment and charged with Count One, Hobbs Act Robbery Conspiracy in violation of 18 U.S.C. § 1951(a); Count Two, the Hobbs Act Robbery of the Annadale Smoke Shop in Staten Island, New York, in violation of 18 U.S.C. § 1951(a) on or about June 3, 2023 (the "June 3, 2023 Annadale Smoke Shop Robbery"); Count Three, Use of a Firearm During a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A) in connection with the June 3, 2023 Annadale Smoke Shop Robbery; and Count Four, the Attempted Hobbs Act Robbery of a jewelry store owner in Edison, New Jersey in violation of 18 U.S.C. § 1951(a) on or about June 27, 2023 (the "June 27, 2023 Attempted Home Invasion").  (Indictment ¶¶ 1-4.) Clanton was also arraigned in connection with Count Five, the Hobbs Act Robbery of the ice cream store owner in Brooklyn, New York in violation of 18 U.S.C. § 1951(a) on or about July 12, 2023 (the "July 12, 2023 Robbery") and Count Six, Use of a Firearm During a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A) in connection with the July 12, 2023 Robbery. (Indictment ¶¶ 5-6.)

## LEGAL STANDARD

---

"after seeing Clanton in person and upon further review of the evidence, the affiant informed the assigned prosecutor that the person identified in the July 24, 2023 Complaint as Clanton in the June 3, 2023 Annadale Smoke Shop video may possibly be another person."  (Govt. Opp. at 12.)  For purposes of assessing Clanton's motion to suppress, the Court considers it to be undisputed that the FBI Agent-Affiant's identification of Clanton in the video depicting the June 3, 2023 Annadale Smoke Shop Robbery is uncertain.

In advance of a trial, parties may submit motions in limine for the district court's review and decision.  "'*In limine*' has been defined as 'on or at the threshold; at the very beginning; preliminary.'"  *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984) (citing Black's Law Dictionary 708 (5th ed. 1979)).  This Court's authority to rule on in limine motions stems from the inherent and discretionary authority of a district court to manage its own docket and to ensure the just and efficient course of trial.  *See Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) ("the purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.") (internal quotation marks and citation omitted).  A district court's ruling on an in limine motion constitutes a preliminary determination in preparation for trial, but the district court's ruling "is subject to change [as] the case unfolds" and the district court is free, "in the exercise of [its] sound judicial discretion, to alter a previous *in limine* ruling."  *Luce*, 509 U.S. at 41-42.

## DISCUSSION

### I.   Clanton's Motion to Suppress

Clanton moves to suppress evidence obtained pursuant to the one July 12, 2023 Warrant and the six July 24, 2023 Warrants.

17

Clanton contends that the warrant affidavits contained intentionally and knowingly false or recklessly false information regarding the FBI Agent-Affiant's ability to identify Clanton, in violation of Clanton's constitutional right under the Fourth Amendment of the United States Constitution to be protected from unreasonable searches and seizures. Clanton alleges that all of the searches that resulted from the flawed warrants also violate the principles outlined in *Franks v. Delaware*, 438 U.S. 154 (1978), and that an evidentiary hearing is required to affirmatively establish whether probable cause existed to support the July 12, 2023 Warrant and the July 24, 2023 Warrants. For the reasons set forth below, Clanton's motion to suppress and for a hearing is **DENIED**.

## Legal Standard

The Fourth Amendment of the United States Constitution protects against "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. const. amend. IV. Probable cause is determined based on "a practical, common-sense [assessment of] whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Once a magistrate judge has made such a determination and issued the

challenged warrant, "the task of a reviewing court is simply to ensure that the totality of the circumstances afforded the magistrate a substantial basis for making the requisite probable cause determination." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (internal quotation marks and citation omitted). Indeed, the Supreme Court has long cautioned that "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Gates*, 462 U.S. at 236.

However, in certain limited circumstances, a criminal defendant may challenge a warrant by attacking the veracity of the warrant's underlying affidavit pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). "To be entitled to a *Franks* hearing, a defendant must make a 'substantial preliminary showing' that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and [that] (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998) (citing *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987)).

The first prong of the *Franks* test requires a showing of deliberate falsehood or reckless disregard for the truth. Importantly, "[e]very statement in a warrant affidavit does not

19

have to be true." *United States v. Trzaska*, 111 F.3d 1019, 1027
(2d Cir. 1997) (citing *Franks*, 438 U.S. at 165).  Instead,
*Franks* requires that the statements in a warrant affidavit "be
'believed or appropriately accepted by the affiant as true.'"
*United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989)
(internal citation omitted).  A defendant challenging
misstatements or omissions in connection with a warrant
affidavit under *Franks* must demonstrate that the allegedly false
statements were "made intentionally, knowingly, or with reckless
disregard for the truth." *United States v. Ferguson*, 758 F.2d
843, 848 (2d Cir. 1985).  Allegations of intentionally or
knowingly false statements must be "accompanied by an offer of
proof." *Franks*, 438 U.S. at 171 ("Allegations of negligence or
innocent mistake are insufficient."); *see also United States v.
Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) ("The reviewing
court must be presented with credible and probative evidence
that the [misstatement or] omission of information . . . was
'designed to mislead' or was 'made in reckless disregard of
whether it would mislead.'") (internal citation omitted).
"Recklessness may be inferred where the omitted information was
'clearly critical' to the probable cause determination." *Rivera
v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).

"[I]f a defendant can make a sufficient showing that false
statements were deliberately or recklessly included in a warrant

20

affidavit, a court should" then move on to the second prong of the *Franks* test, which takes the form of a materiality analysis. *Trzaska*, 111 F.3d at 1027 (citing *Franks*, 438 U.S. at 171-72). This inquiry requires that the court put aside the alleged misstatements or omissions and determine whether "the remaining portions of the affidavit would support probable cause to issue the warrant." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000). A *Franks* hearing is only required if the reviewing court determines that, taking together the untainted portions of the application, the affidavit includes an insufficient basis for a finding of probable cause. *See Rajaratnam*, 719 F.3d at 146. Otherwise, "suppression is not required." *Id.*

### Discussion

Clanton argues that the July 12, 2023 Warrant and the six July 24, 2023 Warrants "were based on materially misleading affidavits" that included misrepresentations, which were "at least reckless and likely intentional[,]" under *Franks*. (Mot. to Suppress at 14.) Clanton further argues that the alleged misrepresentations were material in that "[t]ruthful warrant affidavits would not have" supported a finding of "probable cause." *Id.*

The Government contends that in the first instance, "Clanton has not alleged—let alone demonstrated—that" any of the FBI Agent-Affiant's statements in the affidavits in support of

21

the July 12, 2023 Warrant or the July 24, 2023 Warrants are false and that, in any event, "Clanton's motion falls far short of making the required showing" of intentionality or recklessness, and of materiality.  (Govt. Opp. at 7.)

For the reasons set forth below, the Court agrees that Clanton has failed to provide "credible and probative evidence" that the FBI Agent-Affiant's "possible" misidentification of Clanton in the July 24, 2023 Complaint as it relates to the video footage from the June 3, 2023 Annadale Smoke Shop Robbery, the FBI Agent-Affiant's identification of Clanton in the July 12, 2023 Warrant and the July 24 2023 Warrants with respect to the June 27, 2023 Harbor Freight Tools video, or the FBI Agent-Affiant's statements regarding her ability to identify Clanton generally, constitute a false statement or omission "made intentionally, knowingly, or with reckless disregard for the truth."  *Ferguson*, 758 F.2d at 848.  Indeed, the only time the FBI Agent-Affiant "possibly" misidentified Clanton was in the now-dismissed July 24, 2023 Complaint, which included reference to a video from the June 3, 2023 Annadale Smoke Shop Robbery. Moreover, with regards to materiality, even when setting aside the possible misidentification, there exists sufficient bases for a finding of probable cause based on the remainder of information in the challenged warrant affidavits.

### A.    *Deliberate Falsehood or Reckless Disregard for the Truth*

With respect to the June 27, 2023 Harbor Freight Tools video, which is referenced in the July 12, 2023 Warrant and the July 24, 2023 Warrants, Clanton argues that the FBI Agent-Affiant "stated that she was sufficiently able to identify Mr. Clanton based upon previously view[ed] photographs, surveillance video and other records, and [that she was able to] recognize[] him based on his physical features."  (Mot. to Suppress at 19.) Although Clanton does not allege that he was actually misidentified in the June 27, 2023 Harbor Freight Tools video, the allegedly false statement relates to the FBI Agent-Affiant's "ability to identify Mr. Clanton" which the Court understands to be distinct from the FBI Agent-Affiant's "possible" misidentification of Clanton in the now-dismissed July 24, 2023 Complaint and acknowledgement that the person in the June 3, 2023 Annadale Smoke Shop Video "may possibly be a person other than Mr. Clanton."[7]  (Mot. to Suppress at 16.)  In short, Clanton argues that because the FBI Agent-Affiant may have misidentified Clanton once in the dismissed July 24, 2023 Complaint, she could not have correctly identified Clanton on another, entirely separate occasion in a different video, and any claim that the FBI Agent-Affiant could have identified Clanton correctly on

---

[7] The Court notes that there is no reference to the possible misidentification of Clanton in the June 3, 2023 Annadale Smoke Shop video either in the July 12, 2023 Warrant affidavit or the July 24, 2023 Warrant affidavits – only the now-dismissed July 24, 2023 Complaint.

another occasion is not only false - but was deliberately intended to mislead the Court or made with reckless disregard for the truth.

With respect to the evidentiary basis for Clanton's allegation that the FBI Agent-Affiant made statements in the affidavits in support of the warrants that were deliberately false or with reckless disregard for the truth about her ability to identify Clanton, Clanton points to the "certainty of the affidavit identifications and the quick dismissal of the complaint[.]" (Mot. to Suppress at 19.) Specifically, Clanton contends that "a mere four days [after the FBI Agent-Affiant made the allegedly false statements], she and the government conceded that the identification information was false" presumably because of the government's decision to move for dismissal of the Complaint without prejudice on July 28, 2023. (*Id.*)

Clanton's argument regarding the FBI Agent-Affiant's ability to identify him is misguided for two reasons. Putting aside the question of whether the FBI Agent-Affiant's statements regarding her ability to identify Clanton were intentional or reckless, Clanton has not proffered sufficient evidence to infer that the FBI Agent-Affiant's statements are in fact false. The FBI Agent-Affiant's statement in the now-dismissed July 24, 2023 Complaint that her identification of Clanton in video footage

from the June 3, 2023 Annadale Smokes Shop Robbery "may possibly" be another person, does not in and of itself mean that the FBI Agent-Affiant could not identify Clanton in the June 27, 2023 Harbor Freight Tools video or that the FBI Agent-Affiant's statements regarding her review of "photographs, surveillance video and other records," her familiarity with "[Clanton's] physical features," or her ability to identify Clanton based on the evidence and her experience, were "deliberate falsehoods" or "made with reckless disregard for the truth." *United States v. Salameh*, 152 F.3d at 113.

Secondly, the Court cannot find, based on the entire affidavit, that the FBI Agent-Affiant's statements regarding her ability to identify Clanton were false or misleading, but even assuming so for purposes of the Court's *Franks* analysis, there is "no basis to conclude that" any misrepresentations regarding the FBI Agent-Affiant's ability to identify Clanton amount to a "deliberate falsehood or reckless disregard for the truth." *United States v. Awadallah*, 349 F.3d 42, 67 (2d Cir. 2003) (internal citation omitted). Clanton's reference to the "certainty" (Mot. to Suppress at 19), of the FBI Agent-Affiant's statements regarding her ability to identify Clanton in the challenged affidavits and the Government's July 28, 2023 motion to dismiss the Complaint fall short of the "credible and probative evidence" required to infer a deliberate intention to

25

mislead or reckless disregard for whether such statements would mislead. *Rajaratnam*, 719 F.3d at 154 (internal citation omitted). Clanton provides no support for the proposition that a particular degree of "certainty" (Mot. to Suppress at 19), expressed in an affidavit with respect to an affiant's ability to interpret the evidence in a case and an affiant's familiarity with a case, evinces a deliberate intention to mislead. *Awadallah*, 349 F.3d at 68 ("*Franks* protects against omissions that are *designed to mislead*").

