1

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - X
                                :
3    UNITED STATES OF AMERICA,   :   23-CR-328(KAM)
                                :
4                                :
          -against-             :   United States Courthouse
5                                :   Brooklyn, New York
                                :
6    TONY CLANTON,               :
                                :   April 14, 2025
7              Defendant.        :   9:00 a.m.
                                :
8    - - - - - - - - - - - - - X
```

9   _____

        **TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL**
10       **BEFORE THE HONORABLE KIYO A. MATSUMOTO**
              **UNITED STATES DISTRICT JUDGE**
11  _____

12
                    A P P E A R A N C E S:
13
     For the Government:  JOHN J. DURHAM, ESQ.
14                        Interim United States Attorney
                          Eastern District of New York
15                        271-A Cadman Plaza East
                          Brooklyn, New York 11201
16                        BY: ANDREW RODDIN, ESQ.
                          MATTHEW SKURNIK,ESQ.
17                        DAVID PITLUCK, ESQ.
                          Assistant United States Attorneys
18
     For the Defendant:   LAW OFFICES OF JILL R. SHELLOW PLLC
19                        15 Chester Avenue
                          White Plains, New York 10601
20                        BY: JILL R. SHELLOW, ESQ.

21                        SUSAN G. KELLMAN, ESQ.
                          15 Eighth Avenue
22                        Brooklyn, New York 11217

23                        HINE LAW PLLC
                          P.O. Box 170096
24                        Brooklyn, New York 11217
                          BY: NICHOLAS HINE, ESQ.
25
```

PROCEEDINGS                    2

1   REPORTED BY:

2   Kristi Cruz, RMR, CRR, RPR
    Official Court Reporter
3   kristi.edny@gmail.com

4   Proceedings recorded by computerized stenography.  Transcript produced by
    Computer-Aided Transcription.

5

6                    *     *     *     *     *

7

8            (In open court; jury not present.)

9            THE COURTROOM DEPUTY:  Good morning, everyone.

10  This is Criminal Cause for Jury Trial, docket 23-CR-328,

11  *USA v. Tony Clanton.*

12           Will counsel on behalf of the Government please

13  state your appearances.

14           MR. RODDIN:  Appearing for the United States,

15  Assistant U.S. Attorneys Andrew Roddin, Matthew Skurnik, and

16  David Pitluck, along with Paralegal Specialist Timothy

17  Migliaro and Special Agent Jacqueline Muller.

18           Good morning.

19           THE COURT:  Thank you.  Good morning.

20           THE COURTROOM DEPUTY:  And on behalf of

21  Mr. Clanton?

22           MS. KELLMAN:  Good morning, Your Honor.

23           Susan Kellman, Jill Shellow, and Nicholas Hine for

24  Mr. Clanton, who is here, who is present in court.  And

25  we're assisted at counsel table by our paralegal specialist

PROCEEDINGS                                3

1   Preston Gover.

2            MS. SHELLOW:  Good morning, Your Honor.

3            THE COURT:  Thank you.  Good morning.  Have a

4   seat.

5            Are we ready to bring the jury up?  As soon as

6   they're all here, we will do so.

7            What I propose to do is we'll first swear the

8   jury, and then I'll give them their preliminary

9   instructions.  Did you want me to reintroduce you, or you're

10  going to do that yourself during your openings, or what

11  would you like to do?  I know that Mr. Skurnik's here today,

12  but how would you like to deal with that?

13           MR. RODDIN:  For the Government, we're going to

14  reintroduce ourselves in the opening.

15           THE COURT:  Okay.  You as well, Ms. Kellman?

16           MS. SHELLOW:  Yes.

17           THE COURT:  So do you have a rough idea about the

18  length of the openings any better?

19           MR. RODDIN:  Mine will be about 10 to 12 minutes.

20           THE COURT:  You, Ms. Kellman or Ms. Shellow?

21           MS. SHELLOW:  Approximately the same.  No more

22  than 15.

23           THE COURT:  All right, great.  Thank you.

24           So if you're all here, we'll bring them up.

25           MR. RODDIN:  Just three housekeeping items, if I

PROCEEDINGS                                          4

1   may.

2            THE COURT:  Yes.

3            MR. RODDIN:  One is with regard to our first

4   witness, Vernon Fields --

5            MS. KELLMAN:  Your Honor, before you bring them

6   out, can we have a moment with our client?  We haven't had

7   an opportunity to speak with him.  We'll just be a moment.

8            THE COURT:  Sure.

9            (Pause in proceedings.)

10           MS. KELLMAN:  We're good, Judge.  Thank you.

11           THE COURT:  Okay.

12           MS. KELLMAN:  What we need to discuss can hold

13  until lunchtime.

14           THE COURT:  Great.  Thank you.

15           MR. RODDIN:  Your Honor, that first housekeeping

16  item from the Government relates to our first witness.  I'm

17  going to lead him in a certain portion of his direct to

18  avoid bringing out inadmissible hearsay.  In substance, one

19  of the reasons that he agreed to meet with the defendant

20  after the home invasion and asked him for money was that

21  Mr. Fields heard from the streets that the defendant had

22  been involved.  To avoid getting into what the streets told

23  him, I intend to just ask:  Without telling us why, did you

24  at some point come to believe that Tony Clanton had been

25  involved?

PROCEEDINGS                                    5

1          THE COURT:  Well, what's his name again?

2          MR. RODDIN:  Mr. Fields.

3          THE COURT:  Okay, thank you.

4          I take it you have no objection to the Government

5    leading just to confine his testimony away from evidence

6    that I've already excluded?

7          MS. SHELLOW:  We have no objection, Your Honor.

8          THE COURT:  You can remain seated, if you'd like,

9    Ms. Shellow.  Thank you.

10          MR. RODDIN:  The second item is that after

11    Mr. Fields testifies, we're going to read several

12    stipulations and move to admit a significant number of

13    exhibits pursuant to those stipulations.  We've discussed

14    those with the defense, and our understanding is that for

15    the most part, there's no objection to those exhibits,

16    including the ones we intend to display today.  But the

17    defense would like to reserve an objection to certain parts

18    of Government Exhibit 601-C, which is a lengthy message

19    spread between the defendant and another person.

20          So we understand there to be no objection to the

21    portions we're using today, but we'll continue to confer

22    about the remainder of that exhibit.

23          THE COURT:  All right.  Thank you.

24          MR. RODDIN:  And my last --

25          THE COURT:  So, wait.  You want to admit this

PROCEEDINGS                        6

1   exhibit subject to your reservation of objections?  I mean,

2   I would prefer to just rule on those objections and decide

3   that.  What would we be waiting for?  Is it a connection

4   issue or what?

5           MS. SHELLOW:  Your Honor, the exhibit is

6   approximately 1,426 pages long, and although we have

7   reviewed parts of it and we've been through parts of it with

8   the Government and agreed on what they were going to

9   introduce today, until they can identify for us what other

10  portions of the exhibit they want to offer, if they're going

11  to continue to offer 1,426 pages, then we will have

12  objections to it.

13          So I think the way to do it is to admit those

14  portions that they have -- that they are offering

15  specifically and reserve on the balance of the exhibit.

16          THE COURT:  All right.  Well, if you're not

17  offering the balance of it, can you just forego pushing the

18  admission of the entire exhibit?

19          MR. RODDIN:  Yes, I think that makes sense.  We

20  will, as I said, continue to confer about what other

21  portions of it we intend to introduce.

22          THE COURT:  All right.  Thank you.

23          What's the third item?

24          MR. RODDIN:  The third item is that our second

25  witness, Sarah Wenner, who is an analyst at the U.S.

PROCEEDINGS                    7

1   Attorney's Office, is going to testify twice; once today and

2   once near the end of the trial.  The reason for that is that

3   the second time that she testifies, she'll be discussing

4   certain records that will not yet be admitted the first time

5   she testifies.  And we've discussed that with defense, too.

6              THE COURT:  And no objection?

7              MS. SHELLOW:  No objection.

8              THE COURT:  Okay, great.

9              Does the defense have anything to bring to my

10  attention?

11             MS. KELLMAN:  Not until after the lunch break.

12  We're going to try to iron it out during lunch.

13             THE COURT:  All right, good.  I appreciate it,

14  thank you, whatever it is.

15             All right.  So if they're all here, what we'll do

16  is bring them in and, as I said, Ms. Jackson will swear them

17  and then we will start with the trial.

18             (Jury enters.)

19             (In open court; jury present.)

20             THE COURT:  Good morning, members of the jury.

21  You're all present.

22             Please have a seat, counsel.

23             At this time, Ms. Jackson will administer the oath

24  of jury service to all of you.  So please raise your right

25  hand and take the oath.

PROCEEDINGS                                    8

1          (Jury sworn.)

2          THE COURT:  Members of the jury, now that you have

3    been sworn, I will give you some preliminary instructions to

4    guide you in your participation in this case.

5          First, let me remind you that Mr. Clanton has

6    denied all charges and has pleaded not guilty to these

7    charges.  He has, thus, raised issues of fact that the jury

8    must decide.  As in any criminal case, the Government has

9    the burden of proof to establish Mr. Clanton's guilt beyond

10   a reasonable doubt as to each element of each charge.

11         The defendant is presumed innocent.  Accordingly,

12   Mr. Clanton has no burden to present any evidence or to

13   testify.  Additionally, because the United States

14   Constitution protects a defendant's right to remain silent,

15   you may not consider whether Mr. Clanton testifies when

16   deliberating on this case.  These are basic principles of

17   our criminal justice system.

18         It will be your duty to find, based on the

19   evidence presented and only on that evidence, what the facts

20   are.  You and you alone will be the judges of the facts.

21   You will have to apply those facts to the law as I will

22   instruct you.  I, alone, am the judge of the law.  You must

23   follow the law as I instruct you, whether or not you agree

24   with it.

25         Nothing I say or do during this trial is intended

PROCEEDINGS                                     9

1   to indicate, nor should you interpret it as indicating, what

2   your verdict should be.  The evidence from which you will

3   find facts will consist of the sworn testimony of witnesses,

4   documents, and other things received into the record as

5   exhibits, any facts that the attorneys stipulate to, that

6   means the Government and the defense counsel, and any fact

7   that I may instruct you to find.

8           Certain things are not evidence and you must not

9   consider them.  I will list them for you.  I remind you that

10  the superseding indictment is merely a charge; it is not

11  evidence.

12          Statements, arguments, and questions by the

13  attorneys are not evidence.  Objections to questions are not

14  evidence.  Attorneys make objections when they believe that

15  evidence is offered in violation of the Federal Rules of

16  Evidence.  Do not let the objection or my ruling on the

17  objection influence you.  If I sustain the objection, you

18  must ignore the question that was asked.  If I overrule the

19  objection, you must treat the witness's answer to that

20  question as you would treat any other answer by the witness.

21  You may not consider a witness's answer more significant

22  because an attorney objected to it and I overruled the

23  objection.

24          If I instruct you to consider evidence only for a

25  certain or limited purpose and not for any other purpose,

1   you must follow that instruction.  Testimony that I exclude

2   or tell you to disregard or I strike from the record is not

3   evidence and you may not consider it.  Anything that you may

4   see or hear outside this courtroom is not evidence.  You

5   must disregard it.  You must decide this case based solely

6   on the evidence presented in this courtroom during the

7   trial.

8           I'm going to explain direct and circumstantial

9   evidence, both of which you may consider.

10          There are two kinds of evidence:  Direct evidence

11  and circumstantial evidence.  Direct evidence is direct

12  proof of a fact, such as an eyewitness's testimony.

13  Circumstantial evidence is proof of a fact or facts from

14  which you may infer that another fact exists.  I will

15  instruct you further on direct and circumstantial evidence

16  at the end of the case.  For now, just keep in mind that you

17  may consider both direct and circumstantial evidence.

18          It will be up to you to decide, as you observe and

19  listen to the testimony of witnesses, which witness to

20  believe, which witness not to believe, or how much of each

21  witness's testimony to accept or reject.  It will also be up

22  to you to decide how to weigh that testimony.  I will give

23  you guidelines for evaluating witness correct at the end of

24  the case.

25          Now, although we will try to avoid this, there

PROCEEDINGS                                          11

1    will be times when an attorney may request or I may require

2    that you temporarily leave the courtroom or we will turn on

3    that annoying white noise and we'll discuss a matter at

4    sidebar so that the attorneys and I may discuss something

5    outside of your presence.  These discussions may include

6    arguments about evidence that I might eventually decide to

7    exclude.  They can also include arguments on legal questions

8    that the jury must play no role in resolving.  The reason I

9    will discuss matters at sidebar or I will ask you to step

10   out is to ensure that you do not hear evidence or arguments

11   that is not properly admissible.

12           As I have said before, this is a criminal case,

13   and there are certain important rules about criminal cases

14   that you must always keep in mind.

15           First, again, never forget that Mr. Clanton is

16   presumed innocent unless and until proven guilty beyond a

17   reasonable doubt as to each element of each offense charged.

18   The indictment is only the Government's accusation against

19   the defendant; nothing more.  The indictment is not proof of

20   guilt and it is not evidence.  The defendant is entitled to

21   this presumption of innocence throughout the entire trial.

22   The presumption may be overcome only if, after appropriate

23   deliberations, the jury unanimously finds that the

24   Government has proven the defendant's guilt as to each and

25   every element of the offenses charged beyond a reasonable

PROCEEDINGS                                    12

1    doubt.  In other words, the defendant starts with a clean

2    slate.

3              The burden of proof is always going to be on the

4    Government for the entire case.  A defendant has no burden

5    to prove his or her innocence, present any evidence, present

6    any witnesses, or to testify.  Because the defendant has the

7    right to remain silent, should the defendant choose not to

8    testify, you must ignore that fact and draw no inferences

9    from it.  In fact, I will instruct you that you may not

10   consider the fact that a defendant doesn't testify in your

11   deliberations.  The Government must prove the defendant's

12   guilt beyond a reasonable doubt, and I will give you further

13   instructions on this subject later.  For now, just keep in

14   mind that the Government's burden of proof in a criminal

15   case is higher than the plaintiff's burden in a civil case.

16             In this case, the Government has charged the

17   defendant with five separate counts:

18             One count of Hobbs Act robbery conspiracy; that's

19   Count One.  Two counts of completed Hobbs Act robbery;

20   Counts Two and Five.  One count of attempted Hobbs Act

21   robbery; that's Count Four.  And one count of using a

22   firearm during a crime of violence, this is Count Three;

23   specifically, the completed Hobbs Act robbery charged in

24   Count Two.

25             I will give you detailed instructions on the law

PROCEEDINGS                                    13

1   at the end of the case, and those instructions will control

2   your deliberations and decisions.  For now, just keep in

3   mind that you must decide whether Mr. Clanton is guilty or

4   not guilty on each of the five counts that are charged.

5           Let me just instruct you on your conduct during

6   this trial.

7           First, during this trial you may not discuss this

8   case with anyone, even amongst yourselves.  So during

9   breaks, don't talk about the case at all.  Don't talk about

10  the witnesses or the evidence.  Do not allow anyone to

11  discuss this case with you.  This includes your family and

12  your close friends.  If someone asks, you should say only

13  this:  I've been selected to serve as a juror in a criminal

14  case and the Judge has instructed me not to discuss this

15  case.

16          Until you retire to the jury room at the end of

17  the this case -- that is, after you hear summations of the

18  parties and I give you the legal instructions -- that will

19  be the time that you will retire to the jury room and

20  deliberate on your verdict.  You simply may not talk about

21  this case until then.

22          I know that many of you use cell phones,

23  smartphones, the internet, and other tools of technology.

24  You may not electronically communicate with anyone about

25  this case.  You may not use a computer or cell phone or

1  smartphone to discuss this case, including by email, text

2  message, Facebook, Twitter, Instagram, TikTok, LinkedIn,

3  YouTube, or any other social media platform, blog, or

4  website.  I know some of you said you do use social media.

5  You may not discuss this case at all.

6          Additionally, when I say that you must not talk

7  about this case, I mean any aspect of this case, not just

8  the evidence.  So no opinions about me or the court or the

9  lawyers or the witnesses.  You may not discuss anything you

10 see or hear in this courtroom.

11          You must not have any contact with any of the

12 parties or their attorneys or staff.  I have instructed the

13 parties and their counsel and their staff that they may not

14 have any contact with any member of this jury.  If you see

15 any of the parties or their counsel or staff in the

16 courthouse or hallways or on the street or any other place

17 and they look away without speaking to you, do not hold that

18 against them.  That is simply the best method of following

19 my instructions, avoiding any possible appearance of

20 impropriety and ensuring the absolute impartiality required

21 of you as jurors in this case.

22          It is important for you to remain impartial and to

23 keep an open mind.  Don't think about which conclusions

24 until all the evidence is in and you're given the legal

25 instructions and you start to deliberate.  Please do not

PROCEEDINGS                                          15

1   conduct any research.  Do not read or listen to anything
2   touching on this case in any way.  This includes newspapers,
3   magazines, radio, television, or the internet.  Do not
4   conduct any independent research about this case, the
5   matters in the case, or the individuals or entities involved
6   in this case.  Do not consult dictionaries, reference
7   materials, the internet, websites, blogs, or any other
8   electronic means about the case.  It is important that you
9   decide this case based solely on the evidence presented in
10  this courtroom during the trial.  Do not try to find any
11  information from any other source.  Also, do not visit or
12  view any location where the offenses allegedly occurred.
13          Now, if any person attempts to discuss this case
14  with you while you are serving on this jury, or if you learn
15  of any incident involving an attempt by any person to
16  improperly influence you or any other juror, you must
17  promptly bring it to my attention.  You may either speak
18  with Ms. Jackson or my law clerk, Ms. Picard.  Don't talk
19  about it amongst yourself.  Just report it directly to us.
20  If anyone approaches you or asking you about the case,
21  again, report it immediately to Ms. Jackson or my law clerk,
22  Ms. Picard.
23          Additionally, if it becomes necessary to report
24  such an incident, again, don't discuss it with your fellow
25  jurors, either the incident or the fact that you feel the

1    need to bring an incident to my attention.  Please simply

2    report it to the Court as quickly as possible.

3              Do not form any opinion about this case until all

4    the evidence has been presented.  As I said, keep an open

5    mind until the case ends and you begin your deliberations.

6    These admonitions apply whenever the Court is in recess, and

7    I will repeat it each time we take a break.

8              Now, you all have notepads and some of you may

9    wish to take notes during the trial.  It is difficult, bear

10   in mind, to take detailed notes while also paying attention

11   to what the witness is saying and observing the witness's

12   demeanor.  If you take notes, make sure that your note

13   taking does not interfere with your listening to and

14   observation of and consideration of all the evidence.  Also,

15   if you do take notes, do not discuss your notes with anyone,

16   including your fellow jurors.  Once you begin your

17   deliberations, you may discuss your notes only with your

18   fellow jurors.  But with every recess, you will leave your

19   notes face down on your seats when you leave the room.  We

20   will gather those notebooks and keep them safe.

21             If you choose not to take notes, remember that

22   every juror, whether or not you take notes, has an

23   individual responsibility to listen to all the evidence

24   presented.  You may not rely on any of your fellow jurors to

25   take notes or remember anything for you.  We depend on the

PROCEEDINGS                    17

1    independent judgment of each member of the jury, so you must

2    remember all the evidence in this case.

3              The trial will now begin.  First, the Government

4    will make an opening statement.  Next, the attorneys for the

5    defendant may, but is not required to, make an opening

6    statement.  Remember that an opening statement is not

7    evidence.  It also is not an argument.  It is only an

8    outline of what each lawyer expects the evidence to show,

9    and the opening statement is designed to help you understand

10   the evidence that is expected to come before you during this

11   trial.  You may consider an opening statement as a preview

12   for what the attorney expects the evidence will show or will

13   not show.

14             Now, after the opening statements, the Government

15   will present its witnesses.  This part of the trial is

16   called the Government's case in chief.  For each witness,

17   the Government will ask the questions to the witnesses,

18   which is called direct examination.  Then the defense

19   attorney may cross-examine those witnesses.  After that,

20   there may be further questions asked of the witnesses by the

21   Government.  This is called redirect.  And then there's an

22   attempt or an opportunity to recross that witness.  This

23   process will be completed with each witness until the

24   witness is excused.

25             After the Government's case, the defendant may, if

PROCEEDINGS                              18

1    he wishes -- and remember, he's not required to -- present

2    his own witnesses.  The Government may cross-examine those

3    witnesses.  Again, bear in mind the defendant has no duty or

4    burden to present any evidence because the burden of proof

5    remains on the Government throughout the entire trial.

6            After all the evidence is in, each side's attorney

7    will present what we call a closing argument which

8    summarizes and interprets the evidence that was shown to you

9    during the trial.  After closing arguments, I will then

10   instruct you on the law.  After that, you will retire to

11   deliberate your verdict.

12           Now we will proceed with the Government's opening

13   statement.

14           MR. RODDIN:  May I proceed, Your Honor?

15           THE COURT:  Yes, please.

16           MR. RODDIN:  Between January and July 2023, this

17   defendant, Tony Clanton, orchestrated a string of violent

18   armed robberies in Staten Island, in Brooklyn, and in New

19   Jersey.  He and his accomplices pointed guns at victims,

20   they pistol whipped one of them, zip tied another, pretended

21   to be FBI agents while trying to rob two more, and put their

22   victims in fear for their lives to get them to give up money

23   and property.  We are here today to hold the defendant

24   accountable for the fear and violence he unleashed.

25           Members of the jury, my name is Andrew Roddin, and

PROCEEDINGS                                    19

1    I'm an Assistant United States Attorney here in the Eastern

2    District of New York.  With me today are Assistant U.S.

3    Attorneys Matthew Skurnik and David Pitluck, Paralegal

4    Specialist Timothy Migliaro, and FBI Special Agent

5    Jacqueline Muller.  Together, we have the honor of

6    representing the United States of America.

7            As I just mentioned, the defendant led a group of

8    criminals who planned and executed five armed robberies in

9    the New York City area in 2023.  The evidence will show that

10   in several of them, the defendant used the same accomplices.

11   He and his accomplices used the same cars, and they used the

12   same phone numbers to communicate with each other.

13           First on January 17, 2023, the defendant rented a

14   U-Haul van that the evidence will show he was planning to

15   use in an armed robbery.  He parked that U-Haul van right

16   across from an apartment building on Staten Island where his

17   victim lived.  And over the next three days, the defendant

18   and his accomplice sat in that U-Haul van watching the

19   building and planning the home invasion that was about to

20   unfold.

21           On January 20, 2023, the victim, a father and his

22   young son, came home to that apartment building with no idea

23   of the terror that was waiting for them.  When they arrived,

24   the defendant's accomplice was in the entryway of their

25   building wearing a white painter suit and pretending to

PROCEEDINGS                    20

1   paint the walls.  The accomplice closed the door and pulled

2   a gun on them.  Seconds later, the defendant, who was also

3   armed with a gun, charged into the doorway.  He took the

4   father's keys and tried to get into his apartment.  And the

5   evidence will show that when the defendant couldn't get

6   inside and the accomplice fired his gun, they ran.  They

7   went outside, got back into the U-Haul van the defendant had

8   rented, and they drove off.

9            Second, on June 3, 2023, the defendant and two

10  accomplices robbed a Staten Island smoke shop.  They drove

11  to the smoke shop and parked their cars across the street

12  where the defendant again sat and carefully watched the shop

13  from inside his car.  When the store's employee came outside

14  to close the store for the night, the defendant's

15  accomplices rushed him.  They put guns to him, they zip tied

16  his hands, and they forced him to give up money, cigarettes,

17  and marijuana.

18           While this was happening, the evidence will show

19  that the defendant was directing the action.  He continued

20  to watch from inside his car across the street.  He listened

21  to a police scanner to find out if the police were coming,

22  and he stayed on a phone call with his accomplices to warn

23  him that the police were coming.

24           Third, a few weeks later on June 24, 2023, the

25  defendant and his two accomplices tried to rob a local car

1    dealer on Staten Island.  This time, the defendant spoke

2    with the victim in advance to set him up.  The evidence will

3    show that the defendant pretended he wanted to sell a

4    Mercedes to the victim for a good price, hoping that the

5    victim would show up to buy the car with cash that the

6    defendant could then steal from him.  On the day of the

7    robbery, the defendant drove one of his accomplices to the

8    victim's house, and with the victim's teenage son watching

9    from the doorway, the accomplice tried to rob the victim

10   right outside the house at gunpoint.  The victim narrowly

11   escaped him, running inside and closing the door a split

12   second before the defendant's accomplice slammed his body

13   against the door to try to get inside.

14          Fourth, just three days after that, on June 27,

15   2023, the defendant and his two accomplices tried to rob the

16   owners of a New Jersey jewelry store at gunpoint by

17   pretending they were FBI agents.  Like with the first

18   attempted robbery, the evidence will show that in this one

19   the defendant not only planned it, but he carried a gun and

20   confronted the victims directly.  The defendant and one of

21   his accomplices dressed up in fake FBI clothing and waited

22   for the jewelry store owners, a husband and wife, to come

23   home.  When the jewelry store owners pulled into their

24   driveway, the defendant and his accomplice, both armed with

25   guns, tried to order them out of the car.  The victims,

PROCEEDINGS                    22

1   recognizing that these were criminals and not real FBI

2   agents, sped away and were thankfully unharmed.

3        The defendant still wasn't finished.

4        Fifth, three weeks later on July 12, 2023, he

5   drove an accomplice to Brooklyn, where you will see evidence

6   that the two of them sat in the defendant's car outside of a

7   bank, watching and waiting for a victim to emerge from the

8   bank with cash that they could steal.  When a man walked out

9   of the bank with a bag of money, they struck.  The defendant

10  followed the man all the way to his home, where his

11  accomplice got out of his car, pointed a weapon at the

12  victim, and took his bag of cash.  The accomplice then got

13  back into the passenger side of the defendant's car, and the

14  defendant drove them away.  That was the fifth and final

15  robbery.

16       After that, the defendant was arrested, he was

17  charged with these crimes and he was brought to court, and a

18  trial was scheduled.  But instead of having his day in

19  court, the defendant fled before his trial could be held.

20  The evidence will show that he left his home on Staten

21  Island with luggage, he left New York City, and for about

22  five weeks he changed the cars he used and ran from the

23  police when they tried to pull him over.  Finally, he was

24  caught in Pennsylvania and he was brought back to New York

25  to face justice.

PROCEEDINGS                                  23

1           For his spree of violence, the defendant is

2     charged with robbery, attempted robbery, and conspiracy to

3     commit robbery, which means agreeing to commit robberies.

4     He's also charged with using a firearm during one of the

5     robberies.

6           We will prove these charges to you with several

7     types of evidence.  First, you'll hear from the victims of

8     these robberies who will tell you about armed men pointing

9     guns at them, taking or trying to take their money and their

10    property, and in some cases trying to get into their homes.

11    You'll also see surveillance video of some of these crimes.

12    You'll watch the defendant charge into the entryway of a

13    home on Staten Island to rob a father and his ten-year-old

14    son.  You'll see the defendant's accomplices pointing guns

15    at the smoke shop owner and zip tying his hands on video.

16    You'll see video of the defendant's cars or the U-Haul van

17    he rented at every single one of these crimes.

18          We'll present you with cell phone location data,

19    revealing that the defendant's cell phones were at every

20    single one of these crimes and that he was communicating

21    with his accomplices around the times of the robberies.  And

22    we'll show you records from Amazon showing that just days

23    before the defendant put on fake FBI clothing to rob the

24    jewelry store owners, he purchased from Amazon two FBI

25    jackets and two law enforcement hats.

PROCEEDINGS                                    24

1          There will also be evidence of the defendant's

2    attempt to flee from justice after he was arrested and

3    charged with these crimes.  For example, you'll see police

4    body-worn camera video of the defendant driving away at a

5    high speed from a police officer who had pulled him over.

6    And you'll see the internet history from his cell phone

7    showing that while the defendant was on the run, he even

8    searched for how to fake his own death.

9          On top of all of that evidence, you will also hear

10   directly from one of the defendant's accomplices, a man

11   named Lawrence Dotson.  Dotson will testify about executing

12   many of these robberies with the defendant.  He'll tell you

13   about how he and the defendant watched the victims and the

14   locations of the robberies in advance, about how the

15   defendant used a police scanner so he could warn his

16   accomplices that the police were coming, and how he and the

17   defendant wore that fake FBI clothing when they tried to rob

18   the jewelry store owners.

19         Lawrence Dotson had a violent role in these

20   robberies.  He committed serious crimes with the defendant.

21   He pled the guilty to those crimes, and he's cooperating

22   with the Government in the hope of receiving leniency at

23   sentencing.  You should examine his testimony carefully.

24   When you do, I expect that you will see that his testimony

25   makes sense and that it is corroborated, it is supported by

PROCEEDINGS                            25

1   all the other evidence in the case.

2           Members of the jury, that is a brief summary of

3   some of the evidence that you will see and hear during this

4   trial.  At the end of the trial, Mr. Skurnik and I will

5   speak to you again, and we will ask you to return the only

6   verdict that is consistent with that evidence and with

7   justice.  A verdict of guilty on all counts.

8           THE COURT:  Ms. Shellow?

9           MS. SHELLOW:  If you would give me a moment, Your

10  Honor.

11          THE COURT:  Of course.

12          MS. SHELLOW:  Good morning.  Finally we're here.

13          I'm Jill Shellow, I'm one of the lawyers

14  representing Mr. Clanton.  I am joined at counsel table by

15  Susan Kellman, Nicholas Hine, and Preston Gover.

16  Mr. Clanton is sitting between Mr. Gover and Mr. Hine.

17          I don't have to address you.  I don't have to say

18  anything in this courtroom.  Mr. Clanton is presumed

19  innocent.  That's one of the significant pillars of our

20  system of criminal justice.  He has pled not guilty before a

21  judge in this courthouse, and that is enough.

22          I'll come back to a theme that the Judge

23  reiterated on several occasions, which is that it is the

24  Government's burden to prove beyond a reasonable doubt each

25  of the five crimes charged in the indictment.  That's

1    another important pillar of our system of criminal justice.

2            When you swore to the oath this morning, you swore

3    to fairly and impartially evaluate the evidence and to come

4    up with a lawful verdict.  Evidence at a trial doesn't come

5    in quite as neatly as the Government's opening statement.

6    It comes in in bits and pieces.  It's not linear.  The

7    Government has described what they expect the evidence will

8    show.  Evidence is sort of like a jigsaw puzzle, except that

9    there's no box.  It all gets tossed into a plastic bag and

10   then laid out on the table, and it's for you to decide

11   whether the image is the image that supports the

12   Government's burden of proof.  And until you reach the very

13   end, until all of the evidence has been admitted and you

14   have returned to the jury room to deliberate, you will not

15   know whether the Government has met its burden.