Nor can the "quick dismissal of the complaint" (Mot. to Suppress at 19), a decision made by the AUSA – not the FBI Agent-Affiant – be imputed to the FBI Agent-Affiant's state of mind about her ability to identify Clanton. *See Rajaratnam*, 719 F.3d at 153 ("[The] inquiry looks to the mental states of [the] mind[s] of government officials . . . [and] is said to be a 'subjective' test rather than an 'objective' one."). Even if the decision to move for dismissal of the July 24, 2023 Complaint on the basis of the possible misidentification was interpreted to reflect on the FBI Agent-Affiant's state of mind, Clanton provides no evidence to support the conclusion that the "quick" dismissal of the Complaint is indicative of a deliberate intention to mislead. To the contrary, the FBI Agent-Affiant's efforts to "inform[] the assigned prosecutor that the person identified in the [July 24, 2023 Complaint] as Clanton in the

26

June 3, 2023 Annadale Smoke Shop video may "possibly be" someone else (Govt. Opp. at 12), evinces anything but a "*design[] to mislead*." *Awadallah*, 349 F.3d at 68.  The FBI Agent-Affiant's decision to raise the possibility of a misidentification suggests that the FBI Agent-Affiant acted with an intention to preserve the integrity of the investigative and prosecutorial process and to uphold Clanton's constitutional rights.

In the alternative, Clanton mistakenly argues that the FBI Agent-Affiant's possible misidentification of Clanton in the June 3, 2023 Annadale Smoke Shop video was at least reckless because the alleged misstatements were "the only identifications of Mr. Clanton by the affiant who presented the applications to Judge Henry."  (Mot. to Suppress at 19.)  However, the identification of Clanton in the June 3, 2023 Annadale Smoke Shop video is not the only identification of Clanton made by the FBI Agent-Affiant.  The FBI Agent-Affiant identified Clanton in the June 27, 2023 Harbor Freight Tools store video and this identification is the only identification that appears in any of the warrant affidavits.[8]  Clanton acknowledges this in his reply

---

[8] Although Clanton challenges the FBI Agent-Affiant's statements regarding her ability to identify Clanton generally, including the FBI Agent-Affiant's ability to identify Clanton the June 27, 2023 Harbor Freight Tools video, Clanton does not assert that the FBI Agent-Affiant's identification of him in the June 27, 2023 Harbor Freight Tools video is actually false.  The government maintains that the FBI Agent-Affiant's identification of Clanton as an individual depicted in the June 27, 2023 Harbor Freight Tools video is accurate.  (Govt. Opp. at 7.)

brief, but maintains that the FBI Agent-Affiant's identification of him in the June 27, 2023 Harbor Freight Tools store video was reckless because the Court cannot "trust the basis of the identification" in light of the FBI Agent-Affiant's subsequent misidentification of Clanton weeks later on July 24, 2023. (Def. Reply at 2.)

In support of his argument, Clanton alleges that in moving to dismiss the Complaint, the government revealed its own lack of faith in the FBI Agent-Affiant's ability to identify Clanton. (Mot. to Suppress at 19.)  Clanton asks this Court to speculate that because the Government purportedly "[did] not believe it had probable cause for Mr. Clanton's arrest with such a misidentification," so too would Magistrate Judge Henry have determined that the July 12, 2023 Warrant, which predates the alleged misidentification, and the July 24, 2023 Warrants, were not supported by probable cause.  Clanton further asserts that Magistrate Judge Henry would not have found sufficient probable cause to support the warrants because she would have determined that the FBI Agent-Affiant was not capable of identifying Clanton in the June 27, 2023 Harbor Freight Tools video based on the FBI Agent-Affiant's subsequent misidentification of Clanton in the June 3, 2023 Annadale Smoke Shop video, even though none of the warrants referenced the June 3, 2023 Annadale Smoke Shop video.  (Mot. to Suppress at 19-20.)  In light of this

28

possibility, Clanton contends that "the [alleged] identifications were a critical component of the probable cause determination" regarding the July 12, 2023 Warrant and the July 24, 2023 Warrants.  (Mot. to Suppress at 19.)

The Court is not persuaded by Clanton's argument that the FBI Agent-Affiant was reckless.  As set forth previously, "[r]ecklessness may be inferred" if the misstatements or omissions are "'clearly critical' to a probable cause determination." *Rivera*, 928 F.2d at 604 (internal citations omitted).  Here, the Second Circuit's explanation of the meaning of the recklessness standard in *Franks* is instructive:

> [T]he reckless disregard aspect of a *Franks* inquiry can sometimes be *inferred* from the omission of critical information. . . . Subjective intent, after all, is often demonstrated with objective evidence.  But such an inference is not to be automatically drawn simply because a reasonable person would have included the omitted information . . . and the inference is particularly inappropriate where the government comes forward with evidence indicating that the omission resulted from nothing more than negligence, or that the omission was the result of a considered and reasonable judgment that the information was not necessary to the wiretap application.

*Rajaratnam*, 719 F.3d at 154-55 (internal citations omitted).

First, as previously noted, neither the July 12, 2023 Warrant application nor the July 24, 2023 Warrant applications reference the possible misidentification of Clanton from the June 3, 2023 Annadale Smoke Shop Video.  Only the now-dismissed July 24, 2023 Complaint includes reference to the possible

misidentification of Clanton in the June 3, 2023 Annandale Smoke
Shop video.  Instead, the July 24, 2023 Warrant applications
contain factual allegations similar to the July 12, 2023 Warrant
application and also include highly probative cell site location
information and GPS data regarding Clanton's and Dotson's cell
phones.  (Mot. to Suppress Ex. C ¶¶ 15, 24.)   The government
also refers to the "wealth of information known to the affiant"
and "cited in the search warrant affidavits" based on the
affiant's "thorough investigation" as another basis for its
assertion that the FBI Agent-Affiant's statements were made "in
good faith."  (Govt. Opp. at 11.)

Second, Clanton has not provided "objective evidence" of
the backwards-looking theory regarding the FBI Agent-Affiant's
ability to identify him.  *Rajaratnam*, 719 F.3d at 154-55.
Clanton has made no showing that the alleged misidentification
from the now-dismissed July 12, 2023 Complaint rises above the
level of mere negligence and the government has correctly noted
that the FBI Agent-Affiant's subsequent decision to inform the
court of the possibility of a misidentification strongly
suggests the absence of any "deliberate intent to mislead"
Magistrate Judge Henry or any reckless disregard for the
possibility of that occurrence.  *Id*. at 155.

Accordingly, Clanton has failed to satisfy the first *Franks*
prong because he has not demonstrated, based on probative

evidence or otherwise, that the FBI Agent-Affiant engaged in "deliberate falsehood[s] or [acted with] reckless disregard for the truth." *Salameh*, 152 F.3d at 113.

### B.   *Materiality*

Even assuming, *arguendo*, that Clanton was able to provide evidence of deliberate falsehoods or evidence from which the Court could infer the FBI Agent-Affiant's reckless disregard for the truth, the Court must consider whether the alleged misstatements or omissions were material under the second prong of the *Franks* test.  With respect to materiality, the Court considers whether a finding of probable cause could have been supported by the remainder of the information within the affidavit, putting aside the allegedly false information.  *See United States v. Coreas*, 419 F.3d 151, 155 (2d Cir. 2005).  The Court finds that affidavits in support of both the July 12, 2023 Warrant and July 24, 2023 Warrants included sufficient information and evidence to warrant a finding of probable cause without the FBI-Agent's possible misidentification of Clanton in the video from the June 3, 2023 Annadale Harbor Shop Robbery and even without the identification of Clanton in the video from the June 27, 2023 Harbor Freight Tools video.

Clanton first argues that because the Government dismissed the Complaint in its entirety "solely due to the misidentification," probable cause in the July 12, 2023 Warrant

and the July 24, 2023 Warrants did not exist.  (Mot. to Suppress at 19.)  Clanton argues that given the government's dismissal of the Complaint, the FBI Agent-Affiant's misidentification should be considered "an omission [that] would have been fatal to the issuance of the warrant" such that the misidentifications are material.  (Mot. to Suppress at 20.)  Putting aside the reality that the alleged misidentification played no role in the determination of probable cause in any of the warrants, the government's dismissal of the July 24, 2023 Complaint, alone, is not dispositive of materiality.  The Court must look to the warrant affidavits as a whole to determine materiality.  *See United States v. Discala*, No. 22-675, 2023 WL 4118637, at *3 (2d Cir. June 22, 2023) ("When viewed in the context of the application as a whole, the challenged representations and omissions were clearly not material.").

The Court finds that there was ample evidence to support a finding of probable cause in the July 12, 2023 Warrant application and the July 24, 2023 Warrant applications.  Indeed, because neither the July 12, 2023 Warrant application, nor the July 24, 2023 Warrant applications reference the possible misidentification of Clanton in the June 3, 2023 Annadale Smoke Shop video, all the evidence cited in the those warrant affidavits supported a finding of probable cause then and now.  Even setting aside the identification of Clanton in the June 27,

2023 Harbor Freight Tools store video, which Clanton does not allege is incorrect, the warrant affidavits include highly probative evidence regarding Clanton's alleged purchase of zip ties from the Harbor Freight Tools store on the morning of June 27, 2023.  This includes the allegation that "the Clanton BMW had parked at Harbor Freight Tools and that a person had gotten out of its driver's seat, purchased zip ties inside, and got[] back into the Clanton BMW, which was later shown to have been in the vicinity of the June 27, 2023 [Attempted Robbery,] along with the Dotson Mercedes, and the Black Infiniti, and (as set forth in the July 24, 2023 Residences and Cars Warrant)," Clanton Phone 2.  (Govt. Opp. at 12) (citing Mot. to Suppress Ex. A ¶ 25; Mot. to Suppress Ex C ¶ 35.)  The warrant affidavits also reference Clanton's receipt for the purchase of zip ties from the Harbor Freight Tools store on June 27, 2023.  (Mot. to Suppress Ex. A ¶ 25; Mot. to Suppress Ex. C ¶ 35.)

Beyond the events of June 27, 2023, each warrant affidavit reflects videos, license plate reader information, and witness identification of the same handful of vehicles associated with Clanton and Dotson in the vicinity of the alleged robberies and attempted robberies at the approximate time of the alleged robberies and attempted robberies.  *See* (Mot. to Suppress Ex. A ¶¶ 10, 13, 19; Mot. to Suppress Ex. C ¶¶ 15, 24.)  The warrant affidavits also note the repeated use of zip ties, as well as

evidence suggesting that on multiple occasions, Clanton
impersonated figures that victims would believe may have lawful
access to the subject premises.  (*Id.*)  The July 24, 2023
Warrant affidavits include even more probative information,
including cell site location information and GPS data.  (Mot. to
Suppress Ex. C ¶ 41.)

Based on the foregoing evidence, the Court is satisfied
that there existed a sufficient probable cause basis for the
July 12, 2023 Warrant and the July 24, 2023 Warrants.  Clanton
has failed to demonstrate that the FBI Agent-Affiant's
statements regarding her ability to identify Clanton and her
possible misidentification of Clanton in the video from the June
3, 2023 Annadale Smoke Shop Robbery constitute false statements,
much less deliberately or recklessly false statements.  In any
event, the alleged misstatements or omissions were immaterial,
and no *Franks* hearing is warranted.  Accordingly, Clanton's
motion to suppress evidence resulting from the July 12, 2023
Warrant and July 24, 2023 Warrants is **DENIED**.