16           No experience is needed for being a juror.  It's

17   really equal parts attention, patience, and common sense.

18   You started with the attention when we first saw you and the

19   Judge asked a whole bunch of questions.  You then were

20   administered the oath after you were selected to be on this

21   jury.  When witnesses testify, paying attention means not

22   only listening to what they have said, but listening to what

23   they have not said.  Watching them, because their testimony

24   is not only a function of their words, but it's also, as the

25   Judge pointed out, it's a function of their demeanor.

PROCEEDINGS                    27

1   What's their body language?  What's their eye contact?  Do

2   they have something to hide?  Do they have an interest in

3   the outcome of this case?  Do they have something to gain by

4   testifying?  At some point, you will have to decide whether

5   they were telling the truth or whether they were being

6   evasive.

7             Patience.  Patience goes back to the jigsaw

8   puzzle.  In a jigsaw puzzle, typically there are straight

9   edges along all four sides, and the puzzle is built by

10  linking the pieces around the edges before working in the

11  middle of the puzzle.  In the middle of the puzzle, there

12  are clues as to what it's going to be, because remember, of

13  course, you don't have the box.  So as you piece together

14  the pieces, say, for example, you have discovered what would

15  appear to be a body of water.  It's hard to know, perhaps

16  virtually impossible to know as you're building those water

17  pieces whether what you're going to see is the East River,

18  perhaps Jamaica Bay, the Gowanus Canal, or even the Atlantic

19  Ocean.  It's all water until there are other pieces that

20  surround it.  You need patience to keep an open mind about

21  what that water is until you have seen and heard all the

22  evidence.

23            Common sense.  That one should be the easiest, but

24  as a practical matter, it's not.  The Judge will decide the

25  law, she will explain it to you, but you will decide the

PROCEEDINGS                        28

1    facts, and you alone will decide whether the Government has

2    met its burden to prove Mr. Clanton guilty beyond a

3    reasonable doubt.

4            Just as in life, you don't have to believe

5    everything you see and hear.  Rather, you have to take the

6    well of experience and assess what you have seen and heard

7    using your common sense.  I go back to the puzzle.  You take

8    everything you've learned in this courtroom, you fill in the

9    pieces, and you decide whether the Government's met its

10   burden or is there a missing piece or two.  Perhaps a piece

11   that got slipped between the pillows of the couch or is

12   under the table, or perhaps the dog got it.  But missing

13   pieces mean that the Government has not proven its case.

14   You have to assess the importance of the missing pieces.

15   Keep an open mind.  Don't jump to conclusions about what the

16   puzzle is.  And above all else, remember that Mr. Clanton

17   has no obligation to testify or to explain anything.  He has

18   no obligation to present any evidence at all.

19           The system of criminal justice is one that's very

20   important to the people who work in this courtroom.  We've

21   chosen to be here.  It's our vocation, it's our commitment.

22   We believe in the system.  And when you arrive in the

23   courtroom and when you leave, we will stand as a sign of our

24   respect not only for the role that you play, but

25   individually the role that you play as jurors and

PROCEEDINGS                                    29

1    collectively for the jury system.

2          Mr. Clanton is not here voluntarily.  The

3    Government has accused him of serious crimes, and he has

4    faith that after you have seen and heard all of the

5    evidence, you will conclude that the Government has not met

6    its burden and that Mr. Clanton is not guilty.

7          Thank you.

8          THE COURT:  Are you ready to call your first

9    witness, Mr. Roddin?

10         MR. RODDIN:  Yes, Your Honor.

11         THE COURT:  Okay.

12         MR. RODDIN:  The Government calls Vernon Fields.

13         THE COURT:  One thing I would suggest, maybe you

14   could move the mic stand and the podium back to the corner,

15   please.

16         MR. RODDIN:  Yes.

17         THE COURT:  Thank you.

18         Hello, sir.  Come on up to the witness stand.

19         (Witness takes the stand.)

20         THE COURT:  Please raise your right hand.

21         (Witness sworn.)

22         THE COURTROOM DEPUTY:  State and spell your name,

23   please.

24         THE WITNESS:  Vernon Fields.

25         THE COURT:  Please spell it for the record, sir.

1          THE WITNESS:  V-E-R-N-O-N, F-I-E-L-D-S.

2          THE COURT:  Thank you, sir.

3          You may proceed, Mr. Roddin.

4          MR. RODDIN:  Thank you, Your Honor.

5   **VERNON FIELDS**,

6          called as a witness, having been first duly

7          sworn/affirmed, was examined and testified as

8          follows:

9   DIRECT EXAMINATION

10  BY MR. RODDIN:

11  Q    Mr. Fields, how old are you?

12  A    50.

13  Q    How do you feel about being here today?

14  A    I don't want to be here.

15  Q    Why are you here to testify?

16  A    I got subpoenaed.

17  Q    You've been subpoenaed?

18  A    Yes.

19  Q    By whom?

20  A    By the U.S. Attorney.

21          (Continued on the following page.)

22

23

24

25

*V. FIELDS - DIRECT - RODDIN*                                          31

1    BY MR. RODDIN:

2    Q    Mr. Fields, what borough of New York City do you live in?

3    A    Staten Island.

4    Q    Did you grow up there?

5    A    Yes.

6    Q    How far did you go in school?

7    A    College.

8    Q    What did you study in college?

9    A    Architecture.

10   Q    If you could just bring that microphone a little bit

11   closer and sit close to it, that might help.

12            What line of work are you in?

13   A    Construction.

14   Q    Do you, yourself, do physical work on construction sites?

15   A    No.

16   Q    What's your role in the construction industry?

17   A    I get guys from the community to work, and did security

18   contracts.  Basically, minority contract.

19   Q    When you say you get guys from the community to work, can

20   you explain what you mean by that?

21   A    Yes.  We get guys -- you know, basically there's crew

22   jobs in the community, it's people that need work, and we

23   provide work to them.

24   Q    If your company --

25   A    Laborers.

V. FIELDS - DIRECT - RODDIN                                          32

Q      Laborers?

A      Yeah.

Q      And I think you mentioned security contracts a moment
ago?

A      Security, yes.

Q      If your company provides laborers or security guards to a
construction site, can your company earn money from providing
that labor?

A      Yes.

Q      Explain how that works.

A      We would bid on the job, we would get the contract, and
the way we would make money is they'll pay us like 35 dollars
an hour and -- for nonlaborer -- I mean, nonunion, and we'll
pay the worker like 28, and then the rest will be for like
profit and insurance and stuff like that.

Q      So the 35 dollars would be paid from the construction
site company to your company?

A      Yes.

Q      And then your company pays, say, 28 dollars to the
laborer?

A      Uh-huh.

Q      And your company keeps the difference?

A      No.  It would go to taxes and insurance, and then
whatever's left, we'll keep.

Q      What are the names of some of the companies you work

1    with?

2    A    What do you mean, like contractors or people?

3    Q    Some of the companies that you work for directly.

4    A    Oh.  There's Utopia Security, Franks Brothers

5    Construction.  Those are the two.

6    Q    Do you work with other people in those businesses?

7    A    Yes.

8    Q    What are some of their names?

9    A    There's Don Brown, there's Robert Fields.

10   Q    Who is Don Brown?

11   A    That's my partner.

12   Q    Do people call him by any nicknames?

13   A    Yeah.  They call him "Evil."

14   Q    Evil?

15        I just need you to say yes or no.

16   A    Yes.

17   Q    Is "Evil" short for a slightly longer nickname?

18   A    Evil D.  That's about it.

19        THE COURT:  Evil what?

20        THE WITNESS:  Evil D.

21        THE COURT:  Thank you.

22   Q    You mentioned Robert Fields.  Who is that?

23   A    That's my brother.

24   Q    Does your brother Robert Fields have any nicknames?

25   A    Yeah, they call him Boy Boy.

V. FIELDS - DIRECT - RODDIN                                      34

1   Q    Boy Boy?

2   A    Yes.

3   Q    Do you know someone named Tony Clanton?

4   A    Yes.

5   Q    How do you know Tony Clanton?

6   A    I know him from -- I met him like 2016, '17.  Met him

7   through one of my old partners.

8   Q    Can you please take a look around the courtroom and tell

9   us if you see Tony Clanton in court today?

10  A    Yes.

11  Q    Can you please tell us where he is and describe an

12  article of clothing he's wearing?

13  A    He's sitting between the two gentlemen, there's one in a

14  black suit, and he has a tan suit.

15          MR. RODDIN:  Indicating the defendant, Your Honor.

16          THE COURT:  So noted.

17  Q    Does Tony Clanton go by any nicknames?

18  A    I just know him by Tone.

19  Q    You know him as?

20  A    Tone.  That's it.

21  Q    Tone, T-o-n-e?

22  A    Yes.

23  Q    Does your brother Robert also know the defendant Tony

24  Clanton?

25  A    Yes.

1    Q    How do they know each other?

2    A    I guess from the New Brighton area.  I don't -- that's

3    all I know, from the New Brighton area.

4    Q    They're both from the New Brighton area?

5    A    He's not from New Brighton, but he know him from New

6    Brighton, yes.

7    Q    Is New Brighton a neighborhood on Staten Island?

8    A    Yes.

9    Q    Do you know any members of the defendant's family?

10   A    Yes.

11   Q    Who do you know?

12   A    I know his uncle.

13   Q    What is his uncle's name?

14   A    I just call him Knowledge.  His name is Knowledge.

15   Q    Knowledge?

16   A    Yes.

17   Q    Do you know Knowledge's real name?

18   A    No.

19   Q    How do you know Knowledge?

20   A    I just know him from, you know, just from Staten Island.

21   Like, I'm from Staten Island.  So he lives on Staten Island.

22   Q    Have you known him for a long time or a short time?

23   A    I know him for like a while.

24   Q    If you had to peg it between a long time and a short

25   time, which would you say?

1    A    Probably longest like 20 years, 20 something years.

2    Q    You mentioned a few moments ago that one of your old

3    partners first introduced you to the defendant; is that right?

4    A    Yes.

5    Q    Why did that person introduce you and the defendant?

6    A    Because we were in the same business.

7    Q    Can you explain that?

8    A    Well, you know, construction, so he was doing -- he's

9    doing the same thing, getting people jobs in the community.

10   Q    He does the same thing as you?

11   A    Yes.

12   Q    Do you know what the company the defendant worked for or

13   with was called?

14   A    No.

15   Q    At some point were you aware that the defendant's company

16   had a contract for a particular job site?

17   A    Yes.

18   Q    What was the job site?

19   A    Amazon.

20   Q    Amazon?

21   A    Yes.

22   Q    Where was that site?

23   A    It was like in the Mariner's Harbor section of Staten

24   Island.

25   Q    Were there any other landmarks near that job site in

1    Mariner's Harbor?

2    A    Yes.  There's Goethals Bridge over there.  Yes.  The

3    Goethals Bridge.  Yes.

4    Q    And roughly when was it that you were aware the

5    defendant's company had that contract with Amazon?

6    A    Was that when?

7    Q    Yes.

8    A    Probably 2018 or '19, something like that.

9    Q    Around that time, did you ever do business with the

10   defendant?

11   A    No.

12   Q    Did you ever have a business arrangement with the

13   defendant?

14   A    Yes.  While I was -- you know, I would recommend some

15   guys to him to work for him from our community.  Because I

16   knew that he was looking for guys that wanted to work at

17   Amazon, so, you know, I gave him one or two guys.

18   Q    Explain how that worked.

19   A    It was just -- I just --

20   Q    When you say you gave him one or two guys, tell us what

21   you mean by that, please.

22   A    I knew guys that wanted to work at Amazon, and I was

23   giving them his number and telling them to call them to go to

24   work.

25   Q    So you told laborers who wanted to work, that they should

1    call Tony Clanton so that they could then go to work at the

2    Amazon site?

3    A    Yes.  I know that he needed some -- you know, he asked

4    me, you know, if I got guys, if I know guys that wanted to

5    work, so.

6    Q    Did you get paid for making that referral?

7    A    No.

8    Q    Why were you willing to do that?

9    A    Because we in the same -- you know, we helping the

10   community out.  I was helping my community out, give them

11   some.

12   Q    Did there come a time when the companies you were working

13   with had a dispute with the defendant's company?

14   A    Yes, we had one dispute.

15   Q    Tell us about that dispute.  What happened?

16   A    Well, we got -- I got a call stating that, you know, we

17   work with the -- we work with the company, and they called me

18   and told me that they was having a problem on the job on

19   Staten Island, Victory Boulevard.  There was a women's shelter

20   that we was building, that he was there, you know, demanding,

21   you know, I guess he want to work.

22          So we got the call -- well, I got the call stating

23   to get down there.  And when I got there and they was gone,

24   and that was it.

25   Q    So just to be clear, you went down to the site on Victory

1   Boulevard where your company had a job?

2   A      Uh-huh.

3   Q      Yes?

4   A      Yes.

5   Q      And the defendant was no longer there when you got there?

6   A      Yeah, he wasn't there.  He was gone.

7   Q      After that, did you speak to the defendant about what had

8   happened?

9   A      Yes.

10  Q      Please tell us about that conversation.

11  A      Called him, you know, I guess he put in the same bid for

12  the contract, with the company, and I told him that we had it.

13  I told him, you know, when they ready to take some laborers, I

14  will call, you know, I will call him and, you know, reach out

15  and take some guys from him, just the way he did for me, so.

16  Q      Just to be clear, when you said the defendant had bid for

17  the same contract?

18  A      Yes.

19  Q      Who ultimately got the contract at that Victory Boulevard

20  site?

21  A      We got it.  I got the contract.

22  Q      And when you said you would take some guys from him, what

23  did that mean?

24  A      That mean that, you know, he's in the same business I'm

25  in, when they went -- when the company want to take some

1    laborers, I was going to call him and tell him, you know, send

2    some guys down just the way he did for me at Amazon.

3    Q    What are some of the ways that it could help the

4    defendant if you sent his laborers to your job site?

5    A    It would help his community, just like it helps my

6    community.

7    Q    When you offered to do that, how did the defendant

8    respond?

9    A    He was okay with it.

10   Q    Did the folks from that job site on Victory Boulevard

11   ever ask you for more laborers?

12   A    No, they didn't.

13   Q    So did you ultimately end up taking the defendant's

14   laborers for that job site, or no?

15   A    No, that's it.

16   Q    Did the defendant ever ask you about that?

17   A    Yes.

18   Q    About how many times?

19   A    Probably twice a month.

20   Q    Twice a month?

21   A    Yes.

22   Q    And in those conversations, who was reaching out to whom?

23   A    Well, he would call me, and I'd be like, we're not ready

24   yet.

25   Q    After that, did the defendant ever ask you if he could

1  provide workers to a different construction site where you had

2  a contract?

3  A    Yes.

4  Q    How did you respond?

5  A    I told him yes.

6  Q    Did that ever come about?

7  A    No, it didn't.

8  Q    Now, I'd like to move forward and ask you about the

9  afternoon of January 20, 2023.

10        First of all, was January 20, 2023 after the dispute

11  and the agreement that we just discussed?

12  A    Yes.

13  Q    Roughly when had the dispute and agreement happened in

14  relation to January of '23?

15  A    Probably about a year, year and a half.

16  Q    And we will get into the details in a few moments, but,

17  first, in just one or two words, tell us what happened to you

18  the afternoon of January 20, 2023.

19  A    Well, I picked my son up.  I picked my son up from an

20  after school program which was up the street from where I was

21  living at on Clinton Avenue.  And we got out, we got out the

22  van, I walked to my building, my apartment building complex at

23  the time.  And as I got into my hallway of the building, there

24  was a painter painting outside of my door.

25        And I thought nothing of it.  I pulled out my key to

1  go in my apartment, and the guy closed the door, and then he

2  pulled out a revolver and told me, don't make it a homicide.

3          THE COURT:  Don't make it what?

4          THE WITNESS:  Don't make it a homicide.

5          THE COURT:  So you said -- had you opened your door

6  by this time?

7          THE WITNESS:  Yeah.

8          THE COURT:  Your door?

9          THE WITNESS:  No, no, I didn't open the apartment

10  door.  The front door, to get into the building.

11          THE COURT:  I see.

12          And the painter was outside your apartment?

13          THE WITNESS:  Apartment.  Yes.

14          THE COURT:  So you could see him from the entry?

15          THE WITNESS:  I could see him as I was walking up to

16  my building.

17          THE COURT:  I see.

18          THE WITNESS:  I seen him painting.  The door was

19  wide open.

20  Q    Mr. Fields, you mentioned you were living on Clinton

21  Avenue at the time?

22  A    Yes.

23  Q    On Staten Island?

24  A    Yes.

25  Q    Where on Clinton Avenue?

1   A    181 Clinton Avenue.

2   Q    And at that time, who lived there with you?

3   A    It was my girlfriend and my son.

4   Q    How old was your son at the time?

5   A    10.

6   Q    When you opened the door and saw that somebody was

7   painting inside, was your son with you?

8   A    Yes.

9   Q    When this person pulled out a revolver and said "don't

10   make it a homicide," where was your son?

11   A    He was holding my waist.

12   Q    And the judge asked you about this a moment ago, but just

13   to be clear, were you inside your apartment or were you inside

14   the outer door that leads to the apartment?

15   A    I was in my outer door.

16         MR. RODDIN:  I'd like to show just Mr. Fields what

17   has been marked for identification as Government Exhibits 1028

18   through 1037, please.

19         THE COURTROOM DEPUTY:  Do you see it on the screen?

20         THE WITNESS:  Yes.

21         MR. RODDIN:  And if we could flip through those

22   slowly, please.

23   Q    Mr. Fields, what are those exhibits?

24   A    That was the front -- I mean, that was the hallway of my

25   complex, I seen painting, a paint can and paint.

1    Q    Are they photos of those things?

2    A    Yes.

3    Q    Do they fairly and accurately show how your apartment

4    building looked shortly after the incident that we're

5    discussing?

6    A    Yes.

7              MR. RODDIN:  I move to admit Exhibits 1028 through

8    1037.

9              MS. SHELLOW:  No objection.

10             THE COURT:  We admit Government Exhibits 1028 to

11   1037.

12             (Government Exhibits 1028 through 1037 received in

13   evidence.)

14             THE COURT:  You may publish.

15             MR. RODDIN:  Can we start with Exhibit 1028, please.

16   Q    Mr. Fields, can you describe for us what we're looking at

17   in Exhibit 1028, please.

18   A    That was the entry to my apartment building.

19   Q    Is the door to your apartment shown in this image?

20   A    Yes.

21   Q    Describe where that is, please.

22   A    This is at 181 Clinton Avenue, inside the door, inside

23   the vestibule of my apartment building, the hallway.

24   Q    Is the maroon door toward the front foreground the outer

25   door to your building?

1    A    Yes.

2    Q    And then is the second door past that the door to your

3    apartment itself?

4    A    Yes.

5    Q    Mr. Fields, you mentioned that the person who pulled out

6    the revolver was a painter you said, right?

7    A    Yes.  He appeared to be a painter, yes.

8    Q    Can you describe what kind of clothing he was wearing?

9    A    White hazmat suit.

10   Q    Could you see his face?

11   A    No.

12   Q    Why not?

13   A    It was fully covered.

14             THE COURT:  With a mask or something else?

15             THE WITNESS:  He had the mask, and the hood.

16             THE COURT:  The painter did?

17             THE WITNESS:  Yes.

18   Q    What is a revolver?

19   A    It's a handgun that has rotating chambers.

20   Q    What color was this revolver?

21   A    It was silver.

22   Q    Could you see whether it was loaded?

23   A    Yes.

24   Q    Was it loaded?

25   A    Yes, it was.

1    Q    How could you tell?

2    A    You would see the bullets inside the chamber.

3    Q    You mentioned that while this was happening, your son was

4    grabbing your waist?

5    A    Yes, he was holding my waist, yes.

6    Q    Where was your girlfriend?

7    A    She was at the nail salon at the time.  She wasn't home.

8    Q    Was there anybody else inside your apartment at the time?

9    A    No.

10   Q    When this man wearing the painting suit, the hazmat suit,

11   took out the revolver and said "don't make it a homicide,"

12   what happened next?

13   A    I just my raised my hands in the air and told him, you

14   know, I don't got nothing.  Like, I got nothing.  And he was

15   just telling me, just don't make it a homicide.  Just kept

16   repeating that.

17   Q    What happened then?

18   A    Then he hit me in the head with the gun, and then I fell

19   on the floor with my son, and then he took a -- he just shot,

20   like took a blast at my head.

21   Q    Who did?

22   A    The painter.

23   Q    Where did the bullet end up?

24   A    It ended up on the corner of the floor, in the wall.

25              THE COURT:  So he shot in the direction of your

1    body?

2              THE WITNESS:  My head.  Yes.

3              THE COURT:  Your head?

4              THE WITNESS:  My head.  Yes.

5              THE COURT:  When you were on the floor?

6              THE WITNESS:  Yes.

7              MR. RODDIN:  I would like to show just Mr. Fields

8    what is marked for identification -- what are marked for

9    identification as Government Exhibits 1052 and 1053, just for

10   Mr. Fields, please.

11             THE WITNESS:  Yes.

12   Q    Can you see those?

13   A    Yes.

14   Q    What are they?

15   A    That's the bullet wound.

16   Q    Do those fairly and accurately show how the wall looked

17   after the bullet entered it?

18   A    Yes.

19             MR. RODDIN:  We move to admit those.

20             MS. SHELLOW:  No objection.

21             THE COURT:  We admit Government Exhibits 1052 and

22   1053.

23             (Government Exhibits 1052 and 1053 received in

24   evidence.)

25             THE COURT:  You may publish.

1    MR. RODDIN:  And let's start with 1053, please.

2    And let's move to 1052.

3  Q    And, Mr. Fields, if you would just describe where in the

4  image the hole is?

5  A    So it's on the side of the wall.

6  Q    Is it towards the center of the image?

7  A    Yes.

8    MR. RODDIN:  Thank you.  We can take that down.

9  Q    After that shot was fired and hit the wall, what happened

10  next?

11  A    Another guy busted in the door, and he went for -- my

12  keys were on the floor, and he took the keys.  And he was -- I

13  had a key chain with a lot of keys on it, and he's fumbling to

14  try to get into the door, going through each key.

15  Q    Was he able to get into your door?

16  A    Yes.

17  Q    Was he able to get inside your apartment, or not?

18  A    Oh, no, no.  Not the apartment, but he got into the

19  building, the front door.

20  Q    When that second man came in, could you see his face?

21  A    No.

22  Q    Why not?

23  A    He had the mask on.  He was covered up.

24  Q    Could you see whether he had a gun?

25  A    No.  He didn't have a gun.

1    Q    Where was your attention focused at that point?

2    A    It was focused on my son.  I just kept saying, you know,

3    just don't shoot my son.  I just kept repeating that.

4    Q    While this was happening, where was your cell phone?

5    A    It was on the floor because I was holding my phone when I

6    got -- when I was walking into my building, I was on the

7    phone, you know, with my girlfriend.  She was on loud speaker.

8    But when that all happened, everything hit the floor, my keys,

9    my cell phone, and my girl was still on the phone the whole

10   time.

11   Q    Did the two men say anything about that?

12   A    Yes.  They --

13   Q    What happened?

14   A    They was like, oh, shit.  Somebody's on the phone.

15   Because she was screaming and talking, and they was like,

16   let's get out of here.

17   Q    What happened next?

18   A    So when he was like, let's get out of here --

19            THE COURT:  Which one side let's get out of here?

20            THE WITNESS:  The second guy that came in.

21            THE COURT:  Thank you.

22   A    Before they left, they blew another shot.

23   Q    Did you eventually go outside?

24   A    Yes, I did.

25   Q    What happened when you went outside?

1    A    Well, after they took the second shot, I made sure my son

2    was okay, made sure he wasn't hit or nothing.  And I took his

3    keys out of his bag, because he had a set of keys, I put him

4    in the apartment, told him lock the door, and then I ran

5    outside.

6    Q    When you went outside, what was happening?

7    A    Everybody was pointing in the direction that the two guys

8    ran, and they're pointing to the van, the U-Haul van, fled up

9    the block.  Was riding up the block.

10   Q    Had you seen that U-Haul van before?

11   A    Yes.

12   Q    Where?

13   A    Outside of my apartment building on the street, parked on

14   the street.

15   Q    About how long was it parked outside your apartment

16   building?

17   A    Like a week.

18   Q    After this home invasion, did you have any physical

19   injuries?

20   A    No.

21   Q    Did your son have any physical injuries?

22   A    My son, no.

23        THE COURT:  May I ask a question?

24        You said that there was a second shot after the

25   person said let's get out of here.

1    THE WITNESS:  Yes.

2    THE COURT:  Do you know who shot it, the shot --

3    made the second shot, where it was shot?

4    THE WITNESS:  I believe it was the first guy.

5    THE COURT:  The painter?

6    THE WITNESS:  Sounded like the same blast that I

7    heard the first time.

8    THE COURT:  And where did he shoot the gun the

9    second time?

10   THE WITNESS:  I know my son's coat had a big bullet

11   hole in it, so -- well, we didn't see, we didn't where the

12   shot hit.  My son wasn't hit.

13   THE COURT:  Was he standing up your son, at the

14   time, when you were on the ground?

15   THE WITNESS:  No.  He was on the floor with me.

16   THE COURT:  Okay.  And then, also, did they take

17   your keys when they ran out of your building and went into the

18   U-Haul?

19   THE WITNESS:  Yes, they did.

20   THE COURT:  Thank you.

21   MR. RODDIN:  Can we just briefly bring back up

22   Exhibit 1029, please, which is in evidence.  And then 1030.

23   Q    Mr. Fields, we talked about this a moment ago, but was

24   this some of the equipment that you saw in your apartment

25   hallway?

1    A    Yes.

2         MR. RODDIN:  Thank you.  We can put that down.

3    Q    Did this incident affect your son in other ways?

4    A    Yes, it did.

5    Q    In what other ways?

6    A    Nightmares, he didn't go to school for a few weeks, and

7    he's scared of U-Haul trucks to this day.

8    Q    Do you still live at 181 Clinton Avenue?

9    A    No, I don't.

10   Q    Why did you move?

11   A    Because of the situation.  We couldn't -- my son didn't

12   want to stay there no more, my girl didn't want to stay there

13   no more, so we moved.

14   Q    About how long after this home invasion did you move?

15   A    Probably about a month.

16   Q    And during that period of time, how were you feeling

17   about living there?

18   A    It was just nerve-racking, you know.  I felt unsafe.

19   That's about it.

20   Q    Did you miss any work as a result of this?

21   A    Yes.

22   Q    Did you lose money because of that?

23   A    I didn't lose money, but I didn't go to work.

24   Q    Did moving to a new residence cost you money?

25   A    Yes.  Definitely.

1    Q    I would like to move forward a little bit again.

2         After this home invasion, without telling us why,

3    did you eventually come to believe that Tony Clanton had been

4    involved in it?

5    A    Yes, I did.

6    Q    After the home invasion, did you speak with anyone from

7    his family?

8    A    Yes, I did.

9    Q    Please tell us about that.

10   A    Well, like I said, I spoke to his uncle, because my

11   partner, which is Don Brown, which is his uncle's like best

12   friend, told me that.  Because his uncle, you know, wanted to

13   talk to me, stating that, you know, he didn't have nothing to

14   do with nothing.

15   Q    When you say you spoke to his uncle, do you mean the

16   defendant's uncle, Knowledge?

17   A    Yes.

18   Q    And Knowledge reached out to Don Brown, you said?

19   A    Yes.

20   Q    And said what?

21   A    And said, you know, tell Vernon, I want to meet with him,

22   I want to talk to him, stating that, you know, he had nothing

23   to do with what happened.

24   Q    Did you speak with Knowledge?

25   A    Yes.

1   Q    In that conversation with Knowledge, did you tell him

2   that you believed the defendant had been involved in this home

3   invasion?

4   A    Yes.

5   Q    And how did Knowledge respond?

6   A    He told me, you know -- he told me to have a meeting with

7   him, talk to him face to face, you know, to get to the bottom

8   of everything.  So I told him, all right, I'll meet with him.

9   So he set the meeting up.

10  Q    Just to be clear, Knowledge was setting up a meeting

11  between you and who?

12  A    And Tone.

13  Q    Did that meeting happen?

14  A    Yes, it did.

15  Q    What month did that take place?

16  A    What month?  Probably -- it was in March.

17  Q    March of 2023?

18  A    Yes.

19  Q    Where did the meeting take place?

20  A    Staten Island, Borough Hall.

21  Q    Are there any other landmarks near Staten Island, Borough

22  Hall?

23  A    Yes, the ferry terminal, St. George ferry terminal.

24  Q    Why was Staten Island, Borough Hall the location of the

25  meeting?

1  A    I don't know.  He -- you know, that was his meeting, his

2  plan, so.

3  Q    Whose plan?

4  A    Tone's plan.

5          THE COURT:  Tone?  Tone?

6          THE WITNESS:  Yes.

7          THE COURT:  You mean Mr. Clanton?

8          THE WITNESS:  Yes.  I call him Tone.  Yes.

9          THE COURT:  Okay.

10  Q    Was there anything significant about Staten Island,

11  Borough Hall that you were aware of?

12  A    No, nothing significant, it was just -- to me, it was a

13  smart location.

14  Q    Why?

15  A    Because to get in the building, you had to have, you

16  know, got to get metal detectors.

17  Q    And why would metal detectors be important?

18  A    There was no weapons involved.

19  Q    Where within the building did you and the defendant meet?

20  A    On the third floor.

21  Q    Was there anybody else on the third floor?

22  A    Not that I knew, no, nobody was there.

23  Q    Tell us what happened at that meeting, please.

24  A    Well, at the meeting, I went up there, and I seen him.

25  And I'm like, why would you do that?  And he was like, I

1    didn't do nothing.  Like, say he didn't do it.

2            And I was just saying, like, no, like I didn't -- my

3    mind is made up that, you know, he had something to do with

4    it.

5    Q    And what did you say?

6    A    You talking, what did I say?

7    Q    Yes.

8    A    I just kept telling, like, you know, I didn't want to

9    hear he didn't have nothing to do with it.  And I was like,

10   the only thing that's going to make this, you know, go away,

11   you know, you have to, you know, give me some cash, you know,

12   something, like give me some money.  I requested money from

13   him.