**II.  Clanton's Motion to Preclude Cross-Examination Regarding
his Criminal History; and the Government's Motion to
Admit Cross-Examination regarding Clanton's 2008 Felony
Convictions, Clanton's 2009 Felony Conviction, and
Dotson's 1992 Felony Convictions**

Clanton seeks to preclude cross-examination about his
criminal history, including six prior felony convictions on the
grounds that none of the felony convictions involve proof of

dishonesty as an element of the crime under Fed. R. Evid. 609(a)(2) and that any probative value is substantially outweighed by the risk of undue prejudice under Fed. R. Evid. 609(a)(1) and Fed. R. Evid. 403.  The government moves in limine to permit cross-examination of both Clanton and Dotson with respect to certain prior convictions.

## LEGAL STANDARD

Courts maintain "broad discretion to determine the scope of cross-examination." *United States v. Koskerides*, 877 F.2d 1129, 1136 (2d Cir. 1989).  Pursuant to Fed. R. Evid. 609(a)(1)(B), evidence of a defendant's prior felony conviction must be admitted for purposes of cross-examination "if the probative value of the evidence outweighs its prejudicial effect to that defendant."  Evidence of a prior criminal conviction also "must be admitted if the court can readily determine that establishing the elements of the crime underlying the prior felony conviction required proving — or the witness's admitting — a dishonest act or false statement."  Fed. R. Evid. 609(a)(2).  For convictions more than ten years old, the probative value of a prior criminal conviction must "substantially outweigh[]" the prejudicial effect.  Fed. R. Evid. 609(b).

Fed. R. Evid. "609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully." *United States v. Estrada*, 430 F.3d 606, 617 (2d

Cir. 2005). The "Rule 403 analysis" under Fed. R. Evid.
609(a)(1) requires courts to balance probative value against the
risk of unfair prejudice. *Id.* Courts conducting the Rule 403
analysis under Fed. R. Evid. 609(a)(1) consider (1) "the
impeachment value of the prior crimes," (2) "the date of
conviction and the Defendant's subsequent history," (3) "the
degree of similarity between the past crimes and this crime,"
(4) "the centrality of the Defendant's credibility in this
case," and (5) "the importance of the Defendant's testimony."
*United States v. Brown*, 606 F. Supp. 2d 306, 311-12 (E.D.N.Y.
2009) (internal citation omitted). Although "crimes of
violence" and in particular, "depraved and offensive acts, such
as wanton violence or sexual immorality" are generally less
probative of an individual's propensity for truthfulness,
"violent crimes involving premeditation are relatively higher in
probative value because they suggest the [individual] is willing
to break the law when it furthers his interests." *Estrada*, 430
F.3d at 618 (internal citation and quotation marks omitted).
For crimes greater than ten years old, "admissibility is subject
to the 'more stringent' balancing test required under Rule
609(b)[,]" which requires that the probative value of the prior
conviction "substantially outweighs" the prejudicial effect.
*Brown*, 606 F. Supp. 2d at 313.

If a district court conducts the Fed. R. Evid. 609(a)(1) balancing test and determines that admission of a prior conviction is warranted, the court may admit the relevant evidence "to be used to impeach a criminal defendant under Rule 609(a)(1)[.]" *United States. v. Crumble*, No. 18-cv-32 (ARR), 2018 WL 2016852, at *6 (E.D.N.Y. May 1, 2018).  In such circumstances, the government "is generally limited to establishing the bare or essential facts of the [defendant's prior] conviction[s]: usually the name of the offense, the date of the conviction, and the sentence." *Brown*, 606 F. Supp. 2d at 312 (internal brackets omitted).

With respect to Fed. R. Evid. 609(a)(2), the court must "look beyond the elements of the offense to determine whether the conviction rested upon facts establishing dishonesty or false statement." *United States v. Payton*, 159 F.3d 49, 57 (2d Cir. 1998).  Nevertheless, the Second Circuit has held that "[w]hile much successful crime involves some quantum of stealth, all such conduct does not, as a result, constitute [a] crime of dishonesty" under Fed. R. Evid. 609(a)(2).  *Estrada*, 430 F.3d at 614.  Courts must also bear in mind that "felonies not involving dishonesty or false statements such as to fall within the scope of Rule 609(a)(2) [may] nonetheless bear on credibility to varying degrees[]" and may be admitted under Fed. R. Evid. 609(a)(1) instead.  *Id*. at 617.

**DISCUSSION**

In 2008, Clanton was convicted of criminal possession of a controlled substance in the third degree in violation of N.Y.P.L. § 220.16(1) and criminal possession of a weapon in the second degree, in violation of N.Y.P.L. § 265.03(2) (the "2008 Felony Convictions").  In 2009, Clanton was convicted of assault in the second degree, in violation of N.Y.P.L. § 120.05(2) (the "2009 Felony Conviction").  The government argues that it should be permitted to cross-examine Clanton about the 2008 Felony Convictions and the 2009 Felony Conviction under Fed. R. Evid. 609(a)(1).  (Govt. Mot. in Lim. at 31-33.)  The government does not object to Clanton's motion to preclude cross-examination with respect to any other prior convictions.

**A. Clanton's 2008 Felony Convictions**

The 2008 Felony Convictions involve charges of drug possession and unlawful gun possession.  As an initial matter, courts in this Circuit have repeatedly ruled that possession charges have low impeachment value because such charges have little bearing on an individual's propensity to testify truthfully.  *See United States v. Joe*, No. 07-cr-734 (JFK), 2008 WL 2810169, at *4 (S.D.N.Y. July 21, 2008) ("unlawful possession of a firearm . . . is not very probative of an untruthful character"); *United States v. Puco*, 453 F.2d 539, 543 (2d Cir. 1971) ("a narcotics conviction has little necessary bearing on

38

the veracity of the accused as a witness"). Nevertheless, the Second Circuit has "expressly cautioned" against any per se rule that such convictions "can never be used to impeach a defendant." *United States v. Ortiz*, 553 F.2d 782, 784 (2d Cir. 1977) (internal citation omitted).

Where, as here, the prior convictions do "not automatically implicate the use of dishonesty . . . the proffering party must demonstrate that the particular prior conviction rested on facts warranting the dishonesty . . . description." *United States v. Raines*, No. 22-cv-18 (NSR), 2023 WL 6211980, at *5 (S.D.N.Y. Sept. 25, 2023) (citing *Daniels v. Loizzo*, 986 F. Supp. 245, 250 (S.D.N.Y. 1997) (internal quotation marks omitted). The government points to the factual circumstances underlying the 2008 Felony Convictions to argue that the 2008 Felony Convictions are more probative of Clanton's credibility than a charge of possession of drugs or a weapon ordinarily may be. (Govt. Mot. in Lim. at 32.) Clanton used "fake law enforcement-style materials . . . to persuade the victim that he was a genuine [federal] agent." (Govt. Mot. in Lim. at 32.) Specifically, Clanton "used the trappings of a federal law enforcement agent to make the victim believe that Clanton had a genuine search warrant and legal authority to enter the victim's residence" (Govt. Mot. in Lim. at 10), including a "fake search warrant, a bulletproof vest, handcuffs, a counterfeit law

enforcement [and] identification card[.]"  (Govt. Mot. in Lim. at 13.)  Indeed, "crimes requiring [such] planning or preparation bear more strongly on veracity" because of the "element of deceiving the victim."  *Estrada*, 403 F.3d at 618 (internal citation and quotation mark omitted).  Accordingly, the underlying factual circumstances of the 2008 Felony Convictions indicate a degree of dishonesty that weighs in favor of admission under the first factor, notwithstanding the general view that possession charges do not bear meaningfully on the credibility of a defendant's testimony.

The second factor, the date of the 2008 Felony Convictions weighs slightly in favor of admission as well.  Prior convictions that are less than ten years old are presumptively probative of credibility under Fed. R. Evid. 609(b).  *See United States v. Washington*, 746 F.2d 104, 106 (2d Cir. 1984).  Clanton was released from state custody in connection with the 2008 Convictions on July 13, 2016.  Because Fed. R. Evid. 609(b) only applies "if more than [ten] years have passed since . . . conviction or release from confinement, whichever is later[,]" the 2008 Convictions are less than ten years old and the more stringent balancing test required under Fed. R. Evid. 609(b) does not apply.  Older convictions within the ten-year limit prescribed by Fed. R. Evid. 609(b) still warrant admission although the jury "may properly consider the date of the

conviction[s] in determining" the impeachment value of the 2008 Felony Convictions.  Accordingly, the second factor weighs in favor of admission.  *Brown*, 606 F. Supp. 2d at 315.

Third, the degree of similarity between the 2008 Felony Convictions and the instant charged offenses weighs against admission.  The government concedes that "the 2008 conviction more closely resembles the charged crimes[.]"  (Govt. Mot. in Lim. at 32.)  Clanton is charged with unlawful gun possession under federal law, whereas one of the 2008 Felony Convictions involves a charge of unlawful gun possession, albeit under state law.  Importantly, the factual circumstances underlying the 2008 Felony Convictions, specifically Clanton's impersonation of federal law enforcement officials, bears striking resemblance to the alleged conduct in the instant offenses.  *See Brown*, 606 F. Supp. 2d at 314 ("the danger of unfair prejudice is particularly present where, as here, the prior conviction for [] possession 'involves precisely the same activity as the'" charged offense) (quoting *United States v. Joe*, No. 07-cr-734 (JFK), 2008 WL 2810169, at *4 (S.D.N.Y. July 21, 2008)).  Notwithstanding the fact that this degree of similarity, as it applies to the rather unique *modus operandi* attendant to the 2008 Felony Convictions and alleged in the instant case, weighs in favor of admission under the first factor, the similarity may prompt the jury to find that "that [Clanton] has a propensity to commit firearms

41

offenses" under the third factor. *Id.* The similarity between the charges, with respect to the weapons possession charge, further weighs against admission under the third factor.

The fourth and fifth factors, which relate to the centrality of Clanton's credibility and the importance of his testimony, respectively, will depend on whether Clanton testifies and the nature of Clanton's testimony and cannot be fully assessed by the Court at this time. *See Washington*, 746 F.2d at 106 ("Without adequate notification of what defendant's testimony will reveal, the trial judge cannot compare the relevance of the prior conviction to credibility with the importance to defendant's defense of having him testify free from . . . reference to" the conviction) (internal quotation marks and citation omitted).

Based on the foregoing considerations, the Court finds that, under the third factor, the similarity of the past and instant charged offenses may be unduly prejudicial under Fed. R. Evid. 403, although the first and second factors weighing slightly in favor of admission. If Clanton testifies at trial, the Court will likely preclude cross-examination regarding Clanton's 2008 Felony Convictions pursuant to Fed. R. Evid. 609(a). If Clanton opens the door to cross-examination regarding the government's allegation that he impersonated law enforcement officers by denying the prior convictions or the

impersonating conduct, the Court will likely permit the
government to cross-examine him regarding the 2008 Felony
Convictions, including the impersonating conduct underlying
those convictions because evidence of the 2008 Felony
Convictions will be highly probative of his credibility in such
a circumstance.  Nevertheless, the Court reserves ruling pending
additional information relating to the fourth and fifth factors.

### B. Clanton's 2009 Felony Conviction

With respect to Clanton's 2009 Felony Conviction for
assault, the Court has even less information at its disposal to
make a proper determination.

First, crimes of violence, like assault, rank low on the
scale of probative worth in terms of assessing credibility.  *See
Estrada*, 430 F.3d at 618.  The government notes that Clanton
perpetrated the assault underlying the 2009 Felony Conviction
while awaiting sentencing in a carceral setting.  The government
argues that the "stringent supervision" and "jail context" is
especially indicative of Clanton's willingness to break the law,
which bears more strongly on credibility than an assault charge
otherwise would.  *See Estrada*, 430 F.3d at 618 (noting that
violent crimes can have more significant "probative value [if]
they suggest the witness is willing to break the law when it
furthers his interests" by, for example, demonstrating an
element of "premeditation").  The Court agrees that the fact

43

that Clanton perpetrated the assault underlying the 2009 Felony Conviction while in custody awaiting sentencing on a prior conviction demonstrates a staunch defiance in the face of a court adjudication in his criminal proceeding that may bear on his credibility as a witness in this Court.  Accordingly, the Court finds that the first factor weighs slightly in favor of admission.