14   Q    Why did you want money from him?

15   A    Because, to me, that was the more rational thing.  You

16   know, I think, rationally, I didn't want to be out there in

17   the streets, you know, committing crimes, you know.  I just

18   figured it was rational for me to, you know, just have him pay

19   and just forget anything ever happened.

20   Q    And you mentioned this was to make this go away, I think

21   you said, right?

22   A    Yes.

23   Q    How did the defendant respond to that?

24   A    I asked for 25 grand.  He told me he didn't have that.

25   He was like, I don't got that.  And he was like, well, what am

1   I paying you for?  He was like, what am I paying you for?  For

2   you not to call the police?  Tell the cops?

3            I was like, I don't call cops.  Like, I said I

4   didn't even call the cops when the situation happened.

5            So then I went down on the price because he said he

6   didn't have the 25.  So I went down to 15.  And he said he

7   didn't have that, so then we agreed to 10,000.

8   Q    Before we move forward from there, I just want to follow

9   up on what you said about "I don't call the cops," right?

10  A    Uh-huh.

11  Q    Can you explain why?

12  A    I mean, I grew up -- you know, the way we grew up, we

13  don't call -- we don't talk to cops, we don't call cops.

14  Q    Why not?  Explain that a little more.

15  A    You know, from Stapleton, you know, Stapleton projects,

16  and as I was a kid, any problems we ever had, we just -- we

17  would solve it ourselves.  Like, just taught not to, you know,

18  talk to police or call police.

19  Q    Does that include other kinds of law enforcement, not

20  just the police?

21  A    All law enforcement.  Feds, NYPD, anybody.  We just don't

22  talk to cops.

23  Q    So you said that you and the defendant eventually agreed

24  that he would pay you 10,000, right?

25  A    Yes.

1    Q    Did that -- did he eventually pay you?

2    A    Yes.  He paid me, yes, 5,000.  Yeah.

3    Q    He paid you 5,000?

4    A    Yes.

5    Q    Where did that payment take place?

6    A    I told him, meet me at my job site, which was the Victory

7    Boulevard site, the women's shelter that we built.

8    Q    And how did he pay you?

9    A    He paid me in cash.

10   Q    Did he ever give you the remaining 5,000?

11   A    No.

12   Q    Did he say why not?

13   A    No.  I never seen him.  After I got the first payment, I

14   never seen him again.

15   Q    After -- I'm sorry.

16        Roughly when did that meeting and the payment take

17   place on Victory Boulevard?

18   A    A week after.  Probably a week -- between a week or two

19   after the meeting, the first meeting that we had at the --

20   Q    At Borough Hall?

21   A    At Borough Hall.  Yes.

22   Q    After that meeting and the payment, did you have any

23   further problems with the defendant after that?

24   A    No.  I never seen him again.

25   Q    Later on, did there come a time when the federal

1  government asked to meet with you about the January 2023 home

2  invasion?

3  A    Yes.

4  Q    And was that after the defendant had paid you?

5  A    Yes.

6  Q    Was it after he had been arrested for robbery?

7  A    Yes.

8  Q    When you first met with the government, did you reveal

9  the meeting and the payment that we've just been discussing?

10  A    No, I didn't.

11  Q    Did you tell the government that you believed the

12  defendant had been involved?

13  A    I told him he wasn't involved.  Yeah.

14  Q    What did you tell the government about the voices of the

15  two men who entered your apartment building?

16  A    I told them I didn't recognize them.

17  Q    Why did you not mention the meeting and the payment and

18  your belief that the defendant had been involved?

19          THE COURT:  Had or had not?

20          MR. RODDIN:  I'm sorry.

21          Why did Mr. Fields not mention the meeting, the

22  payment, and his belief that the defendant had been involved.

23  Q    Why did you leave those things out?

24  A    Because I don't talk to police, like.

25  Q    For the same reasons that we discussed a moment ago?

1    A    Yes.

2    Q    You mentioned near the start of your testimony that you

3    received a subpoena requiring you to be here, from my office,

4    right?

5    A    Yes.

6    Q    Did you also receive something called an immunity letter?

7    A    Yes, I did.

8    Q    Who gave you the immunity letter?

9    A    The US Attorney's Office.

10   Q    My office?

11   A    Yes.

12   Q    What is that letter?

13   A    A letter is just saying that anything that you can't

14   hold -- you can't hold my words against me, like.

15   Q    Your statements can't be used against you?

16   A    Yes.

17   Q    In what context?

18   A    Like, what do you mean, in what context?

19   Q    Does the letter limit the nonuse of your statements to

20   certain kinds of crimes?

21   A    Yes.

22   Q    If you provide false statements or false testimony today,

23   what could happen?

24   A    The agreement would go away.  The letter wouldn't stand.

25   Q    And so the statements could be used against you?

1  A    Yes.

2  Q    Could you also be charged with perjury or making false

3  statements?

4  A    Yes.

5  Q    And just to be clear, does that letter promise that you

6  won't be charged with any crimes, or does it promise that your

7  statements won't be used against you if you were charged with

8  those crimes?

9  A    It's just promises that my statements used against me,

10  towards any crimes.

11        MR. RODDIN:  Can I have one moment, please.

12        THE COURT:  Yes.

13        (Short pause.)

14        MR. RODDIN:  Thank you.  I have no further

15  questions.

16        THE COURT:  Would you like to cross this witness?

17        MS. SHELLOW:  Your Honor, if we could approach the

18  sidebar, please.

19        THE COURT:  Now might be a good time to give the

20  jury its mid-morning break, while we are at sidebar.

21        Please put your notebooks facedown.  Don't talk

22  about the case.  You will retire to the jury room, and

23  Ms. Jackson will come retrieve you when we're ready to bring

24  you back.

25        Thank you.

1              (Jury exits the courtroom.)

2              THE COURT:  Sir, if you want to step off the stand

3    and take a break, you can.

4              (Sidebar conference had on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar conference had, as follows:)

2          THE COURT:  Yes.

3          MS. SHELLOW:  By making this the mid- morning break,

4    you solved my problem, which is that my colleagues have all

5    been taking notes for me because I can't take notes.  And so I

6    would like the time to review with them what their notes are.

7    I can't write.

8          THE COURT:  I know, I know.

9          MS. SHELLOW:  Okay.

10         THE COURT:  I told you I would accommodate you.

11         MS. SHELLOW:  That's what the -- I had -- we didn't

12   have a chance to ask you this morning whether we would be able

13   to take a break immediately after the direct, and so --

14         THE COURT:  Okay.

15         MS. SHELLOW:  -- that's what the question is.

16         THE COURT:  Use the break for that then.

17         MS. SHELLOW:  Okay.

18         THE COURT:  Thank you.

19         MS. SHELLOW:  Thanks.

20         (Sidebar conference ends.)

21         (Continued on the next page.)

22

23

24

25

1    (Open court; no jury present.)

2              THE COURT:  All right.  We are going to bring the

3    jury back now.

4              MR. SKURNIK:  Yes.

5              MS. SHELLOW:  Your Honor, unfortunately, I still

6    need time.  I am still going through with Ms. Kellman her

7    notes, and I have not consulted with Mr. Hines.  We are doing

8    the best we can.

9              THE COURT:  All right.  Well, I will give it a few

10   more minutes.  But if you are going to take 10 or 15 minutes

11   between each cross -- between each direct, I think it is going

12   to slow this trial down considerably.

13             I know that you --

14             MS. SHELLOW:  I don't have very many witnesses,

15   Your Honor, if that's of any -- I mean, we have deliberately

16   kept the number of witnesses --

17             THE COURT:  All right, all right.

18             MS. SHELLOW:  -- that I'm doing to a minimum.

19             THE COURT:  We need to keep the trial going, and it

20   is not usually the case.  I am trying accommodate you, but I

21   also -- five more minutes, okay?

22             Did you need to see me?

23             MR. PITLUCK:  Judge, I was just going to suggest, if

24   we are going to read a lot of stipulations that the parties

25   had agreed to, and they're quite lengthy.  I know the Court

1    has said before said to the jury, this is upon agreement of

2    the parties, it helps to move the trial along faster, this is

3    a good thing.  That would be -- I think that would be

4    beneficial to all sides to show we are being efficient, and

5    they might have to sit there for a while and listen.

6              THE COURT:  You want me to tell them more about what

7    a stipulation is?

8              MR. PITLUCK:  No, just that this serves to

9    streamline the trial.

10             THE COURT:  All right.  Okay.

11             MR. SKURNIK:  And, Your Honor, that would be after

12   Mr. Fields testifies.  After cross and then redirect.

13             THE COURT:  All right.

14             MR. PITLUCK:  Thank you.

15             (Recess taken.)

16             MS. SHELLOW:  Your Honor, you can bring in the jury

17   now.  Thank you.

18             THE COURT:  All right.  Thank you.

19             (Short pause; jury re-enters the courtroom.)

20             THE COURT:  All jurors are present.

21             Please have a seat.

22             Ms. Shellow, if you would like to cross-examine this

23   witness, please proceed.

24             MS. SHELLOW:  Thank you, Your Honor.

25

1   CROSS-EXAMINATION

2   BY MS. SHELLOW:

3   Q    Mr. Fields, if at some point in my questions you either

4   do not hear me or you do not understand what I am asking, if

5   you would please let me know, you can do that.

6   A    Yes.

7   Q    You and Mr. Clanton were in the same line of work?

8   A    Yes.

9   Q    You had an amicable business relationship?

10  A    Yes.

11  Q    You shared workers.  If you needed someone, he could help

12  you, if he needed someone, you could help him?

13  A    Yes.

14  Q    And whoever did the supplying was paid some money, that

15  is, it was beneficial financially for both of you?

16  A    It could be, but not all the time.

17  Q    But it could be?

18  A    Yes.

19  Q    And in your business, you had no specific set salary?

20  A    What do you mean?  Me, personally?

21  Q    You personally.

22  A    No.

23  Q    Your partner gave you money when you needed it?

24  A    Yeah.  Yeah, if I need it, yes.  Definitely.

25  Q    Going to the day in January --

1          THE COURT:  January 20?

2     Q     -- January 20, 2023 --

3     A     Yes.

4     Q     -- it was important to you that the police understand

5     what happened that day?

6     A     Yes.

7     Q     Even though talking to police was not something that you

8     were used to doing?

9     A     Yes.

10    Q     But it was important that the police get all of the

11    details?

12    A     Yes.

13    Q     And you met with the police the day of the event?  The

14    day of the incident?

15    A     What, the NYPD?

16    Q     Yes.

17    A     Yes, they came -- yes.  They came -- it was called to the

18    location where it had happened at, and I spoke to them, yes.

19    Q     And they came back again the next day?

20    A     Yes.

21    Q     And then you had a series of other meetings with law

22    enforcement officials, including the United States Attorney's

23    Office?

24    A     Not after the incident, no.

25    Q     You did not meet with other law enforcement officials or

1    people from the US Attorney's Office after the incident?

2    A    Not immediately after the incident.  Yeah, after a while,

3    when everything happened with Tone and the newspapers and when

4    he got arrested, that's when I met with the US Attorney.

5    Q    After Mr. Clanton was arrested?

6    A    Yes.

7    Q    And you met with them more than once?

8    A    Yes.

9    Q    When you met with them -- when you met with NYPD right

10   after the incident, you didn't show them your son's jacket,

11   did you?

12   A    Yes.  They took it.  They took it for evidence.

13   Q    Did you tell them about it that day?

14   A    Well, yes, when they came, I told them right after it

15   happened, when they came to the location, yes.

16   Q    You said that your son's reaction after the incident was

17   that he was very scared?

18   A    Very.  Yes.

19   Q    Scared of seeing things like U-Haul trucks?

20   A    Yes.

21   Q    He wasn't scared of loud noises like gunshots?

22   A    Of course he was.

23   Q    You never shared that with the police, did you?

24   A    What police?  NYPD or the federal?

25   Q    Any of the law enforcement.

1          You told them he was afraid of U-Haul trucks,

2    correct?

3    A    Yes.  That was one of the things he was afraid of, yes.

4    Q    At the time of the incident you didn't recognize either

5    of the two men who accosted you, correct?

6    A    No, I didn't.

7    Q    And NYPD never showed you any photos?

8    A    No.

9    Q    The law enforcement people from the US Attorney's Office

10   never showed you any photos?

11   A    No.

12   Q    The meeting at Borough Hall wasn't your idea?

13   A    No.

14   Q    It wasn't Mr. Clanton's idea?

15   A    I believe it was his idea.

16   Q    You heard about it not from Mr. Clanton, correct?

17   A    No.

18   Q    You heard about it through your brother?

19   A    No.

20   Q    Mr. Brown, also known as Evil D, talked to Knowledge?

21   A    Yes.

22   Q    And Knowledge knew your brother well?

23   A    Yes.  Knowledge knew my brother, yes.

24   Q    And it was your idea to settle this matter without

25   involving police, correct?

1    A    Yes.

2    Q    And you wanted money so you could feel better?

3    A    No, not to feel better, no.

4    Q    Well, you told the police you wanted money so that you

5    could feel better?

6    A    No, I didn't.

7              MS. SHELLOW:  If I could have a moment, Your Honor.

8              THE COURT:  Yes.

9              MS. SHELLOW:  Mr. Gover, if you would please show to

10   only the witness and the parties what has been marked as VF14,

11   at page 6.

12   Q    Mr. Fields, I am going to ask you to look at a section

13   that Mr. Gover is going to highlight for you.  Look at it to

14   yourself, don't read it out loud, please, and see if that

15   refreshes your recollection of what you told the police.

16             THE COURT:  Can you see it, sir?

17             MS. SHELLOW:  I think we are locating the piece that

18   we need, Your Honor.

19   Q    Do you see the portion that has been highlighted?

20   A    Yes, I do.

21   Q    Does that refresh your recollection of what you told the

22   law enforcement officer?

23   A    No, it don't, because I never seen this before.  And what

24   law enforcement did I tell this to?

25             (Continued on the next page.)

V. Fields - Cross - Ms. Shellow                                    71

1    CROSS-EXAMINATION

2    BY MS. SHELLOW: (Continuing.)

3    Q    You testified that were you on the phone with your

4    fiancee or girlfriend when you entered your apartment door,

5    entered the outside door to the vestibule?

6    A    Yes.

7    Q    You didn't tell that to the police when you first met

8    with them, did you?

9    A    The detectives, no, I didn't.

10   Q    And on January 29, approximately, 2025, almost two years

11   later, you told them that your fiancee was on a speakerphone?

12   A    Yes.

13   Q    And that the second person who entered your apartment

14   building said, oh, shit, someone is on the phone?

15   A    Yes.

16   Q    But that's the first time that you told law enforcement

17   that?

18   A    Because that's the only time that they asked me exactly

19   what happened, like detail to detail.

20   Q    You met with them on August 1st of 2023?

21   A    Yes.

22   Q    To discuss the incident?

23   A    Yes.

24            THE COURT:  Them being who, please?

25            MS. SHELLOW:  I'm sorry.  Law enforcement from the

1  U.S. Attorney's Office and/or one of the law enforcement
2  agencies.
3  Q     You met with them on April 29th of 2024?
4  A     Yes.  I believe so, yes.
5  Q     And then again on January 29th of 2025?
6  A     Yes.
7  Q     And that's the first time that you told them about being
8  on the phone with your fiancee?
9  A     I mean, yes.  I don't know the exact dates, but the U.S.
10 Attorney's Office are the only ones I told the exact details.
11 When I was talking to the NYPD when it happened, I told them
12 about the situation of the robbery.  So that's why two
13 different stories, two different law enforcements.
14 Q     It was important at the time of the incident that the
15 police know what happened, right?
16 A     Yes.
17 Q     And you tried to tell them everything that you knew when
18 they talked to you after the incident, right?
19 A     NYPD, yes.  It was about my son, he had just been shot
20 at.  So I didn't tell them about how I was on the phone with
21 my girlfriend because that wasn't important.  What was
22 important was to make sure that my son was okay.  Nobody else
23 asked me anything after that.
24 Q     Mr. Fields, my question was whether it was important to
25 you to convey the details to NYPD at the time of the incident.

That's all my question was.

A    I'm giving you why I didn't tell them.

Q    Yes or no.

A    Yes.

Q    You testified that you had seen a U-Haul truck outside your building for a period of days?

A    Yes.

Q    There was nothing unusual about a U-Haul truck being there, was there?

A    Yes, it was unusual.

Q    You didn't report it to anyone?

A    Yes, my neighbors.  We all talked about it.

Q    You used U-Haul trucks in your construction business?

A    Yes, I do.

Q    To haul debris?

A    Yes, I do.  Yes.

Q    And other people in your business use U-Haul trucks?

A    Probably.  I don't know.

Q    You don't know of anyone else who uses a U-Haul truck in your line of business?

A    No, I don't.

Q    You said that you asked Tone, as you refer to Mr. Clanton, for $25,000?

A    Yes.

Q    You never mentioned that sum to the U.S. Attorney's

V. Fields - Cross - Ms. Shellow                    74

1   Office or their investigators, did you?

2   A    Yes.  I told them about it, yes.

3   Q    $25,000?

4   A    Yes.  I told them, yes.

5          MS. SHELLOW:  If I could consult with Mr. Gover,

6   please.

7          (Pause.)

8   Q    It was your idea to ask for money?

9   A    Yes, it was.

10  Q    And it was your idea to ask for something on the order of

11  $25,000?

12  A    Yes, it was my idea, yes.

13  Q    And you and Mr. Clanton agreed on a sum?

14  A    Yes.

15  Q    You decided the amount together?

16  A    No.  It was me.  I did the numbers and degree to the last

17  number and that was it.

18  Q    Mr. Clanton never told you that he committed the robbery?

19  A    No, he didn't.

20  Q    He denied committing the robbery?

21  A    Yes.

22  Q    And he repeated that denial several times?

23  A    Yes.  During the meeting, yes.

24  Q    During the meeting.  And you told him you didn't want to

25  hear about it?

V. Fields - Cross - Ms. Shellow                    75

1   A    Yes.

2   Q    Matters or disputes in the community were settled on the

3   streets, weren't they?

4   A    Yes, they are.  Yes.

5   Q    And that's what you were attempting to do?

6   A    No, that's what I didn't want to do.  I mentioned the

7   money because I have a lot to lose.

8   Q    When I say settle on the streets, in my mind I'm thinking

9   of settling without law enforcement involvement.  Matters or

10  disputes within your community were settled without the

11  involvement of law enforcement?

12  A    Yes.

13  Q    Settled on the streets to you implied some form of

14  violence?

15  A    Yes.

16  Q    There was never any violence between you and Mr. Clanton?

17  A    No, there wasn't.

18           MS. SHELLOW:  Your Honor, if I could have a moment,

19  please.

20           THE COURT:  Yes, please.

21           MS. SHELLOW:  Your Honor, I have no further

22  questions.  Thank you.

23           THE COURT:  Is there any redirect, Mr. Roddin?

24           MR. RODDIN:  Yes, please.

25

1    REDIRECT EXAMINATION

2    BY MR. RODDIN:

3    Q    Mr. Fields, I want to follow up about a few things you

4    were asked about on cross-examination just now.  Do you

5    remember being asked about your conversations with the NYPD

6    immediately after the home invasion just now?

7    A    Yes.

8    Q    And immediately after the home invasion, so the very day

9    it happened, did the police come to speak with you?

10   A    Yes.

11   Q    At that point did you believe that the defendant had been

12   involved?

13   A    No.

14   Q    You were also asked about the fact that you asked the

15   defendant for money.  Do you remember being asked that?

16   A    Yes.

17   Q    And you were asked about the exact figure.  How did the

18   figure get from the higher number, the $25,000, down to 10,000

19   and ultimately 5,000?

20   A    Because he told me he didn't have it.

21   Q    You were also asked whether there was ever any violence

22   between you and the defendant and I think you said no.  Just

23   to be clear, was there ever any violence between you and the

24   defendant after the home invasion occurred?

25   A    No.

V. Fields - Recross - Ms. Shellow                    77

1   Q    You testified on direct you believed he had been involved

2   in the home invasion, correct?

3   A    Yes.

4          MR. RODDIN:  I have no further questions.  Thank

5   you.

6          THE COURT:  Any recross, Ms. Shellow?

7   RECROSS-EXAMINATION

8   BY MS. SHELLOW:

9   Q    You testified that you believed that Mr. Clanton was

10  involved in the home invasion?

11  A    Yes.

12  Q    You had no knowledge of whether he was involved in the

13  home invasion?

14  A    No, I didn't.

15         MS. SHELLOW:  I have no further questions.

16         THE COURT:  All right.  Any redirect?

17         MR. RODDIN:  No.  Thank you.

18         THE COURT:  Sir, you're excused.  You may step off

19  the stand.

20         (Witness excused.)

21         THE COURT:  Jurors, on your side there is a screen.

22  If you open up the panel, flip it open, and you may pull the

23  screen out.  Who is your next witness?  Oh, you're going to do

24  the stipulations.

25         MR. SKURNIK:  Yes, Your Honor.  We plan to read

Proceedings                                                    78

1    stipulations.

2              THE COURT:  Members of the jury, what will happen

3    next is the government will read into evidence certain

4    stipulations.  A stipulation is an agreement.  Yes, sir.

5              THE JUROR:  It isn't working.

6              THE COURT:  It will work in a moment.  We just don't

7    have anything for you to see.  Sandy, these jurors don't have

8    anything on their screen.  Jurors 11 and 12 aren't seeing the

9    logo.  Let me continue.

10             The government is going to read into the record

11   certain stipulations.  A stipulation is an agreement between

12   the parties, that is the government and Mr. Clanton's lawyers,

13   about certain facts, which you should accept.  The reason the

14   parties have presented stipulations is to save some time so

15   that witnesses don't have to come and testify about the

16   matter.

17             So the stipulations will be read to you by

18   Mr. Skurnik.  And you'll let us know the exhibit number,

19   correct, sir?

20             MR. SKURNIK:  Yes, Your Honor.

21             THE COURT:  You may proceed.  We'll get you

22   technical help.  Oh, it's working now.

23             MR. SKURNIK:  Your Honor, we're going to start with

24   the stipulation that's been marked as S-7.  Mr. Migliaro, if

25   we could pull that up, please.  With Your Honor's permission,

Proceedings                                              79

1    we'll move the stipulation into evidence after reading it.

2    But I would like to show the jury as we're reading it, if

3    that's okay.

4                THE COURT:  You should move it in now, then.

5                MR. SKURNIK:  In that case, Your Honor, I'll move

6    into evidence what's been marked as Government Exhibit S-7,

7    and this is the 911 call stipulation.

8                THE COURT:  All right.  Any objection?

9                MS. SHELLOW:  No.

10               THE COURT:  We admit into evidence Government's

11   Exhibit S-7.

12               (Government's Exhibit S-7 was received in evidence.)

13               MR. SKURNIK:  This stipulation states:  It is hereby

14   stipulated and agreed by and among the United States of

15   America by its undersigned counsel and defendant, Tony

16   Clanton, by his undersigned counsel that 1.) Government

17   Exhibits 850A through 850D are true and accurate copies of

18   recordings of 911 calls that occurred on January 20, 2023.

19               And then on the second page it states 2.) Government

20   Exhibits 851A through 851C are true and accurate copies of

21   recordings of 911 calls that occurred on June 27, 2023.

22               The next stipulation, Your Honor, is the Motor

23   Vehicle Commission stipulation.  This is S-8.  And I move that

24   stipulation into evidence.

25               MS. SHELLOW:  No objection.

Proceedings                                            80

1          THE COURT:  We admit into evidence Government's

2    Exhibit S-8.

3          (Government's Exhibit S-8 was received in evidence.)

4          MR. SKURNIK:  Before I read that one, what I'd like

5    to do, Your Honor, just to go back to the 911 calls, is

6    actually move to admit the underlying 911 calls that are the

7    subject of S-7 that I just read.

8          THE COURT:  These will be the tapes themselves, sir?

9          MR. SKURNIK:  These are the tapes themselves.  So

10   it's Government 850A through D and 851A through C.

11         MS. SHELLOW:  No objection.

12         THE COURT:  Thank you.  Those are admitted.

13         (Government's Exhibits 850A, 850B, 850C, 850D, 851A,

14   851B, 851C were received in evidence.)

15         MR. SKURNIK:  Mr. Migliaro, if we could pull up S-8.

16   This is the DMV stipulation.  So this stipulation states:

17   Government Exhibit 257 is a record maintained by the New York

18   Motor Vehicle Commission, NY MVC.

19         One, that was made at or near the time by someone

20   with knowledge or made from information transmitted by someone

21   with knowledge.

22         Two, that was kept by NY MVC in the course of its

23   regularly conducted business activity.

24         Three, where making the record was a regular

25   practice of NY MVC's business activity.

Proceedings                                    81

1          Four, that satisfies the requirements of Federal

2    Rule of Evidence 803(6).

3          Two, Government Exhibit 258 is a record maintained

4    by the New Jersey Motor Vehicle Commission, NJ MVC.

5          One, that was made at or near the time by someone

6    with knowledge or made from information transmitted by someone

7    with knowledge.

8          Two, that was kept by NJ MVC in the course of its

9    regularly conducted business activity.

10         Three, where making the record was a regular

11   practice of NJ MVC's business activity.

12         Four, that satisfies the requirements of Federal

13   Rule of Evidence 803(6).

14         So now that we've read the stipulation, Your Honor,

15   I'll move to admit into evidence Government Exhibits 257 and

16   258, which are the two motor vehicle records.

17         MS. SHELLOW:  No objection.

18         THE COURT:  We admit Government's Exhibit S-8 and

19   Government Exhibit 257 and 258.

20         (Government's Exhibits 257, 258 were received in

21   evidence.)

22         MR. SKURNIK:  The next stipulation has been marked

23   as S-12.  This is the provider's stipulation, the internet

24   service providers.  I would move this stipulation into

25   evidence, Your Honor.

Proceedings                                                    82

1         MS. SHELLOW:  No objection.

2         THE COURT:  We admit Government's Exhibit S-12.

3         (Government's Exhibit S-12 was received in

4    evidence.)

5         MR. SKURNIK:  This stipulation states:

6         1.) Government Exhibits 201, 233, 234, and 601 are

7    the records maintained by Apple, Inc., or Apple.  One, that

8    were made at or near the time by someone with knowledge or

9    made from information transmitted by someone with knowledge.

10   Two, that were kept by Apple in the course of its regularly

11   conducted business activity.  Three, where making the record

12   was a regular practice of Apple's business activity.  And

13   four, that satisfy the requirements of Federal Rule of

14   Evidence 803(6).

15        2.) Government Exhibits 202, 203, and 239 are

16   records maintained by Google, LLC or Google.  One, that were

17   made at or near the time by someone with knowledge or made

18   from information transmitted by someone with knowledge.  Two,

19   that were kept by Google in the course of its regularly

20   conducted business activity.  Three, where making the record

21   was a regular practice of Google's business activity.  And

22   four, that satisfy the requirements of Federal Rule of

23   Evidence 803(6).

24        Third paragraph, Government Exhibits 205 and 206 are

25   records maintained by Amazon.com, Inc., or Amazon.  One, that

Proceedings                                                83

1    were made at or near the time by someone with knowledge or

2    made from information transmitted by someone with knowledge.

3    Two, that were kept by Amazon in the course of its regularly

4    conducted business activity.  Three, where making a record was

5    a regular practice of Amazon's business activity.  And four,

6    that satisfy the requirements of Federal Rule of Evidence

7    803(6).

8              Fourth paragraph, Government Exhibits 214, 15, 16,

9    17, 18, and 19, and then 240, 243, 244, and 245 are records

10   maintained by Meta Platforms, Inc., or Meta.  One, that were

11   made at or near the time by someone with knowledge or made

12   from information transmitted by someone with knowledge.

13             Two, that were kept by Meta in the course of its

14   regularly conducted business activity.  Three, where making

15   the record was a regular practice of Meta business activity.

16   And four, that satisfy the requirements of Federal Rule of

17   Evidence 803(6).

18             And so at this time, Your Honor, I'm going to move

19   to admit the majority of the exhibits that are subject to this

20   stipulation but not all of them.

21             So I'm going to move to admit Government

22   Exhibits 201, 233, and 234.  We're not moving to admit 601 at

23   this time.  We're moving to admit 202, 203, 239, 205, 206,

24   214, 215, 216, 217, 218, 219, 240, 243, 244, 245.  And that's

25   it for the stipulation.

Proceedings                    84

1              MS. SHELLOW:  No objection.

2              THE COURT:  We'll receive them in evidence

3    Government Exhibits S-12, 202, 203, 239, 205, 206, 214,

4    through 219, 240, 243, 244, and 245.  Government Exhibits 201,

5    233, and 234.  Did I miss anything there?

6              MR. SKURNIK:  That's correct, Your Honor, and not

7    601.

8              THE COURT:  Okay.  Those are admitted.  Thank you.

9              (Government's Exhibits 201, 233, 234, 202, 203, 239,

10   205, 2-6, 214, 215, 216, 217, 218, 219, 240, 243, 244, 245

11   were received in evidence.)

12             MR. SKURNIK:  Thank you, Judge.

13             The next stipulation has been marked Government

14   Exhibit S-14.  It is the T-Mobile stipulation.  I move to

15   admit that stipulation at this time.

16             MS. SHELLOW:  No objection.

17             THE COURT:  We admit Government Exhibit S-14.

18             (Government's Exhibit S-14 was received in

19   evidence.)

20             MR. SKURNIK:  This stipulation reads:  Government

21   Exhibits 224 through 229, and then 231, 232, 246, 247, 248,

22   249, 250, 251, and 252 are records maintained by T-Mobile US,

23   Inc., or T-Mobile.  One, that were made at or near the time by

24   someone with knowledge or made from information transmitted by

25   someone with knowledge.  Two, that were kept by T-Mobile in

Proceedings                                             85

1    the course of its regularly conducted business activity.

2              Three, where making the record was a regular

3    practice of T-Mobile's business activity.  And four, that

4    satisfy the requirements of Federal Rule of Evidence 803(6).

5              At this time, Your Honor, I'll move to admit

6    Government Exhibits 244 through 239, 231, 232, and then 246

7    through 252.

8              THE COURT:  You said 244.  Did you mean 224, sir?

9              MR. SKURNIK:  Yes, 224.  224 through 229, then 231

10   through 232, and 246 through 252.

11             THE COURT:  All right.

12             MS. SHELLOW:  No objection.

13             THE COURT:  We will admit Government Exhibits S-14

14   and Exhibits 224 to 229, 231 to 232, 246 to 251 and 252.

15             (Government's Exhibits 224 to 229, 231, 232, 246 to

16   251, 252 were received in evidence.)