The Court has insufficient information to assess the second factor regarding the relevant date of the 2009 Felony Conviction.  Specifically, the Court cannot determine, based on the current record, whether Fed. R. Evid. 609(b) applies. Although Clanton was convicted more than ten years ago, he served a carceral sentence for the 2009 Felony Conviction for assault concurrently with the carceral sentence for the 2008 Felony Convictions for possession of drugs and a weapon. Clanton was ultimately released from prison on July 13, 2016. Clanton's term of incarceration in connection with the 2009 Felony Conviction had expired before his July 13, 2016 release date, but he continued to serve a period of incarceration in connection with the 2008 Felony Convictions and was ultimately released into the community on July 13, 2016.  The government relies on *United States v. Crumble,* No. 18-cr-32 (ARR), 2018 WL 2016852, at * 8 (E.D.N.Y. May 1, 2018) to support its argument that the relevant date for purposes of assessing the

applicability of Fed. R. Evid. 609(b), is July 13, 2016 because that is the date on which Clanton reentered the community following the 2009 Felony Conviction, notwithstanding the fact that his sentence for the 2009 Felony Conviction ended prior to his July 13, 2016 release date. (Govt. Mot. in Lim. at 33); *see Crumble*, 2018 WL 2016852, at * 8 ("the structure of the Federal Rules of Evidence suggest that the probative value of a conviction is affected by time spent in the community since a conviction, not the time since the conviction.") However, *Crumble* did not involve a similar factual circumstance wherein the defendant's release date, which would normally be used to calculate the relevant date for purposes of determining the applicability Fed. R. Evid. 609(b), did not correspond to the prior conviction at issue.

A similar set of facts was examined by a court in the District of Columbia, which ruled that Fed. R. Evid. 609(b) was applicable. In *United States v. Pettifor*d, 238 F.R.D. 33, 39 (D.D.C. 2006), the court considered whether the defendant's prior conviction for carrying a pistol without a license should be assessed under the more stringent balancing test required under Fed. R. Evid. 609(b). The defendant in *Pettiford* was sentenced to a one-year term of imprisonment in connection with the pistol charge, but his sentence was concurrent with a conviction for second-degree murder. As a result, the defendant

45

did not reenter the community until several years after the
conclusion of his sentence for the pistol charge.  Because of
the concurrent sentence, the defendant's date of release from
prison was fewer than ten years prior to the Court's assessment
of the applicability of Fed. R. Evid. 609(b), but the date on
which the defendant's sentence for the pistol charge concluded
was more than ten years prior.  *See Pettiford*, 238 F.R.D. at 39
("*but for* the contemporaneous second-degree murder while armed
plea, Defendant would have been released from imprisonment on
the pistol charge [earlier], which would have made the
conviction remote for the purposes of the Rule 609(b)
limitations period analysis.")  The Court examined the
legislative history of Fed. R. Evid. 609(b) and ultimately ruled
that "Defendant's contemporaneous . . . conviction, which
carried with it [a more] extensive sentence, cannot be used to
'piggyback' his [conviction] into the 10-year limitations period
set out in Rule 609(b)."  *Pettiford*, 238 F.R.D. at 40.

The Court applies the same analysis here.  The relevant
date, for purposes of calculating the applicability of Fed. R.
Evid. 609(b), shall be determined based on the date on which
Clanton's sentence for the 2009 Felony Conviction concluded, not
the date on which he was released from prison in connection with
his concurrent sentence.  Because neither Clanton nor the

government has proffered evidence of the relevant date, the Court cannot conclude whether Fed. R. Evid. 609(b) should apply.

Third, the dissimilarity of the 2009 Felony Conviction to the charges in the Indictment in this case weighs in favor of admission.  Clanton is not alleged to have committed assault in the instant case and the factual circumstances of the 2009 Felony Conviction – particularly the carceral setting – pose a low risk of confusing the jury or prompting an improper assumption about Clanton's proclivities or propensity.

As with the 2008 Felony Convictions, the Court has not been presented at this time with sufficient information about Clanton's anticipated testimony to assess the fourth and fifth factors.  Because the Court has insufficient information to assess the second, fourth, and fifth factors in connection with the 2009 Felony Conviction and because the applicability of Fed. R. Evid. 609(b) under the second factor is likely dispositive, the Court reserves ruling on the admissibility of evidence related to the 2009 Felony Conviction for purposes of cross-examination.  The Court further orders the government to provide information to the defense and to the Court regarding the relevant date of the 2009 Felony Conviction, if such information is in the possession of the government, by March 19, 2024. Relatedly, Clanton notes in his motion that the government has failed to disclose "any of the relevant materials (charging

47

documents, certificates of disposition, etc.)" regarding either the 2008 Felony Convictions or the 2009 Felony Conviction.  To the extent this is still the case, the Court orders that the relevant discovery be turned over if the government has access to the discovery.

### C. Dotson's Felony Convictions

The government seeks to admit evidence of Dotson's 1992 convictions for second degree murder in violation of N.Y.P.L. § 125.25(1), criminal possession of a weapon in the second degree in violation of N.Y.P.L. § 265.03, and criminal possession of a loaded firearm in the third degree in violation of N.Y.P.L. § 265.02(4) (the "1992 Felony Convictions") for purposes of cross-examination if Dotson chooses to testify.  The government argues that Dotson's 1992 Felony Convictions carry enough probative value to outweigh the risk of unfair prejudice under Fed. R. Evid. 609(a)(1) and Fed. R. Evid. 403.  As noted, Dotson does not object to the government's motion to admit evidence of his prior convictions for purposes of cross-examination.  Neither has Dotson indicated that he intends to testify at trial.  Accordingly, the Court reserves ruling on the government's motion with respect to Dotson's 1992 Felony Conviction because the government's motion as to Dotson's 1992 Felony Convictions may ultimately be moot.

48

### III. Clanton's Motion to Preclude Reference to Him as a "Convicted Felon"

Clanton argues that "there should be no use of the phrase[s]" "felony" or "convicted felon" and that the government should be precluded from referring to him as a "felon." (Def. Mot. in Lim. at 4.) Clanton argues that the term "'convicted felon' . . . connotes a bad and dangerous person" and may inspire misplaced fear and unfair prejudice in the jury. (Def. Mot. in Lim. at 4.) Instead, Clanton asks that the government be required to use the term "crime punishable by more than one year of imprisonment" in describing a felony offense. (*Id.*) Clanton's arguments regarding the word "felony," which defines an offense – not an individual, are unconvincing. The Court agrees with Clanton's argument that the term "convicted felon" should not be used to describe him. However, the government has represented that "it does not intend to refer to Clanton as a 'convicted felon[.]'" (Govt. Opp. at 14.) Accordingly, Clanton's motion in limine to preclude reference to him as a "convicted felon" is denied as **MOOT** and his motion in limine to preclude the government from using the word "felony" is **DENIED**. The same ruling applies to Dotson.

### IV. Clanton's Motion to Preclude License Plate Reader Results

Clanton asks the Court to preclude license plate reader results that have been produced by the government in the course of discovery on the grounds that the government has, thus far,

failed to provide notice of an expert that will explain the license plate reader results, pursuant to Fed. R. Crim. P. 16(a)(1)(G). (Def. Mot. in Lim. at 5.) Clanton contends that such notice is required because the interpretation of license plate reader results purportedly requires "scientific, technical, or other specialized knowledge" pursuant to Fed. R. Evid. 702 and *Daubert*. (*Id*.) Clanton also asserts that the summary reports provided by the government fail to explain how the computer program or analyst that produced the relevant records "reached the conclusion that the cars [depicted] belong to Mr. Clanton" or to describe "how the license plate reader works, what technology was used, or what level of confidence" can be ascribed. (*Id*.) The government confirms it intends to introduce license plate reader results through the testimony of a police officer to demonstrate the location of Clanton's and Dotson's vehicles during the time period of the alleged robberies. (Govt. Opp. at 15.) The government states that the testifying police officer will describe his review of the license plate reader results and explain that such records are automatically created and maintained in the ordinary course of business. (*Id*.)

As the government notes, Clanton's argument regarding the applicability of Fed. R. Evid. 702 is a novel one and is not supported by any case law within this Circuit. As to the one

case cited by Clanton, *Green v. City and Cnty. Of San Francisco*,
751 F.3d 1039 (9th Cir. 2014), Clanton appears to suggest that
the Ninth Circuit's description of the policies in place in San
Francisco to account for the reality that license plate readers
"occasionally make[] false 'hits'" in the context of traffic
stops calls into question the regular practice within courts in
the Second Circuit of admitting evidence of license plate reader
results in criminal trials without live, real-time confirmation
by a police officer or expert witness testimony.  The Court
respectfully disagrees.  To the extent Clanton seeks to contest
the accuracy of any particular license plate reader result, he
may do so upon cross-examination at trial.  Accordingly,
Clanton's motion in limine to preclude evidence of license plate
reader results is **DENIED**.

### V.   Clanton's Motion to Preclude Reference to "Victims"

Clanton argues that pursuant to Fed. R. Evid. 401 and 403,
the government should be precluded "from characterizing any
witness as a 'victim' at any point during the trial" because
"such a term assumes the guilt of Mr. Clanton."  (Def. Mot. in
Lim. at 6.)  Clanton further argues that the use of the term
"victim" would have the inevitable result of "inflaming the
passions of the jury," would "mislead[] and confuse" the jury,
and would cause the jury to assume guilt in violation of the
"presumption of innocence" to which Clanton is entitled at this

stage, all of which would "impermissibly shift the burden of proof to Mr. Clanton[.]" (*Id.*)

In response, the government argues that the term victim is not in and of itself unduly prejudicial and that the government should be permitted to advocate for a different view of the evidence as compared Clanton. (Govt. Opp. at 16.) The government notes that the Court is within its discretion to remind the jury that "arguments by counsel do not constitute evidence" and that the government's reference "to someone as a victim does not constitute evidence that a defendant has committed a crime." (*Id.*)

Both Clanton and the government cite to cases within this Circuit where courts have precluded or admitted reference to witnesses as victims. The varied rulings within the Circuit are indicative of the fact-specific nature of the inquiry. Clanton has not offered any explanation as to how the government's reference to witnesses as victims would prejudice him. Nor does Clanton provide support for his generalizations about the inevitable impact of the use of the term "victims" on the jury's determination of the specific facts of his case. No Court within this District has ruled that the use of the word "victim" is *per se* prejudicial. In each case cited by Clanton, the defendant convincingly argued that the nature of the alleged crime and the factual circumstances of the case warranted the

requested preclusion of the term "victim."  In both *United States v. Wagner*, No. 20-cr-410 (NSR), 2022 WL 19179, at *6 (S.D.N.Y. Jan. 3, 2022) and *United States v. King*, 2023 WL 3949122, at *7-8 (S.D.N.Y. June 12, 2023), the defendants argued that a particular witness should not be referred to as a victim because the defendants had not been charged with "a crime for which there is any identifiable victim" *Wagner*, 2022 WL 19179, at *6, and because reference to the alleged victim in each case might confuse the jury regarding the fact that the defendant was on trial only for possession.  In *United States v. Ray*, No. 20-cr-110 (LJL), 2022 WL 558146, at *26 (S.D.N.Y. Feb. 24, 2022), the Court acknowledged that "[e]ach case must be judged on its own facts" and ruled that reference to witnesses as victims, where the defendant's defense was that no crime had ever occurred, was improper.  Even in such circumstances, the court permitted reference to victims in jury addresses, noting that "the Government is permitted to lay out for the jury in its opening statement what it expects the evidence to prove, including that the complaining witnesses are victims and in its closing statement what it believes that the evidence has proved, [] that the witnesses are victims."  *Id*.