17             MR. SKURNIK:  The next stipulation, Your Honor, has

18   been marked as Government Exhibit S-16.  This is the U-Haul

19   stipulation.  I'll move to admit that stipulation at this

20   time.

21             MS. SHELLOW:  No objection.

22             THE COURT:  We'll admit Government Exhibit S-16.

23             (Government's Exhibit S-16 was received in

24   evidence.)

25             MR. SKURNIK:  This stipulation states:  Government

Proceedings                                        86

1    Exhibits 221, 222, and 223 are records maintained by U-Haul

2    Holding Company, or U-Haul.  One, that were made at or near

3    the time by someone with knowledge or made from information

4    transmitted by someone with knowledge.  Two, that were kept by

5    U-Haul in the course of its regularly conducted business

6    activity.  Three, where making the record was a regular

7    practice of U-Haul's business activity.  And four, that

8    satisfy the requirements of Federal Rule of Evidence 803(6).

9            At this time, Your Honor, I'll move to offer

10   Government Exhibits 221, 222, and 223 in evidence.

11           MS. SHELLOW:  No objection.

12           THE COURT:  We admit Government's Exhibits S-16 and

13   Exhibits 221 to 223.

14           (Government's Exhibits 221 to 223 were received in

15   evidence.)

16           MR. SKURNIK:  The next stipulation, Your Honor, has

17   been marked as Government Exhibit S-1.  This is the

18   January 20th incident video surveillance stipulation.  I'll

19   move to offer that stipulation.

20           MS. SHELLOW:  One moment, Your Honor.  Your Honor,

21   if we could defer that stipulation so that I could consult

22   with Mr. Skurnik at the very end.

23           THE COURT:  At the end of what?

24           MS. SHELLOW:  When he finishes reading all of the

25   stipulations that he's proposing to move into evidence.

Proceedings                                                    87

1        THE COURT:  Are there underlying videos with this

2   exhibit, Mr. Skurnik?

3        MR. SKURNIK:  Yes, Your Honor.  So this stipulation

4   authenticates a number of videos related to the January 20th

5   incident.  We intend to read the stipulation and then offer

6   those underlying videos into evidence.  We won't show all of

7   them.  We have a video compilation that we'll show.

8        MS. SHELLOW:  Your Honor, if Mr. Skurnik could

9   arrange for the stipulation to be put on our screen that would

10  be appreciated.

11       MR. SKURNIK:  We can do that, Your Honor.  Mr.

12  Migliaro, it's S-1.

13       MS. SHELLOW:  No problem.  Thank you, Your Honor.

14       THE COURT:  No problem meaning we can admit these

15  exhibits?

16       MS. SHELLOW:  Meaning no objection.  I have now seen

17  these.

18       THE COURT:  You have no objection, correct?

19       MS. SHELLOW:  That's correct.

20       THE COURT:  We're going to admit Government's

21  Exhibit S-1, and there are a number of exhibits mentioned in

22  that stipulation.  Do you also have no objection to admission

23  of those surveillance videos, ma'am?

24       MS. SHELLOW:  That's correct.  No objection.

25       THE COURT:  We will admit Government Exhibit S-1 and

Proceedings                                          88

1    all the exhibits enumerated in the paragraphs in S-1.

2              (Government's Exhibit S-1 was received in evidence.)

3              THE COURT:  Do you want to read that in or can we

4    agree?

5              MR. SKURNIK:  I'm happy to agree.

6              THE COURT:  All the exhibits listed in Government

7    Exhibit S-1 and from Government Exhibit S-1 are admitted.

8              MR. SKURNIK:  The next stipulation, Your Honor, has

9    been marked S-2.  This is the video, similar video

10   stipulation, related to July 12, 2023.  I'd offer that

11   stipulation and the exhibits outlined in the stipulation.

12             MS. SHELLOW:  No objection to the stipulation or the

13   exhibits.

14             THE COURT:  All right.  We will admit Government

15   Exhibit S-2 and the videos that are enumerated in Government's

16   Exhibit S-2.  The exhibit numbers are identified in the

17   stipulation.  Those are all admitted.  Thank you.

18             (Government's Exhibit S-2 was received in evidence.)

19             MR. SKURNIK:  Next, Your Honor, the government

20   offers Government Exhibit S-3.  This is the video stipulation

21   for June 3rd.  And, again, the government offers both the

22   stipulation and the exhibits identified in the stipulation.

23             MS. SHELLOW:  No objection to the admission of the

24   stipulation or the underlying exhibits.

25             THE COURT:  All right.  We admit Government Exhibit

Proceedings                                              89

1    S-3 and the video exhibits in Government's Exhibit S-3.

2              (Government's Exhibit S-3 was received in evidence.)

3              MR. SKURNIK:  Your Honor, next we offer Government

4    Exhibit S-4.  This is the videos for the June 24th incident,

5    and we offer both the stipulation and the exhibits outlined in

6    the stipulation, the underlying videos.

7              THE COURT:  June 24, 2023?

8              MR. SKURNIK:  That's correct, Your Honor.

9              THE COURT:  Any objection, ma'am?

10             MS. SHELLOW:  No objection, Your Honor, to the

11   stipulation or the underlying exhibits.

12             THE COURT:  We admit Government's Exhibit S-4 and

13   the underlying videos regarding June 24, 2023.

14             (Government's Exhibit S-4 was received in evidence.)

15             MR. SKURNIK:  Next, Your Honor, is S-5.  This is the

16   June 27th video stipulation.  We offer both this stipulation

17   and the exhibits identified in the stipulation.

18             MS. SHELLOW:  No objection, Your Honor, to either

19   the stipulation or the underlying exhibit.

20             THE COURT:  We admit Government's Exhibit S-5 and

21   the underlying videos enumerated therein.  Thank you.

22             (Government's Exhibit S-4 was received in evidence.)

23             MR. SKURNIK:  Thank you, Your Honor.  That's our

24   last stipulation for now.  So with Your Honor's permission, we

25   can call our next witness.

Proceedings                                    90

1          THE COURT:  That would be great.  Thank you.

2          MR. SKURNIK:  At this time, Your Honor, the

3    government calls Sarah Wenner.

4          THE COURT:  Good morning.  Please step up to the

5    witness stand.

6          (Witness sworn.)

7          THE COURTROOM DEPUTY:  State and spell your full

8    name.

9          THE WITNESS:  Sarah Wenner, S-A-R-A-H  W-E-N-N-E-R.

10         THE COURT:  You may proceed.

11         MR. SKURNIK:  Thank you, Your Honor.

12         (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

S. Wenner - Direct - Mr. Skurnik                                   91

1   **SARAH WENNER**,

2        called as a witness by the Government, having been first

3        duly sworn/affirmed by the Courtroom Deputy, was examined

4        and testified as follows:

5   DIRECT EXAMINATION

6   BY MR. SKURNIK:

7   Q    Ms. Wenner, where do you work?

8   A    I work at the United States Attorney's Office, Eastern

9   District of New York.

10  Q    Is that the same office where I work?

11  A    Yes.

12  Q    How long have you been at the U.S. Attorney's Office?

13  A    Almost two years.

14  Q    What is your title at the U.S. Attorney's Office?

15  A    I'm an intelligence analyst.

16  Q    What do you do as an intelligence analyst?

17  A    I assist the office with long-term investigations and

18  criminal prosecutions by collecting and analyzing various

19  types of data and evidence, and preparing visual aids such as

20  video compilations, PowerPoint presentations, charts, maps.

21  Q    I want to ask you about some of those.  A video

22  compilation, what is that?

23  A    A video compilation is a collection of clips edited

24  together to showcase a particular event.

25  Q    What is your typical process for creating a video

1  compilation?

2  A    I typically start by meeting with the case team,

3  discussing video, and coming up with a plan that show all the

4  portions.

5  Q    Do you add effects to video compilations you're creating?

6  A    Sometimes.

7  Q    What type of effects?

8  A    Features like zoom in, zoom out, speed up, slow down,

9  moving circles and arrows, things like that.

10 Q    Do you use any particular software to do this?

11 A    Yes, I use Camtasia.

12 Q    In creating a video compilation you typically work with a

13 case team?

14 A    Yes.

15 Q    And what involvement does the case team typically have?

16 A    They're involved in the entire process.  We frequently

17 meet to make sure we have everything and that everything is

18 correct.

19 Q    I want to turn your attention now to this case.  What, if

20 anything, have you been asked to create for this particular

21 case?

22 A    I was asked to create video compilations and phone

23 charts.

24 Q    Just briefly, what is a phone chart?

25 A    A phone chart is a visual aid that displays communication

S. Wenner - Direct - Mr. Skurnik                    93

1  patterns between individuals typically through phone calls and

2  text messages.

3  Q    What sort of information is typically displayed in a

4  phone chart?

5  A    Typically subscriber information and call logs, sometimes

6  text messages.

7  Q    So going back to the video compilations, the compilations

8  you created for this case, generally, what do they cover?

9  A    They cover five different robberies.

10 Q    What sort of information did the case team provide you

11 about those robberies?

12 A    For the video compilations they provided a description of

13 each incident, the surveillance footage for each incident, and

14 then direction for editing each video compilation.

15 Q    What sort of effects, if any, did you add to the videos?

16 A    For these compilations I added zoom in, zoom out,

17 highlights, some text, maps, and I think speed up and slow

18 down.  That's about it.

19       MR. SKURNIK:  This is just for the witness, Your

20 Honor, Government Exhibits 77 through 81, and then 83 and 84.

21 If we could flip through those, please.

22 Q    Ms. Wenner, do you recognize these exhibits?

23 A    Yes.

24 Q    What are they?

25 A    These are screenshots I took from Google Earth of the

S. Wenner - Direct - Mr. Skurnik                    94

1    incident locations.

2    Q    So are these maps?

3    A    Yes.

4    Q    Do these maps fairly and -- do these exhibits fairly and

5    accurately depict the screenshots you took from Google Earth?

6    A    Yes.

7             MR. SKURNIK:  Your Honor, at this time I would like

8    to move into evidence Government Exhibits 77 through 81, and

9    83 through 84.

10            MS. SHELLOW:  No objection, Your Honor.

11            THE COURT:  We admit Government's Exhibits 77

12   through 81, 83 and 84.

13            (Government's Exhibits 77 to 81, 83, 84 were

14   received in evidence.)

15   Q    I'm going to ask you now about Government Exhibits 334,

16   336, 337, 338, and 339.  Have you reviewed these exhibits?

17   A    Yes.

18   Q    What are they?

19   A    Those are the video compilations I created.

20            MR. SKURNIK:  Your Honor, we can show Ms. Wenner

21   Government Exhibit 85.

22            THE COURT:  All right.

23   Q    What is Government Exhibit 85?

24   A    This is a chart I created that shows which videos and

25   maps I used in each video compilation.

1   Q     Does this chart accurately describe the underlying videos

2   and maps that you used to make each video compilation?

3   A     Yes.

4             MR. SKURNIK:  So, Your Honor, at this point I'll

5   move just the chart, Government Exhibit 85, into evidence.

6             THE COURT:  Any objection?

7             MS. SHELLOW:  No objection.

8             THE COURT:  We'll admit Government's Exhibit 85.

9             (Government's Exhibit 85 was received in evidence.)

10  Q     If we could publish 85 for the jury, please.  Ms. Wenner,

11  could you explain what this chart shows?

12  A     This chart, it's showing each video compilation which has

13  been given a government exhibit number.  And then the middle

14  column is showing each underlying video that was included in

15  that video compilation, and also each underlying map that was

16  included in each video compilation.

17            MR. SKURNIK:  Your Honor, at this time I would move

18  to admit the compilations themselves, which are Government

19  Exhibits 334, 336, 337, 338, and 339.

20            MS. SHELLOW:  No objection, Your Honor.

21            THE COURT:  We admit Government Exhibits 334

22  through 339 which are the video compilations.

23            MR. SKURNIK:  Just so that the record is clear, Your

24  Honor, we're not moving to admit 335.  So it's 334 and skips

25  to 336 through 339.

S. Wenner - Direct - Mr. Skurnik                    96

1    THE COURT:  Sorry about that.  334 and 336, 337,

2    338, and 339 are admitted.

3    MR. SKURNIK:  Thank you, Your Honor.

4    (Government's Exhibits 334, 336 337, 338, and 339

5    were received in evidence.)

6    Q    So Ms. Wenner, I'm going to ask you now about one of the

7    video compilations you created.  So if we could please pull

8    up, Mr. Migliaro, this is now in evidence as Government

9    Exhibit 334.  If we could play the first ten seconds.

10    (Video played.)

11    Q    Ms. Wenner, what is this exhibit?

12    A    This is a screenshot I took from Google Earth that is

13    showing the location of the first surveillance video we're

14    going to see.

15    Q    The first video surveillance, what is the date of it?

16    A    It's from January 17, 2023.

17    Q    What location is depicted here?

18    A    1050 Bay Street in Staten Island.

19    Q    And in this first video clip, what is the jury going to

20    see?

21    A    You will see a grey BMW pull into a U-Haul store parking

22    lot, and then a few moments later you'll see a masked

23    individual in all dark clothing enter the U-Haul store.

24    MR. SKURNIK:  Mr. Migliaro, if we could play ten

25    seconds to 2 minutes and 30 seconds, please.

1           (Video played.)

2    Q    Ms. Wenner, at the bottom of the video screen, what date

3    is listed?

4    A    January 17, 2023.

5    Q    What time is listed?

6    A    8:35 in the morning.

7    Q    If we could pull up Government Exhibit 223, please.  This

8    is in evidence.  And if you could go to page 4, we can zoom

9    in, please, at the top.  Thank you.

10          Ms. Wenner, what does it say at the top of the

11   exhibit, Government Exhibit 223.

12   A    U-Haul equipment contract.

13   Q    What is the address of the rental location?

14   A    1050 Bay Street, Staten Island, New York 10305.

15   Q    Is that the same address as the video we just watched?

16   A    Yes.

17   Q    What is the rental date and time?

18   A    January 17, 2023 at 8:33 in the morning.

19   Q    Is that the same date and time as the video the jury just

20   saw?

21   A    Yes.

22   Q    Who is the customer listed?  What name is under customer

23   name?

24   A    Wesley Smith.

25   Q    Ms. Wenner, do you know what an iCloud account is?

S. Wenner - Direct - Mr. Skurnik                 98

1    A    Yes.

2    Q    What is it?

3    A    An iCloud account is Apple's storage for your data across

4    all your devices using your Apple ID.

5    Q    How does data generally get to an iCloud account?

6    A    A user has to have iCloud enabled on the device.

7    Q    So the data in the iCloud account, where does it come

8    from?

9    A    It comes from an Apple device that's usually an iPhone or

10   computer.

11   Q    If we could now -- let me ask.  Ms. Wenner, have you

12   reviewed Government Exhibit 601?

13   A    Yes.

14   Q    What is Government Exhibit 601?

15   A    Tony Clanton's iCloud account.

16   Q    Is it a single iCloud account or multiple iCloud

17   accounts?

18   A    Multiple.

19   Q    How many?

20   A    Two.

21   Q    Just for the witness, please, Government Exhibit 601-V.

22   Do you recognize this exhibit?

23   A    Yes.

24   Q    What is it?

25   A    This is subscriber information from Apple.

S. Wenner - Direct - Mr. Skurnik                    99

1   Q      Subscriber information for what, specifically?

2   A      For the iCloud account.

3   Q      Is it for both iCloud accounts or for one of the two?

4   A      This is just for one of the two.

5   Q      Generally, what is subscriber information?

6   A      It's information that a customer provides, name, phone

7   number, address, email address.

8              (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Continuing.)

2   BY MR. SKURNIK:

3   Q    Government Exhibit 601-V, is this a particular file

4   from Government Exhibit 601?

5   A    Yes.

6             MR. SKURNIK:  Your Honor, at this time we move to

7   admit Government Exhibit 601-V.

8             MS. SHELLOW:  No objection.

9             THE COURT:  All right.  So you're not moving 601

10  in, sir?

11            MR. SKURNIK:  That's correct, Your Honor.  601 is

12  the entire iCloud account.  We're just moving individual

13  files.

14            THE COURT:  All right.  Thank you.  We'll admit

15  601-V.

16            (Government Exhibit 601-V received in evidence.)

17            MR. SKURNIK:  If we could please publish that now

18  for the jury.

19            (Exhibit published.)

20  Q    So, Ms. Wenner, do you know what an Apple ID is?

21  A    Yes.

22  Q    What is it?

23  A    It's typically the name and email address that a

24  customer provides to Apple.

25  Q    What Apple ID is listed here?

1    A    Tover0525@gmail.com.

2    Q    If we look to the right on this page, what's the first

3    name and last name listed?

4    A    Tony Clanton.

5              MR. SKURNIK:  So now, Your Honor, if we could show

6    Government Exhibit 601-W just for the witness.  This is not

7    yet in evidence.

8    Q    What is 601-W, Ms. Wenner?

9    A    This is subscriber information from Apple for the other

10   iCloud account.

11   Q    So this is the second iCloud account of the defendant?

12   A    Yes.

13   Q    Is Government Exhibit 601-W a true and accurate copy of

14   that subscriber information?

15   A    Yes.

16   Q    And is this one of the files from Government

17   Exhibit 601?

18   A    Yes.

19             MR. SKURNIK:  Your Honor, move to admit 601-W.

20             MS. SHELLOW:  No objection.

21             THE COURT:  We admit Government Exhibit 601-W.

22             (Government Exhibit 601-W received in evidence.)

23             MR. SKURNIK:  If we could now please publish.

24             (Exhibit published.)

25   Q    Ms. Wenner, what's listed as the Apple ID on this

1    subscriber information?

2    A    tonyclanton316136@gmail.com.

3    Q    Under First Name and Last Name, what's listed?

4    A    The initials TC.

5    Q    How about under Log-in Alias, what does it say?

6    A    tonyclantony@icloud.com.

7         MR. SKURNIK:  We can take that down.

8    Q    Ms. Wenner, I'm going to ask you now about a series of

9    other exhibits; Government Exhibit 639 through 658, and

10   601-A through C, 601-C-12, 601-C-16, 601-D through 601-U.

11        Have you reviewed these records?

12   A    Yes.

13   Q    Where do these records come from?

14   A    From the defendant's iCloud account.

15   Q    How do you know that these records are from -- well,

16   let me back up.

17        From one of the iCloud accounts or from either of

18   the iCloud accounts?

19   A    From both.

20   Q    How do you know that these records came from one of the

21   two iCloud accounts?

22   A    Because I reviewed every single record and exhibit

23   myself.

24   Q    And when you reviewed them, did you determine that each

25   of these exhibits, in fact, was contained within one of the

1    defendant's two iCloud accounts?

2    A    Yes.

3              MR. SKURNIK:  So, Your Honor, I'm now going to

4    move to admit those exhibits.  This is Government Exhibits

5    639 through 658, 601-A through 601-C, 601-C-12, 601-C-16,

6    601-D through 601-U.  And the only limitation is for 601-C,

7    there are certain portions of that, which is a large

8    exhibit, that we've discussed with the defense that we'll

9    show to the jury today.

10             MS. SHELLOW:  We have no objection to the

11   admission of the particular pages that we have discussed

12   with the Government, but we will reserve our objection to

13   the balance of the exhibit.

14             THE COURT:  All right.  So noted.

15             Why don't you read them into the record.  I will

16   admit all of these exhibits.  I just lost a couple at the

17   end.

18             MR. SKURNIK:  No problem, Your Honor.

19             So it's 639 through 658, then 601-A through 601-C,

20   and C is the exhibit where there are just particular pages

21   we're showing today.

22             THE COURT:  C is just Exhibit C or --

23             MR. SKURNIK:  Sorry, 601-C.

24             THE COURT:  All right.  Without a number

25   following.  Okay.

1          MR. SKURNIK:  Correct.  And then there are two

2   sub-exhibits to 601-C.  They are 601-C-12 and 601-C-16 that

3   we're moving to admit.  And then 601-D through 601-U.

4          THE COURT:  All right.  We will admit all of those

5   exhibits.

6          (Government Exhibit 639 through 658, 601-A through

7   601-C, 601-C-12, 601-C-16, 601-D through 601-U received in

8   evidence.)

9          MR. SKURNIK:  If we can start by showing

10  Government Exhibit 654, and if we could please publish.

11          (Exhibit published.)

12  BY MR. SKURNIK:

13  Q    Ms. Wenner, what is Government Exhibit 654?

14  A    This is a photo taken from the defendant's iCloud

15  account.

16  Q    What's depicted in this photo?

17  A    A U-Haul receipt.

18  Q    In this U-Haul receipt, what name is listed at the

19  bottom?

20  A    Wesley Smith.

21  Q    Is that the same name as on the U-Haul paperwork we

22  looked at a minute ago?

23  A    Yes.

24  Q    What's the date and time of the rental on this

25  photograph?

1   A    From January 17, 2023, at 8:33 in the morning.

2   Q    Is that again the same date and time as the recently we

3   looked at a minute ago?

4   A    Yes.

5   Q    And this Exhibit 654 was found in one of the

6   defendant's iCloud accounts?

7   A    Correct.

8        MR. SKURNIK:  If we could go now to Government

9   Exhibit 642, please, first page.

10       (Exhibit published.)

11  Q    What is this exhibit?

12  A    This is an email taken from the defendant's iCloud

13  account.

14  Q    In the From line, what name is listed?

15  A    Wesley Smith.

16  Q    What does it say next to Wesley Smith?

17  A    There's an email tonyclantony@icloud.com.

18  Q    Is there an attachment to this email?

19  A    Yes.

20       MR. SKURNIK:  If we can go to the second page of

21  this exhibit, please.

22  Q    What does it say at the top of this page?

23  A    Lot Agreement.

24  Q    Generally, what does this appear to be to you?

25  A    It looks like he sent a screenshot of this Lot

S. WENNER - DIRECT - MR. SKURNIK                106

1   Agreement to an individual through email.

2            MR. SKURNIK:  If we can go to page 13, please, of

3   this agreement.

4   Q    Does it again say Lot Agreement at the top?

5   A    Yes.

6   Q    Where it says Tell Us About Your Company, can you

7   please just read the first four words?

8   A    This is Tony Clanton.

9            MR. SKURNIK:  If we can go now to Government

10  Exhibit 649, please.

11           (Exhibit published.)

12           MR. SKURNIK:  Again just zooming in at the top.

13  Q    Ms. Wenner, what name is listed in the From line?

14  A    Wesley Smith.

15  Q    And what email address is next to that name?

16  A    tonyclantony@icloud.com.

17  Q    And whose iCloud account did this email come from?

18  A    Tony Clanton.

19           MR. SKURNIK:  If we can go back now to Government

20  Exhibit 223, please, the U-Haul records, and the fourth

21  page.

22           (Exhibit published.)

23           MR. SKURNIK:  If we can please zoom in at the top.

24  Q    Under Customer Name, below where it says Wesley Smith,

25  what address is listed?

1    A    75 Clinton Street, Staten Island, New York 10304.

2         MR. SKURNIK:  If we can go back now to Government

3    Exhibit 642, please, and page 13.

4         (Exhibit published.)

5    Q    So we saw this a moment ago.  Ms. Wenner, at the top,

6    what address is listed?

7    A    75 Clinton Street, Suite 9, Staten Island, New York

8    10304.

9    Q    Is that the same address we just saw in the U-Haul

10   records?

11   A    Yes.

12   Q    Ms. Wenner, do you know what a bankruptcy petition is?

13   A    Yes.

14   Q    What is it?

15   A    It's a court filing seeking relief from unpayable

16   debts.

17        MR. SKURNIK:  If we can show just for the witness,

18   please, Government Exhibit 75.

19        Your Honor, we'd move to admit this exhibit as a

20   certified public record.

21        MS. SHELLOW:  No objection.

22        THE COURT:  We admit Government Exhibit 75.

23        (Government Exhibit 75 received in evidence.)

24        MR. SKURNIK:  If we could please publish.

25        (Exhibit published.)

1  Q    So, Ms. Wenner, on this first page of Government

2  Exhibit 75, under where it says Official Form 101, what does

3  it say right underneath that?

4  A    Voluntary Petition For Individuals Filing For

5  Bankruptcy.

6        MR. SKURNIK:  If we can zoom back out, please.

7  Q    At the very top, what date is listed next to where it

8  says Filed?

9  A    May 18, 2023.

10        MR. SKURNIK:  And if we can zoom back out, and

11  please zoom in under Part 1.

12  Q    What name is listed for Debtor 1?

13  A    Tony Clanton.

14        MR. SKURNIK:  If we can now go to page 42 of this

15  exhibit, please.  And if we can zoom in at the center of the

16  screen, under Business Name, Address.

17  Q    What company is listed here under Business Name,

18  Address?

19  A    Spin Empire LLC.

20  Q    What address is under Spin Empire?

21  A    75 Clinton Street, Suite 9, Staten Island, New York

22  10304.

23  Q    75 Clinton Street, is that the same address as on the

24  U-Haul application?

25  A    Yes.

1      MR. SKURNIK:  If we can now turn to Government

2  Exhibit 601-L in evidence.

3      (Exhibit published.)

4      MR. SKURNIK:  If we could just hit play --

5  actually, if we could play, sorry, the first three seconds

6  of this exhibit.

7      (Video played.)

8  Q    Ms. Wenner, who does this appear to be to you?

9  A    The defendant, Tony Clanton.

10 Q    And what is this exhibit, generally?

11 A    This is a video taken from his iCloud account.

12     MR. SKURNIK:  If we can play now from this point

13 until 10 seconds.

14     (Video is played.)

15 Q    Ms. Wenner, on this check, what company is listed?

16 A    Spin Empire LLC.

17 Q    And what address is listed under Spin Empire LLC?

18 A    75 Clinton Street, Staten Island, New York 10304.

19 Q    Is that the same address as on the U-Haul records?

20 A    Yes.

21     MR. SKURNIK:  If we can play to the end now.

22     (Video is played.)

23 Q    Whose company does the defendant say Spin Empire

24 belongs to?

25 A    Himself.

1          MR. SKURNIK:  If we can go now back to 223, the

2     U-Haul rental records, and page 4, please.

3          (Exhibit published.)

4     Q    In the center of the page at the top, what email

5     address is listed for the customer?

6     A    gclanton617@gmail.com.

7     Q    Does that contain the defendant's last name?

8     A    It does.

9     Q    What's the first phone number listed above that?

10    A    (929) 285-2967.

11    Q    So earlier you testified about subscriber records for

12    iCloud accounts.  Do phone companies collect subscriber

13    records too?

14    A    Yes.

15         MR. SKURNIK:  If we can show Government

16    Exhibit 228.  This is in evidence.

17         (Exhibit published.)

18    Q    What are these records, Ms. Wenner?

19    A    These are records from T-Mobile.

20    Q    Are they subscriber records?

21    A    Yes.

22    Q    What is the phone number listed for these records in

23    the sort of center of the page?

24         MR. SKURNIK:  If we can scroll up, please.

25    Q    What's the phone number listed at the top of the page?

1  A    It's (929) 285-2967.

2  Q    Is that the same phone number we just saw on the U-Haul

3  rental agreement?

4  A    Yes.

5  Q    Who is the listed customer here, the subscriber?

6  A    Wesley Smith.

7  Q    Again, is that the same name as on the U-Haul rental

8  agreement?

9  A    Yes.

10         MR. SKURNIK:  We can take that down.

11  Q    The man who rented the U-Haul in the videos we showed a

12  few minutes ago, can you remind the jury what type of car he

13  was driving when he arrived?

14  A    A gray BMW.

15         MR. SKURNIK:  If we can pull up now Government

16  Exhibit 257, please, and go to page 91.  This is in

17  evidence.

18         (Exhibit published.)

19  Q    What does it say at the very top of this exhibit?

20  A    State of New York Department of Motor Vehicles, Empire

21  State Plaza, Albany, New York 12228.

22  Q    So are these car registration records?

23  A    Yes.

24  Q    What type of car are these records for?

25  A    For a 2022 BMW, gray.

1  Q    On the right-hand side, what's listed under Registrant
2  Information?
3  A    Spin Empire LLC.
4  Q    Is that the same company that was on the checks in the
5  video from the defendant's iCloud account?
6  A    Yes.
7  Q    Is it the same company that was on his bankruptcy
8  petition?
9  A    Yes.
10 Q    Underneath that, what address is listed?
11 A    755 Narrows Road North, Staten Island, New York 10304.
12        MR. SKURNIK:  If we can go now to Government
13 Exhibit 75, this is the bankruptcy petition, page 31.
14        (Exhibit published.)
15        MR. SKURNIK:  And if we can zoom in, please, at
16 the center of the page.
17 Q    Next to Employer's Name, does that say Spin Empire?
18 A    Yes.
19 Q    What address is listed underneath that?
20 A    The same address, 755 Narrows Road North, #614, Staten
21 Island, New York 10304.
22        MR. SKURNIK:  If we can go back now to Government
23 Exhibit 257, to page 109.
24        (Exhibit published.)
25 Q    Again, are these the vehicle registration records?

1   A    Yes.

2   Q    What does it say at the very top of this document?

3   A    Vehicle Registration, Title Application.

4   Q    Under Name of Primary Registrant, what does it say?

5   A    Spin Empire LLC.

6   Q    And if we look down, what address is listed?

7   A    755 Narrows Road North.

8   Q    And under telephone or mobile phone number, what phone

9   number is listed?

10  A    (929) 285-2967.

11  Q    And just for the record, what is the plate number for

12  this vehicle?

13  A    Sorry, I'm looking for it.

14  Q    Above the phone number, please.

15  A    Oh, sorry.  KMZ 7212.

16       MR. SKURNIK:  If we can go back to Government

17  Exhibit 223, the rental records.

18       (Exhibit published.)

19       MR. SKURNIK:  And page 4, please.  And zoom in at

20  the top.

21  Q    The first phone number listed, what is it?

22  A    (929) 285-2967.

23  Q    Is that the same phone number that was on the record we

24  just saw for the 2022 gray BMW?

25  A    Yes.

1          MR. SKURNIK:  So now back to Government

2     Exhibit 334, the video compilation.

3          (Exhibit published.)

4          MR. SKURNIK:  And if we can now play starting at

5     2:30 to 2:47, please.

6          (Video played.)

7     Q    So, Ms. Wenner, what are we going to see in this clip?

8     A    This is surveillance video from the same day, on

9     January 17th, from a different location located at 181

10    Clinton Avenue in Staten Island.  It's a few hours after the

11    video we saw of the U-Haul store.  We'll see a white U-Haul

12    approach the incident location, park along the street, kind

13    of move around the street a little bit, and eventually a

14    masked man in all dark clothing will exit the driver's side

15    of the U-Haul and go to the very back of the van and then

16    eventually exit again and go back to the driver's side and

17    then eventually will drive away.