Here, Clanton has been charged with a number of crimes for which there are identifiable victims, unlike the defendants in *Wagner* and *King*.  *See Wagner*, 2022 WL 19179, at *6 (noting that

Courts permit use of the term "victim" in cases where
"Defendants were charged with crimes committed against a
person.")  Clanton has not indicated that he seeks to assert a
defense based on the assertion that the alleged victims are not
in fact victims of a crime.  Nor has Clanton not indicated that
he seeks to assert a defense based on his denial that any crime
has occurred as in *Ray*.  In fact, Clanton has not proffered any
facts or circumstances in his case that warrant the requested
ruling.  Given the possibility that a jury could simultaneously
find that Clanton is not guilty of the alleged charges, while
also believing that the alleged victims are in fact victims of a
crime, Clanton has not explained how the presumption of
innocence to which he is entitled is jeopardized by the use of
the term "victim."  Instead, Clanton essentially asks this Court
to issue a blanket ruling that the use of the word "victim"
inevitably results in a shift of the presumption of innocence,
an assumption of guilt, and inflamed passions among the jury.
The Court declines to do so.  Clanton's motion in limine to
preclude reference to witnesses as "victims" at any point in the
trial is **DENIED**.

**VI. Clanton's Motion to Preclude and the Government's Motion
to Admit Evidence of the January 20, 2023 Attempted Home
Invasion and the June 24, 2023 Attempted Home Invasion**

Clanton seeks preclusion of any evidence relating to the
uncharged January 20, 2023 Attempted Home Invasion and the

54

uncharged June 24, 2023 Attempted Home Invasion, which are outlined in the July 12, 2023 Warrant and the July 24, 2023 Warrants.  (Def. Mot. in Lim. at 6.)  Clanton argues that evidence of the January 20, 2023 Attempted Home Invasion and the June 24, 2023 Attempted Home Invasion constitutes impermissible character evidence, that the evidence is more prejudicial than probative, and that the evidence may confuse the jury given the "expected complexity of the trial."  (Def. Mot. in Lim. at 6.)

The government moves in limine to admit evidence of the uncharged offenses on the grounds that it constitutes relevant and direct evidence of the Hobbs Act robbery conspiracy and related 18 U.S.C. § 924(c)(1)(A) offenses charged in the instant Indictment.  (Govt. Mot. in Lim. at 14.)  The government argues that the evidence ties Clanton and Dotson to their respective phone numbers and vehicles, demonstrates a relationship between Clanton and Dotson, and establishes foreseeability with respect to the use of firearms in the course of the alleged conspiracy. (Govt. Mot. in Lim. at 14.)  In the alternative, the government further contends that evidence of the January 20, 2023 Attempted Home Invasion and the June 24, 2023 Attempted Home Invasion demonstrates knowledge, intent, motive, plan, identity, absence of mistake and lack of accident pursuant to Fed. R. Evid. 404(b)(2).

## A. Direct Evidence

District courts within the Second Circuit "follow an inclusionary rule, allowing the admission of" prior uncharged acts "for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the . . . balancing test of Rule 403[.]" *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994)).  This Court has "wide discretion in making this determination[.]" *Id*.  Indeed, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather it is part of the very act charged." *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992).

Evidence of the January 20, 2023 Attempted Home Invasion and the June 24, 2023 Attempted Home Invasion is relevant and admissible as direct evidence of the charged offenses and its probative value is not outweighed by the risk of prejudice.  The evidence from the attempted home invasions includes Clanton's alleged attempt to impersonate an individual that appeared to have lawful access to the victim's abode, which sets the stage for his use of the same alleged tactic to allegedly perpetrate the June 27, 2023 Attempted Robbery in Count Four of the Indictment.  The evidence also ties Clanton to the phone number alleged to have been used in connection with the charged

conspiracy by virtue of the U-Haul registration information used
to obtain the alleged getaway vehicle from the January 20, 2023
Attempted Home Invasion.  Similarly, the evidence ties Dotson to
the Dotson Number, by virtue of his admission to police
following the June 24, 2023 Attempted Home Invasion.  The
evidence also connects Clanton to the Clanton-Business BMW and
Dotson to the Dotson Mercedes, both of which were allegedly used
to carry out the uncharged and charged offenses.  Importantly,
the evidence also ties Defendants to one another and
demonstrates that Clanton and Dotson trusted each other and were
willing to work in concert to achieve mutually beneficial ends.
Finally, the evidence reflects Clanton's and Dotson's access to
weapons, which is, of course, a key feature of the charged 18
U.S.C. § 924(c)(1)(A) offenses.

Together, the evidence of the January 20, 2023 and June 24,
2023 Attempted Home Invasions can "inform the jury of the
background of the conspiracy charged[,] . . . help explain how
the illegal relationship between" Clanton and Dotson developed,
and "explain the mutual trust that existed between
coconspirators." *United States v. Rosa*, 11 F.3d 315, 334 (2d
Cir. 1993).  The use of the same telephones, vehicles,
participants, *modus operandi* regarding impersonation, and the
close timing of the uncharged acts, as compared to the incidents
charged in the Indictment, all strongly weigh in favor of a

determination that the January 20, 2023 Attempted Home Invasion and the June 24, 2023 Attempted Home Invasion are "inextricably intertwined with the . . . charged offense[s]" and constitute direct evidence of the charged offenses. *Carboni*, 204 F.3d at 44. Moreover, the timing of the January 20, 2023 Attempted Home Invasion and the June 24, 2023 Attempted Home Invasion, leading up to and during the conspiracy charged in Count One of the Indictment and just a few days before the incidents underlying Count Four of the Indictment, provide "crucial background evidence that [gives] coherence to the basic sequence of events that occurred" in connection with the incidents underlying the instant charges. *United States v. Gonzalez*, 110 F.3d 936, 941-42 (2d Cir. 1997).

Clanton's arguments relating to unfair prejudice are unpersuasive. The evidence is relevant and probative for the reasons stated previously. With respect to the risk of prejudice, where evidence of uncharged offenses does "not involve conduct more inflammatory than the charged crime, and the district court [gives] a careful limiting instruction," admission does not violate the Rule 403 balancing requirement. *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999). The January 20, 2023 Attempted Home Invasion and the June 24, 2023 Attempted Home Invasion reflect similar conduct as compared to the charged crimes and can by no means be considered "any more

sensational or disturbing than the crimes with which [the defendants are] charged." *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992)(internal citation omitted).

## B. Other Acts Evidence

Because the Court finds that evidence of the January 20, 2023 Attempted Home Invasion and the June 24, 2023 Attempted Home Invasion is admissible as relevant and direct evidence, the Court need not assess the same evidence under Fed. R. Evid. 404(b). Even so, evidence of the uncharged January 20, 2023 Attempted Home Invasion and the June 24, 2023 Attempted Home Invasions is admissible under Fed. R. Evid. 404(b).

Under Fed. R. Evid. 404(b), evidence of "any other crime, wrong, or act is not admissible to prove a person's character," but may be admitted for other purposes, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Courts in the Second Circuit follow an "'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004) (internal citation omitted). Notwithstanding the inclusionary approach, Fed. R. Evid. 404(b) may not be used by the government to "offer, carte blanche, any prior act of the defendant in the same category of crime." *United States v.*

*Garcia*, 291 F.3d 127, 137 (2d Cir. 2002).  Evidence of the uncharged acts may be admitted under Fed. R. Evid. 404(b) if the Court determines that "(1) the prior crimes evidence was 'offered for a proper purpose;' (2) the evidence was relevant to a disputed issue; (3) the probative value of the evidence was substantially outweighed by its potential for unfair prejudice pursuant to Rule 403; and (4) the court administered an appropriate limiting instruction."  *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (quoting *Huddleston v. United States*, 485 U.S. 681, 691-92 (2009)).

The Court finds that evidence of the January 20, 2023 and June 24, 2023 Attempted Home Invasions is relevant under Fed. R. Evid. 401, serves the purpose of establishing the existence and development of a relationship of trust between Dotson and Clanton, under Fed. R. Evid. 404(b)(2), and that the risk of prejudice does not substantially outweigh the probative value of the evidence under Fed. R. Evid. 403.

First, evidence of the uncharged acts is both relevant and probative.  As noted previously, the U-Haul registration information ties Clanton to the phone number alleged to have been used in connection with the charged conspiracy, Clanton Phone 1, as well as Clanton's email address and business address.  Dotson's admission to the police that the Dotson Phone is his phone is relevant to identifying both the co-conspirators

and the means used by the co-conspirators to facilitate the criminal conduct alleged in the charged offenses.  The evidence also connects Clanton and Dotson to their respective vehicles, the Clanton-Business BMW and the Dotson Mercedes.  The evidence further demonstrates a working relationship between Clanton and Dotson that was in full flux leading up to and during the charged Hobbs Act Conspiracy in Count One and within three days of the charged Attempted Hobbs Act Robbery in Count Four of the Indictment.

Second, Clanton's argument that evidence of the uncharged acts fails to show "depth, degree, or any evolution in [the Defendants'] supposed relationship" (Def. Opp. at 5), is belied by the evidence itself.  "The Second Circuit has repeatedly held that, in conspiracy cases, 'other acts' evidence is admissible as background information, to demonstrate the existence of a relationship of mutual trust, or to 'enable the jury to understand how the illegal relationship between the co-conspirators developed.'"  *United States v. Crumble,* No. 18-CR-32 (ARR), 2018 WL 2016852, at *3 (E.D.N.Y. May 1, 2018) (collecting cases).  Here, evidence of the January 20, 2023 and June 24, 2023 Attempted Home Invasions establishes the existence and development of a relationship of trust between alleged co-conspirators, Dotson and Clanton.  Specifically, the evidence connects Dotson and Clanton to each other, by virtue of their

61

cell phones and vehicles, in successive acts that reveal a continued working relationship.

Third, as noted previously, the probative value of evidence of the uncharged offenses is not substantially outweighed by the risk of prejudice because the uncharged offenses do "not involve conduct more inflammatory than the charged crime[.]" *Livoti*, 196 F.3d at 326.  Clanton points out that the January 20, 2023 Attempted Home Invasion involves the alleged discharge of a weapon, whereas the charged offenses involved the alleged brandishing, but not discharging, of weapons.  (Def. Opp. at 4.) According to Clanton, this feature makes the uncharged offenses more sensational than the charged offenses.  (*Id.*)  The Court finds that the alleged discharge of the gun as well as the use of the gun to strike the alleged victim during the January 20, 2023 Attempted Home Invasion does present a slightly higher risk of prejudice, but the uncharged acts are still largely similar to the charged offenses and the highly probative value is not substantially outweighed by the risk of prejudice.  Moreover, the Court will administer an appropriate limiting instruction to prohibit the jury from considering evidence of the uncharged acts as evidence of the Defendants' character or propensity such that any risk of prejudice is further mitigated by the limiting instruction.

Finally, Clanton's evidence regarding proper notice under Fed. R. Evid.404(b)(3) are moot in light of the government's notice of its intention to proffer evidence of the uncharged acts by virtue of the government's motion in limine.

Accordingly, the Court finds that evidence of the uncharged January 20, 2023 and June 24, 2023 Attempted Home Invasions is admissible as direct evidence of the charged conspiracy and as other acts evidence under Fed. R. Civ. P. 404(b). Clanton's motion in limine to preclude evidence related to the January 20, 2023 and June 24, 2023 Attempted Home Invasions is **DENIED** and the government's cross-motion to admit such evidence is **GRANTED**.