18    Q    The address here, 181 Clinton Avenue, is that also on

19    Staten Island?

20    A    Yes.

21         MR. SKURNIK:  If we can now play here from

22    2 minutes and 47 seconds until 4 minutes and 12 seconds,

23    please.

24         (Video is played.)

25         MR. SKURNIK:  We can pause right there.

1  Q    Ms. Wenner, the man in this video, does he appear to be

2  wearing the same clothes as the man at the U-Haul store?

3  A    Yes.

4  Q    Do you notice anything different about what he's

5  wearing?

6  A    He has a white glove on.

7          MR. SKURNIK:  If we can play now until, it will

8  just be a few seconds, until 4:18, please.

9          (Video is played.)

10         MR. SKURNIK:  Pause there.

11 Q    Can you tell what that license plate says?

12 A    Yes.  AL 55544, Arizona.

13         MR. SKURNIK:  If we can go back to Government

14 Exhibit 223, please, the U-Haul records.

15         (Exhibit published.)

16         MR. SKURNIK:  And page 8, please.  If we can zoom

17 in where it says Vehicle Trailer License.

18 Q    What license plate is listed there?

19 A    The same one, AL 55544, Arizona.

20         MR. SKURNIK:  Back to Government Exhibit 334, the

21 video compilation.

22         (Exhibit published.)

23         MR. SKURNIK:  And if we can now play from 4:18 to

24 5:05.

25         (Video is played.)

1   Q    Ms. Wenner, what date is this next clip?

2   A    This is of the following day, on January 18, 2023.

3   Q    Is it the same location?

4   A    It is.

5   Q    Generally, what happens on January 18th?

6   A    We will see a white Mercedes approach the incident

7   location, park along the street, and an individual -- a

8   masked individual in all dark clothing will exit the white

9   Mercedes, walk up the street, and enter a white U-Haul van

10  that's parked outside the incident location.  And then

11  eventually you'll see an individual exit that same white

12  U-Haul wearing an all white painters suit and approach the

13  incident location.

14  Q    So other than the U-Haul van, are there any other

15  vehicles we should pay attention to in this video?

16  A    Yes.  The white Mercedes.

17          MR. SKURNIK:  And now if we can play -- and this

18  will be a longer section, Your Honor -- from 5 minutes and 5

19  seconds until 14 minutes and 49 seconds.

20          (Video is played.)

21          MR. SKURNIK:  If we could pause there.  Thank you.

22  Q    So, Ms. Wenner, the next portion of the video is what

23  date?

24  A    It is from the following day on January 19, 2023.

25  Q    Generally, what happens on January 19th?

1  A    On this day, we'll see the same white Mercedes approach

2  the location, park along the same side of the street, and

3  two individuals wearing the same dark clothing will exit the

4  vehicle and walk up the street and enter the white U-Haul

5  van, and then later they'll exit and walk back to the white

6  Mercedes and drive away.

7          MR. SKURNIK:  This will be about five minutes of

8  video, Your Honor.  We'll play from here until 20 minutes

9  and 10 seconds.

10         THE COURT:  All right.  Thank you.

11         (Video is played.)

12         THE COURT:  May I ask a question?

13         MR. SKURNIK:  Yes, Your Honor.

14         THE COURT:  Was this white van U-Haul parked in

15 the same location between the 17th and the 18th?

16         THE WITNESS:  Yes, as far as I was able to see

17 with the surveillance video we were provided.

18         THE COURT:  Okay.  Thank you.

19         (Video is played.)

20 Q    Ms. Wenner, the various camera angles that we've seen,

21 are these all in the vicinity of 181 Clinton Avenue?

22 A    Yes.  Those videos were all pulled from the same

23 building.

24 Q    What is the date of this next clip?

25 A    This is from January 20, 2023, the following day, the

1   day of incident.

2   Q    Is this the final day of video from the compilation?

3   A    Yes.

4   Q    Generally, what happens on this day, on the 20th?

5   A    On this day you'll see the same white U-Haul parked

6   outside of the location, an individual wearing an all white

7   painter suit will exit the white U-Haul, enter the apartment

8   located at the location, enter the apartment, a couple of

9   times go back to the van and then re-enter the apartment.

10  And then eventually an individual in all dark clothing will

11  exit the white U-Haul van and also enter the apartment,

12  following behind an adult and a child also entering the

13  apartment.

14  Q    And what happens after they all enter the apartment?

15  A    It looks like there is something that goes on inside

16  based on the neighbors' reactions in the video and 911

17  calls.

18          MR. SKURNIK:  So if we can play -- Your Honor,

19  there's just about six minutes of video left.  We'll play

20  from 20 minutes and 10 seconds, where we're currently at, to

21  24 minutes and 36 seconds and pause there.

22          (Video is played.)

23          (Continued on the following page.)

24

25

1    (Continuing...)

2    BY MR. SKURNIK:

3    Q    Pause there.

4         What does the man in all black appear to be holding?

5    A    A firearm.

6         MR. SKURNIK:  We can now play just from here through

7    the end of the video, please.

8         (Video played.)

9         MR. SKURNIK:  So, Your Honor, we next have some

10   recordings of 911 calls we are going to play.  And for those

11   we have, with Your Honor's permission, transcripts of the 911

12   calls printed out that we can distribute to the jury.

13        THE COURT:  Any objection to the transcripts?

14        MS. SHELLOW:  No.  Thank you, Your Honor.

15        THE COURT:  All right.  Members of the jury, as you

16   listen to the 911 calls and review the transcripts, which are

17   provided as a guide only, it is up to you to decide whether

18   what you hear is consistent with what you see on the

19   transcript.  Ultimately, what you hear is what controls.  The

20   911 transcripts are just intended to assist you with

21   understanding the evidence that you will hear.

22        MR. SKURNIK:  Your Honor, there's going to be three

23   calls so three separate transcripts for each call.

24        THE COURT:  So for each call they are getting a

25   separate transcript?

1          MR. SKURNIK:  Yes, Your Honor.

2          THE COURT:  All right.

3          (Short pause.)

4          MR. SKURNIK:  If Your Honor would like a copy.

5          THE COURT:  Yes, I would.  Do you have an extra?

6          MR. SKURNIK:  Yes.  We have two here.  Your Honor,

7   we think there may be one extra transcript, if anyone has an

8   extra one.

9          THE COURT:  So each juror should have three

10  different transcripts, correct?

11         MR. SKURNIK:  Yes.  And they should be marked

12  Government Exhibit 850-A-T, B-T, and D-T.

13         (Short pause; said transcriptions distributed to the

14  Court and the jury.)

15         MR. SKURNIK:  Thank you, Your Honor.

16         So, Mr. Migliaro, if we can pull up Government

17  Exhibit 850-A.  We are going to play not the whole thing, but

18  just from the beginning until 2 minutes.

19         (Audio played.)

20         MR. SKURNIK:  So, Your Honor, that was 850-A.

21         We will now play 850-B, in its entirety.

22         (Audio played.)

23         MR. SKURNIK:  And, Your Honor, the third 911 call

24  will be Government Exhibit 850-D, and we'll play the whole

25  thing.

1           THE COURT:  Thank you.

2           (Audio played.)

3           MR. SKURNIK:  So, Your Honor, at this point I have

4    about 20 or 30 more minutes of questions.  I can keep going or

5    we can break here, whatever you prefer.

6           THE COURT:  Let me ask the jurors, would you like to

7    take a lunch break right now?  We don't have to take the whole

8    hour, but would you like a lunch break?  If so, raise your

9    hand.

10          All right.  Seems there are a fair number who would

11   like a lunch break.

12          Is 45 minutes sufficient for you, Jurors?  Members

13   of the jury?

14          All right.  So why don't you return to the jury room

15   at 1:35.  As soon as you are all here, we'll get started.

16          Thank you.

17          Don't talk about the case.

18          Please leave all materials facedown on your chair.

19          Thank you.

20          (Jury exits the courtroom.)

21          THE COURT:  All right.  So come back no later than

22   1:25, so we can make sure there's nothing that we have to

23   discuss.

24          If you have issues to discuss with your opposing

25   counsel, please do so on the break.  All right?

*PROCEEDINGS*                                                    122

1          We are adjourned until then.  Thank you.

2          Thank you, Marshals.

3          (Luncheon recess taken.)

4          (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2

3    (Proceedings continue in open court; no jury present.)

4

5              THE COURT:  Okay.  Any problems you wanted to bring

6    to my attention before the jurors are let in?

7              MS. SHELLOW:  Your Honor, I think the problem has

8    been averted for now.  I need to talk to the government for a

9    quick second on some of it.

10             MR. PITLUCK:  Your Honor, the doors were locked.  We

11   just got here.  Can we have two minutes to confer?

12             THE COURT:  Yes, of course.

13             (Short pause; attorneys confer.)

14             MS. SHELLOW:  Everything is resolved.

15             THE COURT:  Are you set up at the podium for your

16   cross?  Oh, wait.  It's still direct.

17             All right.  Are we ready to get the jury?

18             Let's get Mr. Clanton.

19             (Short pause.)

20             THE COURT:  All right.  May we bring the jury in

21   now?

22             MR. RODDIN:  Yes.

23             MS. SHELLOW:  Yes.

24             THE COURT:  Okay.  Great.

25             (Short pause.)

1        MR. SKURNIK:  Your Honor, when we start back up, it

2   might make sense to collect back the transcripts of the 911

3   calls, if that works for Your Honor.

4        THE COURT:  Do you want to pick them up now?

5        MR. SKURNIK:  I am totally fine to do that, too.

6   Thank you.

7        THE COURT:  Is the front door open so any spectators

8   or family members can come in?

9        THE LAW CLERK:  It should be open now.

10        (Jury re-enters the courtroom.)

11        THE COURT:  We are just picking up the transcripts,

12   but just come on in and resume your seats.

13        (Short pause.)

14        THE COURT:  All right.  All jurors are present.

15        Have a seat, Counsel.

16        Mr. Skurnik, you may resume your examination.

17        MR. SKURNIK:  Your Honor, may I proceed?

18        THE COURT:  Yes.

19        MR. SKURNIK:  If we can pull up Government Exhibit

20   228, in evidence.

21   (Direct Examination, resumed)

22   BY MR. SKURNIK:

23   Q    Ms. Wenner, can you remind the jury what this exhibit is?

24   A    These are returns from T-Mobile, specifically subscriber

25   information.

1  Q    And what's the phone number that these subscriber records

2  relate to?

3  A    929-285-2967.

4  Q    What's the name, again, listed on this record?

5  A    Wesley Smith.

6  Q    That phone number ending in 2967, where have we seen it

7  before today?

8  A    We have seen it on multiple exhibits.  Like the U-Haul

9  records, U-Haul screenshot, the bank -- I can't recall each

10 time we have seen it, but.

11 Q    Was that number on the U-Haul rental agreement?

12 A    It was.

13 Q    That name, Wesley Smith, that we see here on the

14 subscriber records, was that on the rental agreement?

15 A    Yes.

16 Q    What is listed next to termination date for this phone

17 number 2967?

18 A    January 21, 2023.

19 Q    Is that the day after the incident we just saw on the

20 videos?

21 A    Yes.

22        MR. SKURNIK:  If we can pull up now Government

23 Exhibit 229, please.

24 Q    What is Government Exhibit 229?

25 A    These are also returns from T-Mobile.

1    Q    Are these all subscriber records?

2    A    Yes.

3    Q    And what's the phone number for these subscriber records

4    at the top?

5    A    929-997 -- sorry, 929-979-8087.

6    Q    What name is listed on these subscriber records?

7    A    Wesley Smith.

8    Q    That phone number ending in 8087, is that different from

9    the phone number we saw a moment ago in Government Exhibit

10   228?

11   A    Yes.

12   Q    From what we can see here on the exhibit, can you tell

13   what date the 8087 phone number was activated?

14   A    Yes.  The activation date was on January 21, 2023.

15   Q    Is that the same date that the 2967 number was

16   deactivated?

17   A    Yes.

18   Q    And, again, this is a day after the videos we just saw?

19   A    Yes.

20   Q    If we can go now to Government Exhibit 601-E.

21        Generally, what is this exhibit?

22   A    These are returns from the iCloud.

23   Q    And what's contained in this particular exhibit?

24   A    Messages from the phone number -- actually, I'm not sure

25   which phone number this one is from.

1  Q    Under "display names," what does it say?  What are the

2  two names?

3  A    "Local user" and "Uncle KB."

4  Q    And when you said these are from the iCloud, whose iCloud

5  account?

6  A    The defendant, Tony Clanton.

7  Q    What is the date listed here for first message sent date?

8  A    January 21, 2023.

9  Q    Is that the same day that the phone number switched?

10 A    Yes.

11       MR. SKURNIK:  If we can zoom out, please, and zoom

12 in on the very first message.

13 Q    What is the first -- what is the date of this first

14 message.

15 A    It was sent on January 21, 2023.

16 Q    At what time?

17 A    At 1:39 p.m.

18 Q    And what does it say?

19 A    It says the phone number, 929-979-8087, Tone.

20       MR. SKURNIK:  And if we can scroll down, just to the

21 second text.

22 Q    What does this message say?

23 A    New.

24       MR. SKURNIK:  If we can go down to Government

25 Exhibit 601-C, the first page, please.

1  Q    Are these also messages from the defendant's iCloud

2  account?

3  A    Yes.

4  Q    Who are these messages with?  Who's displayed next to

5  "display names"?

6  A    The phone number ending in 8087 and then Curty.

7         MR. SKURNIK:  If we can please zoom out.

8  Q    In these texts, what color are the defendant's messages

9  and what color or Curty's messages?

10  A    Curty's messages are light gray and the defendant's are

11  blue.

12  Q    What day do the messages start?  What's the date?

13  A    They start on January 23, 2023.

14  Q    If we can go to the second page, please.  And starting

15  with the blue text here from the defendant, I am going to ask

16  you to please read out loud the blue texts, and I'll read the

17  gray texts from Curty.  So starting with this first text on

18  January 23 at 10:47 p.m.

19  A    I need 2500 bro asap I need to go for a few please.

20  Q    Okay.  Give me a little bit.

21  A    No cash app bring to David please.

22  Q    If we can go to the next page.

23         WYM, or, what you mean.  Okay.

24  A    Give them cash so he can bring to me.

25  Q    Okay.

1    A    Need it right away.  Got to get on the road now bro.

2    It's urgent.

3    Q    Next page, please.

4    A    I'm sending N-words at Boy.

5    Q    Scroll up, please.

6    A    I'm sending N-word at Boy Boy and Vernon.

7    Q    Okay.  Relax.  Not on this phone.

8    A    And I'm going to really get at them.  Okay.

9    Q    Okay.  I feel you.

10   A    Go give to David.

11   Q    Okay.  Boy Boy's truck is on Jersey Street by Benziger

12   Avenue.  Parking lot next to store.

13   A    I'll see them when I come back.

14   Q    Okay.

15   A    Bro it's getting late.  I need to get on the road.

16   Q    Okay.  But I will be home in 25 to 30 mins at least.

17   A    Okay.

18   Q    Okay.  And we can stop there.

19             MR. SKURNIK:  If we can now pull up Government

20   Exhibit 601-B.

21   Q    Are these also messages from one of the defendant's

22   iCloud accounts?

23   A    Yes.

24   Q    What's the date of the first message here?

25   A    It is January 24, 2023.

1          MR. SKURNIK:  If we can please zoom in on that first
2    message, Mr. Migliaro.
3    Q    What does the first message say?
4    A    This is Tony.  My new number 929-979-8087.  Please lock
5    me in.  I will come see you soon.
6    Q    And what does the second message say?
7    A    I put a guy in his place and I can't be around for a
8    while.
9          MR. SKURNIK:  If we can go now to Government Exhibit
10   601-A.
11   Q    Are these also messages from the defendant's iCloud
12   account?
13   A    Yes.
14         MR. SKURNIK:  If we can zoom in, please, on the
15   first message.
16   Q    Just read what the fist message says, please.
17   A    Love you and my little man.  I'm going to call you soon.
18   I had to disappear for a minute.  Will stay in touch.
19   Q    And what's the date of this message?
20   A    January 27, 2023.
21         MR. SKURNIK:  If we can go now to Government Exhibit
22   601-E, please.  In evidence.
23   Q    We saw this a moment ago.  Are these the texts with Uncle
24   KB?
25   A    Yes.

1    Q    Okay.

2         MR. SKURNIK:  If we can go to page 11, please.

3    Q    This fist message here on 11, what's the date?

4    A    January 25, 2023.

5    Q    Is that five days after the incident?

6    A    Yes.

7    Q    What does the defendant appear to be sending in this

8    first blue text?

9    A    Looks like a screenshot from the surveillance video taken

10   from the incident.

11   Q    And if we can now scroll to the next page, page 12.

12        What does the text say at the top of this page?

13   A    NYPD, shots allegedly fired in daylight robbery at

14   apartment building in New Brighton.  Tips sought.

15   Q    What does the defendant appear to be sending?

16   A    A news article.

17   Q    If we can go to page 15 now.

18        The third text down on this page, what's the date on

19   this text?

20   A    January 25, 2023.

21   Q    And what is the defendant sending here?

22   A    A screenshot of someone's contact.

23   Q    Whose contact is it?

24   A    Boy Boy Rob Vern Bro.

25   Q    Page 22, please.

WENNER - DIRECT - SKURNIK                    132

1          So here again, we'll read this together.  I'll start

2    with the gray text on January 28, 2023 from Uncle KB.  And if

3    you could read the blue text, please.

4          Yeah.  It was the green eye kid saying it.

5    A    Emoji, emoji, emoji.  How you know?

6    Q    I found out today.  People are not really talking about

7    it.

8    A    So he told the cops it was me?

9    Q    Na.  They going by the information that got off the

10   truck.  I can't say for sure.

11   A    It's no information off the truck.  It's a million

12   people.

13   Q    Oh, okay.  Still ain't seen Rob or Vern.  They might be

14   bouncing.  Don't want to talk to nobody.

15   A    Yep.  But they can't keep those jobs without saying

16   something.

17   Q    Thumbs up emoji.

18   A    If N-words don't get them out of hiding, they going to

19   stay away and try to let Evil run it.  Why they hide until

20   someone gets snatched for that.

21   Q    I am going to see if I can talk to them.  Trying to end

22   this.  They might be trying to let it die down.  People forget

23   once something else happens.

24          MR. SKURNIK:  We can take that down.

25          Actually, if we can, sorry, pull that back up.  So

1  Government Exhibit 601-E, but we'll go to page 38, please.

2  Q    So page 38, what's the date of the first text on this

3  page?

4  A    February 2, 2023.

5  Q    Starting with the second text -- second gray text from

6  Uncle KB.  What does Uncle KB say?

7  A    I am not going to let you die in jail.

8  Q    How about the third text?

9  A    Or in the streets, emoji, emoji.

10 Q    And how does the defendant respond?

11 A    He liked the first message, I'm not going to let you die

12 in jail.

13 Q    We can go to page 47 now.

14        And the first gray text on this page, what date is

15 it?

16 A    It is from February 8, 2023.

17 Q    Can you please read these four texts from Uncle KB.

18 A    I just called Evil D, and he said son ain't telling, so I

19 said to set it up so you can talk to son.

20        He told the police he didn't know who it was.

21        They're going on what I Haul (sic.) is telling them.

22        So I said they can't just do that.  They would have

23 to have a complaint.

24 Q    And in the text below, how does the defendant respond?

25 A    Yup.

1   Q    And what does Uncle KB say?

2   A    He said he'll call me back when son want to meet up.

3   Q    If we can go just to the next page, what does Uncle KB

4   say at the top?

5   A    Just you and him talk.  Gmgb.

6            MR. SKURNIK:  If we can pull up now Government

7   Exhibit 243, in evidence.

8   Q    What is this document, 243?

9   A    This is an extraction report from Cellebrite showing

10  messages between these two phone numbers, one ending 7358 and

11  one ending in 7531.

12  Q    Cellebrite, what is that?

13  A    Oh, I'm sorry.  These are not text messages, these are

14  Instagram messages.

15           Cellebrite is a digital forensic software where you

16  extract phones, but, also, you can use it to go through

17  returns from like Instagram and Facebook.

18  Q    So these are messages from an Instagram account?

19  A    Yes.

20  Q    Okay.

21  A    Sorry.

22  Q    What are the names of the two participants in this

23  conversation?

24  A    Tone and Ise Kream Shalon.

25           MR. SKURNIK:  If we can zoom out, please, and look

1    at the first two messages.

2    Q    Who is sending the first message there?

3    A    Ise Kream Shalon.

4    Q    What's the date of the message?

5    A    February 8, 2023.

6              MR. SKURNIK:  If we can scroll now to -- scroll

7    down, please.

8    Q    The individual named Tone, what does he say?

9    A    You.  I'm just seeing this Fam.  My bad.

10             MR. SKURNIK:  If we can scroll down, please, to the

11   next page.

12   Q    And how does -- what does Ise Kream Shalon say on

13   February 9, 2023 at the top of the page?

14   A    Top of the morning.

15   Q    What does he say next?

16   A    Looks like that was a deleted message.

17             And then I ran down on Boy Boy yesterday.  That's

18   why I was hitting you.  Was trying to let you listen to the

19   conversation for yourself.

20             MR. SKURNIK:  If we can scroll down, please.

21   Q    How does Tone respond?

22   A    What he talking about.

23             MR. SKURNIK:  Next page, please.

24   Q    What does Tone say at the top in this message?

25   A    He gives a phone number, 929-979-8087.

1  Q    Is that the same phone that was activated on January 21?

2  A    Yes.

3           MR. SKURNIK:  If we can go to the next page, please.

4  Oh.  Sorry.  Back up one page, and zoom in at the bottom to

5  Ise Kream Shalon's response.

6  Q    What does he say?

7  A    Basically told him that whatever took place is an

8  unfortunate situation, and if they wanna run with me --

9  sorry -- with the it was you theory, then under no

10 circumstance will it be respected to assist the authorities.

11 Especially for so-called gangstas and gang bangers.  He gave

12 me his word that neither his brother or himself said anything,

13 and that if the authorities ever caught up with Fam, they

14 would both go out of their way to advocate that FAM is an

15 impossible suspect.

16           MR. SKURNIK:  And if we can now scroll to the next

17 page.

18 Q    What does Ise Kream Shalon say next?

19 A    Of course there is so much said, but that was the jest

20 (sic.) of the conversation.

21 Q    How does Tone respond?

22 A    Love you Fam.  Good-looking Fam.

23           MR. SKURNIK:  Go now to Government 657.

24 Q    Where does Government Exhibit 657 come from?

25 A    It comes from the defendant's iCloud account.

1   Q    And what does it appear to be?

2   A    A screenshot of direct messages on Instagram.

3   Q    Who is --

4   A    Or Facebook.

5   Q    Who is the message from?

6   A    Ise Kream Shalon.

7   Q    And what does the message say?

8   A    The same message I just said:  Basically told him that

9   whatever took place is an unfortunate situation, and if they

10  wanna run with the it was you theory, then under no

11  circumstance will it be respected to assist the authorities,

12  especially for so-called gangstas and gang bangers.  He gave

13  me his word that neither his brother or himself said anything,

14  and that if the authorities ever caught up with Fam, they

15  would both go out of their way to advocate that Fam is an

16  impossible suspect.

17  Q    So just to be clear, is this the same message we just saw

18  in the Instagram records?

19  A    Yes.

20  Q    And this was found in the defendant's iCloud account?

21  A    Yes.

22  Q    Okay.

23              (Continued on the next page.)

24

25

1   DIRECT EXAMINATION

2   BY MR. SKURNIK: (Continued.)

3   Q    Government Exhibit 601-C, please.  Go to page 369.  If

4   you could, please, again read the blue messages and I'll read

5   the grey messages.  We'll start with the first blue message at

6   the top here.

7            First of all, what is the date of this message.

8   A    This is from March 29, 2023.

9   Q    If you could read from there.

10            THE WITNESS:  "Tomorrow at 1:00 p.m. at Stuyvesant

11   Borough Hall I'll be meeting Vernon, so be there in the area.

12            MR. SKURNIK:  "I will be at the doctor at one for my

13   stomach."

14            THE WITNESS:  "Bring the thing to me tonight."

15            MR. SKURNIK:  "Okay.  Why Borough Hall?"

16            THE WITNESS:  "So I make sure I don't have weapons

17   on us."

18            MR. SKURNIK:  "Okay."

19            THE WITNESS:  "Got to clean the machines."

20            MR. SKURNIK:  "I hope them not set you up for police

21   or so.  Remember that I gave you address in Long Island and

22   Park Hill."

23            THE WITNESS:  "Nah.  They would have already have my

24   name."

25            MR. SKURNIK:  "Okay.  See you tonight.  Who else

1   will be there?"

2           THE WITNESS:  "He wants to get this over with."

3           MR. SKURNIK:  "I feel you but don't sleep on nobody.

4   Is uncle coming there?"

5           THE WITNESS:  "You know I don't move stupid."

6           MR. SKURNIK:  "I know."

7           THE WITNESS:  "Nah.  Knowledge not coming."

8           MR. SKURNIK:  "Okay."

9           We can stop there.  We can pull up now Government

10  Exhibit 244.

11  Q    What is Government's Exhibit 244?

12  A    These are trans from Meta, Instagram specifically.

13  Q    The Instagram records, what are they generally?

14  A    They are showing direct messages between Instagram

15  account Tone 5085 and an account Ise Kream Shalondon.

16  Q    The first message, what is the date?

17  A    March 30, 2023.

18  Q    Who's talking in the first message?  Who is the author?

19  A    Tone 5085.

20  Q    What does Tone 5085 say?

21  A    I'm meeting Oh Boy tomorrow at Borough Hall 1:00 p.m. on

22  Stuyvesant.  We are going in to settle things, but I'm going

23  to need you outside laying low for when I'm coming out

24  afterwards.

25  Q    How does Ise Kream Shalondon respond?

1    A    Copy.

2    Q    What does he say next?

3    A    You said Stuyvesant, that's the side you're going to be

4    on because there's also the Richmond Terrace side.  I just

5    wanna be all the way on point.

6    Q    What does Tone 5085 say?

7    A    Stuyvesant side.

8    Q    How does Ise Kream Shalondon respond?

9    A    Copy.

10           MR. SKURNIK:  One moment, Your Honor.  No further

11   questions, Your Honor.

12           THE COURT:  All right.  Would you like to cross this

13   witness?

14           MS. SHELLOW:  I have no questions.  Thank you.

15           THE COURT:  Ma'am, you may step down.

16           MR. RODDIN:  The government calls Zaid Yaseen

17   Al-Hemyari.

18           THE COURT:  Come up to the witness stand, please.

19           (Witness sworn.)

20           THE COURTROOM DEPUTY:  State and spell your state,

21   your full name, for the record.

22           THE WITNESS:  Zaid Yaseen Al-Hemyari, Z-A-I-D

23   Y-A-S-E-E-N  A-L-H-E-M-Y-A-R-I.

24           (Continued on the following page.)

25

1   **ZAID YASEEN AL-HEMYARI**,

2        called as a witness by the Government, having been first

3        duly sworn/affirmed by the Courtroom Deputy, was examined

4        and testified as follows:

5   DIRECT EXAMINATION

6   BY MR. RODDIN:

7   Q    Good afternoon, sir.  How old are you, Mr. Al-Hemyari?

8   A    30.

9   Q    Where were you born?

10  A    In Yemen.

11  Q    How old were you when you came to the United States?

12  A    13.

13  Q    At that time did you know anyone here?

14  A    My cousins.

15  Q    How far did you go in school?

16  A    Until graduation.

17  Q    I'm sorry?

18  A    Until graduation.

19  Q    While you were in school were you also working?

20  A    Yes.

21  Q    How did you get the job you were working in?

22  A    I work with my cousins.

23  Q    What kind of job did you have?

24  A    Deli store.

25  Q    A deli store?

Al-Hemyari - Direct - Mr. Roddin                     142

1    A    Yes.

2    Q    Where?

3    A    In Staten Island.  416 Broadway in Staten Island.

4    Q    Around 2022 did you start working at a new store?

5    A    Yes.

6    Q    Where was that located?

7    A    827 Annadale Road.

8    Q    Also in Staten Island?

9    A    Yes.

10   Q    What kind of store is at 827 Annadale Road?

11   A    It's basically smoke shops and snacks.

12   Q    What kinds of things does the store sell?

13   A    Snacks and cigarette.

14   Q    Does the store also sell marijuana sometimes?

15   A    Yes.

16   Q    I'd like to ask you about the evening of June 3, 2023,

17   shortly after 10:00 p.m.  Were you working around that time?

18   A    Yes.

19   Q    Were there cigarettes and snacks and marijuana in the

20   store at that time?

21   A    Yes.

22   Q    Where was the marijuana?

23   A    It was inside, behind the counter, and there was inside

24   in the back also.

25   Q    How about the cigarettes?

Al-Hemyari - Direct - Mr. Roddin                    143

1    A    Also was in the back, too.

2    Q    Were there also cigarettes near the counter?

3    A    Yes.

4    Q    Was there cash in the store?

5    A    Yes.

6    Q    Where?

7    A    It was $3,000 in my pocket and a thousand dollars in the

8    counters, in the cashiers.

9    Q    Shortly after 10:00 p.m. that evening, what were you

10   doing?

11   A    I was getting ready to go home and close up.

12   Q    Can you describe what you were doing to close up?

13   A    I just turn on the light and I was to close the gate and

14   there was two guys come behind my back.

15   Q    Where is the gate?

16   A    It was on the front of the store.

17   Q    Outside the store?

18   A    Yes.

19   Q    And you said two guys came and robbed you?

20   A    Yes.

21   Q    Can you describe what those two men did?

22   A    I lay down on the floor and one of them he just -- I saw

23   him wearing mask.  There was the right guy, I saw him with the

24   gun and I lay down on the floor and they dragged me in the

25   store.  They zip tie me and they was saying where's the money,

Al-Hemyari - Direct - Mr. Roddin                    144

1   if you don't pass the money we'll kill you.  And I just give

2   them the money I have in my pocket, 3,000, and I think it was

3   1,000 behind the register.

4   Q    You mentioned that they zip tied you, correct?

5   A    Yes.

6   Q    Aside from the zip ties what else, if anything, were they

7   holding?

8   A    Just guns.

9   Q    What were they doing with the guns?

10  A    They try and kill me.

11  Q    Can you describe that?

12           THE COURT:  He wants you to tell us what the men

13  were doing with the guns that they were holding during this

14  incident.