## VII. Clanton's Motion to Preclude Records from his Prior Incarceration

Clanton moves to preclude any evidence or records relating to his prior New York State terms of incarceration. (Def. Mot. in Lim. at 6-7.) Clanton argues that records relating to his prior terms of incarceration are not relevant to any material issue of fact, are substantially more prejudicial than probative, and constitute impermissible character evidence pursuant to Fed. R. Evid. 401, 403 and 404(b). (*Id.*) He also notes that the government has not, as of the date of his motion, provided notice of its intent to introduce any such evidence pursuant to Fed. R. Evid. 404(b). (*Id.*) Clanton contends that "the jury may improperly consider his prior incarceration history in making a determination about whether the government

63

has met their burden to prove the charges in this case" and that
the records in question contain impermissible hearsay, including
information relating to Clanton's educational background,
employment, visitor logs, mail records, summaries of
communications, disciplinary records, and medical evaluation
information, including personally identifying information.
(*Id.*)  Apart from the introduction of evidence of the 2008
Felony Convictions and the 2009 Felony Conviction for purposes
of impeachment and upon which the Court has reserved ruling, the
government does not appear to seek admission of other evidence
of Clanton's prior convictions or terms of incarceration at this
time.  Accordingly, Clanton's motion to preclude evidence or
records relating to his prior New York State terms of
incarceration is denied as **MOOT**.

## VIII.  Clanton's Motion to Preclude Witness Testimony without Sufficient Expert Notice

At the time of Clanton's motion, neither party had provided
a witness list, including to identify whether any expert
witnesses would be called at trial.  Neither had the deadlines
in the Court's Pre-Trial Scheduling Order yet lapsed to submit a
witness list.  *See* (ECF No. 48.)  The Court notes that on
repeated occasions (Oct. 25, 2023 Min. Entry; Dec. 14, 2023 Min.
Entry), the parties jointly requested extensions of the Pre-
Trial Scheduling Order (ECF No. 68) because they were engaged in
plea negotiations.  Now that the government has proffered a

witness list identifying an expert witness (ECF No. 61),
Clanton's motion in limine to preclude witness testimony without
notice is denied as **MOOT**.

### IX.  The Government's Motion to Admit Evidence from Dotson's Cell Phone

The government seeks to admit evidence obtained from the
Dotson Phone, which was seized pursuant to Dotson's arrest, and
which was searched pursuant to the July 12, 2023 Search Warrant.
(Govt. Mot. in Lim. at 24-27.)  Dotson has not opposed the
government's motion.  The government notes that Dotson exchanged
text messages with a contact called "Tone" who the government
expects to prove is Clanton, and with Clanton Phone 2, which is
saved as "Tone 2" in the Dotson Phone.  (Govt. Mot. in Lim. at
10.)  According to the government, the text messages reflect
Clanton's and Dotson's efforts to plan a robbery.

As an example of the alleged planning of a robbery via text
message, the government points to a January 2022 text exchange,
which predates the charged offenses, wherein "Clanton referred
to a 'nice mix I'm lining up' 'in the Bronx' that would involve
'like 400,000 cash Rolex's [sic] and bricks'" to which Dotson
responded "'U know u can count on me!', 'I'll lay down whoever
needs to be laid down!'"  (Govt. Mot. in Lim. at 10.)  Dotson
stressed, "'I need to do something now, I'm on E and insurance
is due in a few days! [emojis].'"  (*Id.*)  In another example,
the government refers to a July 15, 2023 text exchange, which

occurred during the timeline of the Hobbs Act Conspiracy alleged in Count One of the Indictment, wherein Dotson texted Tone 2 that he "sent a video showing a theft from a Brinks truck and wrote, '3days [sic] ago 6.8 million cash brinks truck [emoji]' [and] Dotson responded, 'That's an inside job', 'For sure', 'With those jump offfs [sic], we can do it'".  (Govt. Mot. in Lim. at 11.)  In a third example that the government describes for the first time in its reply brief, Dotson is alleged to have engaged in a text message with a victim referred to as "Victim-3" for the purpose of enticing Victim-3 to obtain money for a prospective car sale, when in fact Clanton and Dotson allegedly conspired to rob Victim-3 of the funds that Victim-3 obtained for the car purchase.  (Govt. Reply at 10-11.)  The government does not specify the date of the text exchange in its third example.

The government argues that all of the proffered statements from the Dotson Phone, including, but not limited to the three examples described in its motion, are admissible either because they are not hearsay or because, if the statements are hearsay, one or more of several applicable hearsay exceptions apply. (Govt. Mot. in Lim. at 24.)  In particular, the government points to the hearsay exception for "statements made by the defendant . . . when introduced . . . to prove the truth of the facts stated therein" pursuant to Fed. R. Evid. 801(d)(2)(A),

the exception for "hearsay statements 'made by a party's co-conspirator . . . during and in furtherance of the conspiracy under Fed. R. Evid. 801(d)(2)(E), and statements offered for their truth which are not hearsay. (Govt. Mot. in Lim. at 25-26.)

In response, Clanton argues that statements obtained from the Dotson Phone constitute impermissible hearsay, none of which were made in furtherance of a conspiracy. Clanton contends that the examples of text exchanges that the government seeks to admit are nothing more than "casual conversation" and "idle chatter" that do not rise to the level of furthering a conspiracy. (Def. Opp. at 8) (citing *United States v. Lieberman*, 637 F.2d 95, 103 (2d Cir. 1980)). Clanton further notes that the government's examples lack sufficient "context" which "makes it impossible to determine their meaning." (Def. Opp. at 9.)

With respect to text messages from the Dotson Phone that involve statements made by Clanton, the Court is likely to admit such evidence because they are not hearsay pursuant to Fed. R. Evid. 801(d)(2). However, the Court must also undergo a balancing analysis of the relevance and the probative value of the text messages as compared to the prejudicial effect. *See* Fed. R. Evid. 401, 403. The Court cannot definitively determine the admissibility of the text messages from the Dotson Phone

because the government has failed to provide the actual text messages it seeks to admit.  To that end, the Court agrees with Clanton that the government has not provided sufficient contextual information to facilitate the Court's review.  Accordingly, the Court reserves ruling on the admissibility of statements obtained from the Dotson Phone and orders the government to provide the Court and the defense with a copy of the text exchanges and other content from the Dotson Phone which it seeks to admit by March 19, 2024.

**X.   The Government's Motion to Preclude Reference to Possible Punishment**

The government seeks preclusion of evidence or argument concerning the possible punishment or collateral consequences if Clanton is convicted.  (Govt. Mot. in Lim. at 27-29.)  Clanton asks this Court to reserve ruling on this issue until trial and notes that the Court has discretion to instruct the jury on possible punishments.  (Def. Opp. at 6-7.)

It is axiomatic that "juries are not to consider the consequences of their verdicts" and must undertake their duties as triers of fact without regard for the sentences that may be imposed by the Court following a determination of guilt. *Shannon v. U.S.*, 512 U.S. 573, 579 (1994) ("The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor between the judge as sentencer and the jury as trier of fact.")  Clanton asks the

68

Cour to "reserve ruling on this issue until trial" so that the Court can exercise its "discretion to instruct the jury on possible punishments." (Def. Opp. at 6-7.) In "some, albeit limited, circumstances, it may be appropriate to instruct the jury regarding [possible] consequences" of a conviction to remedy a misstatement or error. *United States v. Polouizzi*, 564 F.3d 142, 161 (2d Cir. 2009). Clanton, however, has not offered any reason "why this case would fall into the unusual circumstance where it would be" appropriate for the Court to instruct the jury as to possible punishment. *U.S v. Almonte*, 638 F. App'x 71, 73 (2d Cir. 2016). Nor can the Court conceive of any such reason under the present circumstances.

As with all in limine rulings, if a change in circumstances call for the Court to revisit its prior rulings, the Court may do so. *See United States v. Perez*, No. 09-cr-1153 (MEA), 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) ("Because a ruling on a motion *in limine* is 'subject to change as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial.") (internal citation omitted). However, the Court has provided the parties the opportunity to assert their positions with respect to their motions. Moreover, the parties will have an opportunity to weigh in on jury charges at the charging conference. At the present time, however, Clanton has failed to provide any evidence or argument that compels this

Court to exercise its discretion in order to depart from the long-established precedent in this Circuit and elsewhere with respect to possible punishment.  Accordingly, the government's motion in limine to preclude evidence or arguments regarding possible punishment or collateral consequences of a conviction is **GRANTED**.

**XI.  The Government's Motion to Preclude Identification of Clanton in the Dismissed July 24, 2023 Complaint**

As previously noted, on July 28, 2023, the government moved to dismiss the July 24, 2023 Complaint after the FBI Agent-Affiant shared with prosecutors that "after seeing Clanton in person and upon further review of the evidence, a person who had been identified in the complaint as Clanton may possibly be another person."  (Govt. Mot. in Lim. at 11-12.)  The government states that as of the date of its motions in limine, it "does not intend to call the [FBI Agent-Affiant] who swore to the July 24, 2023 complaint to testify at trial."  (Govt. Mot. in Lim. at 12.)  The government argues that Clanton should be precluded from referencing the fact that he was potentially misidentified in the dismissed July 24, 2023 Complaint on the basis that any such reference "has no relevance or probative value and has great potential for prejudice[.]" (Govt. Mot. in Lim. at 29.)  With respect to relevance, the government notes that it "expects the evidence to establish that Clanton participated in the robbery without being physical present inside the" Annadale

70

Smoke Shop on June 2, 2023 such that the fact that someone once believed one of the gunmen inside the smoke shop was Clanton does not make Clanton's "guilt any more or less likely."  (*Id.*) Moreover, the government argues that because the FBI Agent-Affiant will not be called to testify, evidence of the misidentification in the July 24, 2023 Complaint is not relevant to any witness's credibility.  (*Id.*)

Clanton argues that "[e]vidence that the [FBI Agent-Affiant], the sole affiant for every search warrant, the criminal complaint, and the arrest warrant, misidentified Mr. Clanton is clearly relevant evidence to the trial."  (Def. Opp. at 6.)  The Court agrees with Clanton's statements about the importance of cross-examination in assessing the credibility of a witness and in exposing a testifying witness's potential biases, (Def. Mot. in Lim. at 6) (citing *Davis v. Alaska*, 415 U.S. 308, 316 (1974)), but those considerations are inapplicable in the instant case because there is no testifying witness to confront.  The government has repeatedly stated that it does not intend to call the FBI Agent-Affiant witness.  (Govt. Mot. in Lim. at 12; Govt. Reply at 6.)  If the government were to call the FBI Agent-Affiant as a witness, Clanton would be entitled to confront her on cross-examination regarding the misidentification in the dismissed July 24, 2023 Complaint. Otherwise, Clanton is precluded from raising the

misidentification in the July 24, 2023 Complaint in the abstract
in order to make a generalized argument about a Complaint that
has long been dismissed and that is not at issue.  Accordingly,
the government's motion in limine to preclude reference to the
possible misidentification in the July 24 2023 Complaint is
**GRANTED**.

## XII. Clanton's Motion to Exclude the Government's Expert Witness

On December 11, 2023, the government submitted notice of
its intent to call an expert witness, FBI Special Agent John
Hauger ("SA Hauger"), to testify regarding "historical cell site
and location data analysis[.]"  (ECF No. 61 at 2.)  On January
25, 2024, the government submitted supplemental expert
disclosure describing SA Hauger's anticipated testimony
regarding "T-Mobile timing advance records."  (ECF No. 74-3,
Mot. to Excl. Ex. C, "Govt. Supplemental Discl." at 2.)

Subsequently, Clanton submitted a motion to exclude SA
Hauger's testimony in its entirety or to request a hearing
pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579
(1993), on the basis that the government's notice is
insufficient pursuant to Fed. R. Crim. P. 16 and because the
government has purportedly failed to meet its burden of
establishing admissibility under *Daubert*.  *See generally* (Mot.
to Excl.)  Clanton asks this Court to preclude historical "Cell
Site Location Information" ("CSLI") and to exclude timing

advance records ("TAR"), as well as SA Hauger's testimony and report regarding his analysis of the historical CSLI and TAR in this case.[9]  (*Id.*)

## A. Fed. R. Crim. P. 16 Notice Requirement

Fed. R. Crim. P. 16(a)(1)(G)(iii) requires that the government proffer a written summary of (1) the "opinions that [it] will elicit from the [expert] witness" as well as (2) "the bases and reasons for them" and (3) the witness's qualifications, including both the expert's prior publications within the last ten years and a list of any other cases in connection to which the witness has offered testimony in the last four years.  Fed. R. Crim. P. 16(a)(1)(G)(iii).