15           THE WITNESS:  They put it on my head.

16           THE COURT:  Did both of them put a gun on your head?

17           THE WITNESS:  I went down on the floor and it was

18  two guys, they put the gun on my head.  I don't know who did

19  that but it's two people.

20  Q    Just to be clear, did they both have guns?

21  A    Yes.

22  Q    You mentioned that they were saying where's the money and

23  if you don't give it to us, we'll kill you.

24  A    Yes.  They asked me where's the weed.  We been watching

25  you for six months and you selling weed.

Al-Hemyari - Direct - Mr. Roddin                    145

1    Q    Could you hear anything else that they were saying?

2    A    There was like a noise in the phone, like they had

3    somebody watching out in the front.

4    Q    What do you mean by a noise on the phone?

5    A    I don't know.  I just hear somebody outside too.

6    Q    Where was the phone that you could hear?

7    A    That had it.  They had it, I think, in their pockets.

8    Q    So you were hearing a phone or phones that the two men

9    with guns had?

10   A    Yes.

11   Q    What could you hear coming from that phone or those

12   phones?

13   A    They say just keep going faster and clear, clear.  That's

14   all.

15   Q    Keep going, faster, and clear?

16   A    Yeah.

17   Q    What else did these men do while they were inside the

18   store?

19   A    Well, they was kicking my head.  When they drag me behind

20   the register, they was kicking my head.  I remember the zip

21   tie.  They were kicking my head behind the register and they

22   drag me back to the room.  They think I have a basement, and I

23   don't have a basement.

24   Q    When they dragged you back to the room, what happened?

25   A    Well, they bring me to the back room and they close the

1    door and they close out the switch light.

2    Q    Did they also take the marijuana?

3    A    Yes.

4    Q    While these men were inside the store, what did you think

5    was going to happen to you?

6    A    I die.  They were going to kill me.  I gave them what I

7    had.

8    Q    When they left, what happened then?

9    A    I just have a zip tie and I just break the zip tie from

10   like my tooth.  And I went from the backyard to get help from

11   next door and they would not help me.

12        MS. KELLMAN:  Your Honor, I'm having difficulty

13   hearing the answer.

14        THE COURT:  Sir, can you repeat your answer?  After

15   the men left, what did you do?  Could you keep your voice up,

16   also?

17   A    After they left I was in the back of the room and I

18   trying to get help.  I had the zip tie in my hand.  I break it

19   with my mouth.  I went to the next door to help and they

20   wouldn't help me, so I just called 911.

21   Q    How did you break the zip tie with your mouth?

22   A    With my teeth.  I don't know how's that.

23   Q    What did that do to your mouth?

24   A    I had infection and break my lips.  Everything has

25   bleeding.

Al-Hemyari - Direct - Mr. Roddin                    147

1   Q     We talked about the fact that you gave these men the cash

2   and they took the marijuana and cigarettes, right?

3   A     Yes.

4   Q     What kind of cigarettes or what were some of the

5   cigarettes that they took?

6   A     It's Newport 100 only for short and Marlboro Red,

7   Marlboro like it's from Virginia.

8   Q     From Virginia?

9   A     Yes.

10  Q     How do you know they're from Virginia?

11  A     They have the stamp on them.

12  Q     A stamp?

13  A     Yes.

14  Q     What kind of stamp?

15  A     Virginia stamp.

16          THE COURT:  Do both the Newport and the Marlboros

17  have Virginia stamps or just the one?

18          THE WITNESS:  Just Newport.

19          THE COURT:  Okay.  Thank you.

20  Q     Did the police eventually come to the store and meet with

21  you?

22  A     Yes.

23  Q     And did you also later meet with the FBI and U.S.

24  Attorney's Office?

25  A     Yes.

Al-Hemyari - Cross - Ms. Kellman                    148

Q    In those initial conversations, did you tell the police

and the FBI that there was marijuana in the store?

A    No.

Q    Why not?

A    I was afraid.

Q    Afraid of what?

A    I would get locked up.

Q    Did you eventually tell the government that there was

marijuana in the store?

A    Yes.

Q    After this incident did you ever see the two men in

person again?

A    No.

            MR. RODDIN:  I have no further questions.  Thank

you.

            THE COURT:  Any cross?

            MS. KELLMAN:  Yes.  Thank you, Judge.

CROSS-EXAMINATION

BY MS. KELLMAN:

Q    Good afternoon, sir.  My name is Susan Kellman.  I have

just a few questions by way of follow up for you.  You said

when the incident first happened you spoke with the police; is

that right?

A    Yes.

Q    And you didn't tell them about the marijuana that you had

1  in the place, correct?

2  A    Yes.

3  Q    And that was because it was before marijuana was legal to

4  sell; is that right?

5  A    Yes.

6  Q    And so you were concerned that you would have some

7  exposure for breaking the law, correct?

8  A    Yes.

9  Q    Would it be fair to say that you regularly had marijuana

10  in the store?

11  A    Yeah.

12  Q    Yes, right?  Correct?

13  A    Yeah.

14  Q    You said that the two men -- there were two men in the

15  store, correct?

16  A    Yes.

17  Q    And that one of them I think you -- withdrawn.  You had

18  an opportunity to talk to the police that night, correct?

19  A    Yeah.

20  Q    Did you also talk to them in the days that followed?

21  A    I did.

22  Q    And during that time you've told us what you didn't tell

23  them.  Let's talk about what you did tell them.  Did you try

24  your best to describe the individuals?

25  A    I did because they was wearing mask.  I told them I

Al-Hemyari - Cross - Ms. Kellman                    150

1    didn't know them.  I never see them.

2    Q    Do you remember telling them that you thought that one of

3    them was about 20 years old?

4    A    No.

5    Q    Were they taking any notes when you were talking to them?

6    A    Yeah.

7    Q    Do you remember telling them that one of them was slim?

8    A    Yes.

9    Q    And that's your recollection that one of them was slim?

10   A    Yes.

11   Q    And you say one of them had lighter skin than the other

12   one?

13   A    No.

14   Q    Were you able to see their faces at all?

15   A    No.

16   Q    You can't see the individual, either of the individuals,

17   that you saw that night, you don't see either of them in the

18   courtroom today, correct?

19   A    I did in the news.

20   Q    You saw something on the news?

21   A    Yes.

22   Q    Do you know whether or not the police came after the

23   incident and looked for fingerprints or DNA, blood, anything

24   like that?

25   A    No, I don't remember.

Al-Hemyari - Cross - Ms. Kellman                    151

1    Q    You don't remember?

2    A    I don't think so.  I didn't see that.

3    Q    So after you called the police they did nothing?

4    A    They did the investigation.

5    Q    That's what I'm asking you.  When you say they did the

6    investigation, did they come into your shop to do any part of

7    the investigation?

8    A    I was inside the ambulance.

9    Q    What about the next day?

10   A    The next day, yes, they did.

11   Q    Were you there that day?

12   A    No.

13   Q    How do you know they came?

14   A    They came and they call me to see the videos.

15   Q    How did they get in?

16   A    Well, the next day I take a day off and the third day

17   they came back again.

18   Q    So then the third day they came in to do their

19   investigation, correct?

20   A    Yes.

21   Q    When you say they were doing their investigation, what

22   did you see them doing?

23   A    Well, they just get the tape.

24   Q    They went for the cameras?

25   A    Yes.

Al-Hemyari - Cross - Ms. Kellman                    152

1    Q      And you gave them those, correct?

2    A      Yes.

3    Q      And did they also -- did you see if they swept any of the

4    surfaces to see if there were fingerprints?

5    A      I don't know.

6    Q      You didn't see that?

7    A      I don't know.

8    Q      Did you ever learn whether or not there were any

9    fingerprints?

10   A      I don't remember.

11   Q      You don't remember?

12   A      I don't know.

13   Q      Is that the kind of thing you would remember if they

14   found fingerprints from somebody who had assaulted you if they

15   told you that?

16   A      I don't see that.

17   Q      You didn't see that.  And did you see if they found any

18   gloves?

19   A      No.

20   Q      Any blood?

21   A      No.

22   Q      Any hair?

23   A      No.

24   Q      Now, when you were interviewed by the police in the days

25   after this incident happened, would it be fair to say that you

Al-Hemyari - Cross - Ms. Kellman                    153

1  never told them anything about the speakerphone or a voice

2  outside, correct?

3  A    I did tell them.

4  Q    You did tell them?

5  A    Yes.

6  Q    You told the FBI or you told that to the police?

7  A    I told the police and I told the FBI I heard noise in the

8  phones.

9  Q    Did you tell them anything about a man and a woman who

10  were bicycling by and that you thought that they might have

11  something to do with this?

12  A    Yes, I did.

13  Q    And did you tell them whether or not the people bicycling

14  were young or old?

15  A    No, I just have suspicious.

16  Q    And do you have a recollection of whether or not the

17  people biking past your store were young or old?

18  A    One of them is a old, tall guy, skinny, and the second,

19  she was a woman.

20  Q    She was just a woman?

21  A    Yes.

22  Q    And the fellow -- what was the ethnicity of these people?

23  Were they white?  Were they black?

24  A    Black.

25  Q    Both of them?

1   A    Yes.

2   Q    And the male, was he tall?

3   A    He's tall, yes.

4   Q    And thin?

5   A    Yes.

6            THE COURT:  You said they were passing by as you

7   were being robbed or earlier that night or at what point?

8            THE WITNESS:  Same day as the robbery.

9            THE COURT:  Was it before or after you got robbed?

10           THE WITNESS:  About five hour, like around 5:00 and

11  I got robbed ten.

12           THE COURT:  So five hours before the robbery?

13           THE WITNESS:  Yes.

14  BY MS. KELLMAN:

15  Q    And then you saw them again later, isn't that right?

16  Isn't that what made you feel suspicious about them?

17  A    No, that's the only time.  That's the first time I see

18  them.

19  Q    So you just thought that people who were biking past your

20  store were probably suspicious?

21  A    That time they came to the store and they was suspicious

22  to me.  They looking for something coil and I told them we

23  never have this existing there prior.

24  Q    So they came into the store?

25  A    Yes, the black male.  The black male guy.

Al-Hemyari - Cross - Ms. Kellman                    155

1  Q    Who was with the woman on the bike, they were bicycling,
2  correct?
3  A    Yes.
4  Q    And so they came together?
5  A    No.  It was only the male guy who comes to the store.
6  Q    And you saw the woman waiting outside?
7  A    Yes.
8  Q    And he asked for what?
9  A    For coil.
10 Q    Coil?
11 A    Yes.
12 Q    And you said you don't carry coil?
13 A    No, we never carry this.  This is all existence.  So they
14 never have that in the store, particularly in the shop every
15 where.
16          THE COURT:  What kind of coil are you talking about?
17          THE WITNESS:  For vape.
18 Q    And you were suspicious because he was asking for coil?
19 A    It was my first time to see them.  I never know them.  So
20 the same day I just told the cops about it because when I saw
21 the guy who comes rob me, he looks like his size and I just
22 get suspicious.
23 Q    When you say it looked like his size, that was tall and
24 thin, correct?
25 A    Yes.

Al-Hemyari - Cross - Ms. Kellman                     156

1   Q    When he came in off the bicycle, was it then that you

2   thought maybe he was about in his 20s?

3   A    Not really.  Because those guys who come at night, they

4   was wearing masks.  But I saw one of the guys skinny.

5   Q    I'm talking about the guy who came in hours earlier that

6   you were suspicious of and you said --

7   A    Had the same pants as he.

8   Q    Same pants?

9   A    Yeah.

10  Q    And he was tall and thin?

11  A    Yes.

12  Q    My question is, did you have an impression that he was

13  about in his 20s?

14  A    He's over 20s.

15  Q    Over 20s is 80 also?

16  A    No, over 20s like 30, 35.

17  Q    You don't remember telling the police that he was in his

18  20s?

19  A    No.

20  Q    And you never saw this couple again on bicycles?

21  A    No.

22  Q    But you think that the fellow who came in to buy the

23  coil, that he was wearing the same pants as the fellow who

24  came in to rob you, correct?

25  A    Yes.

1    Q    Tall and thin?

2    A    Yeah.

3              MS. KELLMAN:  I have nothing further.

4              THE COURT:  Any redirect?

5              MR. RODDIN:  Yes.  If I could have one moment,

6    please.

7    REDIRECT EXAMINATION

8    BY MR. RODDIN:

9    Q    Mr. Al-Hemyari, I'd like to show you and the jury what's

10   in evidence as Government Exhibit 307-A, and can we move that

11   to about 20:33 and 50 seconds, please, on the timestamp, top

12   left than the player clock.

13             Mr. Al-Hemyari, while we're preparing that, is this

14   video from your shop?

15   A    Yeah.

16   Q    From June 3, 2023?

17   A    Yes.

18   Q    Just to be clear, the two suspicious people you were

19   asked about on cross-examination, do you know whether they had

20   anything to do with the robbery or not?

21   A    I just found to be suspicious.

22   Q    Let's play 20:33 and 45 seconds on the timestamp at the

23   top left.  We'll pause that at about 20:33:56.  Mr.

24   Al-Hemyari, are these the two people you were talking about?

25   A    Yes.

Proceedings                                      158

1          MR. RODDIN:  No further questions.  Thank you.

2          THE COURT:  Any recross?

3          MS. KELLMAN:  No.  Thank you, Judge.

4          THE COURT:  Sir, you're excused.  Thank you.  Have a

5    nice day.

6          MR. RODDIN:  The government calls Detective Ronald

7    Wolfgang.

8          THE COURT:  Thank you.

9          MR. RODDIN:  Your Honor, if we could have one

10   moment.  I just need to step outside for a moment with the

11   witness.

12         THE COURT:  Sir, step up to the witness stand,

13   please.

14         (Witness sworn.)

15         THE COURTROOM DEPUTY:  State and spell your full

16   name for the record.

17         THE WITNESS:  Sure.  My name is Ronald Wolfgang,

18   detective.

19         THE COURT:  Will you spell your last name?

20         THE WITNESS:  W-O-L-F-G-A-N-G.

21         THE COURT:  Thank you.  Please proceed.

22

23         (Continued on the following page.)

24

25

1   **RONALD WOLFGANG**,

2        called as a witness by the Government, having been first

3        duly sworn/affirmed by the Courtroom Deputy, was examined

4        and testified as follows:

5   DIRECT EXAMINATION

6   BY MR. RODDIN:

7   Q    Thank you.  Good afternoon, sir.  Where do you work?

8   A    I am currently assigned to the NYPD, Fifth Precinct.

9   Q    Where is the Fifth Precinct?

10  A    It is located in Manhattan south.

11  Q    I think you told us a moment ago that you hold the rank

12  of detective?

13  A    Yes.

14  Q    Within the police department, where else have you been

15  assigned?

16  A    I have been assigned to the Central Robbery Division,

17  along with the First Precinct.

18  Q    What is the Central Robbery Division?

19  A    It's a unit that investigates robberies.

20  Q    What types of robberies does it investigate?

21  A    Anything to do with weapons or force being used to take

22  property.

23  Q    Within the Central Robbery Division, where within that

24  were you assigned?

25  A    I was assigned to Staten Island.

1    Q    I'd like to ask you about the evening of June 3, 2023.

2    Did you respond to the scene of a robbery that evening?

3    A    I did.

4    Q    What day of the week was that?

5    A    That was a Saturday.

6    Q    Where had that robbery taken place?

7    A    It was 820 Annadale Road.

8    Q    What kind of location was it?

9    A    It was a smoke shop.

10   Q    When you were notified about that robbery, what did you

11   do first?

12   A    Myself, along with my partner, we responded to the scene

13   and we met with the -- my partner met with the victim.

14   Q    What else?

15   A    We looked for video, which I did collect, along with any

16   evidence on the scene.

17   Q    And what, if any, physical evidence on the scene did you

18   find?

19   A    There was zip tie in the back room.

20   Q    I'd like to show, just the witness, please, what are

21   marked for identification as Government Exhibits 1436

22   through 1439.

23   A    Yes.

24   Q    We can go ahead and flip through those, please.  Do you

25   recognize those?

1   A    Yes, I do.

2   Q    What are they?

3   A    That is the zip tie that was recovered inside the

4   location.

5   Q    Photos of it?

6   A    Yes.

7   Q    Is there also a photo of the exterior of the smoke shop?

8   A    Yes.

9   Q    Do those photos fairly and accurately reflect how those

10  things looked on the night of June 3, 2023?

11  A    Yes.

12        MR. RODDIN:  I move to admit Exhibits 1436

13  through 1439.

14        THE COURT:  Any objection?

15        MS. KELLMAN:  No objection.

16        THE COURT:  Received in evidence Government

17  Exhibits 1436 through 1439.  You may publish.

18        (Government's Exhibits 1436 to 1439 were received in

19  evidence.)

20        MR. RODDIN:  Thank you.

21  Q    Can we display, starting with 1436, display that to the

22  jury.  Is that the front of the store, Detective Wolfgang?

23  A    Yes.

24  Q    Let's go ahead and pass through the remaining three.

25  A    This is the rear of the store where the zip tie was

1    recovered.

2    Q    To be clear, you're talking about Exhibits 1437

3    through 1439?

4    A    Correct.

5    Q    You mentioned that you collected video, right?

6    A    Yes.

7    Q    Where did you collect video from that night?

8    A    I collected video from the smoke shop, so 820 Annadale

9    Road.

10   Q    Aside from the videos at the shop itself, did you

11   subsequently later collect video from other locations, too?

12   A    Yes.

13   Q    About how many other locations did you look for video?

14   A    I would say approximately 50 other locations.

15   Q    On approximately how many days?

16   A    About four days.

17   Q    Aside from the smoke shop itself, what were some of the

18   places you were able to actually obtain video footage?

19   A    We obtained video footage from a speed light camera,

20   along with a Ring camera, and it's called an Argus camera.

21   Q    Where was each of those cameras?

22   A    The speed light camera is located on Jefferson Boulevard.

23   The Argus is the service road.  I forget the intersecting

24   streets.  I apologize.  Along with the Ring camera that's on

25   Jefferson Boulevard going further north.

1   Q    We'll talk about those locations in a bit more detail in

2   a moment.  But are those generally in the vicinity of the

3   smoke shop?

4   A    Yes.

5   Q    In addition to the videos you, yourself, helped to

6   collect, have you also reviewed video footage collected by

7   other detectives from additional locations?

8   A    Yes.

9   Q    What were those other locations?

10  A    The other location was 30 Jefferson Boulevard, which is a

11  restaurant.

12  Q    Where is 30 Jefferson Boulevard in relation to the smoke

13  shop?

14  A    It's on the opposite side of the street, separated by a

15  park.

16  Q    Did some of the cameras you reviewed have timestamps on

17  them?

18  A    Yes.

19  Q    What is a timestamp?

20  A    A timestamp just shows the current time when the

21  recording was made.

22  Q    In the videos that you helped to collect yourself, were

23  the timestamps accurate or inaccurate?

24  A    One timestamp was inaccurate.  It was about 28 minutes

25  behind, I believe.

Wolfgang - Direct - Mr. Roddin                                164

1  Q    Which one was that?

2  A    That was on the service road footage I collected, its

3  camera.

4  Q    Was that from a private house?

5  A    Yes.

6  Q    What steps, if any, did you or your partner take to

7  determine whether the timestamps on that and the other cameras

8  were accurate or inaccurate?

9  A    While viewing the camera that we're going to collect

10 footage from, we compare it to the time on our cell phones or

11 a watch, something that we know is accurate, and we just go

12 from there.  If the times are the same, we know it is correct.

13 In the case of the private house, it was about 28 minutes

14 behind.  So we just have to do the math.

15 Q    Are you familiar with the term vehicle of interest?

16 A    Yes.

17 Q    What is a vehicle of interest?

18 A    During the course of an investigation if we discover a

19 vehicle was used it would be a vehicle of interest.

20 Q    What do you mean by used?

21 A    During the commission of a crime if the subjects do get

22 into a vehicle, either before or after, that's being used.

23 Q    In the videos that you reviewed from June 3, 2023, did

24 you identify any vehicles of interest?

25 A    Yes.

1    Q    What were they?

2    A    What appeared to be a silver four-door BMW, a black SUV

3    four-door black Infiniti, along with a white four-door

4    Mercedes sedan.

5    Q    You mentioned that the white Mercedes was a sedan and the

6    black Infiniti was an SUV.  What kind of car was the silver

7    BMW four door?

8    A    What kind of car?

9    Q    What style?

10   A    Four-door sedan.

11   Q    Were you able to track those same three cars through some

12   of the videos you reviewed?

13   A    Yes.

14   Q    I'd like to show you what is in evidence as Government

15   Exhibit 336 from its beginning.  Have you reviewed Government

16   Exhibit 336 before?

17   A    Yes.

18   Q    Is that a compilation of some of the videos that you and

19   your colleagues recovered?

20   A    Yes.

21   Q    Let's pause and rewind if we need to to about 11 seconds,

22   please.

23             (Video played.)

24   Q    And 11 seconds -- just to be clear, I'm going to refer to

25   the times on the player clock now, not the top left timestamp.

1    At about 11 seconds, what address is this camera from?

2    A    This is 30 Jefferson Boulevard.

3    Q    And you mentioned that was the restaurant roughly across

4    the street from the smoke shop?

5    A    Yes.

6    Q    Is the smoke shop visible from this camera?

7    A    Yes.

8    Q    Where is it?

9    A    If you look at the timestamp up top, it's just under the

10   20 minute 37 mark.

11   Q    Sort of toward the top left center under the 20:37?

12   A    Yes.

13   Q    What direction does this camera face?

14   A    This camera faces northeast.

15   Q    And what's the road shown directly in front of the camera

16   just beyond this parking lot?

17   A    This is Jefferson Boulevard.

18   Q    If a person were to drive on Jefferson Boulevard from the

19   right-hand side of the screen toward the left-hand side of the

20   screen, what direction would he be traveling?

21   A    He would be traveling roughly north, northwest.

22   Q    Can we play from 11 seconds up to about 14 seconds,

23   please.

24            (Video played.)

25   Q    At 14 seconds, what is in the highlighted box?

1  A    What appears to be a silver four-door BMW sedan.

2  Q    In general terms, we're going to play this in a moment

3  from about 14 seconds to 2 minutes, 57 seconds.  In general

4  terms, what are we going to see?

5  A    You're about to see an individual exit the silver BMW and

6  walk into the park and then return to the car, drive away, and

7  a black SUV, appears to be an Infiniti truck, is going to come

8  into the camera view.

9  Q    Let's go ahead and play from 14 seconds up to 2 minutes,

10  57 seconds, please.

11          (Video played.)

12  Q    At about 2 minutes, 57 seconds, what is shown in the

13  highlighted box?

14  A    It's the silver BMW sedan along with the black four-door

15  SUV.

16  Q    Let's play up to about 4 minutes, 32 seconds, please.

17          (Video played.)

18          (Continued on next page.)

19

20

21

22

23

24

25

1    (Continuing.)

2    BY MR. RODDIN:

3    Q    At roughly 4 minutes and 32 seconds, what's shown in

4    the highlighted box?

5    A    We see a four-door white, what appears to be a Mercedes

6    sedan.

7         MR. RODDIN:  Let's go ahead and play up to about

8    7 minutes and 36 seconds, please.

9         (Video is played.)

10        MR. RODDIN:  So let's pause there for a moment.

11   Q    Detective Wolfgang, in that last clip, can you tell us

12   what we saw at the very end of that clip?

13   A    Yes.  We saw two individuals walking into the park, one

14   going off to the right side of the screen, another one going

15   off to the left and taking a seat inside the park on one of

16   the benches.

17   Q    On two separate benches?

18   A    Yes.

19   Q    And this next title slide indicates 827 Annadale Road,

20   Staten Island, New York 10312.  What's at that location?

21   A    That is the smoke shop.

22   Q    And just to be clear, is the smoke shop at 827 Annadale?

23   A    Yes.

24        MR. RODDIN:  Let's go ahead and play that until

25   about 7:42.

1           (Video is played.)

2    Q    At 7 minutes 42 seconds, what street are we looking at

3    here?

4    A    We are looking at Annadale Road.

5    Q    And is this from the smoke shop itself?

6    A    Yes.

7    Q    Roughly what direction does this camera face?

8    A    Roughly north.

9           MR. RODDIN:  Let's play to about 8 minutes even.

10          (Video is played.)

11   Q    At 8 minutes 0 seconds, do you recognize the person

12   shown in front of the store at the far left?

13   A    Yes.

14   Q    Who is that?

15   A    That is Zaid.  He's the victim.

16   Q    In general terms, what are we about to see in this

17   portion of the video?

18   A    We're about to see two individuals both come from the

19   park at different sides, appearing -- what's -- I apologize,

20   appearing there holding a firearm.  And they approach the

21   victim and bring him inside.

22          MR. RODDIN:  Let's play from 8 minutes to about

23   12 minutes 58 seconds, please.

24          (Video is played.)

25          MR. RODDIN:  Let's pause that when we get to about

1    12:58.

2              (Video is played.)

3    Q    Detective Wolfgang, are we now back at 30 Jefferson

4    where we started originally?

5    A    Yes.

6    Q    In general terms, what are we going to see in this

7    portion of the video?

8    A    We're going to see two individuals going through the

9    park.  One individual is going to be running off to the left

10   of the screen, another individual is going to be getting

11   into the black SUV truck, and the silver BMW four door is

12   going to drive off.

13   Q    You said we'll see those men coming through the park.

14   What direction are they shown coming from?

15   A    Coming from the location of 827 Annadale Road, so

16   coming from the north.

17   Q    So the smoke shop?

18   A    Yes.

19             MR. RODDIN:  Let's play from there until about

20   13:47, please.

21             (Video is played.)

22   Q    In the earlier videos, Detective Wolfgang, when the

23   white Mercedes arrived, which direction did it go?

24   A    It continued north-northwest on Jefferson Boulevard.

25   Q    Sorry.  When it arrived on this block, did we see it go

1    from right to left?

2    A    Yes, I apologize, right to left.

3    Q    So one of those men was running in that same direction?

4    A    Correct.

5              MR. RODDIN:  Let's play from 13:47 to about 13:54,

6    please.

7              (Video is played.)

8    Q    In relation to this marker at Carlton Boulevard and

9    Jefferson Boulevard, where would the smoke shop be?

10   A    It would be just below where that camera is.  Yeah,

11   just south of the camera, a little bit off to the right.

12   Q    In that sort of green shaded zone to the bottom right

13   of the camera?

14   A    Correct.

15   Q    Or in that general area, I should say?

16   A    Yes.

17   Q    And which camera is at Carlton boulevard and Jefferson

18   Boulevard?

19   A    That is a speed camera.

20   Q    And generally speaking, in the next few clips what are

21   we going to see?

22   A    We're going to see three vehicles driving together.

23   We're going to see a silver BMW along with the black SUV

24   truck and the white Mercedes all driving together.

25             MR. RODDIN:  Let's start playing from there,

1    please, and we'll pause at about 14 minutes 34 seconds.

2              (Video is played.)

3    Q    In that last clip from Carlton and Jefferson, which

4    street were we looking at?

5    A    We were looking on Jefferson Boulevard.

6    Q    Facing what direction?

7    A    North-northwest.

8    Q    Was that the same direction that the three -- excuse

9    me, that the men and the cars went when they went off camera

10   from after the robbery?

11   A    Correct.

12   Q    Now, at 13 -- excuse me, at 14:34, approximately, where

13   is 167 Jefferson in relation to the cameras we just watched?

14   A    It is further on that same road, continuing the same

15   north-northwest direction.

16   Q    And is the green shaded area that shows the park near

17   the smoke shop shown at the very bottom of the screen, a

18   little bit to the bottom right of the camera?

19   A    Yes.

20             MR. RODDIN:  Let's play from there, please.

21             (Video is played.)

22             MR. RODDIN:  If we can pause here for a moment.

23   Q    We paused that at 15 minutes 11 seconds, this marker

24   that indicates Arthur Kill Road and Drumgoole Road, where is

25   that in relation to the Jefferson Boulevard cameras that we

R. WOLFGANG - DIRECT - MR. RODDIN                173

1    just watched?

2    A    I'm trying to find it here.  It's now continuing north

3    looking forward on the road.  If you go about halfway down

4    the screen in the greenery area, that's where Jefferson

5    Boulevard is.

6    Q    Is that screen in front of you a touchscreen?

7    A    I tried before.

8    Q    If you can touch it to indicate Jefferson, please do.

9    If not, we'll move on.

10   A    Jefferson -- the touchscreen doesn't appear to be

11   working.

12   Q    Okay.  You said it was somewhat below or south of the

13   marker we are looking at now?

14   A    Yes.

15   Q    Let's go back for just a moment to about 14 minutes

16   58 seconds.

17          Before we look at the next video, what kind of

18   video did we see at 14:58 at 167 Jefferson?

19   A    We saw a silver four-door sedan, possibly a BMW, along

20   with a black SUV that appeared to be an Infiniti truck,

21   driving together.

22   Q    Sorry.  My question was just what kind of video.

23   A    Oh, I apologize.  This is a Ring camera video.

24   Q    What is a Ring camera?

25   A    It's a type of recording device that can be activated

1  with motion or set to 24/7 recording.

2  Q    If a Ring camera is activated by motion, what effects

3  does that have on the video that it records?

4  A    It takes a brief recording of whatever is in view.

5  Q    From reviewing this Ring camera at 167 Jefferson, could

6  you tell whether it was motion activated or constantly

7  recording?

8  A    Yes.  It was motion activated.

9  Q    And could you tell what moving object activated it?

10 A    The American flag in the video.

11         MR. RODDIN:  Let's move ahead to 15:11, please.

12 And we'll play from there to the end of the video.

13         (Video is played.)

14 Q    Detective Wolfgang, in those last two clips from Arthur

15 Kill Road and Drumgoole Road and then 472 Drumgoole Road,

16 which cars, if any, did we see?

17 A    We see the silver four-door BMW sedan, along with the

18 black SUV Infiniti.

19 Q    This last clip from 472 Drumgoole, is that video

20 timestamp accurate or not accurate?

21 A    It is inaccurate.

22 Q    And you told us that this one was about 28 minutes

23 behind?

24 A    Yes.

25         MR. RODDIN:  Can I have one moment, please?

1    THE COURT:  Yes.

2         (Pause in proceedings.)

3    Q    Detective Wolfgang, I just have a couple of other

4    questions for you.

5         Have you ever driven in a car from Atlantic City,

6    New Jersey to Staten Island, New York?

7    A    Yes.

8    Q    Approximately how long does it take to make that drive

9    without significant traffic?