Clanton argues that the government's original notice on December 11, 2023 and supplemental disclosures on January 25, 2024 fail to provide sufficient notice under Fed. R. Crim. P. 16(a)(1)(G)(iii) because the government's disclosures do not "provide [Hauge's] opinion or any conclusions that he drew" and because the government's disclosures do not describe the bases and reasons for SA Hauger's testimony by virtue of the fact that

---

[9] Clanton distinguishes Cell Site Location Information ("CSLI"), which he describes as "showing the towers and sectors that [an individual's] cell phone connect[s] with," from "timing advance records" ("TAR"), which Clanton alleges "purport to show the precise distance of the phone from the tower based on the time it took for the cell phone's signal to travel to the tower and back."  (Mot. to Excl. at 2.)

there is no identification of "any method, test, or technique
[that] Hauger used to assess the cell site and location data[.]"
(Mot. to Excl. at 5.)

### 1. Summary of SA Hauger's Testimony

Clanton's argument regarding the government's purported
failure to "provide any description of [SA] Hauger's opinions[]"
is belied by the record.  (Mot. to Excl. at 5.)  Clanton
contends that SA "Hauger's PowerPoint report fails to describe
any of his opinions" and that the government's "generic
description of [SA Hauger's] proposed testimony" makes it
impossible for Clanton to challenge Hauger's testimony[] or
cross-examine him.  (Mot. to Excl. at 5-6.)

Contrary to Clanton's contentions, the government has
provided a detailed visual depiction of SA Hauger's analysis and
conclusions, including the location of the Dotson Phone, Clanton
Phone 1, and Clanton Phone 2 during the relevant time periods;
as well as the cell site coordinates used to compile the
relevant evidence; and defined terms, shading, and color
coordinates to identify SA Hauger's conclusions and the
corresponding technical analysis from which those conclusions
were derived.  *See e.g.* (ECF No. 74-1, Mot. to Excl. Ex. A, "SA
Hager Report" at 8-9) (explaining that "[t]he shaded arc
demonstrates the Timing Advance access distance and illustrates
the general area [in which] the cellular telephone was

located.")  Moreover, the government's disclosures explain that SA Hauger "will testify regarding his historical cell site and location data analysis" including explaining how cellular technology works, how cell sites operate, how cell phones connect to cell sites, how call detail records reflect cell phone usage, and how call detail records are created and maintained.  (ECF No. 61 at 2.)

The government's expert notice further states that SA Hauger will "identify the particular areas, times, and usage of cellular devices relevant to this case" which is further depicted visually in the expert report.  (*Id.*)  The government's supplemental disclosure states that SA Hauger will "testify regarding T-Mobile timing advance records," including to explain what TAR is, how TAR is used by all cellular providers, how TAR is used within different areas of law enforcement, and how TAR "measurements have proven accurate[.]"  (Govt. Supplemental Discl. at 3.)

Clanton's assertion that the maps prepared by SA Hauger are not accompanied by any explanation of "what the maps mean, what conclusions, if any, [Hauger] drew from the maps, or [Hauger's] degree of confidence in those opinion . . . [or] how the maps were created" is undermined by the government's provision of two written disclosures.  The government's disclosures describe SA Hauger's anticipated testimony and methodology, the government's

identification, by Bates number, of the underlying records on which SA Hauger relied, and the fact that the maps themselves depict SA Hauger's conclusions, which are visual in nature and show the estimated locations of the Defendants' cell phones at various points relevant to this case.   (Mot. to Excl. at 6.) *See United States v. Ramsey*, No. 21-cr-495 (ARR), 2023 WL 2523193, at *17 (E.D.N.Y. Mar. 15, 2023) ("As for the opinions that [the expert witness] will testify to, the PowerPoint presentation contains his conclusions, which are visual estimations of where the cell phones associated with [the defendants] were during times relevant to this case.")

Accordingly, the Court finds that the government's December 11, 2023 and January 25, 2024 written disclosures, combined with the government's production of SA Hauger's maps, provide adequate notice of SA Hauger's opinion that far exceeds "general topics about which the expert will testify." *United States v. Ray*, No. 20-cr-110 (LJL), 2022 WL 101911, at *5 (S.D.N.Y. Jan. 11, 2022) (internal quotation marks and citation omitted)(confirming that notice of historical CSLI analysis was sufficient where the government's disclosures "indicate[d] what wireless devices the expert [would] reference and the cell sites with which those devices communicated at the relevant times[]" and where the government's provision of "maps . . . [revealed]

76

whether wireless devices were in geographic proximity to one another.")

### 2. Bases and Reasons for SA Hauger's Testimony

The government's disclosures regarding the bases and reasons for SA Hauger's testimony are also sufficient.  Clanton argues that SA Hauger did not confirm whether he employed "[d]rive tests and performance analysis tests" in connection with his analysis and that "[t]here is no record of [SA Hauger's] documentation of any of the topography, how he took into account the weather of the day, . . . the traffic in the area, or . . . any service changes or outages during the relevant times."  (Mot. to Excl. at 7.)  Clanton further argues that the government's notice "does not describe any method, test, or technique [SA] Hauger used to assess the cell site and location data[.]"  (Mot. to Excl. at 5.)

The SA Hauger PowerPoint explains that the records on which SA Hauger relied to create maps depicting the approximate location of Dotson Phone, Clanton Phone 1, and Clanton Phone 2 "document[s] the network interaction to and from the target" phones, "document[s] the cell tower and cell sector," and "estimate[s] distance from the tower" in the case of TAR.  (SA Hauger Report at 3.)  SA Hauger further explains that the underlying data which is "input into mapping software using latitude/longitude coordinates of the cell sites" is provided by

"the National Domestic Communications Assistance Center."  (SA Hauger Report at 3, 8.)  In conjunction with a visual depiction of location estimates based on TAR, the government's expert disclosures explain what TAR is and how TAR works.  (*Id.*)  As noted by the government, the PowerPoint further shows "which cell towers and which cell sectors the [Dotson Phone], [Clanton Phone 1], and [Clanton Phone 2] connected to at various times . . . and the locations of other cell towers, to which the defendant's phones did not connect during the relevant time periods."  (Opp. to Excl. at 5) (citing SA Hauger Report at 4-6, 8-11.)  The Court finds that SA Hauger's maps and the government's expert disclosures, which describe SA Hauger's methodology, adequately identify the bases and reasons for SA Hauger's conclusions.

### 3. SA Hauger's Qualifications

Finally, Clanton argues that the government "fail[ed] to establish [SA Hauger's] qualifications to specifically testify regarding the 'timing advance' technique[.]"  (Mot. to Excl. at 5).  The Court is satisfied that SA Hauger is exceptionally qualified to testify as to both historical CSLI analysis and TAR.  SA Hauger has been an FBI Special Agent for nearly 16 years.  (Opp. to Excl. at 6.)  According to his resume, SA Hauger is "[c]urrently assigned to the Cellular Analysis Survey Team ["CAST"] as a National Asset."  (ECF No. 85-2, "SA Hauger

Resume" at 2.)  SA Hauger has also been qualified "as an expert witness in historical cell site analysis in both State and Federal Court over 135 times."  (*Id.*)  With respect to TAR in particular, SA Hauger testified before the New Jersey Superior Court that he "received a half-day of training from NetScout, T-Mobile's[10] developer for their Timing Advance system, regarding (1) how their system, True Call, works; (2) what their system is capable of collecting; and (3) what data is given to law enforcement."  (ECF No. 85-1, "N.J. M&O" at 20.)  Finally, SA Hauger has also served as an instructor, conducting "roughly 50 to 60 courses in his career[,]" including a basic two-day class and an advanced class as part of the certification process for CAST (N.J. M&O at 20), which has been attended by over "3,000 law enforcement officers."  (SA Hauger Resume at 3.)  Moreover, "FBI CAST Agents, such as [SA Hauger], are trained yearly by cell phone providers . . . and at least one engineer and a subpoena compliance person from the cellular phone company train agents on their networks[.]"  (N.J. M&O at 25.)

In light of SA Hauger's resume, the government's description of SA Hauger's qualifications, SA Hauger's substantial record of testimony on the topics at issue here, and SA Hauger's testimony regarding his training before a New Jersey

---

[10] Service to each of the three subject phones, the Dotson Phone, Clanton Phone 1, and Clanton Phone 2, is provided by T-Mobile.  (Mot. to Suppress, Ex. A ¶ 26.)

state court in *State of New Jersey v. Wright, et al.*, No. 21-03-468-I (N.J. Sup. Ct. Essex Cnty. 2023), the Court is satisfied that SA Hauger is qualified to testify regarding historical CSLI analysis and TAR analysis.

**B. Fed. R. Evid. 702 and *Daubert* Analysis**

In determining whether to admit expert testimony at trial, Fed. R. Evid. 702 requires that the Court consider whether "[1] the expert's . . . knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; [2] the testimony is based upon sufficient facts or data, [3] the testimony is the product of reliable principles and methods, and [4] the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The United States Supreme Court set forth a non-exhaustive list of factors to evaluate the reliability of scientific expert testimony in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Those factors include: (1) whether the evidence "can be (and has been) tested[]" or challenged, (2) whether "the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error" and the "existence and maintenance of standards controlling the technique's operation," and (4) whether there is general or widespread acceptance of the theory or technique among the relevant scientific or technical community. 509 U.S. at 593-95.

80

The Supreme Court and the Second Circuit have repeatedly emphasized that the *Daubert* test is "a flexible one." *Daubert*, 509 U.S. at 594.  Moreover, "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999); see also *United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) ("While the gatekeeping function requires the district court to ascertain the reliability of [an expert's] methodology, it does not necessarily require that a separate hearing be held to do so.")  The role of the district court is to serve a "gatekeeping" function to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  "The flexible *Daubert* inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Id*. at 267.

Notwithstanding the broad discretion afforded to the district court in determining admissibility of expert testimony, the district court's discretion "is not unfettered." *Williams*, 506 F.3d at 160.  Ultimately courts are only to exclude evidence if flaws in the expert's reasoning or methodology are "large

enough that the expert lacks 'good grounds' for [the expert's] conclusions.  This limitation . . . accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267 (internal citation omitted).

### 4. Historical CSLI Analysis

As an initial matter, Clanton concedes that "historical CSLI has been admitted in numerous cases, often without a formal *Daubert* hearing[,]" but he argues that because neither the Supreme Court nor Second Circuit has specifically ruled that a hearing is not required, this Court should rule against the weight of our sister courts and either require a hearing or reject the evidence all together.  (Mot. to Excl. Reply at 2.) Indeed, district courts throughout this Circuit and nationwide have routinely admitted testimony regarding historical CSLI analysis.  *See United States v. Daskal*, No. 21-cr-110 (NGG), 2023 WL 9424080, at *15 (E.D.N.Y. July 12, 2023) ("A *Daubert* hearing is not . . . needed to explore the reliability of historical cell site data analysis."); *United States v. Belloisi*, No. 20-cr-219 (DLI), 2023 WL 2716551, at *2 (E.D.N.Y. Mar. 30, 2023) ("a *Daubert* hearing is unnecessary because the admissibility of cell site testimony is relatively non-controversial at this point"); *United States v. Powell*, No. 21-

cr-572 (EK), 2022 WL 4451389,at *2 (E.D.N.Y. Sept. 23, 2022)
("the admissibility of cell-site testimony is, as the government
argues, relatively non-controversial . . . [and any alleged]
limitations are properly raised in cross-examination, rather
than as a basis for exclusion").  The consensus among courts
that historical CSLI is reliable is wide, longstanding, and
amply supported.  As such, the Court takes judicial notice of
the broad consensus among the courts that historical CSLI is
reliable.  *See United States v. Jakobetz*, 955 F.2d 786, 799 (2d
Cir. 1992) ("[I]n [] cases with a similar evidentiary issue, a
court [may] properly take judicial notice of the general
acceptability of the general theory and the use of these
specific techniques.")