10   A    About one and a half, maybe two hours.

11        MR. RODDIN:  If we can go back for just a moment

12   to the 167 Jefferson video and Exhibit 336, which is about

13   14 minutes and 58 seconds.

14        (Exhibit published.)

15        MR. RODDIN:  Let's go ahead and play that.

16        (Video is played.)

17   Q    Detective Wolfgang, which --

18        MR. RODDIN:  Let's play that a little bit more.

19        (Video is played.)

20   Q    Which car do we see first going by?

21   A    We saw the black SUV, four-door.

22   Q    Followed by?

23   A    The white four-door sedan.

24        MR. RODDIN:  I have no further questions.  Thank

25   you.

1           THE COURT:  All right.  Who would like to cross?

2           MS. KELLMAN:  I will, Your Honor.

3    CROSS-EXAMINATION

4    BY MS. KELLMAN:

5    Q    Good afternoon, Detective Wolfgang.

6    A    Good afternoon.

7    Q    My name is Susan Kellman.  I have just a few follow-up

8    questions, if I may.

9           Did you respond to the scene the night of?

10   A    Yes.

11   Q    And fair to assume there were other officers there, as

12   well?

13   A    Yes.

14   Q    Approximately how many?

15   A    Approximately maybe 15.

16   Q    And fair to say that at least one of them, if not more,

17   were wearing body cams, recorders?

18   A    Yes.

19   Q    Have you had a chance to review any of the body cam

20   recordings?

21   A    I have not.

22   Q    Do you know if they were turned over to the Government?

23   A    I do not know.

24   Q    Would you agree with me that it's sort of standard

25   fair, after an incident like this, that some number of

1   police officers would be processing the scene looking for

2   evidence?

3   A     Yes.

4   Q     Is that the right word, processing?

5   A     Yeah.

6   Q     I watch television.

7         And would it be fair to say that what you'd be

8   looking for are things like fingerprints, correct?

9   A     Yes.

10  Q     DNA?

11  A     Yes.

12  Q     Maybe blood?

13  A     Yeah.

14  Q     And you saw a little bit of violence there, there may

15  be some blood?

16  A     Possibly.

17  Q     And that might help you identify who the perpetrators

18  were, correct?

19  A     It can assist in an investigation.

20  Q     Did you notice in the video that one of the individuals

21  was wearing what appeared to be latex gloves, correct?

22  A     Yes.

23  Q     And the other one was not wearing any gloves at all,

24  correct?

25  A     Yes.

R. WOLFGANG - CROSS - MS. KELLMAN                    178

1    Q    And the fellow who wasn't wearing any gloves, among

2    other things, was grabbing boxes of cigarettes, correct?

3    A    Yes.

4    Q    Are you in the Crime Scene Unit?

5    A    No.

6    Q    But there was a Crime Scene Unit there?

7    A    There was Evidence Collection Team there.

8    Q    And do you know whether or not the Evidence Collection

9    Team retrieved any fingerprints from the cash register area?

10   A    I do not.

11   Q    Do you know whether or not they were able to retrieve

12   any fingerprints from the area where the cigarettes were

13   being thrown back and forth and into the bag?

14   A    I do not.

15   Q    Do you know whether or not they retrieved any

16   fingerprints from the counters that were being touched

17   pretty regularly?

18   A    I do not.

19   Q    But it was being processed for that kind of thing,

20   correct?

21   A    Yes, ma'am.

22   Q    Now, you had an opportunity to look at a zip tie that

23   was found on the floor at the scene, correct?

24   A    Yes.

25   Q    And that was a white zip tie, correct?

1   A    Yes.

2   Q    And it appeared to be intact?

3   A    It appeared to be broken or cut when it was on the

4   floor.

5   Q    I mean --

6   A    To my knowledge, it looked like it was cut, yeah.

7   Q    Did it look like it was chewed through?

8   A    That I do not know.

9   Q    Did you see any blood on it?

10  A    I did not.

11  Q    Do you know if any blood was recovered from it?

12  A    I do not.

13  Q    Now, we looked at dozens and dozens and dozens of

14  pictures of these cars that you say were vehicles of

15  interest, correct?

16  A    Yes.

17  Q    And in addition to the other cameras, one of the

18  cameras at least was what you call a speed camera, correct?

19  A    Yes.

20  Q    And a speed camera I think you said is triggered by

21  motion, correct?

22  A    The speed camera is triggered when a vehicle is

23  traveling faster than the speed limit.

24  Q    And the idea is to capture the license plate, correct?

25  A    That's the idea, yes.

1  Q    And we saw these cars kind of speeding right by,
2  correct?
3  A    Yes.
4  Q    And this was in a local residential area, correct?
5  A    Yes.
6  Q    And there are no pictures of the license plates,
7  correct?
8  A    Not to my knowledge, no.
9  Q    You've never seen anything that indicates what any of
10 the license plates were, correct?
11 A    No.
12 Q    And in all the pictures that you saw, has anybody tried
13 to, like, enlarge them to see if it was possible, on the
14 highway or when they were parked, to see what the license
15 plates were?
16 A    I was not involved in that, no.
17 Q    You have never seen a report that indicates that
18 license plates were recovered that night?
19 A    No.
20 Q    Now, you say that in the first vehicle you saw an
21 individual enter the vehicle and leave the vehicle, correct?
22 First I think you saw you saw someone exiting the vehicle,
23 correct?
24 A    Correct.
25 Q    And would you agree with me that that individual

1   appeared to be rather tall?

2   A    I cannot tell from that distance.

3   Q    Well, he was taller than the car, correct?  I mean,

4   relative to the car, he was taller than the car, correct?

5   A    Yes.

6   Q    And slim?

7   A    From that distance, it's hard to tell.

8   Q    Well, when he came in the front of the store when the

9   individual, the shopkeeper was first being surrounded by

10  these individuals with the guns, that was very close up.

11  Would you agree with me that that individual appeared to be

12  quite slim?

13  A    Are we talking about the video recovered inside the

14  shop or when they were getting out of the vehicle?

15  Q    I apologize.  No, the one that was outside the shop,

16  when the two men were approaching the shopkeeper and when he

17  threw himself on the ground.

18  A    Yes.

19  Q    So now you have a close view of the individuals, and

20  I'm asking you, would it be fair to say that they appeared

21  to be tall and slim?

22  A    I wouldn't say slim, but on the taller side, yes.

23  Q    Not stocky at all, correct?

24  A    No.

25  Q    Now, I know that it was nighttime, but would you agree

1  with me that at no time were you able to see anyone who was

2  in the cars?

3  A    That is correct.

4  Q    And from the videos that were taken in the store, would

5  you agree with me that at least one of the two perpetrators

6  appeared to be quite light skinned?

7  A    It's hard to tell.

8  Q    Well, when you saw his hands, the one without the

9  gloves, could you see that he was light skinned?

10  A    I wouldn't say light skinned.  I would just --

11  Q    He wasn't particularly dark skinned, correct?

12  A    It's hard to tell in the video complexions, at least.

13  Q    Now, you were asked just a few minutes ago about how

14  long it takes to go back and forth from Atlantic City to

15  this area, correct?

16  A    Yes.

17  Q    Would you agree with me that depending on the time of

18  day, that would vary, correct?

19  A    Yes.

20  Q    And depending on the day of the week it would vary,

21  correct?

22  A    Yes.

23  Q    And depending on how fast or slow a car was going it

24  would vary, correct?

25  A    Yes.

1  Q    How far is Atlantic City from this scene?

2  A    I don't know the exact mileage.  I would say maybe

3  roughly 80 miles.

4  Q    When you say roughly, would it be fair to say you don't

5  know?

6  A    No.

7  Q    That's a guess?

8  A    Correct.

9          MS. KELLMAN:  Nothing further.

10         THE COURT:  All right.  Any other redirect?

11         MR. RODDIN:  Yes, please, briefly.

12 REDIRECT EXAMINATION

13 BY MR. RODDIN:

14 Q    Detective Wolfgang, during cross-examination you were

15 asked about the fact that the Evidence Collection Team

16 responded, and I think you said their job includes looking

17 for forensic evidence, right?

18 A    Yes.

19 Q    What areas did the Evidence Collection Team examine?

20 A    They examined the cash register and the counter.

21 Q    Do you know whether any forensic evidence was obtained

22 from those areas?

23 A    I do not.

24 Q    We talked about the fact that there were three vehicles

25 of interest shown in the videos.  When the two men came out

1  of the smoke shop after the robbery, where did they each go?

2  A    One individual goes into the black SUV, the Infiniti,

3  and the other one goes off camera.

4  Q    Did either of them run into the gray BMW?

5  A    You do not see that on camera.

6  Q    Would knowing whose fingerprints or DNA was on the cash

7  register or the countertop tell you anything about who was

8  in the gray BMW?

9  A    It would not.

10  Q    Why not?

11  A    If the individual was not in the store, there would be

12  no evidence to collect.

13        MR. RODDIN:  Thank you.  I have no further

14  questions.

15        MS. KELLMAN:  May I very briefly, Your Honor?

16        THE COURT:  Yes.

17  RECROSS EXAMINATION

18  BY MS. KELLMAN:

19  Q    You were asked on redirect examination about whether or

20  not any evidence that might have been collected in the store

21  would tell you who was in the BMW, correct?

22  A    Correct.

23  Q    And of course it would not, correct?

24  A    Yes.

25  Q    But it would tell you who the other individuals were,

1   correct?

2   A    Sometimes it does.

3   Q    Okay.  And if you were able to find out who the other

4   individuals were, you could make further inquiries, correct?

5   A    Yes.

6   Q    And you were asked about the things that were viewed in

7   the shop.

8          MS. KELLMAN:  I'd like to go back, if I could, to

9   Government Exhibit 1439.  If we could pull that up.  I'm the

10  only one without a camera, so I don't know if anybody is

11  looking at it.  Is it on the screen?  No?

12         Can I ask the Government, would you mind pulling

13  it up, 1439.

14         (Exhibit published.)

15  Q    You testified that you had seen this before, this zip

16  tie; is that right?

17  A    Yes.

18  Q    And that it had been -- it seemed to be cut, correct?

19         MR. RODDIN:  Objection.  Outside the scope.

20         THE COURT:  Well, it's outside the scope of the

21  redirect, yes.

22         Sustained.

23  Q    This is one of the things that was collected, correct?

24  A    Yes.

25  Q    Did you have anything to do with processing it?

PROCEEDINGS                                      186

1   A     No.

2              MS. KELLMAN:  Nothing further.

3              THE COURT:  Any redirect?

4              MR. RODDIN:  No, thank you.

5              THE COURT:  All right, sir, you're excused.  Thank

6   you.  You can take the water with you.

7              THE WITNESS:  Thank you.

8              (Witness is excused.)

9              THE COURT:  How are the jurors doing?  Do you need

10  a mid afternoon break or do you want to keep going?  If

11  anyone needs a break, raise your hand.  All right, we have

12  two.

13             We'll take a quick break, let's say ten minutes,

14  please.  Be ready to proceed in ten minutes.  Thank you.

15             (Jury exits.)

16             (In open court; jury not present.)

17             THE COURT:  All right.  We'll take a few minutes.

18  Thank you.  Try to be back here by 25 after.

19             (Recess was taken.)

20             THE COURT:  Are we ready to bring the jury back?

21             MR. RODDIN:  Yes, Your Honor.

22             (Jury enters.)

23             (In open court; jury present.)

24             THE COURT:  All jurors are present.  Please have a

25  seat, counsel.

D. CAPOFARI - DIRECT - MR. SKURNIK                187

1              Would you like to call your next witness or

2     proceed with your stipulations, Mr. Skurnik?

3              MR. SKURNIK:  Thank you, Your Honor.

4              The Government calls Detective David Capofari.

5              THE COURT:  Hi, good afternoon.  Step up to the

6     witness stand, please, sir.

7              (Witness takes the stand.)

8              THE COURTROOM DEPUTY:  Good afternoon, sir.

9     Please raise your right hand.

10             (Witness sworn.)

11             THE COURTROOM DEPUTY:  Please have a seat.  State

12    and spell your full name.

13             THE WITNESS:  Detective David Capofari; D-A-V-I-D,

14    last name C-A-P-O-F-A-R-I.

15             THE COURT:  All right, thank you.  You may

16    proceed.

17             MR. SKURNIK:  Thank you, Your Honor.

18    **DAVID CAPOFARI**,

19             called as a witness, having been first duly

20             sworn/affirmed, was examined and testified as

21             follows:

22    DIRECT EXAMINATION

23    BY MR. SKURNIK:

24    Q    Detective Capofari, where do you work?

25    A    Currently in the Narcotics Bureau of Staten Island, New

D. CAPOFARI - DIRECT - MR. SKURNIK          188

1    York, with the NYPD.

2    Q    What's your title there?

3    A    I'm a detective.

4    Q    How about before the NYPD, what did you do?

5    A    I was a listed soldier, Airborne in the United States

6    Army.

7    Q    For about how long?

8    A    Four years.

9    Q    What are some of your responsibilities as a detective

10   at the NYPD?

11   A    Interviewing complainants, making arrests, interviewing

12   potential subjects, defendants, vouchering, doing video

13   canvases, trying to collect evidence.

14   Q    As a detective, have you investigated home invasions?

15   A    Yes.

16   Q    Are you assigned to a particular unit at the NYPD?

17   A    Currently?  Right now?

18   Q    Yes.

19   A    In the Narcotics Bureau of Staten Island, yes.

20   Q    How about before that, were you previously assigned to

21   a different unit or bureau?

22   A    Yes.  I was in the 123 Detective Squad from about

23   April 2022 -- I'm so sorry, August 2022 to about March 2024.

24   And prior to that, I was in narcotics.

25   Q    Where is the 123 Detective Squad based out of?

D. CAPOFARI - DIRECT - MR. SKURNIK                    189

1    A    In Staten Island, New York.

2    Q    I'm going to ask you about a particular date, June 24,

3    2023.  Were you on the 123 Detective Squad at that time?

4    A    Yes, I was.

5    Q    Did you investigate any crimes that day, June 24, 2023?

6    A    Yes, I did.

7    Q    What crimes specifically?

8    A    I was alerted to a possible home invasion at 52 Gunton

9    Place in Staten Island, New York.

10   Q    How did you first learn about the incident?

11   A    The patrol supervisor, Lieutenant Hachmeister, notified

12   me.

13   Q    What did you do after you were notified?

14   A    I immediately went to the scene.

15   Q    And is that 52 Gunton Place?

16   A    Yes, sir.

17   Q    So what happened when you arrived?

18   A    When I arrived, I interviewed the complainant,

19   Mr. Frimerman.

20   Q    Do you know his first name?

21   A    I believe it's Mark.

22   Q    What did you say his last name was?

23   A    Frimerman.

24   Q    Generally, what did you learn from Mr. Frimerman?

25   A    He stated that a friend of his, Mr. Dotson, arrived in

1    front of his house.  He went into Mr. Dotson's vehicle.

2    After being there only moments --

3              MS. KELLMAN:  Objection, Your Honor.  Move to

4    strike.

5              THE COURT:  I'm going to sustain the objection.

6    Q    What did you do after you interviewed Mr. Frimerman?

7    A    I asked him to contact Mr. Dotson to see if he could

8    come back to the scene.

9    Q    Did he do so?

10   A    Yes.

11   Q    Did Mr. Dotson come back to the scene?

12   A    Yes.

13   Q    When Mr. Dotson arrived, what kind of vehicle was he

14   driving?

15   A    A white Mercedes Benz, New York plate KPX 1979.

16   Q    Did you speak with Mr. Dotson?

17   A    Yes.

18   Q    Generally, what did he tell you?

19             MS. KELLMAN:  Objection.

20             THE COURT:  Overruled.

21   Q    You can answer.

22   A    I asked Mr. Dotson about the incident.  Mr. Dotson

23   stated it all happened so fast, that he didn't see or hear

24   anything.

25   Q    Did Mr. Dotson tell you that he had any role in the

1    incident other than as a bystander or victim?

2    A    No.

3    Q    So what happened next after you spoke to Mr. Dotson?

4    A    I asked Mr. Dotson permission for us to call our

5    Evidence Collection Team and collect any evidence that might

6    be in his vehicle.

7    Q    And just taking a step back, at that point in time,

8    what was your understanding of the crime you were

9    investigating?

10   A    A possible home invasion or attempted burglary.

11   Q    And so why did you ask ECT to look at Mr. Dotson's

12   vehicle?

13   A    Based on the statement that the complainant made, that

14   the unknown individual got in the rear passenger seat --

15          MS. KELLMAN:  Objection.

16          THE COURT:  Sustained.

17   Q    Generally, what type of evidence does the Evidence

18   Collection Team look for?

19   A    Any type of blood, DNA, weapons, fingerprints.

20   Q    Did they, in fact, examine Mr. Dotson's car?

21   A    Yes.

22   Q    Do you know whether they found any evidence in the car?

23   A    No, they did not.

24   Q    Did the Evidence Collection Team examine any other

25   locations?

1    A    Yes.

2    Q    Where is that?

3    A    The front door to 52 Gunton Place.

4    Q    And who lives at 52 Gunton Place?

5    A    The complainant, Mr. Frimerman.

6    Q    Did the Evidence Collection Team find any evidence on

7    the front door?

8    A    Partial palm print.

9    Q    Do you know whether that partial palm print ever

10   matched up to a particular person?

11   A    No.  I only had the case for about six hours.

12   Q    If the Evidence Collection Team finds a match to a

13   print, would you typically get notified?

14   A    Yes.

15   Q    Did that happen here?

16   A    No, because it wasn't my case.

17   Q    Whose case was it?

18   A    After the initial that I did?  As stated, it was still

19   marked down as a burglary.  It gets a little confusing.  We

20   have one -- there's one detective inside the 123 Detective

21   Squad that only handles burglaries, so it was going to go to

22   Detective Mormino.  But then later it was classified a

23   robbery, which then went to the Robbery Squad.

24   Q    Did you ever learn from the Robbery Squad whether the

25   Evidence Collection Team had --

1          MS. KELLMAN:  Objection.

2          THE COURT:  Why don't you ask him a more

3   open-ended question.

4          MR. SKURNIK:  I'll move on, Your Honor.

5          THE COURT:  Okay.

6   Q    Did officers at the scene collect any video?

7   A    I did personally.

8   Q    Where did you collect video from?

9   A    From 52 Gunton Place and I believe 36 Gunton Place.

10  Q    In relation to each other, where is 36 Gunton Place

11  versus 52 Gunton Place?

12  A    Either next door or approximately one house over, one

13  residential house over.

14  Q    So they're on the same street?

15  A    Yes, sir.

16         MR. SKURNIK:  If we can pull up Government

17  Exhibits 318 -- we'll start actually with Government

18  Exhibit 319, please.  And this is in evidence, Your Honor.

19         THE COURT:  All right.  Thank you.

20         (Exhibit published.)

21  Q    Do you recognize this video?

22  A    Yes, sir.

23  Q    Where is this video from?

24  A    The front of 52 Gunton Place.

25  Q    Who do we see here getting into a vehicle?

1  A    Mr. Frimerman entering into Mr. Dotson's passenger

2  front.

3  Q    And what type of vehicle is this?

4  A    This is the white Mercedes Benz.

5  Q    Is this the same white Mercedes that Mr. Dotson arrived

6  in to the scene after you arrived?

7  A    Yes, it is.

8         MR. SKURNIK:  If we can play here from this point

9  until the end of the video, please.

10         (Video is played.)

11 Q    Generally, what do we see in that video?

12 A    We see a grayish 4-door sedan Drive past Mr. Dotson and

13 Mr. Frimerman, and then moments later we see an unknown

14 individual enter the rear passenger side of Mr. Dotson's

15 vehicle, followed by Mr. Frimerman frantically getting out

16 of Mr. Dotson's vehicle and running to his east.

17         MR. SKURNIK:  If we can just start at the

18 beginning and play from the beginning until 9 seconds and

19 pause at 9 seconds, please.

20         (Video is played.)

21 Q    Is this the gray four-door sedan you just mentioned?

22 A    Yes, sir.

23         MR. SKURNIK:  If we can now play from here until

24 20 seconds, and please pause at 20 seconds.

25         (Video is played.)

1  Q    So who is this individual who just entered the screen?

2  A    I don't know, sir.

3  Q    Is this the person you referred to as the unknown

4  individual?

5  A    Yes, sir.

6  Q    From the video, where is his right hand?

7  A    It appears to be in his right front jacket or

8  sweatshirt pocket.

9         MR. SKURNIK:  If we can play now until 37 seconds,

10  please.

11         (Video is played.)

12  Q    When the unknown individual gets out of the car, what

13  does he do with his rapid?

14  A    It looks like he attempts to put it right back in his

15  jacket pocket or sweatshirt pocket.

16         MR. SKURNIK:  If we can pull up now Government

17  Exhibit 318.

18         (Exhibit published.)

19         MR. SKURNIK:  And just pause at the beginning.

20  Q    Where is this video from?

21  A    52 Gunton Place.

22  Q    And what's depicted here on the left-hand side of the

23  video?

24  A    The front door residence to 52 Gunton Place.

25         MR. SKURNIK:  If we can play the first few

 1    seconds, please.

 2              (Video is played.)

 3              MR. SKURNIK:  Pause there.

 4    Q    Who is visible on the left of the video?

 5    A    Mr. Frimerman's son.

 6    Q    Did you check the timestamp on this video?  At the time

 7    you collected it, did you check whether this timestamp was

 8    accurate?

 9    A    I did.

10    Q    Was it accurate?

11    A    No.

12    Q    About how far off was it?

13    A    That was unable to be determined.

14    Q    What is the date listed on the video on the bottom

15    right?

16    A    6/24/2023.

17    Q    Is the day accurate?

18    A    Yes.

19              MR. SKURNIK:  If we can play now until 24 seconds,

20    please.

21              (Video is played.)

22              THE COURT:  Is it advancing?

23              MR. SKURNIK:  If we can now play from 24 to the

24    end, please.

25              (Video is played.)

D. CAPOFARI - DIRECT - MR. SKURNIK                197

1   Q    Detective Capofari, who did we see run into the house?

2   A    Mr. Frimerman.

3   Q    And the person following him, was that the unknown

4   individual?

5   A    That was the unknown individual that entered the rear

6   passenger side of Mr. Dotson's vehicle.

7          MR. SKURNIK:  If we can just go back to 24 seconds

8   now, please, and just play two seconds, from 24 to 26.

9          (Video is played.)

10         MR. SKURNIK:  A few more seconds, please.

11         (Video is played.)

12         MR. SKURNIK:  Stop.

13  Q    This individual here, from the video, can you see

14  whether he's holding anything in his hand?

15  A    It appears he has an object that appears to look like a

16  firearm in his right hand.

17         MR. SKURNIK:  If we can do Government Exhibit 320

18  now.

19         (Exhibit published.)

20  Q    So where is this video from?

21  A    36 Gunton Place.

22         THE COURT:  This is Government Exhibit 36?

23         MR. SKURNIK:  Sorry.  This should be Government

24  Exhibit 320.

25         THE COURT:  320.

1      MR. SKURNIK:  And the address of the video is

2   36 Gunton.

3      THE COURT:  Okay.  Thank you.

4   Q    On the video here, what vehicle is in the middle of the

5   street?

6   A    The unknown gray sedan that in the previous video we

7   saw drive by Mr. Dotson's vehicle.

8   Q    Did you check whether the timestamp on this video was

9   accurate?

10  A    I did, and at the time I generally thought it was

11  accurate, but I can't prove that.

12  Q    When you say it was generally accurate, what do you

13  mean by that?

14  A    A lot of times these camera systems, they're off

15  because of daylight savings.  So when I do a quick check, I

16  was by myself, the times looked and appeared to be similar

17  and true and accurate.  So at the time I collected both

18  videos, I thought they both were, later on discovering that

19  one appears to be just three minutes off in how it's

20  numbered.

21  Q    So setting aside the three-minute difference, were they

22  generally otherwise accurate?

23  A    Yes.

24      MR. SKURNIK:  If we can just play this video until

25  37 seconds, please.

D. CAPOFARI - DIRECT - MR. SKURNIK                      199

1               (Video is played.)

2    Q    The individual who just entered the screen, who is

3    that?

4    A    That's the same individual that entered the rear

5    passenger side door in Mr. Dotson's vehicle, then got out

6    and chased Mr. Frimerman into his house at 52 Gunton Place.

7               MR. SKURNIK:  Let's play it again, please.

8               (Video is played.)

9    Q    What happens in the last portion of this video,

10   Government Exhibit 320?

11   A    The unknown individual gets into that gray sedan and

12   they drive off.

13               (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing...)

2              MR. SKURNIK:  If we can pull up now Government

3    Exhibit 337.  And just play the whole thing, please.

4              (Video played.)

5              MR. SKURNIK:  Nothing further, Your Honor.

6              THE COURT:  Can I ask a question?

7              MR. SKURNIK:  Yes.

8              THE COURT:  How do you identify the vehicle we see

9    in this last clip where the individual jumps in the back?

10   It's the same vehicle that passed the white Mercedes that was

11   parked on the side?

12             THE WITNESS:  The videos bleed together, and then

13   you can see how that vehicle passes Mr. Dotson's vehicle, and

14   then makes a left.

15             THE COURT:  Okay.  Thank you.

16             THE WITNESS:  And we don't see any other vehicle

17   pass that location during the video's time frame.  That's the

18   only gray sedan that passes, and that's the only gray sedan

19   that is in front of 36.

20             THE COURT:  All right.  Thank you.

21             MS. KELLMAN:  May I, Your Honor?

22             THE COURT:  Yes.

23   CROSS-EXAMINATION

24   BY MS. KELLMAN:

25   Q    Good afternoon, Detective.

1    A    Good afternoon, ma'am.  How are you?

2    Q    Good.  Thank you.

3         I have just a few questions, if I may.

4         You said that this wasn't your case, correct?

5    A    Yes, ma'am.

6    Q    You were called there that night, but, ultimately, you

7    were there for a few hours, and then it was someone else's

8    case, correct?

9    A    Yes.

10   Q    And I think you said it might have bounced from burglary

11   to robbery, but it wasn't yours?

12   A    That's correct, ma'am.

13   Q    Okay.  The evening that you were -- you were there in the

14   evening, correct?

15   A    Yes, ma'am.

16   Q    And during the course of the evening, would it be fair to

17   say that there were many, many officers there?

18   A    The patrol cops in uniforms?  Yes.

19   Q    And would those officers be wearing body cam recorders?

20   A    Yes, ma'am.

21   Q    And do you know whether they were working -- whether they

22   were wearing body cam recorders that evening?

23   A    They should have been.

24   Q    And do you know whether or not they were operable?

25   A    They should have been operable.

1   Q    Did you ever have occasion to see any of the videos that

2   were recorded that evening?

3   A    I saw a clips of one during trial prep.

4   Q    Okay.  So you know that at least one was operable?

5   A    Yes.

6   Q    Was present and operable?

7   A    But I can't speak or swear to all.

8   Q    I'm not asking you to.  So we're good.

9         You say that, again, it wasn't your case, but would

10  it be fair to say that in the normal course of police

11  investigation what would happen either the evening of or the

12  next day, would be that a crime scene unit would attempt to

13  process the scene, correct?

14  A    Our guidelines, crime scene wouldn't have came out on

15  that particular.

16  Q    Okay.  On that particular occasion at all, or just not

17  that night?

18  A    Evidence collection would come.

19  Q    I'm sorry.

20  A    When you say "crime scene," are you --

21  Q    I'm sorry.  That's from television.  Sorry.

22         Evidence collection.  So was there an evidence

23  collection team there that night?

24  A    Yes.  I called them.

25  Q    You called them.

CAPOFARI - CROSS - KELLMAN                        203

1        And I would gather that their job is to collect

2   evidence, correct?

3   A    Yes, ma'am.

4   Q    And among the kinds of evidence that they'd try to

5   collect would be the things like fingerprints, right?

6   A    Yes, ma'am.

7   Q    And if they got fingerprints, they might be able to track

8   whose fingers they belong to, correct?

9   A    Yes.

10  Q    So that could be an important lead in the case, correct?

11  And you had many opportunities, I would venture to guess, to

12  look at these videos, correct?  The ones that we've seen just

13  in the last hour, correct?

14  A    That night or altogether?

15  Q    Altogether.

16  A    I have seen the videos probably four or five times.

17  Q    And would you agree with me that the individual, we'll

18  call him the perpetrator, wasn't wearing any gloves, correct?

19  A    That -- no, because the partial palm print on the front

20  door.

21  Q    That was my clue, too.

22        But you saw this individual, you said he had

23  something in one hand, so he had to use the other hand to open

24  the door, correct?

25  A    I think on the video he tried to like shoulder it.

1   Q    No, not the front door, the car door?

2   A    The car door?

3   Q    The first thing he had to do was get into the vehicle

4   where Mr. Frimerman was, correct?

5   A    Yes.

6   Q    And so I think you testified that he had a gun in his

7   hand, and what appeared to you to be a gun in his right hand,

8   but to get into the car he used his left hand, correct?

9   A    I would have to see the video again.

10  Q    Well, you saw -- you said that he had a gun in one hand,

11  correct?

12  A    Yes.

13  Q    And he did open the door, correct?

14  A    Yes.

15  Q    So does it matter if he opened it with his left hand or

16  his right hand?

17  A    No.

18  Q    But one way or the other, whether it was his left hand or

19  his right hand, it probably would have left a print, correct?

20  A    If he wasn't wearing gloves.

21  Q    If he wasn't wearing gloves.

22       And then he entered the vehicle, correct?

23  A    He did.

24  Q    And do you know whether or not the evidence collection

25  team was able to lift any prints from the door handle to the

1   back seat of -- the back door of the car?

2   A    They were not able to get anything from the back seat of

3   the vehicle on the outside or the inside.

4   Q    Okay.  So nothing from the vehicle at all, correct?

5   A    No.

6   Q    But it's unlikely that the individual was wearing gloves

7   because they were able to get a partial print from the front

8   door, correct?

9   A    The base of it, or one hand -- I --

10  Q    They are not going to give you the answer.

11  A    I'm sorry.  Can you repeat the question again.

12  Q    Sure.

13         It's fairly clear, it seems to me, that they weren't

14  able to -- that they were able to get a palm print, a partial

15  print you said, palm print, correct, from the front door of

16  Mr. Frimerman's house, correct?

17  A    They were able to, yes.

18  Q    Okay.  That would indicate to you, would it not, that he

19  wasn't wearing a glove, if they could get a palm print,

20  correct?