Moreover, Clanton raises the same arguments — (1) that
cellphones don't always connect to the closest cell tower and
(2) that factors such as topography, weather, population
density, and the technical characteristics of each cell tower
may affect the strength of the signal and the corresponding
accuracy of historical CSLI — that have been repeatedly reviewed
and rejected in the face of similar requests for a generalized
preclusion of historical CSLI analysis.  *See United States v.
Rosario*, 09-cr-415 (VEC), 2014 WL 6076364, at *2 (S.D.N.Y. Nov.
14, 2014) (the defendant "asserts that Agent Hauger's method is
premised on the assumption that a cell phone will always connect

83

to the tower closest to it . . . . This precise argument has been considered and rejected"); *United States v. Fama*, 12-cr-186 (WFK), 2012 WL 6102700, at *4 (E.D.N.Y. Dec. 10, 2012) (the defendant "lists a variety of factors that purportedly can impact the communication of a cellular phone and a particular cellular tower, stating that there is no evidence presented that the government has even considered these various factors . . . [but] these concerns go [to] the weight of [the expert's] testimony, not the reliability[]" of the proposed testimony) (internal quotation marks and citation omitted).

The Court agrees that such arguments go to the weight of the evidence, not admissibility.  The Supreme Court noted in *Daubert* that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" challenged evidence.  *Daubert*, 509 U.S. at 596.  Here, Clanton may raise his arguments regarding the factors that can affect the accuracy of historical CSLI during cross-examination of SA Hauger, or upon direct examination of Clanton's own rebuttal expert, should he choose to call one.  *See* Ray, 2022 WL 101911, at *7 (ruling that the defendant's concerns that the government's expert witness's methodology may be "unreliable because it does not take into account the effect of certain characteristics . . . including the surrounding water, the

density, and the complexities in coverage . . . go to the weight

to the expert's testimony and not to its admissibility.");

*Rosario*, 2014 WL 6076364, at *2 (the "vagaries of cell phone

technology affect the persuasiveness of the circumstantial

evidence, but they do not render [Agent Hauger's] testimony

inadmissible.")

### 5. TAR Analysis

With respect to the government expert's TAR analysis,

Clanton argues that the government has failed to meet its burden

of establishing admissibility under *Daubert* and that the

relative novelty of the TAR technique warrants exclusion.

Clanton argues that the exercise of this Court's discretion to

admit TAR analysis without a formal *Daubert* hearing would

constitute an "abandonment of the Court's gatekeeping role."

(Mot. to Excl. Reply at 3.)

With respect to the first *Daubert* factor, Clanton argues

that TAR is "completely untested" because the accuracy of the

"estimated distance measurement calculated by the timing advance

system . . . is based on a proprietary algorithm."  (Mot. to

Excl. at 14-15.)  Clanton's argument is directly contradicted by

SA Hauger's previous testimony and the ruling of the New Jersey

state court in *Wright*, which this Court finds persuasive.  (N.J.

M&O at 24) ("It is a common misconception . . . that the

methodology used to calculate Round-Trip Time ("RTT")[11] and the Timing Advance Records is proprietary" when in fact such information "is in the public domain.")  The court in *Wright* reasoned that the FBI's field tests "us[ing] the distance-to-tower measurement to locate the phone within the approximate location – utilizing T-Mobile's [TAR] . . . is the scientific testing method."  (N.J. M&O at 25.)  As noted by the court in *Wright*, "*Daubert* does not require a specific type of scientific or mathematical testing of the methodology."  (*Id.*)  The *Wright* court further cited T-Mobile's business incentive to ensure that "Timing Advance Records [are] accurate and reliable in order for the cellular phone company to provide quality service to their customers."  (N.J. M&O at 25.)

Courts in this Circuit have considered the business interest of a cellphone company to maintain accurate and reliable data as a factor weighing in favor of a determination that the relevant evidence is reliable and admissible.  *See Ray*, 2022 WL 101911, at *7 (because "the providers have a financial interest in the[] accuracy" of the underlying data, there is no reason to question their reliability.")

---

[11] The court explained that TAR works by estimating the distance of a cell phone vis-à-vis a cell tower or cell site based on a "measurement [that] is calculated by the time that it takes to indicate a signal from the tower to the phone and back to the tower" which the court refers to as "the Roundtrip time ('RTT')".  (N.J. M&O at 24.)

Second, Clanton argues that "a single published study concerning timing advance" does not constitute sufficient peer review.  (Mot. to Excl. at 16.)  Clanton raises the concern, with respect to TAR, that SA "Hauger has not peer reviewed this 'suite of tools' or done anything to verify whether the data kept by T-Mobile is accurate."  (Mot. to Excl. Reply at 5.)  The Court notes, at the outset, that publication "is not a *sine qua non* of admissibility" particularly when a theory is "well-grounded but innovative[.]"  *Daubert*, 509 U.S. at 593.  This flexibility in how courts are permitted to assess the peer review and publication factor is especially warranted where a particular technology cannot easily be peer reviewed or subject to publication because of the nature of its use (i.e. the technology is only available to its corporate owners and to law enforcement).

Moreover, Clanton's assertions regarding the accuracy of the underlying T-Mobile data go to the weight of the evidence, not its admissibility.  *See Ray*, 2022 WL 101911, at *7 ("As to the accuracy of the underlying data, the facts and data underlying [the expert's] testimony comes from service providers and is maintained by those providers in the ordinary course of their business for billing purposes . . . [such that] there is no reason to question their reliability.")  This Court agrees with the New Jersey state court in *Wright* that the independent

review of any TAR analysis by a different CAST member constitutes sufficient peer review under these circumstances. *See* (N.J. M&O at 29.)  In any case, the publication that Clanton references confirms the reliability of TAR.  (N.J. M&O at 36) ("The publication states one of the best practices to improve accuracy is to 'use the methodology currently employed by the FBI's CAST team, showing sector antenna locations and orientations on maps instead of coverage estimates.'")

Clanton argues that the third factor, whether there is a known or potential rate of error, also warrants preclusion. Specifically, Clanton states that "T-Mobile does not provide an error rate for its timing advance data" and that the "Low" to "Medium" to "High" confidence levels that T-Mobile does provide should not be considered a system of error rates[.]"  (ECF No. 74 at 18.)  The Court is satisfied that T-Mobile's confidence level rating system indicates "the existence and maintenance of standards" that govern TAR analysis and results in "a known or potential rate of error."  *Daubert*, 509 U.S. at 594.  As noted previously, "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142.

Fourth and finally, Clanton argues that because TAR is a relatively new technology and because there are "no federal

cases permitting such testimony," it cannot be concluded that there is either general or widespread acceptance of the technology.  (Mot. to Excl. at 19.)  However, cell phone service providers from T-Mobile to Sprint to Verizon all use TAR "to optimize, troubleshoot and fix their network[.]"  (N.J. M&O at 23.)  The maintenance of TAR by service providers "for business reasons and the . . . incentive [that service providers have] to ensure its accuracy" are also indicative of widespread acceptance in the relevant technological community.  (Opp. to Excl. at 16.)  Moreover, "the FBI and other law enforcement agencies across the country use [TAR] to track the general location of a phone," including to support efforts to locate fugitives, missing children, and victims of kidnapping, as well as to exonerate suspects.  (N.J. M&O at 23.)  As noted by the court in *Wright*, TAR analysis "ha[s] been the subject of (1) expert testimony, from Special Agent Hauger, other special agents and other law enforcement officers; (2) authoritative articles, which Defense counsel even uses in their brief and peer-review publication, which [the] Defense expert [] relied on; and (3) numerous judicial opinions across the United States."  (N.J. M&O at 33-34) (collecting cases).

  **ii.  Fed. R. Evid. 401 and 403**

  Apart from Fed. R. Evid. 702, the Court also looks to other rules of evidence to supplement its analysis, including an

examination of relevance under Fed. R. Evid. 401, and a balance of the probative value of the challenged evidence and testimony, as compared to the risk of prejudice under Fed. R. Evid. 403. *See Daubert*, 509 U.S. at 595.

Clanton does not challenge the relevance of the SA Hauger's testimony. Nor could he. The historical CSLI analysis and TAR analysis are plainly relevant to a material factual dispute regarding Clanton's physical location at the time of the alleged robberies and attempted robberies. With respect to the Court's probative-prejudice balancing, Clanton "reserve[s] the right to expand on" his statement that expert testimony "can be powerful and misleading, and thus difficult to evaluate." (Mot. to Excl. at 20.) Clanton does not appear to offer any argument regarding the probative value of historical CSLI analysis or TAR analysis or the risk that such evidence may be more prejudicial than probative. The Court finds that the evidence is plainly probative with respect to Clanton's locations during the relevant time periods and that such evidence is not unduly prejudicial. *See Daskal*, 2023 WL 9424080, at \*16 ("Location analysis bears on an essential element of a charge against [the defendant]" and any risk of misunderstanding or confusion "can be mitigated by cross-examination on the accuracy of this methodology.")

Accordingly, the Court finds that the government has met its burden of demonstrating admissibility, both with respect to historical CSLI analysis and TAR analysis, and the Court will permit SA Hauger's testimony regarding both forms of analysis. Clanton's motion to exclude SA Hauger's testimony based on the current record, and Clanton's request for a *Daubert* hearing are **DENIED.**

## CONCLUSION

For the reasons set forth previously and based on the Court's review of the parties' motions, the case record, and applicable law, Clanton's pre-trial motion to suppress evidence and Clanton's request for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) are **DENIED.**  Clanton's *Daubert* motion to exclude testimony by the Government's expert witness is also **DENIED.**  Clanton's motions in limine to preclude reference to any witnesses as "victims" and to preclude evidence of license plate reader results are **DENIED.**

Clanton's motions in limine to preclude reference to him as a "Convicted Felon," to preclude witness testimony without expert notice, and to preclude admission of records relating to his prior incarceration are denied as **MOOT.**

The Government's motions in limine to preclude reference to the possible consequences of a conviction, to admit evidence of the uncharged January 20, 2023 and June 24, 2023 Attempted Home

Invasions as direct evidence of the charged conspiracy, and to preclude reference to the possible misidentification of Clanton in the now-dismissed July 24, 2023 Complaint are **GRANTED**.

The Court reserves ruling on Clanton's motion in limine to preclude cross-examination regarding his criminal history and the government's corresponding motion in limine to admit cross-examination regarding Clanton's 2008 Felony Convictions for drug and weapons possession, Clanton's 2009 Felony Conviction for assault, as well as Dotson's 1992 Felony Convictions.  The Court also reserves ruling on the government's motion in limine to admit evidence obtained from the Dotson Phone, including the text messages described in the government's motion.

By Tuesday, March 19, 2024, the government shall provide (1) copies of the text messages and other content from the Dotson Phone that it seeks to admit at trial and (2) further documentation within its possession regarding the end date of Clanton's carceral sentence with respect to the 2009 Criminal Conviction.

The parties are strongly encouraged to confer and attempt to resolve any outstanding objections or disputes regarding the items in Section 3 of the Court's October 25, 2023 Pre-Trial Scheduling Order (ECF No. 48) prior to trial to avoid sidebars, delays, and interruptions during trial.  The parties shall file

a joint status update advising the Court of any outstanding

disputes or objections by Tuesday, March 19, 2024.


**SO ORDERED.**

Dated:      March 12, 2024
            Brooklyn, New York

_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York