21  A    Sometimes your glove could slip off, something like that.

22  Q    At the time he left the palm print, he was not wearing a

23  glove, correct?  He wouldn't leave a print through the glove,

24  correct?

25  A    Correct.

1   Q    Okay.  So no prints on the vehicle, on the door, and no

2   prints on the back seat, and a partial print on the front

3   door; I have it right?

4   A    Yes.

5   Q    And as far as you know, none of -- the print -- the

6   partial palm print on the front door was not helpful in the

7   investigation; is that right?

8   A    I have no idea.

9   Q    Because it's not your case?

10  A    Correct.

11  Q    Whose case is it, by the way?

12  A    I don't know where it went to after Detective Mormino

13  assigned it to robbery squad.

14  Q    So there are a number of police officers who are involved

15  in this investigation, correct?

16  A    Yes.

17  Q    And you're not one of them?

18  A    Just the initial.

19  Q    But you said there were many, many other officers there

20  that night, correct?

21  A    You would have to say what's many.  There's --

22  Q    Well, there are more than two, right?

23  A    I was the only detective there, and then there was other

24  police officers in uniforms.

25  Q    And were there many there?

1    A    I would guess many.  There were several.

2    Q    More than two?

3    A    Yes, there were more than two.

4    Q    More than three?

5    A    Yes.

6    Q    More than four?

7    A    Yes.

8    Q    And would it be fair to say that during the course of the

9    time you were there, that one of the things they were doing is

10   going up and down trying to figure out -- trying to find other

11   cameras, correct?  So that they could see what was happening

12   on the street?

13   A    I was.

14   Q    You were going from house to house trying to find cameras

15   that might illuminate what you were looking for, correct?

16   A    Yes.  I --

17   Q    Try to help you figure out what happened, correct?

18   A    I believe I went to every house on the block.

19   Q    Okay.  And while you were doing that, there were other

20   officers who were at the house speaking with Mr. Frimerman,

21   correct?

22   A    Initially, yes.

23   Q    And speaking with Mr. Dotson when he returned, correct?

24   A    Uh-huh.

25   Q    Have you had occasion to see the video -- either of the

1   videos of those interviews?

2   A    Not in full.

3   Q    You've seen portions of them?

4   A    Yes.

5   Q    You've seen portions of Mr. Dotson being interviewed?

6   A    Not that I can remember.

7   Q    Because it is not your case?

8   A    Correct.

9   Q    Now, you said that you saw -- you showed us on the video

10  that you saw a gray vehicle, gray sedan going past the

11  residence at a particular time, correct?

12  A    Yes.

13  Q    And do you know what make and model that car was?

14  A    No, I do not.

15  Q    Do you know how many gray sedans there are in Staten

16  Island?

17  A    Probably a lot.

18  Q    Now, there came a time when you saw an individual running

19  towards the gray sedan, correct?

20  A    Yes.

21  Q    And would you agree with me that the individual who was

22  running towards that sedan was rather tall and slim, correct?

23  A    I can't determine that on the video.  I just --

24  Q    Well, when you look at him, he doesn't look like a short,

25  fat guy right?

1   A    Right.

2   Q    Doesn't look stocky, correct?

3   A    Well, I wouldn't be able to swear to you his height or

4   weight.

5   Q    Well, just, I am asking -- I'm not asking you to swear to

6   his height or weight.  I'm asking you what he looked like.  He

7   didn't look like a short, fat guy, right?

8   A    What's short?

9   Q    Or did he?

10       I don't want to lead you.  I mean, did he look like

11  a short, fat guy?

12       THE COURT:  He's having trouble with your definition

13  of "short."

14       THE WITNESS:  Thank you, Judge.

15  Q    If you had to describe him -- I will do it another way.

16       If you had to describe him to the jury, would you

17  describe him as short or tall?

18  A    I would say an unknown individual, an unknown height,

19  unknown body weight.

20  Q    Very helpful.

21       Do you have any idea of the relationship between

22  Mr. Frimerman and Mr. Dotson?

23  A    Mr. Dotson stated to me that they had frequented several

24  clubs in New Jersey, adult clubs, and --

25  Q    Strip clubs.

1    A    -- that Mr. Frimerman owned a car place.

2    Q    And did you investigate the car place at all?

3    A    No, ma'am.

4    Q    Okay.

5         THE COURT:  So Dotson had strip clubs and Frimerman

6    had a car place?

7         THE WITNESS:  I asked, you know, how do you guys

8    know each other, how are you guys friends?  And they alluded

9    to -- he said that they frequented the same strip clubs and

10   that he knows him from his car place.

11        THE COURT:  Thank you.

12        MS. KELLMAN:  Thank you, Judge.

13   Q    Did you understand that they were friends?

14   A    Acquaintances.

15   Q    Okay.  And --

16   A    To my understanding.

17   Q    To your understanding.

18        Do you have any idea why they were meeting in front

19   of his house instead of inviting Mr. Dotson into his home?

20        MR. SKURNIK:  Objection.

21        THE COURT:  Sustained.

22        MS. KELLMAN:  If he knows.

23        MR. SKURNIK:  Objection.

24        THE COURT:  I will sustain the objection.

25   Q    Were you present when Mr. Dotson was being interviewed?

1  A    I was present for the time I interviewed Mr. Dotson.

2  Q    Okay.  And what part of the evening was that?  Was it the

3  beginning of his interview, the middle, the end?

4  A    The only interview that I am fully aware of with

5  Mr. Dotson is when I talked to him.

6  Q    And when was that?

7  A    Without looking at the report time that I wrote, I

8  wouldn't be able to swear to it.  I'm pretty sure I put it in

9  the DD5 that I wrote.

10  Q    Well, what time did you get there?

11  A    Again, I would have to look at the DD5, what time I

12  arrived.

13  Q    Did you have an opportunity to review your own report

14  before you testified here?

15  A    Yes.

16  Q    And you don't remember it?

17  A    Well, I don't want to give the wrong time, ma'am.  But if

18  there's --

19  Q    Approximately.

20        Was it 2:00 in the afternoon?  Was it 6:00 in the

21  evening?  Was it 11:00 at night?

22  A    It was sometime after the incident.  Not long after,

23  but --

24  Q    And what time would that have been, approximately?

25  A    If I had to -- something to look at, either my notes or

1  the report that I wrote, I could answer that.

2  Q    Well, what time did this incident occur?

3  A    Approximately 20:00, somewhere around there.

4  Q    And how long after that did you interview Mr. Dotson?

5  A    Again, I would have to look at my report to make sure

6  that I get the time frame.

7  Q    Would it be fair to say that you have no idea who was in

8  the gray vehicle, correct?

9  A    Absolutely.

10  Q    Absolutely that's correct?

11  A    Yes.

12         MS. KELLMAN:  I have nothing further.

13         THE COURT:  Any redirect?

14         MR. SKURNIK:  One moment, Your Honor.

15         (Short pause.)

16         MR. SKURNIK:  Brief redirect, Your Honor.

17         THE COURT:  Yes.

18  REDIRECT EXAMINATION

19  BY MR. SKURNIK:

20  Q    Detective Capofari, you testified a moment ago that this

21  is -- today, this is not your case, right?

22  A    Yes.  Correct.

23  Q    Immediately after this incident happened, who was the

24  first detective who responded on the scene?

25  A    Me.

1   Q    The videos that we watched a moment ago, who collected

2   those videos?

3   A    Me.

4   Q    The partial palm print from the front door of

5   Mr. Frimerman's house, do you know who that palm print belongs

6   to?

7   A    No, sir.

8   Q    Do you know whether it belongs to, say, Mr. Frimerman?

9          MS. KELLMAN:  Objection.  He just said he doesn't

10  know.

11         THE COURT:  All right.  Sustained.

12         MR. SKURNIK:  Nothing further, Your Honor.

13         THE COURT:  Any recross?

14         MS. KELLMAN:  May I have a moment?

15         (Short pause.)

16         MS. KELLMAN:  Very briefly, Your Honor.

17  RECROSS-EXAMINATION

18  BY MS. KELLMAN:

19  Q    Detective, you were just asked on redirect examination

20  whether or not this was your case, correct, today?

21  A    Correct.

22  Q    And it's not, correct?

23  A    No, ma'am.

24  Q    And it wasn't your case back then either, correct, but

25  for a few hours?

1    A    Initially.

2    Q    For a few hours?

3    A    It is my -- it was.

4    Q    For a few hours?

5    A    Correct.

6    Q    But you have had nothing to do with this case since then,

7    correct?

8    A    Correct, ma'am.

9    Q    And several officers -- other officers have, correct?

10   A    That I couldn't swear to.  I don't know where it went

11   after me.

12   Q    Well, has any -- I didn't ask you who.

13        Is it fair to assume that somebody in the police

14   department took over after you?

15        MR. SKURNIK:  Objection.

16        THE COURT:  Sustained.

17   Q    You don't know who took over after you left that night,

18   correct?

19   A    I gave it to our burg guy, Detective Mormino.

20        When I say "burg guy," I'm sorry.

21   Q    Burglary.

22   A    The detective in charge in our office that handles

23   burglaries.

24   Q    And I think you said on direct examination that then

25   might have been gone to the robbery --

*PROCEEDINGS*                                                      215

1    A      Because then --

2    Q      -- section?

3    A      -- the complaint was then later reclassified to robbery,

4    and in Staten Island, the robbery squad handles all robberies.

5           Had it been labeled a robbery right from the

6    beginning, I would have never went.

7    Q      Okay.  But as it turns out, other than a few hours at the

8    scene, when you were collecting videos, you have had nothing

9    to do with this case?

10   A      Yes, ma'am.

11          MS. KELLMAN:  Nothing further.

12          THE COURT:  Any more redirect?

13          MR. SKURNIK:  No, Your Honor.

14          THE COURT:  Sir, you're excused.  Thank you for your

15   time.

16          THE WITNESS:  Thank you, ma'am.

17          THE COURT:  Have a nice day.

18          (Witness excused.)

19          THE COURT:  Mr. Skurnik?

20          MR. SKURNIK:  The government now has some additional

21   stipulations we would like to read.

22          THE COURT:  All right.  Thank you.

23          MR. SKURNIK:  So the first stipulation, Your Honor,

24   has been marked Government Exhibit S-15.  And I would like to

25   move that into evidence at this time.

*PROCEEDINGS*                                                      216

1          By the way, this is the Uber stipulation.

2          MS. SHELLOW:  No objection.

3          THE COURT:  We receive in evidence Government

4    Exhibit S-15.

5          (Government Exhibit S-15 received in evidence.)

6          MR. SKURNIK:  If we could please publish that for

7    the jury.

8          S-15 states:  Government Exhibits 253, 254, and 255

9    are records maintained by Uber Technologies, Inc. or Uber, 1,

10   that were made at or near the time by someone with knowledge,

11   or made from information transmitted by someone with

12   knowledge; 2, that were kept by Uber in the course of its

13   regularly conducted business activity; 3, where making the

14   record was a regular practice of Uber's business activity;

15   and, 4, that satisfying requirements of Federal Rule of

16   Evidence 803(6).

17         So at this time, Your Honor the government would

18   move into evidence Government Exhibits 253, 254, and 255.

19         MS. SHELLOW:  No objection.

20         THE COURT:  We receive in evidence Government

21   Exhibit 253 through 255, along with Government Exhibit S-15.

22         (Government Exhibits 253, 254, and 255 received in

23   evidence.)

24         MR. SKURNIK:  Next stipulation, Your Honor, is S-18,

25   and this is the license plate reader stipulation.

*PROCEEDINGS*                                                      217

1        We move the stipulation into evidence at this time.

2        MS. SHELLOW:  No objection.

3        THE COURT:  We receive in evidence Government

4   Exhibit S-18.

5        (Government Exhibit S-18 received in evidence.)

6        MR. SKURNIK:  This stipulation states:  Government

7   Exhibits 826A through 826F are true and accurate copies of

8   license plate reader records, related to a BMW sedan New York

9   license plate KNZ7212.

10       Second paragraph:  Government Exhibits 827A and 827B

11  are true and accurate copies of license plate reader records

12  related to an Infiniti sport utility vehicle, or SUV, with New

13  York license plate LAL7587.

14       Third paragraph:  Government Exhibits 828A through

15  828H are true and accurate copies of license plate reader

16  records related to a Mercedes sedan with New York license

17  plate KPX1979.

18       Fourth paragraph:  The exhibits referred to above

19  are records maintained by Flock Group, Inc., or Flock, 1, that

20  were made at or near the time by someone with knowledge, or

21  made from information transmitted by someone with knowledge;

22  2, that were kept by Flock in the course of its regularly

23  conducted business activity; 3, where making the record was a

24  regular practice of Flock's business activity; and, 4, that

25  satisfy the requirements of Federal Rule of Evidence 803(6).

1          So at this time, Your Honor, we move into evidence

2     the exhibits described in stipulation S-18.

3          MS. SHELLOW:  No objection.

4          THE COURT:  We receive in evidence Government

5     Exhibits S-18 and the exhibits from the DMV license plate

6     readers, for the specific exhibits enumerated in that exhibit.

7          (Government Exhibits 826A through 826F received in

8     evidence.)

9          MR. SKURNIK:  The next stipulation, Your Honor, is

10    S-17.  This is the phone forensic extraction stipulation.

11         And we'd move this stipulation into evidence.

12         MS. SHELLOW:  No objection, Your Honor.

13         THE COURT:  We receive in evidence Government

14    Exhibit S-17.

15         (Government Exhibit S-17 received in evidence.)

16         MR. SKURNIK:  This stipulation states:  Government

17    Exhibit 603 consists of a true and accurate copy of a forensic

18    extraction of an Apple iPhone, bearing International Mobile

19    Equipment Identity, or IMEI, number 352906117830259, and

20    marked as Government Exhibit 917.

21         Second paragraph states:  Government Exhibits 604

22    through 629, consist of true and accurate copies of records

23    from the forensic extraction of the Apple iPhone 11, marked as

24    Government Exhibit 917.

25         Third paragraph states:  Government Exhibits 600(a)

PROCEEDINGS                                    219

1   through 600(e) consist of true and accurate copies of records

2   from a forensic extraction of an Apple iPhone, bearing

3   International Mobile Equipment Identity or IMEI number

4   352850116284110, and marked as Government Exhibit 915.

5          So, Your Honor, at this time we would move into

6   evidence not 917 or 915, which are physical phones that

7   haven't been offered, but, instead -- haven't yet been

8   offered, but we would offer, subject to connection, the other

9   exhibits described in stipulation S-17.  So that will be

10  Government Exhibits 604 through 629, and 600(a) through

11  600(e), and 603.

12         MS. SHELLOW:  No objection subject to connection,

13  Your Honor.

14         THE COURT:  We receive in evidence the Government

15  Exhibit S-17, and all the enumerated exhibits, subject to

16  connection.

17         (Government Exhibits 604 through 629, and 600(a)

18  through 600(e), and 603 received in evidence.)

19         MR. SKURNIK:  The next stipulation, Your Honor, is

20  S-13.  This is the PLS Financial Services stipulation, which

21  we offer into evidence.

22         THE COURT:  What is it?  What letter did you say it

23  was?  PLS?

24         MR. SKURNIK:  PLS Financial Services.

25         THE COURT:  And this is Government Exhibit S?

PROCEEDINGS                                          220

1        MR. SKURNIK:  13.

2        THE COURT:  13.  All right.  Thank you.

3        MR. SKURNIK:  So at this time we offer the

4  stipulation itself into evidence.

5        THE COURT:  All right.

6        MS. SHELLOW:  No objection.

7        THE COURT:  We receive in evidence Government

8  Exhibit S-13.

9        (Government Exhibit S-13 received in evidence.)

10        MR. SKURNIK:  This stipulation states:  Government

11  Exhibits 241 and 242 are records maintained by PLS Financial

12  Services, Inc., or PLS, 1, that were made at or near the time

13  by someone with knowledge, or made from information

14  transmitted by someone with knowledge; 2, that were kept in

15  PLS -- kept by PLS in the course of its regularly conducted

16  business activity; 3, where making the record was a regular

17  practice of PLS' business activity; and, 4, that satisfy the

18  requirements of Federal Rule of Evidence 803(6).

19        At this time we'd offer Government Exhibits 241 and

20  242, which are the subject of this stipulation, into evidence.

21        MS. SHELLOW:  No objection.

22        THE COURT:  We receive Government Exhibit S-13 and

23  Exhibits 241 to 242.

24        (Government Exhibit 241 and 242 received in

25  evidence.)

*PROCEEDINGS*                                                    221

1          MR. SKURNIK:  Next stipulation, Your Honor, is S-11.

2     This is the hotel and casino stipulation.  We offer this

3     stipulation into evidence.

4          MS. SHELLOW:  No objection, Your Honor.

5          THE COURT:  We receive in evidence Government

6     Exhibit S-11.

7          (Government Exhibit S-11 received in evidence.)

8          MR. SKURNIK:  This stipulation states:  Government

9     Exhibits 200A through E are records maintained by Ocean Casino

10    Resort Hotel in Atlantic City, New Jersey, or Ocean Casino, 1,

11    that were made at or near the time by someone with knowledge,

12    or made from information transmitted by someone with

13    knowledge; 2, that were kept by Ocean Casino in the course of

14    its regularly conducted business activity; 3, where making the

15    record was a regular practice of Ocean Casino's business

16    activity; and, 4, that satisfy the requirements of Federal

17    Rule of Evidence, 803(6).

18         Second paragraph:  Government Exhibit Exhibits 211,

19    212, and 213 are records maintained by the Hard Rock Hotel and

20    Casino in Atlantic City, New Jersey, otherwise known as the

21    Hard Rock Casino, 1, that were made at or near the time by

22    someone with knowledge, or made from information transmitted

23    by someone with knowledge; 2, that were kept by Hard Rock

24    Casino in the course of its regularly conducted business

25    activity; 3, where making the record was a regular practice of

*PROCEEDINGS* 222

1  Hard Rock Casino's business activity; and, 4, that satisfy the

2  requirements of Federal Rule of Evidence 803(6).

3       Third paragraph:  Government Exhibits 235 through

4  238 are records maintained by Days Inn, 1, that were made at

5  or near the time by someone with knowledge, or made from

6  information transmitted by someone with knowledge; 2, that

7  were kept by Days Inn in the course of its regularly conducted

8  business activity; and, 3, where making the record was a

9  regular practice of Days Inn's business activity; and, 4, that

10  satisfy the requirements of Federal Rule of Evidence 903(6).

11       So at this time, Your Honor, we offer the exhibits

12  subject -- that are the subject of Government Exhibit S-11

13  into evidence.

14       MS. SHELLOW:  Your Honor, I believe Mr. Skurnik

15  misspoke.  I believe that they satisfy the requirements of

16  Federal Rule of Evidence 803(6).

17       MR. SKURNIK:  I agree with that, Your Honor.  If I

18  misspoke, I apologize.

19       THE COURT:  All right.  Any objection?

20       MS. SHELLOW:  No.

21       THE COURT:  All right.  We receive in evidence

22  Government Exhibits S-11, 200A through E from Ocean Casino,

23  and Exhibits 211 to 213, and Government Exhibits 235 through

24  238.

25            (Government Exhibits 200A through E, 211 to 213, and

1    235 to 238 received in evidence.)

2              MR. SKURNIK:  The next stipulation, Your Honor --

3    just two more -- is S-10.  This is the Harbor Freight Tools

4    stipulation.  And we'd offer the stipulation into evidence.

5              MS. SHELLOW:  No objection, Your Honor.

6              THE COURT:  We receive in evidence Government

7    Exhibit S-10.

8              (Government Exhibit S-10 received in evidence.)

9              MR. SKURNIK:  This states Government Exhibit 210 is

10   a record maintained by Harbor Freight Tools, 1, that was made

11   at or near the time by someone with knowledge, and made from

12   information transmitted by someone with knowledge; 2, that was

13   kept by Harbor Freight Tools in the course of its regularly

14   conducted business activity; 3, where making the record was a

15   regular practice of Harbor Freight Tools' business activity;

16   and, 4, that satisfies the requirements of Federal Rule of

17   Evidence 803(6).

18             So we'd offer Government Exhibit 210 into evidence.

19   Your Honor.

20             THE COURT:  All right.  So we are admitting both

21   Government Exhibit S-10 and Government Exhibit 210?

22             MR. SKURNIK:  Yes, Your Honor.

23             MS. SHELLOW:  No objection.  Your Honor.

24             THE COURT:  All right.  Thank you.

25             We admit those exhibits.

PROCEEDINGS                                    224

1              (Government Exhibit 210 received in evidence.)

2              MR. SKURNIK:  Last stipulation, Your Honor.

3              This is S-9, and it states -- this is the New York

4   state Department of Corrections records, and we'd offer the

5   stipulation into evidence first.

6              MS. SHELLOW:  No objection, Your Honor.

7              THE COURT:  We receive into evidence Government

8   Exhibit S-9.

9              (Government Exhibit S-9 received in evidence.)

10             MR. SKURNIK:  This stipulation states:  Government

11  Exhibits 207, 208, 209 and 256 are records maintained by the

12  New York State Department of Corrections and Community

13  Supervision, or DOCCS, 1, that were made at or near the time

14  by someone with knowledge, or made from information

15  transmitted by someone with knowledge; 2, that were kept by

16  DOCCS in the course of its regularly conducted business

17  activity; 3, where making the record was a regular practice of

18  DOCCS business activity; and, 4, that satisfy the requirements

19  of Federal Rule of Evidence 803(6).

20             So, Your Honor, we offer at this time Government

21  Exhibits 207 through 209 and 256.

22             MS. SHELLOW:  No objection, Your Honor.

23             THE COURT:  We receive Government Exhibit S-9 and

24  Exhibits 207 to 209 and 256.

25             (Government Exhibits 207 to 209 and 256 received in

*PROCEEDINGS*                                                          225

1    evidence.)

2            MR. SKURNIK:  Thank you, Your Honor.

3            THE COURT:  All right.  Thank you.

4            Did you have any other witnesses today, sir?

5            MR. SKURNIK:  We don't for today, Your Honor.

6            THE COURT:  All right.  Well, the jurors get to go

7    home now.

8            Don't talk about the case, at all.  No private

9    research or Googling.

10           Leave your notebooks face down.

11           Please come promptly at 9:00.  We will start as soon

12   as you are all here.

13           Thank you very much for your attention.

14           (Jury exits the courtroom.)

15           (Proceedings continue in open court; no jury

16   present.)

17           THE COURT:  So have a seat.

18           I think we should schedule the charging conference,

19   and Mr. Clanton, it's your right to be there.  This is where

20   we review the legal charges, the instructions on the law that

21   I will give to the jury.  And you can let me know whether you

22   would like to be present.  And I'm thinking maybe we would try

23   to do this either during the day on Thursday or Friday,

24   depending on how the case unfolds.

25           The government is moving faster than it thought it

*PROCEEDINGS*                                                          226

1    might, so we might finish early.

2              Would you like to be heard, Ms. Shellow or

3    Ms. Kellman and Mr. Clanton?

4              MS. SHELLOW:  Your Honor, we can do either one, at

5    the Court's pleasure.

6              THE COURT:  All right.  Well, does Mr. Clanton want

7    to be present?

8              MS. SHELLOW:  He does, Your Honor.

9              THE COURT:  So we could -- if you're truly going to

10   be finished by Thursday, government counsel, we can do this

11   Thursday, after we dismiss the jury.

12             MR. RODDIN:  We don't know for sure, Your Honor.  We

13   have at least one witness who will need to testify Thursday

14   morning, but we did move very quickly today and expect to

15   continue doing so.

16             I think either Thursday afternoon or Friday morning

17   would be fine for us, too.  As I sit here now, I don't know

18   yet whether we will be finished by Thursday afternoon, but

19   certainly we can make either of those work.

20             THE COURT:  All right.  Well, we'll think about

21   being ready by Thursday afternoon.  And, if necessary, then we

22   will continue on Friday morning.

23             What I usually like to do is post a draft of our

24   charges.  Sometimes it's challenging, and we put in

25   placeholder instructions because we don't know answers to

1    certain questions like whether Mr. Clanton will testify,

2    et cetera.  So I would put those in brackets, if we don't know

3    how the case will unfold.  And once I post those as a court

4    exhibit, you should come to the conference prepared to suggest

5    any edits or assert any objections or request any additional

6    instructions.

7            Is that enough time for all of you to be ready for

8    Thursday afternoon?

9            MS. SHELLOW:  When do you anticipate posting that?

10           THE COURT:  Maybe Wednesday.  Wednesday.

11           MS. SHELLOW:  Wednesday.

12           And will they be posted -- it's a technical

13   question.  Will they be posted in Word as well as in PDF form?

14           THE COURT:  We post in PDF.

15           MS. SHELLOW:  If necessary, can we inquire of Your

16   Honor's chambers for a copy in Word, if we would like to make

17   suggests or objections that we can interlineate easily?

18           THE COURT:  Well, usually what happens is that

19   this -- at the charging conference, we would make edits as we

20   go and then repost.

21           Is it easier for you to give us a black line?

22           MS. SHELLOW:  Your Honor, it's a -- without seeing

23   the draft, I suspect -- I can do it either way.  I am used to

24   doing it by interlineating, but now that Ms. Kellman reminds

25   me, I can't type anyway.  So I think it probably doesn't make

1    a difference.

2            THE COURT:  All right.  Well, Ms. Kellman can type,

3    or one of your colleagues.

4            MS. KELLMAN:  We have been doing a lot of it.

5            THE COURT:  Or assistants.  But, otherwise, my usual

6    way is to post a PDF.

7            MS. SHELLOW:  That's fine, Your Honor.

8            THE COURT:  Okay.  Is there anything else?

9            MR. RODDIN:  Not from the government.

10           THE COURT:  All right.  Thank you.

11           Thank you, Marshals.

12           MS. SHELLOW:  Thank you, Judge.

13           MS. KELLMAN:  Thank you, Judge.

14           THE COURT:  All right.  Thanks.

15           Have a good evening, everyone.

16           MS. KELLMAN:  Your Honor, actually, there is one

17   more thing.

18           Can get a list, since we are finishing more quickly

19   than we anticipated, we have the first several witnesses, but

20   it sounds like -- if we could just get the order of the rest

21   of the witnesses, that would be very helpful.

22           MR. RODDIN:  Yes.

23           MS. KELLMAN:  E-mail?

24           MR. RODDIN:  Yes.

25           MS. KELLMAN:  Or put them on the record.  Whatever.

*PROCEEDINGS*                                                    229

1    If you would e-mail this evening, that would help.

2              MR. RODDIN:  We'll e-mail those.

3              MS. KELLMAN:  Okay.  Great.  That will just keep us

4    moving.

5              THE COURT:  Yes.  I like movement.

6              Thank you, Marshals.

7              (At 4:23 p.m., the proceedings were adjourned until

8    9:00 a.m. Tuesday, April 15, 2025.)

9

10

11                        *      *      *      *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

230

1                          I N D E X

2

3    **WITNESS**                                          **PAGE**

4

5    **VERNON FIELDS**

6         DIRECT EXAMINATION BY MR. RODDIN           30

7         CROSS-EXAMINATION BY MS. SHELLOW           65

8         REDIRECT EXAMINATION BY MR. RODDIN         75

9         RECROSS-EXAMINATION BY MS. SHELLOW         77

10

11   **SARAH WENNER**

12        DIRECT EXAMINATION BY MR. SKURNIK          91

13

14   **ZAID YASEEN AL-HEMYARI**

15        DIRECT EXAMINATION BY MR. RODDIN          141

16        CROSS-EXAMINATION BY MS. KELLMAN          148

17        REDIRECT EXAMINATION BY MR. RODDIN        157

18

19   **RONALD WOLFGANG**

20        DIRECT EXAMINATION BY MR. RODDIN          159

21        CROSS-EXAMINATION BY MS. KELLMAN          176

22        REDIRECT EXAMINATION BY MR. RODDIN        183

23        RECROSS EXAMINATION BY MS. KELLMAN        184

24

25

231

**I N D E X** (Cont'd)


**DAVID CAPOFARI**

    DIRECT EXAMINATION BY MR. SKURNIK      187

    CROSS-EXAMINATION BY MS. KELLMAN      200

    REDIRECT EXAMINATION BY MR. SKURNIK      212

    RECROSS-EXAMINATION BY MS. KELLMAN      213

232

**E X H I B I T S**

                                                          PAGE

Government Exhibits 1028 through 1037              44

Government Exhibits 1052 and 1053                 47

Government's Exhibit S-7                          79

Government's Exhibit S-8                          80

Government's Exhibits 850A, 850B, 850C,
850D, 851A, 851B, 851C                           80

Government's Exhibits 257, 258                    81

Government's Exhibit S-12                         82

Government's Exhibits 201, 233, 234, 202,
203, 239, 205, 2-6, 214, 215, 216, 217, 218,
219, 240, 243, 244, 245                          84

Government's Exhibit S-14                         84

Government's Exhibits 224 to 229, 231, 232,
246 to 251, 252                                  85

233

1

2      Government's Exhibit S-16                          85

3

4      Government's Exhibits 221 to 223                   86

5

6      Government's Exhibit S-1                           88

7

8      Government's Exhibit S-2                           88

9

10     Government's Exhibit S-3                           89

11

12     Government's Exhibit S-4                           89

13

14     Government's Exhibit S-4                           89

15

16     Government's Exhibits 77 to 81, 83, 84             94

17

18     Government's Exhibit 85                            95

19

20     Government's Exhibits 334, 336 337, 338, and

21     339                                                96

22

23     Government Exhibit 601-V                           100

24

25     Government Exhibit 601-W                           101

234

1

2    Government Exhibit 639 through 658, 601-A

3    through 601-C, 601-C-12, 601-C-16, 601-D

4    through 601-U                                         104

5

6    Government Exhibit 75                                 107

7

8    Government's Exhibits 1436 to 1439                    161

9

10   Government Exhibit S-15                               216

11

12   Government Exhibits 253, 254, and 255                 216

13

14   Government Exhibit S-18                               217

15

16   Government Exhibits 826A through 826F                 218

17

18   Government Exhibit S-17                               218

19

20   Government Exhibits 604 through 629, and

21   600(a) through 600(e), and 603                        219

22

23   Government Exhibit S-13                               220

24

25   Government Exhibit 241 and 242                        220

235

```
Government Exhibit S-11                              221

Government Exhibits 200A through E, 211 to
213, and 235 to 238                                 222

Government Exhibit S-10                             223

Government Exhibit 210                              224

Government Exhibit S-9                              224

Government Exhibits 207 to 209 and 256             224
```